# 21-2149

## In the
## United States Court of Appeals
### For the Second Circuit

ALANA SOUZA, AKA ALANA CAMPOS, BROOKE BANX, BROOKE
TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA,
JESSICA HINTON, TIFFANY TOTH-GRAY and URSULA SANCHEZ,
AKA URSULA MAYES,

*Plaintiffs-Appellants,*

v.

EXOTIC ISLAND ENTERPRISES, INC., DBA MANSION GENTLEMEN'S
CLUB & STEAKHOUSE and KEITH SLIFSTEIN,

*Defendants-Third-Party-Defendants-Appellees,*

- and -

EXCLUSIVE EVENTS & PROMOTIONS INC., DBA THINK SOCIAL FIRST,

*Third-Party-Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

## JOINT APPENDIX
## Volume I of VIII (Pages JA-1 – JA-296)

CASAS LAW FIRM, P.C.
*Attorneys for Plaintiffs-Appellants*
1740 Broadway, 15th Floor
New York, New York 10019
(646) 872-3178

O'CONNOR & PARTNERS, PLLC
*Attorneys for Defendants-Third-Party-*
*Defendants-Appellees*
255 Wall Street
Kingston, New York 12401
(845) 303-8777

i

# Table of Contents

**Page**

Docket Entries ............................................................................. JA-1

Complaint, Dated October 16, 2018.............................................JA-13

    Exhibit A to Complaint -
    Photos of Alana Campos to Promote Mansion on
    Instagram Page ........................................................................JA-33

    Exhibit B to Complaint -
    Photos of Brooke Banx to Promote Mansion on
    Facebook and Instagram Page...................................................JA-35

    Exhibit C to Complaint -
    Photos of Brooke Taylor to Promote Mansion on
    Facebook Page ........................................................................JA-37

    Exhibit D to Complaint -
    Photos of Jaclyn Swedberg to Promote Mansion on
    Instagram Page ........................................................................JA-38

    Exhibit E to Complaint -
    Photos of Jaime Longoria to Promote Mansion on
    Instagram Page ........................................................................JA-39

    Exhibit F to Complaint -
    Photos of Jessa Hinton to Promote Mansion on
    Facebook and Instagram Page...................................................JA-41

    Exhibit G to Complaint -
    Photos of Tiffany Toth-Gray to Promote Mansion on
    Instagram Page ........................................................................JA-43

    Exhibit H to Complaint -
    Photos of Ursula Mayes to Promote Mansion on
    Instagram Page ........................................................................JA-44

Answer, Dated January 31, 2019 .................................................JA-45

Notice of Motion for Summary Judgment,
    Dated February 5, 2021.............................................................JA-55

Transmittal Declaration of John V. Golaszewski, for Plaintiffs,
    in Support of Motion, Dated February 5, 2021 ........................JA-57

ii

**Page**

Exhibit A to Golaszewski Declaration -
Complaint, Dated October 16, 2018,
with Exhibit A to H Annexed Thereto
(Reproduced herein at pp. JA-13–JA-44) .................................JA-60

Exhibit B to Golaszewski Declaration -
Declaration of Alana Souza, Dated January 27, 2021...............JA-61

Exhibit C to Golaszewski Declaration -
Declaration of Brooke Banx, Dated January 27, 2021..............JA-72

Exhibit D to Golaszewski Declaration -
Declaration of Brooke Taylor Johnson,
Dated January 27, 2021..............................................................JA-82

Exhibit E to Golaszewski Declaration -
Declaration of Jaclyn Swedberg,
Dated January 29, 2021..............................................................JA-92

Exhibit F to Golaszewski Declaration -
Declaration of Jaime Edmondson-Longoria,
Dated January 28, 2021............................................................JA-102

Exhibit G to Golaszewski Declaration -
Declaration of Jessica Hinton, Dated January 27, 2021............JA-112

Exhibit H to Golaszewski Declaration -
Declaration of Tiffany Toth-Gray, Dated January 27, 2021 .....JA-123

Exhibit I to Golaszewski Declaration -
Declaration of Ursula Mayes, Dated January 27, 2021.............JA-133

Exhibit J to Golaszewski Declaration -
Excerpts of Deposition Transcript of Keith Slifstein,
Dated July 29, 2020..................................................................JA-143

Exhibit K to Golaszewski Declaration -
Print-out of Homepage of Mansion Gentlemen's
Club & Steakhouse....................................................................JA-151

Exhibit L to Golaszewski Declaration -
Expert Report of Martin Buncher,
Dated September 16, 2020 ........................................................JA-153

Notice of Motion for Summary Judgment,
Dated February 5, 2020............................................................JA-185

iii

**Page**

Declaration of Michael Kolb, for Defendants,
in Support of Motion, Dated February 5, 2021 ........................JA-188

Exhibit A to Kolb Declaration -
Deposition Transcript of Alana Souza, Plaintiff,
Dated July 21, 2020, with Deposition Exhibits........................JA-198

Exhibit B to Kolb Declaration -
Deposition Transcript of Brooke E. Marrin, Plaintiff,
Dated July 28, 2020, with Deposition Exhibits........................JA-359

Exhibit C to Kolb Declaration -
Deposition Transcript of Brooke Taylor-Johnson,
Plaintiff, Dated July 22, 2020, with Deposition Exhibits .........JA-475

Exhibit D to Kolb Declaration -
Deposition Transcript of Jaclyn E. Swedberg, Plaintiff,
Dated July 28, 2020, with Deposition Exhibits........................JA-599

Exhibit E to Kolb Declaration -
Deposition Transcript of Jaime Edmondson-Longoria,
Plaintiff, Dated July 22, 2020, with Deposition Exhibits .........JA-746

Exhibit F to Kolb Declaration -
Deposition Transcript of Jessica Lynn Hinton, Plaintiff,
Dated July 27, 2020, with Deposition Exhibits........................JA-875

Exhibit G to Kolb Declaration -
Deposition Transcript of Tiffany Gray, Plaintiff,
Dated July 21, 2020, with Deposition Exhibits........................JA-1070

Exhibit H to Kolb Declaration -
Deposition Transcript of Ursula Y. Mayes, Plaintiff,
Dated July 27, 2020, with Deposition Exhibits........................JA-1298

Exhibit J to Kolb Declaration -
Plaintiffs' Objections and Answers to Defendants' First Set
of Requests for Admissions, Dated August 13, 2020 ...............JA-1431

Exhibit M to Kolb Declaration -
Expert Report of Martin Buncher,
Dated September 16, 2020
(Reproduced herein at pp. JA-153–JA-184)
Exhibit 1 to 3 ..........................................................................JA-1438

iv

Page

Exhibit A to Complaint -
Photos of Alana Campos to Promote Mansion on
Instagram Page
(Reproduced herein at pp. JA-33–JA-34) ...........................JA-1447

Exhibit B to Complaint -
Photos of Brooke Banx to Promote Mansion on
Facebook and Instagram Page
(Reproduced herein at pp. JA-35–JA-36) ...........................JA-1447

Exhibit C to Complaint -
Photos of Brooke Taylor to Promote Mansion on
Facebook Page
(Reproduced herein at p. JA-37) .........................................JA-1447

Exhibit D to Complaint -
Photos of Jaclyn Swedberg to Promote Mansion on
Instagram Page
(Reproduced herein at p. JA-38) .........................................JA-1447

Exhibit E to Complaint -
Photos of Jaime Longoria to Promote Mansion on
Instagram Page
(Reproduced herein at pp. JA-39–JA-40) ...........................JA-1447

Exhibit F to Complaint -
Photos of Jessa Hinton to Promote Mansion on
Facebook and Instagram Page
(Reproduced herein at pp. JA-41–JA-42) ...........................JA-1447

Exhibit G to Complaint -
Photos of Tiffany Toth-Gray to Promote Mansion on
Instagram Page
(Reproduced herein at p. JA-43) .........................................JA-1447

Exhibit H to Complaint -
Photos of Ursula Mayes to Promote Mansion on
Instagram Page ...................................................................JA-1448

Exhibit 5-A to Buncher Expert Report -
Tabulated Data ...................................................................JA-1541

Exhibit O to Kolb Declaration -
Intentionally Excluded - Memorandum and Order in the
Matter of *Tiffany Toth v. 59 Murray Enterprises, Inc., et al.*,
Case No. 15 Civ. 8028, Dated January 3, 2019 .......................JA-1735

**Page**

Exhibit Q to Kolb Declaration -
Intentionally Excluded - Order, Report and Recommendation
in the Matter of *Ursula Mayes v. 490 Habitat, Inc., et al.*,
Case No. 18-CV-1427 ................................................................JA-1736

Exhibit S to Kolb Declaration -
Intentionally Excluded - Opinion and Order of in the Matter
of *Cielo Jean Gibson v. SCE Group, Inc., et al.*,
Case No. 15-Civ-08168............................................................JA-1737

Exhibit T to Kolb Declaration -
Intentionally Excluded - Opinion and Order in the Matter of
*Jaime Edmondson v. RCI Hospitality Holdings, Inc., et al.*,
Case No. 16-CV-2242 ...............................................................JA-1738

Exhibit Y to Kolb Declaration -
Article Titled "*Evan Longoria Signs $100m Deal to Stay
with Tampa Bay Rays Until 2023*" from The Guardian,
Dated November 26, 2012 .........................................................JA-1739

Exhibit Z to Kolb Declaration -
Excerpts of Deposition Transcript of Jamie
Edmondson-Longoria, Dated June 30, 2017 ............................JA-1741

Exhibit AA to Kolb Declaration -
Excerpts of Deposition Transcript of Jamie
Edmondson-Longoria, Dated November 9, 2016 .....................JA-1744

Exhibit BB to Kolb Declaration -
Excerpts of Deposition Transcript of Jamie
Edmondson-Longoria, Dated February 10, 2020......................JA-1747

Exhibit CC to Kolb Declaration -
Photograph of Jessica Hinton from the Website of
Las Vegas Sun..........................................................................JA-1751

Exhibit DD to Kolb Declaration -
Photo of Crazy Horse III from Blog.vegas.com........................JA-1752

Exhibit EE to Kolb Declaration -
Excerpts of Deposition Transcript of Jessica Lynn Hinton,
Dated September 13, 2017 .........................................................JA-1754

Exhibit FF to Kolb Declaration -
Pages from website www.jessfinds.com ...................................JA-1760

vi

**Page**

Exhibit GG to Kolb Declaration -
E-Mail from John Golaszewski to Michael Kolb,
Dated September 28, 2020 .........................................................JA-1761

Exhibit HH to Kolb Declaration -
E-Mail from Michael Kolb to John Golaszewski,
Dated July 20, 2020..................................................................JA-1762

Exhibit II to Kolb Declaration -
Photograph of Ursula Mayes.....................................................JA-1764

Exhibit JJ to Kolb Declaration -
Photographs of Alana Campos, Brooke Taylor-Johnson,
Tiffany Toth Gray and Ursula Mayes .......................................JA-1765

Exhibit KK to Kolb Declaration -
Complaint, Dated October 16, 2015..........................................JA-1769

Exhibit LL to Kolb Declaration -
Photographs of Jessica Burciaga from SincityCabaret .............JA-1805

Affidavit of Robert L. Klein, for Defendants, in Support of
Motion, Sworn to January 28, 2021 ..........................................JA-1813

Exhibit A to Klein Affidavit Declaration -
Rebuttal Expert Report to the Report of Martin Buncher,
Dated October 28, 2020 ............................................................JA-1833

Affidavit of Keith Slifstein, Defendant, in Support of Motion,
Sworn to January 28, 2021 ........................................................JA-1865

Exhibit A to Slifstein Affidavit -
Photographs from Instagram Page of
Mansion Gentlemen Club..........................................................JA-1870

Defendants' Response to Plaintiffs' Local Rule 56.1 Statement
of Undisputed Material Facts, Dated March 12, 2021 ..............JA-1873

Plaintiffs' Response to Defendants' Local Rule 56.1 Statement
of Undisputed Facts, Dated March 12, 2021.............................JA-1908

Opinion and Order of Honorable Kenneth M. Karas,
Dated August 9, 2021, Appealed From......................................JA-2071

Judgment of United States District Court Southern District of
New York, Dated August 9, 2021 .............................................JA-2113

Notice of Appeal, Dated September 8, 2021.................................JA-2114

JA-1

CM/ECF

- Query
- Reports
- Utilities
- Help
- Log Out

CLOSED,APPEAL,ECF,MEDTFR4

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:18-cv-09448-KMK

| | |
|---|---|
| Souza et al v. Exotic Island Enterprises, Inc. et al | Date Filed: 10/16/2018 |
| Assigned to: Judge Kenneth M. Karas | Date Terminated: 08/09/2021 |
| Cause: 28:1331 Fed. Question | Jury Demand: Both |
| | Nature of Suit: 840 Trademark |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Alana Souza**
*also known as*
Alana Campos

represented by **John Vincent Golaszewski**
Casas Law Firm, P.C.
1740 Broadway
Ste 15th Floor
New York, NY 10019
646-872-3178
Email: john@talentrights.law
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brooke Banx**

represented by **John Vincent Golaszewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brooke Taylor-Johnson**

represented by **John Vincent Golaszewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jaclyn Swedberg**

represented by **John Vincent Golaszewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jaime Edmondson-Longoria**

represented by **John Vincent Golaszewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA-2

**Plaintiff**

**Jessica Hinton**                    represented by **John Vincent Golaszewski**
*also known as*                                    (See above for address)
Jessa Hinton                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tiffany Toth-Gray**                 represented by **John Vincent Golaszewski**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ursula Sanchez**                    represented by **John Vincent Golaszewski**
*also known as*                                    (See above for address)
Ursula Mayes                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Exotic Island Enterprises, Inc.**   represented by **Joseph Edward O'Connor**
*doing business as*                                Mainetti, Mainetti & O'connor, P.C.
Mansion Gentlemen's Club & Steakhouse              130 N. Front Street
                                                   Kingston, NY 12401
                                                   (845)-331-9434
                                                   Fax: (845)-331-2004
                                                   Email: joconnor@onplaw.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Michael Edward Kolb**
                                                   O'Connor & Partners, PLLC
                                                   255 Wall Street
                                                   Kingston, NY 12401
                                                   845-303-8777
                                                   Fax: 845-303-8666
                                                   Email: mkolb@mmolaw.net
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**Keith Slifstein**                   represented by **Michael Edward Kolb**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**ThirdParty Defendant**

**Exclusive Events & Promotions Inc.**
*doing business as*
Think Social First

**ThirdParty Plaintiff**

**Exotic Island Enterprises, Inc.**   represented by **Joseph Edward O'Connor**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

JA-3

**Michael Edward Kolb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ThirdParty Plaintiff**

**Keith Slifstein**                 represented by **Michael Edward Kolb**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2018 | 1 | **FILING ERROR - DEFICIENT PLEADING - FILER ERROR -** COMPLAINT against Exotic Island Enterprises, Inc., Keith Slifstein. (Filing Fee $ 400.00, Receipt Number ANYSDC-15754490)Document filed by JESSA HINTON, BROOKE TAYLOR, Tiffany Toth-Gray, Brooke Banx, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Edmondson-Longoria Jaime. (Attachments: # 1 Exhibit Exhibits A-H) (Golaszewski, John) Modified on 10/17/2018 (dnh). (Entered: 10/16/2018) |
| 10/16/2018 | 2 | REQUEST FOR ISSUANCE OF SUMMONS as to Exotic Island Enterprises, Inc. and Keith Slifstein, re: 1 Complaint,. Document filed by Brooke Banx, JESSA HINTON, Edmondson-Longoria Jaime, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, BROOKE TAYLOR, Tiffany Toth-Gray. (Attachments: # 1 Civil Cover Sheet) (Golaszewski, John) (Entered: 10/16/2018) |
| 10/16/2018 | 3 | **FILING ERROR - PDF ERROR -** AO 120 FORM TRADEMARK - NOTICE OF SUBMISSION BY ATTORNEY. AO 120 Form Patent/Trademark for case opening submitted to court for review.(Golaszewski, John) Modified on 10/17/2018 (dnh). (Entered: 10/16/2018) |
| 10/17/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney John Vincent Golaszewski. The party information for the following party/parties has been modified: Alana Souza; BROOKE TAYLOR ; Edmondson-Longoria Jaime ; JESSA HINTON ; Ursula Sanchez; Exotic Island Enterprises, Inc.. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps; alias party name was omitted; party name contained typographical errors. (dnh)** (Entered: 10/17/2018) |
| 10/17/2018 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney John Vincent Golaszewski to RE-FILE Document No. 1 Complaint. The filing is deficient for the following reason(s): Due to party modification the wrong filer/filers were selected for the pleading. Re-file the pleading using the event type Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (dnh)** (Entered: 10/17/2018) |
| 10/17/2018 | | **\*\*\*NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney John Vincent Golaszewski. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (dnh)** (Entered: 10/17/2018) |
| 10/17/2018 | 4 | COMPLAINT against Exotic Island Enterprises, Inc., Keith Slifstein. Document filed by Jessica Hinton, Brooke Taylor-Johnson, Tiffany Toth-Gray, Brooke Banx, Ursula |

| | | |
|---|---|---|
| | | Sanchez, Alana Souza, Jaclyn Swedberg, Jaime Edmondson-Longoria.(Golaszewski, John) (Entered: 10/17/2018) |
| 10/17/2018 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney John Vincent Golaszewski. The following case opening statistical information was erroneously selected/entered: Cause of Action code was left blank. The following correction(s) have been made to your case entry: the Cause of Action code has been modified to 28:1331. (dnh) (Entered: 10/17/2018) |
| 10/17/2018 | 5 | FILING ERROR - CIVIL COVER SHEET - PDF ERROR - CIVIL COVER SHEET filed. (Golaszewski, John) Modified on 10/17/2018 (dnh). (Entered: 10/17/2018) |
| 10/17/2018 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Kenneth M. Karas. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (dnh) (Entered: 10/17/2018) |
| 10/17/2018 | | Magistrate Judge Judith C. McCarthy is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (dnh) (Entered: 10/17/2018) |
| 10/17/2018 | | Case Designated ECF. (dnh) (Entered: 10/17/2018) |
| 10/17/2018 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT CIVIL COVER SHEET. Notice to attorney John Vincent Golaszewski to RE-FILE Document No. 5 Civil Cover Sheet. The filing is deficient for the following reason(s): the pdf is blank. Re-file the document using the event type Civil Cover Sheet found under the event list Other Documents and attach the correct PDF. Use civil cover sheet issued by S.D.N.Y. dated June 2017. The S.D.N.Y. Civil Cover Sheet dated June 2017 is located at http://nysd.uscourts.gov/file/forms/civil-cover-sheet. (dnh) (Entered: 10/17/2018) |
| 10/17/2018 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT TRADEMARK FORM. Notice to Attorney John Vincent Golaszewski re: Document No. 3 AO 120 Form Patent/Trademark - Notice of Submission by Attorney. The filing is deficient for the following reason(s): the Patent or Trademark Number field on the AO 120 Patent/Trademark form was not completed by the attorney. Re-file the document using the event type AO 120 Form Patent/Trademark - Notice of Submission by Attorney found under the event list Other Documents and attach the correct AO 120 Patent/Trademark PDF form. (dnh) (Entered: 10/17/2018) |
| 10/17/2018 | 6 | CIVIL COVER SHEET filed. (Golaszewski, John) (Entered: 10/17/2018) |
| 10/17/2018 | 7 | ELECTRONIC SUMMONS ISSUED as to Exotic Island Enterprises, Inc., Keith Slifstein. (dnh) (Entered: 10/17/2018) |
| 01/31/2019 | 8 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Exotic Island Enterprises, Inc..(Kolb, Michael) (Entered: 01/31/2019) |
| 01/31/2019 | 9 | ANSWER to 4 Complaint with JURY DEMAND. Document filed by Exotic Island |

| | | Enterprises, Inc., Keith Slifstein.(Kolb, Michael) (Entered: 01/31/2019) |
|---|---|---|
| 01/31/2019 | 10 | NOTICE OF APPEARANCE by Michael Edward Kolb on behalf of Exotic Island Enterprises, Inc., Keith Slifstein. (Kolb, Michael) (Entered: 01/31/2019) |
| 04/23/2019 | 11 | CALENDAR NOTICE: Please take notice that the above captioned matter has been scheduled for: Rule (16) conference before the Honorable Kenneth M. Karas, United States District Judge, on Monday, May 20, 2019 at 11 :00 a.m. in Courtroom 521, U.S. District Court, 300 Quarropas Street, White Plains, New York 10601. Any scheduling difficulties must be brought to the attention of the Court in writing, at least five business days beforehand. SO ORDERED. (Initial Conference set for 5/20/2019 at 11:00 AM in Courtroom 521, 300 Quarropas Street, White Plains, NY 10601 before Judge Kenneth M. Karas.) (Signed by Judge Kenneth M. Karas on 4/23/2019) (jca) (Entered: 04/23/2019) |
| 05/06/2019 | 12 | LETTER MOTION to Adjourn Conference addressed to Judge Kenneth M. Karas from John V. Golaszewski dated May 6, 2019. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray.(Golaszewski, John) (Entered: 05/06/2019) |
| 05/06/2019 | 13 | NOTICE OF APPEARANCE by Joseph Edward O'Connor on behalf of Exotic Island Enterprises, Inc.. (O'Connor, Joseph) (Entered: 05/06/2019) |
| 05/07/2019 | 14 | ORDER granting 12 Letter Motion to Adjourn Conference. Granted. The conference is moved to 5/28/2019, at 2:00 p.m. SO ORDERED. Initial Conference set for 5/28/2019 at 02:00 PM before Judge Kenneth M. Karas. (Signed by Judge Kenneth M. Karas on 5/6/2019) (kv) (Entered: 05/07/2019) |
| 05/29/2019 | | Minute Entry for proceedings held before Judge Kenneth M. Karas: Initial Pretrial Conference held on 5/29/2019. John Golaszewski appeared by telephone on behalf of Plaintiffs. Michael Kolb appeared by telephone on behalf of Defendants. No court reporter served. The Court adopted a case management order. See Order. The case is referred to mediation. The Court will hold a status conference on March 4, 2020 at 10:30am. (ID) (Entered: 05/29/2019) |
| 05/29/2019 | 15 | CASE MANAGEMENT AND SCHEDULING ORDER: No additional parties may be joined except with leave of the Court. Amended pleadings may not be filed except with leave of the Court. Parties have conferred and their present best estimate of the length of trial is 1 week. Deposition due by 11/30/2019. Expert Deposition due by 3/15/2020. All Fact Discovery due by 11/30/2019. Case Management Conference set for 3/4/2019 at 10:30 AM before Judge Kenneth M. Karas. (Signed by Judge Kenneth M. Karas on 5/29/2019) (kv) Modified on 8/30/2019 (kv). (Entered: 05/29/2019) |
| 05/30/2019 | 16 | ORDER DECLARING CASE ELIGIBLE FOR MEDIATION: This case is determined to be eligible for mediation as to all issues. The entire mediation process is confidential. The parties and the Mediator may not disclose information regarding the process, including settlement terms, to the Court or to third persons unless all parties agree. The identity of the Mediator is not to be disclosed even to the Court. However, persons authorized by the Court to administer or evaluate the mediation program may have access to information necessary to administer or evaluate the program and parties, and counsel and mediators may respond to confidential inquiries or surveys by said persons authorized by the Court to administer or evaluate the mediation program; and as further set forth herein. SO ORDERED. (Please reference the following when corresponding with the Mediation Office. E-mail MediationOffice@nysd.uscourts.gov, telephone (212) 805-0643, and facsimile (212) 805-0647. Mediator to be Assigned by 6/10/2019. Mediator Expertise Request due by 6/4/2019.) (Signed by Judge Kenneth M. Karas on 5/30/2019) (anc) Modified on 5/31/2019 (anc). (Entered: 05/30/2019) |

| 06/10/2019 | | NOTICE OF MEDIATOR ASSIGNMENT - Notice of assignment of mediator. Mediator Schedule due by 7/10/2019.(Chan, Tsz) (Entered: 06/10/2019) |
|---|---|---|
| 06/26/2019 | | MEDIATOR SESSION SCHEDULED First Mediation Session scheduled for 8/12/19, 10 AM at 40 Foley Square.(ah) (Entered: 06/26/2019) |
| 07/25/2019 | 17 | PROPOSED ORDER. Document filed by Exotic Island Enterprises, Inc.. (O'Connor, Joseph) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 07/25/2019) |
| 07/25/2019 | | **\*\*\*NOTICE TO ATTORNEY REGARDING REJECTION OF PROPOSED ORDER TO BRING PERSONAL ELECTRONIC DEVICE(S) OR GENERAL PURPOSE COMPUTING DEVICE(S) INTO THE COURTHOUSES OF THE SDNY FOR USE IN A PROCEEDING OR TRIAL. Notice to Attorney Joseph O'Connor re: Document 17 Proposed Order was rejected by the Clerk's Office for the following reason, the Order to Bring Personal Electronic Device(s) or General Purpose Computing Device(s) Into the Courthouses of the SDNY for Use in a Proceeding or Trial should not be electronically filed. Please download and review the Local Rules, Judge's Individual Rules of Practice and ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (km)** (Entered: 07/25/2019) |
| 09/12/2019 | | **\*\*\*DELETED DOCUMENT. Deleted document number 19 CALENDAR NOTICE. The document was incorrectly filed in this case. (yv)** (Entered: 09/12/2019) |
| 11/21/2019 | 19 | LETTER addressed to Judge Kenneth M. Karas from Michael Kolb dated November 21, 2019 re: Plaintiff's Request for Permission to File a Third-Party Action. Document filed by Exotic Island Enterprises, Inc., Keith Slifstein.(Kolb, Michael) (Entered: 11/21/2019) |
| 11/21/2019 | 20 | MEMO ENDORSEMENT on re: 19 Letter filed by Exotic Island Enterprises, Inc., Keith Slifstein. ENDORSEMENT: Granted, Defendants are to file the Third-Party Action by 12/4/19. So Ordered. (Amended Pleadings due by 12/4/2019.) (Signed by Judge Kenneth M. Karas on 11/21/2019) (rro) (Entered: 11/21/2019) |
| 12/04/2019 | 21 | THIRD PARTY COMPLAINT against Exclusive Events & Promotions Inc., d/b/a Think Social First.Document filed by Exotic Island Enterprises, Inc., Keith Slifstein. (Attachments: # 1 Exhibit Exhibit A: 10-16-18 Summons & Complaint)(Kolb, Michael) (Entered: 12/04/2019) |
| 12/04/2019 | 22 | REQUEST FOR ISSUANCE OF SUMMONS as to Exclusive Events & Promotions Inc., d/b/a Think Social First, re: 21 Third Party Complaint. Document filed by Exotic Island Enterprises, Inc., Keith Slifstein. (Kolb, Michael) (Entered: 12/04/2019) |
| 12/05/2019 | 23 | ELECTRONIC SUMMONS ISSUED as to Exclusive Events & Promotions Inc.. (pc) (Entered: 12/05/2019) |
| 02/04/2020 | 24 | AFFIDAVIT OF SERVICE of Summons and Third Party Complaint. Exclusive Events & Promotions Inc. served on 12/16/2019, answer due 1/6/2020. Service was accepted by Amy Lesch, NY Secretary of State. Document filed by Keith Slifstein..(Kolb, Michael) (Entered: 02/04/2020) |
| 03/04/2020 | | Minute Entry for proceedings held before Judge Kenneth M. Karas: Status Conference held on 3/4/2020. John Golaszewski appeared for Plaintiffs. Michael Kolb appeared for Defendants/Third Party Plaintiffs. No court reporter served. The Court adopted a case management and scheduling order. See Order. The Parties are next scheduled to appear before the Court on September 10, 2020 at 2:00 p.m. Any pre-motion letters are due |

| | | |
|---|---|---|
| | | August 20, 2020, and non-movant responses are due August 27, 2020.(GC) (Entered: 03/04/2020) |
| 03/04/2020 | 25 | CASE MANAGEMENT AND SCHEDULING ORDER: At the conference before the Court held on 3/4/20 this Case Management Plan and Scheduling Order was adopted in accordance with Rules 16-26(f) of the Federal Rules of Civil Procedure. No additional parties may be joined except with leave of the Court. Amended pleadings may not be filed except with leave of the Court. Depositions to be completed by 6/4/20. All expert disclosures, including reports, production of underlying documents and depositions are to be completed by: Expert(s) of Plaintiff(s) 7/3/20. Expert(s) of Defendant(s) 8/3/20. Motions: All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. Summary Judgment or other dispositive motions are due at the close of discovery. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least two.(2) weeks prior to this deadline. All counsel must meet for at least one hour to discuss settlement not later than two weeks following the close of fact discovery. Parties have conferred and their present best estimate of the length of trial is 1 week. The movant's pre-motion letter is due 8/20/20. The non-movant's response is due 8/27/20. Deposition due by 9/3/2020. Fact Discovery due by 6/4/2020. Case Management Conference set for 9/10/2020 at 02:00 PM before Judge Kenneth M. Karas. (And as further set forth herein.) SO ORDERED. (Signed by Judge Kenneth M. Karas on 3/4/2020) (jca) (Entered: 03/04/2020) |
| 03/04/2020 | 26 | ORDER OF REFERENCE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non-dispositive pretrial motions, and settlement). Referred to Magistrate Judge Judith C. McCarthy. SO ORDERED. (Signed by Judge Kenneth M. Karas on 3/4/2020) (ks) (Entered: 03/04/2020) |
| 03/05/2020 | 27 | SCHEDULING ORDER: Status Conference set for 4/24/2020 at 11:30 AM in Courtroom 421, 300 Quarropas Street, White Plains, NY 10601 before Magistrate Judge Judith C. McCarthy. (Signed by Magistrate Judge Judith C. McCarthy on 3/5/2020) (va) (Entered: 03/05/2020) |
| 03/05/2020 | 28 | ORDER: In order to facilitate the progress of pre-trial discovery of this litigation in a just, speedy and inexpensive manner, to ensure compliance with the case management plan, and to prevent the accumulation of unresolved discovery issues, the following procedures will be followed for the resolution of discovery disputes: (As further set forth herein this Order.) (Signed by Magistrate Judge Judith C. McCarthy on 3/5/2020) (va) (Entered: 03/05/2020) |
| 03/06/2020 | 29 | LETTER addressed to Judge Kenneth M. Karas from Michael Kolb dated March 6, 2020 re: Scheduling Order. Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 03/06/2020) |
| 03/09/2020 | 30 | MEMO ENDORSEMENT on re: 29 Letter filed by Exotic Island Enterprises, Inc. ENDORSEMENT: Granted. So Ordered. (Signed by Judge Kenneth M. Karas on 3/7/2020) (ks) (Entered: 03/09/2020) |
| 03/23/2020 | 31 | SCHEDULING ORDER: TO ALL PARTIES: The Status Conference scheduled for April 24, 2020 at 11:30 a.m. before Magistrate Judge Judith C. McCarthy is converted to a Telephone Conference. Counsel shall call the following number at the time of the conference: Toll-Free Number: 877-873-8017, Access Code: 4264138. SO ORDERED. Telephone Conference set for 4/24/2020 at 11:30 AM before Magistrate Judge Judith C. McCarthy. (Signed by Magistrate Judge Judith C. McCarthy on 3/23/2020) (kv) (Entered: 03/23/2020) |

| 04/24/2020 | | Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Telephone Conference held on 4/24/2020, The Court extends the discovery deadlines as follows: (1) Non expert depositions and all fact discovery shall be completed by August 4, 2020; (2) Requests to admit shall be served by July 15, 2020; (3) Plaintiffs expert reports shall be served by September 3, 2020, (4) Defendants expert reports shall be served by October 2, 2020; and (5) Expert depositions shall be completed by November 3, 2020. Next telephone conference scheduled for June 15, 2020 at 11:00 a.m. Counsel shall call the following number at the time of the conference: Toll-Free Number: 877-873-8017, Access Code: 4264138. (Call recorded via AT&T Teleconferencing)( Deposition due by 11/3/2020., Fact Discovery due by 8/4/2020.), ( Telephone Conference set for 6/15/2020 at 11:00 AM before Magistrate Judge Judith C. McCarthy.). (tro) (Entered: 04/27/2020) |
|---|---|---|
| 06/15/2020 | | Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Telephone Conference held on 6/15/2020. By June 19, 2020, plaintiffs shall provide defendants with outstanding documents, verified interrogatories and a response to defendants' settlement offer. Next telephone conference scheduled for August 7, 2020 at 11:00 a.m. Counsel shall call the following number at the time of the conference: Toll-Free Number: 877-873-8017, Access Code: 4264138. (Call recorded via AT&T Teleconferencing) ( Telephone Conference set for 8/7/2020 at 11:00 AM before Magistrate Judge Judith C. McCarthy.). (kgo) (Entered: 06/15/2020) |
| 08/07/2020 | | Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Telephone Conference held on August 7, 2020. The Court extends discovery deadlines as follows: (1) Plaintiffs' expert reports shall be served by September 17, 2020; (2) Defendants' expert reports shall be served by October 16, 2020, and (3) Expert depositions shall be completed by November 17, 2020. The parties are directed to bring any discovery disputes to the Court's attention by August 25, 2020. Responses to such disputes are due August 28, 2020. If no disputes remain, the parties should notify the Court, in writing, on August 25, 2020. Next Telephone Conference scheduled for September 17, 2020 at 10:30 a.m. before Magistrate Judge Judith C. McCarthy. Counsel shall call 877-873-8017 and enter access code 4264138 at the time of the conference. (Court Reporter AT&T Teleconferencing) (jah) (Entered: 08/07/2020) |
| 08/25/2020 | 32 | LETTER addressed to Magistrate Judge Judith C. McCarthy from Michael Kolb dated 8/25/2020 re: Post-Deposition Discovery Requests. Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 08/25/2020) |
| 08/25/2020 | 33 | LETTER addressed to Magistrate Judge Judith C. McCarthy from John V. Golaszewski dated August 25, 2020 re: Discovery Into Defendants' Releases. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Keith Slifstein, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray.. (Golaszewski, John) (Entered: 08/25/2020) |
| 08/26/2020 | 34 | LETTER addressed to Magistrate Judge Judith C. McCarthy from Michael Kolb dated August 26, 2020 re: Response to Plaintiffs' Letter of August 25, 2020. Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 08/26/2020) |
| 09/02/2020 | 35 | LETTER MOTION to Adjourn Conference addressed to Judge Kenneth M. Karas from John V. Golaszewski dated September 2, 2020. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) (Entered: 09/02/2020) |
| 09/03/2020 | 36 | ORDER granting 35 Letter Motion to Adjourn Conference. Granted. The Court will hold a conference on 11/6/2020 at 11:30am. SO ORDERED. Case Management Conference set for 11/6/2020 at 11:30 AM before Judge Kenneth M. Karas. (Signed by Judge Kenneth M. Karas on 9/3/2020) (jca) (Entered: 09/03/2020) |

| | | |
|---|---|---|
| 09/17/2020 | | Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Telephone Conference held on September 17, 2020. (1) Plaintiffs' expert reports shall be served by September 18, 2020; (2) Defendants' expert reports shall be served by October 19, 2020; (3) Plaintiffs are directed to produce all relevant documents currently in their possession by September 21, 2020. Any other remaining documents must be produced by September 28, 2020; and (4) Defendants are directed to produce the bartender release and the Victoria Rose release by September 30, 2020. Requests to Admit may be served regarding any newly produced documents. Next Telephone Conference scheduled for November 6, 2020 at 10:30 a.m. before Magistrate Judge Judith C. McCarthy. Counsel shall call 877-873-8017 and enter access code 4264138 at the time of the conference. (Court Reporter AT&T Recording) (jah) (Entered: 09/17/2020) |
| 10/30/2020 | 37 | NOTICE OF TELECONFERENCE INFORMATION: For the week of November 2, 2020, the Court will hold all civil conferences, hearings, and/or oral arguments by telephone. Counsel shall call the following number at the designated time: Meeting Dial-In Number (USA toll-free): (888) 363-4749 Access Code: 7702195. Please enter the conference as a guest by pressing the pound sign (#). Given that much of the Court is operating remotely and has limited mail capability, counsel involved in any pro se cases shall mail a copy of this Notice to or otherwise inform the pro se party of the above teleconference information. Counsel in any pro se inmate cases shall ensure that the pro se party is on the line before calling the above-referenced number. For initial conferences, counsel shall submit a proposed case management and discovery schedule via ECF by 5 p.m. on the evening before the initial conference. Any requests for adjournments should be filed as soon as possible and clearly explain why the conference should be adjourned. SO ORDERED. (Signed by Judge Kenneth M. Karas on 10/30/2020) (jca) (Entered: 10/30/2020) |
| 11/06/2020 | | Minute Entry for proceedings held before Magistrate Judge Judith C. McCarthy: Telephone Conference held on November 6, 2020. Discovery is complete. Referral closed. (Court Reporter AT&T Teleconferencing) (jah) (Entered: 11/06/2020) |
| 11/06/2020 | | Minute Entry for proceedings held before Judge Kenneth M. Karas: Status Conference held on 11/6/2020. John Golaszewski and Joseph Casas appeared on behalf of Plaintiffs. Michael Kolb appeared on behalf of Defendants. No court reporter served. The Court adopted a briefing schedule. See Order. (EJJ) (Entered: 11/06/2020) |
| 11/06/2020 | 38 | ORDER: At the Conference on November 6, 2020, the Court adopted a briefing schedule for the Parties Motions For Summary Judgment and Defendants' Daubert Motion. Opening briefs shall be due no later than January 15, 2021. Opposition briefs shall be due no later than February 15, 2021. As discussed at the Conference, the Parties are granted leave to file extra pages in their consolidated Summary Judgment and Daubert briefs. The consolidated opening and opposition briefs shall not exceed 37 pages. If oral argument is requested, it may be scheduled by the Court. SO ORDERED. (Motions due by 1/15/2021, Responses due by 2/15/2021) (Signed by Judge Kenneth M. Karas on 11/6/2020) (jca) (Entered: 11/06/2020) |
| 01/07/2021 | 39 | CONSENT LETTER MOTION for Extension of Time *to file Summary Judgment Briefs* addressed to Judge Kenneth M. Karas from John V. Golaszewski dated January 7, 2021. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray.. (Golaszewski, John) (Entered: 01/07/2021) |
| 01/07/2021 | 40 | ORDER granting 39 CONSENT LETTER MOTION for Extension of Time to file Summary Judgment Briefs. Granted. SO ORDERED. Cross Motions due by 2/5/2021. (Signed by Judge Kenneth M. Karas on 1/7/2021) (jca) (Entered: 01/07/2021) |

| 01/07/2021 | | Set/Reset Deadlines: Responses due by 3/12/2021 (jca) (Entered: 01/07/2021) |
|---|---|---|
| 02/05/2021 | 41 | MOTION for Summary Judgment . Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) (Entered: 02/05/2021) |
| 02/05/2021 | 42 | MEMORANDUM OF LAW in Support re: 41 MOTION for Summary Judgment . . Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Keith Slifstein, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) (Entered: 02/05/2021) |
| 02/05/2021 | 43 | DECLARATION of John V. Golaszewski in Support re: 41 MOTION for Summary Judgment .. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L).(Golaszewski, John) (Entered: 02/05/2021) |
| 02/05/2021 | 44 | RULE 56.1 STATEMENT. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) (Entered: 02/05/2021) |
| 02/05/2021 | 45 | MOTION for Summary Judgment *Notice of Motion*. Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 02/05/2021) |
| 02/05/2021 | 46 | DECLARATION of Michael Kolb in Support re: 45 MOTION for Summary Judgment *Notice of Motion*.. Document filed by Exotic Island Enterprises, Inc.. (Attachments: # 1 Exhibit Ex. A part 1, # 2 Exhibit Ex. A part 2, # 3 Exhibit Ex. A part 3, # 4 Exhibit Ex. B, # 5 Exhibit Ex. C, # 6 Exhibit Ex. D part 1, # 7 Exhibit Ex. D part 2, # 8 Exhibit Ex. D part 3, # 9 Exhibit Ex. D part 4, # 10 Exhibit Ex. E, # 11 Exhibit Ex. F part 1, # 12 Exhibit Ex. F part 2, # 13 Exhibit Ex. F part 3, # 14 Exhibit Ex. F part 4, # 15 Exhibit Ex. F part 5, # 16 Exhibit Ex. G part 1, # 17 Exhibit Ex. G part 2, # 18 Exhibit Ex. G part 3, # 19 Exhibit Ex. G part 4, # 20 Exhibit Ex. G part 5, # 21 Exhibit Ex. G part 6, # 22 Exhibit Ex. H, # 23 Exhibit Ex. I, # 24 Exhibit Ex. J, # 25 Exhibit Ex. K part 1, # 26 Exhibit Ex. K part 2, # 27 Exhibit Ex. K part 3, # 28 Exhibit Ex. K part 4, # 29 Exhibit Ex. K part 5, # 30 Exhibit Ex. K part 6, # 31 Exhibit Ex. K part 7, # 32 Exhibit Ex. K part 8, # 33 Exhibit Ex. K part 9, # 34 Exhibit Ex. K part 10, # 35 Exhibit Ex. L part 1, # 36 Exhibit Ex. L part 2, # 37 Exhibit Ex. M part 1, # 38 Exhibit Ex. M part 2, # 39 Exhibit Ex, M part 3, # 40 Exhibit Ex. M part 4, # 41 Exhibit Ex. M part 5, # 42 Exhibit Ex. M part 6, # 43 Exhibit Ex. M part 7, # 44 Exhibit Ex. M part 8, # 45 Exhibit Ex. M part 9, # 46 Exhibit Ex. M part 10, # 47 Exhibit Ex, M part 11, # 48 Exhibit Ex, M part 12, # 49 Exhibit Ex. M part 13, # 50 Exhibit Ex. M part 14, # 51 Exhibit Ex. M-1, # 52 Exhibit Ex. N part 1, # 53 Exhibit Ex. N part 2, # 54 Exhibit Ex. N part 3, # 55 Exhibit Ex. N part 4, # 56 Exhibit Ex. N part 5, # 57 Exhibit Ex. N part 6, # 58 Exhibit Ex. O, # 59 Exhibit Ex. P, # 60 Exhibit Ex. Q, # 61 Exhibit Ex. R part 1, # 62 Exhibit Ex. R part 2, # 63 Exhibit Ex. S, # 64 Exhibit Ex. T, # 65 Exhibit Ex. U, # 66 Exhibit Ex. V, # 67 Exhibit Ex. W, # 68 Exhibit Ex. X, # 69 Exhibit Ex. Y, # 70 Exhibit Ex. Z, # 71 Exhibit Ex. AA, # 72 Exhibit Ex. BB, # 73 Exhibit Ex. CC, # 74 Exhibit Ex. DD, # 75 Exhibit Ex. EE, # 76 Exhibit Ex. FF, # 77 Exhibit Ex. GG, # 78 Exhibit Ex. HH, # 79 Exhibit Ex. II, # 80 Exhibit Ex. JJ, # 81 Exhibit Ex. KK, # 82 Exhibit Ex. LL).(Kolb, Michael) (Entered: 02/05/2021) |
| 02/05/2021 | 47 | RESPONSE to Motion re: 45 MOTION for Summary Judgment *Notice of Motion*. *Rule 56.1 Statement of the Defendants*. Document filed by Exotic Island Enterprises, Inc... (Kolb, Michael) (Entered: 02/05/2021) |
| 02/05/2021 | 48 | AFFIDAVIT of Defendants' Expert Robert Klein in Support re: 45 MOTION for |

| | | |
|---|---|---|
| | | Summary Judgment *Notice of Motion*.. Document filed by Exotic Island Enterprises, Inc.. (Attachments: # 1 Exhibit A).(Kolb, Michael) (Entered: 02/05/2021) |
| 02/05/2021 | 49 | AFFIDAVIT of Defendant Keith Slifstein in Support re: 45 MOTION for Summary Judgment *Notice of Motion*.. Document filed by Exotic Island Enterprises, Inc.. (Attachments: # 1 Exhibit A).(Kolb, Michael) (Entered: 02/05/2021) |
| 02/05/2021 | 50 | MEMORANDUM OF LAW in Support re: 45 MOTION for Summary Judgment *Notice of Motion*. . Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 02/05/2021) |
| 03/08/2021 | 51 | LETTER addressed to Judge Kenneth M. Karas from Michael Kolb dated March 8, 2021 re: request for possible alternatives to submitting hard copy of motion papers with voluminous exhibits. Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 03/08/2021) |
| 03/08/2021 | 52 | MEMO ENDORSEMENT on re: 51 Letter, filed by Exotic Island Enterprises, Inc. ENDORSEMENT: As long as all exhibits have been filed via ECF, there is no need for a courtesy copy of the papers. SO ORDERED. (Signed by Judge Kenneth M. Karas on 3/8/2021) (jca) (Entered: 03/08/2021) |
| 03/12/2021 | 53 | MEMORANDUM OF LAW in Opposition re: 41 MOTION for Summary Judgment . . Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 03/12/2021) |
| 03/12/2021 | 54 | RESPONSE to Motion re: 41 MOTION for Summary Judgment . *Defendants' Response to Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts*. Document filed by Exotic Island Enterprises, Inc...(Kolb, Michael) (Entered: 03/12/2021) |
| 03/12/2021 | 55 | MEMORANDUM OF LAW in Opposition re: 45 MOTION for Summary Judgment *Notice of Motion*. . Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Keith Slifstein, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) (Entered: 03/12/2021) |
| 03/12/2021 | 56 | DECLARATION of John V. Golaszewski in Opposition re: 45 MOTION for Summary Judgment *Notice of Motion*.. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Ursula Sanchez, Keith Slifstein, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H). (Golaszewski, John) (Entered: 03/12/2021) |
| 03/12/2021 | 57 | COUNTER STATEMENT TO Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Keith Slifstein, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) (Entered: 03/12/2021) |
| 08/09/2021 | 58 | MEMORANDUM AND OPINION re: 45 MOTION for Summary Judgment *Notice of Motion*. filed by Exotic Island Enterprises, Inc., 41 MOTION for Summary Judgment . filed by Brooke Banx, Jaime Edmondson-Longoria, Brooke Taylor-Johnson, Ursula Sanchez, Alana Souza, Jessica Hinton, Jaclyn Swedberg, Tiffany Toth-Gray. For the foregoing reasons, Defendants' Motion For Summary Judgment is granted and Plaintiffs' Motion For Summary Judgment is denied. The Clerk of the Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 41, 45), enter judgment for Defendants, and close this case. SO ORDERED. (ate) Transmission to Orders and Judgments Clerk for processing. (Entered: 08/09/2021) |
| 08/09/2021 | 59 | CLERK'S JUDGMENT re: 58 Memorandum & Opinion, in favor of Exotic Island Enterprises, Inc., Keith Slifstein against Alana Souza, Brooke Banx, Brooke Taylor- |

| | | |
|---|---|---|
| | | Johnson, Jaclyn Swedberg, Jaime Edmondson-Longoria, Jessica Hinton, Tiffany Toth-Gray, Ursula Sanchez. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated August 9, 2021, Defendants' Motion for Summary Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied. Judgment is entered for Defendants and this case is closed. (Signed by Clerk of Court Ruby Krajick on 8/9/2021) (Attachments: # 1 Notice of Right to Appeal) (dt) (Entered: 08/09/2021) |
| 09/08/2021 | 60 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** NOTICE OF APPEAL TO THE FEDERAL CIRCUIT from 58 Memorandum & Opinion,,. Form 7 and Form 22 are due within 14 days. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray..(Golaszewski, John) Modified on 9/8/2021 (tp). (Entered: 09/08/2021) |
| 09/08/2021 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Golaszewski, John to RE-FILE Document No. 60 Notice of Appeal to the Federal Circuit. The filing is deficient for the following reason(s): the wrong event type was used to file the appeal. Re-file the appeal using the event type Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (tp)** (Entered: 09/08/2021) |
| 09/08/2021 | 61 | NOTICE OF APPEAL from 58 Memorandum & Opinion,,. Document filed by Brooke Banx, Jaime Edmondson-Longoria, Jessica Hinton, Ursula Sanchez, Alana Souza, Jaclyn Swedberg, Brooke Taylor-Johnson, Tiffany Toth-Gray. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Golaszewski, John) (Entered: 09/08/2021) |
| 09/08/2021 | | Appeal Fee Due: for 61 Notice of Appeal. Appeal fee due by 9/22/2021. (tp) (Entered: 09/08/2021) |
| 09/08/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 61 Notice of Appeal. (tp) (Entered: 09/08/2021) |
| 09/08/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 61 Notice of Appeal, filed by Brooke Banx, Jaime Edmondson-Longoria, Brooke Taylor-Johnson, Ursula Sanchez, Alana Souza, Jessica Hinton, Jaclyn Swedberg, Tiffany Toth-Gray were transmitted to the U.S. Court of Appeals. (tp) (Entered: 09/08/2021) |
| 09/27/2021 | | Appeal Fee Payment: for 61 Notice of Appeal,. Filing fee $ 505.00, receipt number ANYSDC-25116694..(Golaszewski, John) (Entered: 09/27/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/04/2022 08:45:01 | | |
| **PACER Login:** | appealteam | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:18-cv-09448-KMK |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

JA-13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA A/K/A ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON A/K/A JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ A/K/A URSULA MAYES | Case No. _____ |
| Plaintiffs, | |
| - against - | **COMPLAINT** |
| EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN | (Jury Trial Demanded) |
| Defendants. | |

Plaintiffs ALANA SOUZA A/K/A ALANA CAMPOS, BROOKE BANX, BROOKE

TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA,

JESSICA HINTON A/K/A JESSA HINTON, TIFFANY TOTH-GRAY, and URSULA

SANCHEZ A/K/A URSULA MAYES (collectively, "Plaintiffs"), by and through their

undersigned counsel, as and for their Complaint ("Complaint") against defendants EXOTIC

ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB and KEITH

SLIFSTEIN (collectively "Defendants"), respectfully allege as follows:

**BACKGROUND**

1.      This is an action for damages and injunctive relief relating to Defendants' theft,

alteration, and unauthorized publication of images of Plaintiffs, each of whom are world

renowned professional models, to promote their strip club, The Mansion Gentlemen's Club &

Steakhouse ("Mansion" or the "Club"), in Newburgh, New York.

- 1 -

Case 21-2149, Document 48, 01/11/2022, 3241954, Page21 of 303

2.      As detailed below, Defendants' theft and unauthorized use of Plaintiffs' images, photos and likenesses (collectively, "Images") constitutes: a) violation of section 43 of the Lanham Act, 28 U.S.C. § 1125(a)(1), which prohibits both false advertising and the false or misleading use of a person's image for commercial purposes; b) violation of New York Civil Rights Law §§ 50-51, which protects a person's right to privacy and publicity; c) violation of New York's Deceptive Trade Practices Act (New York G.B.L. §349) which prohibits deceptive business practices; and, d) defamation.

3.      In addition to the actual, punitive and exemplary damages set forth below, Plaintiffs likewise seek an Order from this Court permanently enjoining Defendants from using their Images to promote any Club, via any medium.

## JURISDICTION & VENUE

4.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs have stated claims under, *inter alia*, the Lanham Act, 28 U.S.C. § 1125(a)(1), and has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      As set forth immediately below, Plaintiffs are, and at all times relevant to this action have been, professional models who reside throughout the United States.

6.      According to publicly available records, defendant Exotic Island Enterprises, Inc. ("Exotic Island") is a corporation formed under the laws of the state of New York, with its principal place of business located at 5268 Route 9W, Newburgh, New York 12550.  Exotic Island operates Mansion, located at 5268 Route 9W, Newburgh, New York 12550.

7.      Upon information and belief, defendant Keith Slifstein ("Slifstein") is a resident of the State of New York, and at all relevant times was the owner, principal and/or chief executive officer of Exotic Island.

- 2 -

8.      Venue is proper in the United States District Court for the Southern District of New York because Orange County is Defendants' principal place of business.

9.      All parties have minimum contacts with Orange County, a significant portion of the alleged causes of action arose and accrued in Orange County, and the center of gravity for a significant portion of all relevant events alleged in this complaint is predominately located in Orange County.

**PARTIES**

*Plaintiffs*

10.     Plaintiff Alana Souza a/k/a Alana Campos ("Campos") is a well-known professional model, and a resident of Los Angeles County, California.

11.     Plaintiff Brooke Banx ("Banx") is a well-known professional model, and a resident of Travis County, Texas.

12.     Plaintiff Brooke Taylor-Johnson ("Johnson") is a well-known professional model, and a resident of Santa Barbara County, California.

13.     Jaclyn Swedberg ("Swedberg") is a well-known professional model, and a resident of San Bernardino County, California.

14.     Plaintiff Jaime Edmondson-Longoria ("Longoria") is a well-known professional model, and a resident of Pinellas County, Florida.

15.     Plaintiff Jessica Hinton a/k/a Jessa Hinton ("Hinton") is a well-known professional model, and a resident of Los Angeles County, California.

16.     Plaintiff Tiffany Toth-Gray ("Gray") is a well-known professional model, and a resident of Orange County, California.

17.     Plaintiff Ursula Sanchez a/k/a Ursula Mayes ("Mayes") is a well-known

professional model, and a resident of Orange County, California.

*Defendants*

18.     According to publicly available records, defendant Exotic Island is formed under the laws of the state of New York.  During times relevant to this action, Exotic Island operated Mansion, a strip club located at 5268 Route 9W, Newburgh, New York 12550.

19.     Upon information and belief, Slifstein, in his capacity as a Chief Executive Officer of Exotic Island maintains operational control over Mansion including all advertising relating thereto and did so during all times relevant to the allegations herein.

## FACTUAL ALLEGATIONS

20.     As set forth immediately below, each Plaintiff is an extremely well-known professional model who earns her livelihood modeling and selling her Images to companies, magazines and individuals for the purpose of advertising products and services.

21.     Plaintiffs' careers in the modeling industry place a high degree of value on their good will and reputation, which is critical to maximize their earning potential, book modeling contracts, and establish each of their individual brands.  In furtherance of establishing, and maintaining, their brands, Plaintiffs are necessarily selective concerning the companies, and brands, for which they model.

22.     Each of the Plaintiffs' Images was misappropriated, and intentionally altered, by one or more of the Defendants to make it appear that they worked at or endorsed Mansion.

23.     In the case of each and every Plaintiff, such appearance was false.

24.     Moreover, in each and every case, this misappropriation occurred without any of the Plaintiffs' knowledge, consent or authorization, at no point did any Plaintiff ever receive any remuneration for Defendants' improper and illegal use of their Images, and Defendants'

improper and illegal use of Plaintiffs' Images have caused each Plaintiff to suffer substantial damages.

25.     Further, in certain cases Defendants misappropriated Plaintiffs' advertising ideas because the Images they misappropriated came from Plaintiffs' own social media pages, which each Plaintiff uses to market herself to potential clients, grow her fan base, and build and maintain her brand.

***Plaintiffs' Backgrounds and Careers***

26.     Campos is a Brazilian model who started working as a model when she was only fifteen years of age, when she was scouted by the director of Ford Models, which became her agency for five years. While she was nominated in numerous beauty pageants in her country, she decided to move to the United States at twenty years of age, where she is still currently represented by Wilhelmina Models. Campos has been published in *Playboy*, *Ashtonish Mag*, *Viva Glam*, and *Bliss Mag*. She has also been in many campaigns for companies including Arden B, Target, Chynna Dolls, Frederick's of Hollywood, ICollection, Elegant Moments, Drift Eyewear, Sexy Dresses, Sachika, Marisa Kenson, Sports Calendar, and appeared as a spokes model for My Body Journey and as a cover girl for *Arizona Foothills Magazine*. In addition, Campos was featured in the movie "Last Vegas" with Robert DeNiro, Morgan Freeman, and Michael Douglas. Campos has over 519,000 followers on Instagram. [1]

27.     That we know of, Campos is depicted in the photos in Exhibit "A" to promote Mansion on its Instagram page. These Images were intentionally altered to make it appear that Campos was either a stripper working at Mansion, or that she endorsed the Club.

---

[1] In the modeling industry, the number of online followers a model has is a strong indication of her popularity and, thus, earning potential.

- 5 -

28.     Campos has never been employed at Mansion, has never been hired to endorse Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

29.     Banx has been featured in countless magazines, fitness magazines, calendars, posters, lingerie catalos, and ad campaigns nationwide, including in *FHM*, on www.savvy.com, and a recent cover of *American Curves Magazine*. She has also appeared in music videos, films, and a few reality shows, as well as hosting numerous events around the world and she has her biology degree. Banx has over 12,200 Instagram followers, over 13,200 Twitter followers, and over 171,350 followers on Facebook.

30.     That we know of, Banx is depicted in the photo in Exhibit "B" to promote Mansion on its Facebook and Instagram page. This Image was intentionally altered to make it appear that Banx was either a stripper working at Mansion, or that she endorsed the Club.

31.     Banx has never been employed at Mansion, has never been hired to endorse Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

32.     Johnson is a world-renowned model who has appeared in magazines such as *FHM*, *Maxim*, *Viva Glam*, and *Stuff*. She has also appeared in commercials and billboards such as Fredrick's of Hollywood, Coors Light, and Budweiser. In addition, Johnson has also been featured in countless other catalogs, billboards, television commercials and shows.

33.     That we know of, Johnson is depicted in the photo in Exhibit "C" to promote Mansion on its Facebook page.  These Images were intentionally altered to make it appear that Johnson is either a stripper working at Mansion, or that she endorsed the Club.

34.     Johnson has never been employed at Mansion, has never been hired to endorse

- 6 -

Case 21-2149, Document 48, 01/11/2022, 3241954, Page26 of 303

Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

35.     Swedberg is an American actress and model. Swedberg has appeared in a number of TV series including, Badass, Playboy's Beach House, Pauly Shore's Paulytic's, Snake and Mongoose, and Muck, in which she has a starring recurring role. Swedberg was *Playboy's* Playmate of the month April 2011 and went on to win Playmate of the Year 2012/ 2013. Swedberg has 1 million Instagram followers, more than 2.3 million Facebook followers, and over 209,000 Twitter followers.

36.     That we know of, Swedberg is depicted in the photo in Exhibit "D" to promote the Mansion on its Instagram page. This Image was intentionally altered to make it appear that Swedberg was either a stripper working at Mansion, or that she endorsed the Club.

37.     Swedberg has never been employed at Mansion, has never been hired to endorse Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

38.     Longoria is a graduate of Florida Atlantic University, a former police officer and Miami Dolphins cheerleader, and was the January 2010 *Playboy* Playmate of the Month. Edmondson was a participant in the competitive reality TV series *The Amazing Race 14*, has served as a sports blogger for Playboy online and co-host of Sirius Fantasy Sports Radio, and has appeared in *The Bunny House* documentary, in the Trace Adkins video for "This Aint No Love Song" and numerous other television, print, radio and online outlets.  Edmondson has two children with her husband, Major League Baseball superstar, Evan Longoria.

39.     That we know of, Longoria is depicted in the photo in Exhibit "E" to promote Mansion on its Instagram and Facebook page.  This Image was intentionally altered in order to

make it appear that Longoria is either a stripper working at Mansion, or that she endorsed the Club.

40.      Longoria has never been employed at Mansion, has never been hired to endorse Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

41.      Hinton is a model, actress, and host. Hinton was first introduced to the entertainment industry at age 14 when she was discovered by a talent manager at a wedding. She immediately booked three national TV commercials and guest appeared on *Baywatch* and *7th Heaven* by the age of 16.  At the age of 18, Hinton began working runway shows and doing print campaigns. In 2010, she became the face of the Palms Hotel & Casino's 2010 ad campaign. Hinton then expanded to TV personality roles having hosted for *Victory Poker*, and as an interview personality for the *Top Rank Boxing* interviewing the likes of Manny Pacquiao and Shane Mosley.  In 2011, Hinton was selected as the *Playboy* Playmate of the Month for July 2011, becoming one of the most popular Playmates of that year. She then became the centerpiece of an advertisement campaign for Milwaukee's Best Beer in conjunction with Playboy Enterprises.

42.      That we know of, Hinton is depicted in the photos in Exhibit "F" to promote Mansion on its Facebook and Instagram page. These Images were intentionally altered to make it appear that Hinton was either a stripper at Mansion, or that she endorsed the Club.

43.      Hinton has never been employed at Mansion, has never been hired to endorse Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

44.      Gray is an extremely successful model who was the September 2011 *Playboy*

Playmate of the Month. Gray has also appeared in a variety of magazines including *Super Street, Nike, Import Tuner, Sport Truck, Iron Man, Seventeen,* and *Maxim,* as well as appearing in countless other catalogs and publications. Gray's popularity and renown is evidence by the fact that she has over 3.8 million Facebook followers, 1.2 million Instagram followers, and over 217,500 Twitter followers.

45.     That we know of, Gray is depicted in the photos in Exhibit "G" to promote Mansion on its Instagram page.  These Images were intentionally altered to make it appear that Gray was either a stripper working at Mansion, or that she endorsed the Club.

46.     Gray has never been employed at Mansion, has never been hired to endorse any Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

47.     Mayes is a model whose career started when her photos won first place in prestigious photography awards and a spread in *Maxim* magazine. She is well known as a "suitcase model #5" from the hit game show *Deal or No Deal.* Mayes has appeared on *Minute To Win It, The Tonight Show,* and *The Jay Leno Show.* She has also appeared in campaigns for Coronet Diamonds, Volkswagen, Subaru, Bacardi, *Vogue, Elle, In Style, Cosmopolitan,* and *Marie Claire,* to name a few. Mayes is currently a cover model and a star of the game *Juiced 2: Hot Import Nights.* She has a modeling contract under CESD Talent Agency as well as Brand Model & Talent Agency, and as an actress with Abstract Talent Agency.

48.     That we know of, Mayes is depicted in the photo in Exhibit "H" to promote Mansion on its Instagram page.  This Image was intentionally altered to make it appear that Mayes was either a stripper working at Mansion, or that she endorsed the Club.

49.     Mayes has never been employed at Mansion, has never been hired to endorse any

Mansion, has received no remuneration for Defendants' unauthorized use of her Image, and has suffered, and will continue to suffer, damages as a result of same.

***Defendants' Business***

50.     Upon information and belief, Exotic Island has operated, during the relevant time period, Mansion, where it engages or has engaged in the business of selling alcohol and food in an atmosphere were nude and/or semi-nude women entertain the business' clientele.

51.     Upon information and belief, and in furtherance of its promotion of Mansion, Exotic Island owns, operates and controls Mansion social media accounts, including the Mansion Facebook, Twitter, and Instagram accounts.

52.     Exotic Island used the Mansion Facebook, Twitter, and Instagram accounts to promote Mansion, and to attract patrons thereto.

53.     Exotic Island did this for its own commercial and financial benefit.

54.     Exotic Island has used, advertised, created, printed and distributed the Images of Plaintiffs, as further described and identified above, to create the false impression with potential clientele that each Plaintiff either worked as a stripper at Mansion or endorsed Mansion.

55.     Exotic Island used Plaintiffs' Images and created the false impression that they worked at or endorsed Mansion to receive certain benefits therefrom, including but not limited to: monetary payments; increased promotional, advertising, marketing, and other public relations benefits; notoriety; publicity; as well as an increase in business revenue, profits, proceeds, and income.

56.     As Exotic Island was at all times aware, at no point has any Plaintiff ever been affiliated with or employed by Mansion and at no point have any of the Plaintiffs ever endorsed Mansion.

57.    All Exotic Island's activities, including its theft of Plaintiffs' Images, and publication of same, were done without the knowledge or consent of Plaintiffs, and Exotic Island did not compensate Plaintiffs for its use of their Images.

58.    As such, Plaintiffs have never received any benefit for Exotic Island's use of their Images.

***Standard Business Practices in the Modeling Industry***

59.    It is common knowledge in the modeling industry that the hiring of a model for a commercial purpose involves a particularized methodology and process.

60.    The fee that a professional model, such as each of the Plaintiffs, will receive is negotiated by her agency, and involves consideration of, without limitation, at least the following factors: a) the reputation, earning capacity, experience, and demand of that particular model; b) the location where the photo shoot takes place, and the length thereof; c) where and how the images are going to be used by the client (*e.g.*, company website, social media, television commercials, billboards or posters), known as "usage"; and, d) the length of time (known as the "term") the rights to use the photos will be assigned.  Most licenses to use a model's image are for 1, 2, or 3 year terms; but almost never is there a "lifetime" term.

***Defendants' Theft of Plaintiffs' Images***

61.    As detailed above, Defendants knowingly, and without the prior consent of any of the Plaintiffs, invaded Plaintiffs' privacy by using Plaintiffs' Images for commercial purposes to promote Mansion by and through various marketing and promotional mediums including, without limitation, the Mansion website, Twitter, Facebook, and Instagram.

62.    Defendants showcased Plaintiffs' Images on Mansion social media pages to create the false impression that Plaintiffs worked at Mansion or endorsed same.

- 11 -

63.     Defendants did so to attract clientele to Mansion, promote Mansion, and thereby generate revenue for Defendants.

64.     Defendants were aware that, by using Plaintiffs' Images, they were violating Plaintiffs' right to privacy, Plaintiffs' right of publicity, and creating a false impression to potential customers that Plaintiffs worked at and/or endorsed Mansion.

65.     Plaintiffs allege that any improper or unauthorized use of their Images substantially injures their careers.

66.     This is especially so insofar as each of Plaintiffs' Images have been associated with a strip club, and the implication of Defendants' use of Plaintiffs' Images is that they are strippers.

67.     At no point were any of the Plaintiffs ever affiliated with Mansion, or Defendants.

68.     Each of Plaintiffs' Images was used without her consent.

69.     At no point was any Plaintiff ever contacted by any Defendant, or any representative of any of the Defendants, to request the use of any of Plaintiffs' Images.

70.     No Defendant ever obtained, either directly or indirectly, permission to use any of Plaintiffs' Images.

71.     No Defendant ever paid any Plaintiff for its use of her Images on any promotional materials, including the Mansion website, Twitter, Facebook, or Instagram accounts.

72.     Defendants used Plaintiffs' Images without their consent, and without providing remuneration, in order to permanently deprive each of the Plaintiffs of her right to use her Images.

73.     Upon information and belief, Defendants have taken the foregoing actions with the intent of causing irreparable harm to each of the Plaintiffs.

**FIRST CAUSE OF ACTION**
**(Violation of §43 of the Lanham Act, 15 U.S.C. §1125 *et seq*.:**
**False Advertising)**

74.     Plaintiffs hereby repeat and reallege each and every allegation set forth in the

preceding paragraphs as if fully set forth herein.

75.     The provisions of the Lanham Act, 215 U.S.C. §1125, *et seq*. apply to

Defendants, and protect Plaintiffs from the conduct described herein.

76.     As set forth herein, each advertisement at issue in this action were false and

misleading because no Plaintiff ever worked at Mansion, or agreed to appear in Mansion's

advertisements.

77.     Given the false and misleading nature of the advertisements, they had the capacity

to deceive consumers and, upon information and belief, did so deceive consumers.

78.     Upon information and belief, said deceptive advertisements had a material effect

on the purchasing decisions of consumers who attended Mansion.

79.     Insofar as Defendants' published these false and misleading advertisements on the

internet, they had the capacity to affect interstate commerce, and, upon information and belief,

did so affect interstate commerce.

80.     Despite the fact that Defendants were at all times aware that the Plaintiffs neither

worked at, nor endorsed the Club, Defendants nevertheless used Plaintiffs Images in order to

mislead potential customers as to Plaintiff's employment at and/or affiliation with the Club.

81.     Defendants knew that their use of Plaintiffs' Images would cause consumer

confusion as to Plaintiffs' sponsorship and/or employment at the Club.

82.     Upon information and belief, Defendants use of Plaintiffs' Images did in fact

cause consumer confusion as to Plaintiffs employment at and/or endorsement of the Club, and

the goods and services provided by the Club.

83.     Due to Defendants unauthorized use of Plaintiffs' Images in order to create a false advertisement prohibited by section 43 of the Lanham Act, Plaintiffs have been damaged in an amount to be determined at trial and are likewise entitled to punitive and exemplary damages.

**<u>SECOND CAUSE OF ACTION</u>**
**(Violation of §43 of the Lanham Act, 15 U.S.C. §1125 *et seq.*:**
**False Endorsement)**

84.     Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

85.     The provisions of the Lanham Act, 215 U.S.C. §1125, *et seq*. apply to Defendants, and protect Plaintiffs from the conduct described herein.

86.     Defendants used Plaintiffs Images in order, *inter alia*, to create the false impression with the public that Plaintiffs either worked at Mansion or endorsed same.

87.     This was done to promote and attract clientele to Mansion, and thereby generate revenue for the Defendants.

88.     Thus, this was done in furtherance of Defendants' commercial benefit.

89.     Despite the fact that Defendants were at all times aware that the Plaintiffs neither worked at, nor endorsed the Club, Defendants nevertheless used Plaintiffs Images in order to mislead potential customers as to Plaintiff's employment at and/or affiliation with the Club.

90.     Defendants knew that their use of Plaintiffs' Images would cause consumer confusion as to Plaintiffs' sponsorship and/or employment at the Club.

91.     Upon information and belief, Defendants use of Plaintiffs' Images did in fact cause consumer confusion as to Plaintiffs employment at and/or endorsement of the Club, and the goods and services provided by the Club.

- 14 -

Case 21-2149, Document 48, 01/11/2022, 3241954, Page34 of 303

92.     Due to Defendants unauthorized use of Plaintiffs' Images in order to create a false endorsement prohibited by section 43 of the Lanham Act, Plaintiffs have been damaged in an amount to be determined at trial and are likewise entitled to punitive and exemplary damages.

### THIRD CAUSE OF ACTION
#### (Violation of N.Y. Civ. Rights Law §§ 50-51)

93.     Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

94.     As set forth herein, Defendants have violated N.Y. Civil Rights Law §§ 50-51 by invading Plaintiffs' privacy, misappropriating their likeness, and publishing on the Club's website or related social media accounts altered Images of Plaintiffs which made it appear as though Plaintiffs were employed at the Club, or endorsed the Club.

95.     At all relevant times, the Club's website and social media accounts were used and operated by Defendants for advertising and trade purposes.

96.     The Club's website and social media accounts were designed to attract business to the Club and generate revenue for Defendants.

97.     Upon information and belief, Defendants use of Plaintiffs' Images did in fact attract clientele and generate business for the Club.

98.     At no point did any Defendant ever receive permission or consent, be it written or otherwise, to use any Plaintiffs' Image on their website or social media account.

99.     Defendants were at all relevant times aware that they never received any Plaintiffs' permission or consent to use their Images on any website or social media account, or on any other medium, in order to promote the Club.

100.    At no point did Defendants ever compensate Plaintiffs for its use of their Images.

101.    No applicable privilege or authorization exists for Defendants' use of Plaintiffs'

- 15 -

Images.

102.     Due to Defendants' violation of Plaintiffs' rights of privacy and publicity under sections 50 and 51 of the N.Y. Civil Rights Act, Plaintiffs have been damaged in an amount to be determined at trial and are likewise entitled to exemplary and punitive damages.

103.     In addition, and pursuant to section 51 of the N.Y. Civil Rights Act, Plaintiffs hereby requests an Order permanently enjoining Defendants from violating Plaintiffs' right to privacy and publicity.

104.     In addition, and likewise pursuant to section 51 of the N.Y. Civil Rights Act, Plaintiffs hereby request an award of punitive damages, in an amount to be determined at trial, due to Defendants knowing and intentional violation of their statutory rights to privacy and publicity.

### FOURTH CAUSE OF ACTION
**(Violation of N.Y. General Business Law § 349:
N.Y. Deceptive Trade Practices Act)**

105.     Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

106.     Defendants operated the Club's website and social media accounts in order to promote the Club, to attract clientele thereto, and to thereby generate revenue for Defendants. As such, Defendants' operation of the website and social media accounts, and their publication of Images thereon, was consumer-oriented in nature.

107.     Defendants published Plaintiffs' Images on the Club's website and social media accounts in order to create the false impression that Plaintiffs were either strippers working at the Club or endorsed the Club.

108.     As such, Defendants' intent in publishing Plaintiffs' Images was to mislead the

public as to Plaintiffs' employment at and/or affiliation with the Club.

109.    As Defendants were at all times aware, Plaintiffs never worked at the Club, never endorsed the Club, and never had any affiliation with the Club.

110.    Defendants' publication of Plaintiffs' Images was done without any Plaintiffs' consent and was misleading in a material respect because it created the impression that Plaintiffs were strippers working at the Club, or endorsed the Club.

111.    As a result of Defendants' unauthorized and misleading publication of Plaintiffs' Images on their Club's website and social media accounts, each of the Plaintiffs' reputations was injured, and each of the Plaintiffs' ability to market herself as a model was injured.

112.    As a result of Defendants' unauthorized and misleading use of Plaintiffs' Images, Plaintiffs have suffered damages in an amount to be determined at trial, including punitive and exemplary damages.

**FIFTH CAUSE OF ACTION**
**(Defamation)**

113.    Plaintiffs hereby repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

114.    As detailed throughout this Complaint, Defendants have published altered Images of Plaintiffs in order to promote their Club to the general public and potential clientele.

115.    Defendants' publication of said Images constitutes a representation that Plaintiffs was either employed by the Club, that they endorsed the Club, or that they had some affiliation with the Club.

116.    None of these representations were true.

117.    In publishing Plaintiffs' altered Images, it was Defendants' intention to create a false impression to the general public that Plaintiffs were strippers working at the Club, or

endorsed the Club.

118.    Defendants were at least negligent in publishing Plaintiffs' Images because they knew, or should have known, that Plaintiffs were not employed by the Club, had no affiliation with the Club, had not consented to the use of their Images, and had not been compensated for the use of their Images.

119.    In the alternative, Defendants published the Images of Plaintiffs with actual malice because they knew that Plaintiffs were not employed by the Club, had no affiliation with the Club, had not consented to the use of their Images, and had not been compensated for the use of their Images.

120.    Despite Defendants' knowledge and awareness of these facts, they nevertheless made the decision to publish Plaintiffs' Images to attract clientele and generate revenue for themselves.

121.    Defendants' publication of Plaintiffs' Images constitutes defamation under New York law because said publication falsely accuses Plaintiff of having acted in a manner – *i.e.*, working as a stripper and/or endorsing a strip club - which would subject each Plaintiff to hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, and/or could induce an evil opinion of Plaintiffs in the minds of right-thinking persons, and/or could deprive each Plaintiff of confidence and friendly intercourse in society.

122.    Defendants' publication of Plaintiffs' Images likewise constitutes defamation *per se* under New York law because said publication would tend to injure each Plaintiff in her trade, business, and profession as a professional model.

123.    This is because any company or brand that sought to hire any of the Plaintiffs as a company or brand representative would be less likely to do so upon learning that she was a

- 18 -

professional stripper and/or promoting as strip club, an inference which Defendants' publication of the Images support.

124.    Defendants' publication of Plaintiffs' Images likewise constitutes defamation *per se* under New York law because, insofar as said publication falsely portrays each of the Plaintiffs as a stripper, it imputes unchastity to her.

125.    Defendants' publication of Plaintiffs' Image' caused Plaintiffs to suffer damages in an amount to be determined at trial and are likewise entitled to punitive and exemplary damages.

## DEMAND FOR JURY TRIAL

126.    Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request Judgment in their favor and against Defendants as follows:

(a) For actual damages, in an amount to be determined at trial, relating to Plaintiffs' first through fifth causes of action;

(b) For an order permanently enjoining Defendants from using Plaintiffs' Images to promote the Club;

(c) For punitive damages, in an amount to be determined at trial;

(d) For all costs and attorneys' fees incurred by Plaintiffs in the prosecution of this Action;

(e) For such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 16, 2018

                                     **THE CASAS LAW FIRM, P.C.**

                                     By: /s/ John V. Golaszewski
                                        John V. Golaszewski, Esq.
                                        1745 Broadway, 17th Floor
                                        New York, New York
                                        T: 855.267.4457
                                        F: 855.220.9626

                                        *Attorneys for Plaintiffs*

11/22/2017

Mansion Gentlemen's club on Instagram: "Celebrate Cinco De Mayo TONIGHT @ Mansion!" • Instagram

# Alana Campos

Search    Get the app    Sign up | Log in



mansiongentlemensclub   Follow

mansiongentlemensclub Celebrate Cinco De Mayo TONIGHT @ Mansion!

MAY 5, 2016

_luisarroyo_, elvira.yanushko, sapna8237, ebrigz, jessiejolt, lynchmobk, santyhelena, elgroover and showboy_moh like this

Log in to like or comment.

Sign up to see photos and videos from your friends.

Sign up    ✕    1/1

https://www.instagram.com/p/BFCitGTOLSf/?taken-by=mansiongentlemensclub

Case 7:18-cv-09448-KMK   Document 1-1   Filed 10/16/18   Page 3 of 20

10/6/2018

Mansion Gentlemen's club (@mansiongentlemensclub) • Instagram photos and videos

https://www.instagram.com/p/Bla6J47A9Gb/?taken-by=mansiongentlemensclub

# Alana Campos



mansiongentlemensclub • Follow

mansiongentlemensclub Celebrate Cinco De Mayo at the Mansion! It's going to be the sexiest party in the Hudson Valley! #Mansion #GentlemensClub #Steakhouse #Margaritas #Coronas #CincoDeMayo #HudsonValley #Newburgh #NightLife #Sexy #Fun #MakeItAMansionNight

4 likes

MAY 5

Add a comment...

×

1/1

# Brooke Banx



**Mansion Gentlemen's Club & Steakhouse**

Like This Page · January 17, 2016 ·

No sexier place to watch the Steelers vs. Broncos!! #Mansion

5

Like        Comment        Share

Write a comment...

https://www.facebook.com/121426361355283/photos/a.190721227759129.1073741826.121426361355283/576425092520727?type=3&theater

7/6/2017

(50) Mansion Gentlemen's Club & Steakhouse – Posts

1/1

7/6/2017

Mansion Gentlemen's club on Instagram: "No sexier place to watch the #NFL"

https://www.instagram.com/p/BA49qCEiLXU/

# Brooke Banx

Search

Get the app    Sign up | Log in



 mansiongentlemensclub    Follow

mansiongentlemensclub No sexier place to watch the #NFL

JANUARY 18, 2016

11 likes

Log in to like or comment.

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS
PRIVACY   TERMS   DIRECTORY   LANGUAGE
© 2017 INSTAGRAM

**JA-37**

https://www.facebook.com/121426361355283/photos/a.190721227759129.1073741826.121426361355283/371328213031762/?type=3&theater

# Brooke Taylor



Friday Oct 17th
**SEXY SCHOOL GIRL PARTY!**
No Cover For Ladies
That Wear A Sexy School
Girl Skirt
All Our Dancers Will Be
Wearing Short Plaid Skirts!

**Mansion Gentlemen's Club & Steakhouse**
Like This Page · September 30, 2014 ·

Who's ready for the sexiest party of the year! No cover for anyone wearing sexy school girl attire! #SexySchoolGirl #Mansion

Like    Comment    Share

15

1 Share                                                      1 Comment

 Marco Litchfield Rosemary got her sexy schoolgirl skirt who else is turning up?!!!
September 30, 2014 at 7:26pm · Like ·    2

Write a comment...

7/6/2017          Mansion Gentlemen's club on Instagram: "EVERY TURSDAY IS BIKE NIGHT AT #THEMANSION #bikenight #adultentertainment #stripclub #strippers #gentlemensclub #newburgh #hudsonvalley...

https://www.instagram.com/p/2SGcuJROLQc/

# Jaclyn Swedberg

Sign up to see photos and videos from your friends.

Search

Get the app     Sign up | Log in



mansiongentlemensclub
Mansion Gentlemen's C...     Follow

mansiongentlemensclub EVERY TURSDAY IS
BIKE NIGHT AT #THEMANSION #bikenight
#adultentertainment #stripclub #strippers
#gentlemensclub #newburgh #hudsonvalley
#steakhouse

MAY 4, 2015

15 likes

Log in to like or comment.

Sign up

✕

1/1

7/6/2017

Mansion Gentlemen's club on Instagram: "#football #nfl #food #Mansion "

https://www.instagram.com/p/BAzXj_pOLc8/

# Jaime Longoria

Search

Get the app     Sign up | Log in



mansiongentlemensclub

Follow

mansiongentlemensclub #football #nfl #food #Mansion

gregorybessonparis Stunning one

16 likes

JANUARY 17, 2016

Log in to like or comment.

ABOUT US   SUPPORT   BLOG   PRESS   API   JOBS
PRIVACY   TERMS   DIRECTORY   LANGUAGE
© 2017 INSTAGRAM

1/1

7/6/2017

(69) Mansion Gentlemen's Club & Steakhouse - Posts

https://www.facebook.com/121426361355283/photos/a.190721227759129.1073741826.121426361355283/576359625662052/?type=3&theater

# Jaime Longoria



**Mansion Gentlemen's Club & Steakhouse**
Like This Page · January 17, 2016 ·

It's FOOTBALL Sunday at #Mansion! Watch all the BIG games today with us!

Like          Comment          Share

8                                          Chronological

 **Justine Brown** Love this hair color and she is sexy ass well
Like · Reply · 1 · January 25, 2016 at 7:02pm

Write a comment...

https://www.facebook.com/1214263613552283/photos/a.1907212277591229,1073741826,1214263613552283/566265156871399/?type=3&theater

# Jessa Hinton





**Mansion Gentlemen's Club &
Steakhouse**
Like This Page · December 23, 2015 ·

The Naughtiest party of the year is happening
tonight! Are you naughty enough to party with
our girls? https://www.facebook.com/
events/518599734981188/

8

Like        Comment        Share

Write a comment...

1/1

JA-42

11/22/2017

Mansion Gentlemen's club on Instagram: "What are you doing tonight? Come to #Mansion" • Instagram

https://www.instagram.com/p/BAC0nxtOLUE/?taken-by=mansiongentlemensclub

Sign up to see photos and videos from your friends.

# Jessa Hinton

Search

Get the app

Sign up | Log in



mansiongentlemensclub

Follow

mansiongentlemensclub What are you doing tonight? Come to #Mansion

**16 likes**

JANUARY 2, 2016

Log in to like or comment.

Sign up

×

1/1

https://www.instagram.com/p/BQgmRcAyov/?taken-by=mansiongentlemensclub

# Tiffany Toth-Gray



 **mansiongentlemensclub** • Follow

**mansiongentlemensclub** Celebrate Valentine's Day TONIGHT at Mansion! #Mansion #GentlemensClubAndSteakhouse #ValentinesDay #Sexy #ExoticEntertainment #Newburgh #NewYork

**16 likes**

FEBRUARY 14, 2017

Add a comment...

×

1/1

https://www.instagram.com/p/BgaA6LWjK7o/?taken-by=mansiongentlemensclub

10/8/2018

Mansion Gentlemen's club ( @mansiongentlemensclub) · Instagram photos and videos

# Ursula Mayes



mansiongentlemensclub · Follow

mansiongentlemensclub Celebrate St.
Paddy's Day at the sexiest party in the Hudson
Valley!
https://www.facebook.com/events/41794262 8
653300/ #Mansion #Sexy #StPaddysDay
#Party #HudsonValley #Newburgh #Nightlife
#Fun #MakeItAMansionNight

11 likes

MARCH 16

Add a comment...

1/1

**JA-45**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

ALANA SOUZA A/K/A ALANA CAMPOS,          Civil Action No.: 18-cv-09448
BROOKE BANX, BROOKE TAYLOR-              (KMK)
JOHNSON, JACKLYN SWEDBERG,
JAIME EDMOND SON-LONGORIA,
JESSICA HINTON A/K/A JESSA HINTON,
TIFFANY TOTH-GRAY, AND URSULA            **ANSWER OF DEFENDANTS**
SANCHEZ A/K/A URSULA MAYES,              **EXOTIC ISLAND ENTERPRISES,**
                                         **INC.  d/b/a THE MANSION**
                    Plaintiffs,          **GENTLEMEN'S CLUB &**
                                         **STEAKHOUSE and KEITH**
         -against -                      **SLIFSTEIN**

EXOTIC ISLAND ENTERPRISES, INC.
d/b/a THE MANSION GENTLEMEN'S
CLUB & STEAKHOUSE and KEITH
SLIFSTEIN,

                    Defendants.
-----------------------------------------------------------

    Defendants  EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION

GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN, (hereinafter collectively

"Defendants"), for their Answer to the Complaint, set forth as follows:

### BACKGROUND

    1.  Defendants admit that the Complaint is styled as an action for damages and injunctive

relief as alleged in Paragraph 1, but deny the remaining allegations in Paragraph 1 and expressly

deny that the Plaintiffs are entitled to the relief sought.  All allegations not expressly admitted are

denied.

    2.  Defendants deny the allegations contained in Paragraph 2.

    3.  Defendants admit that the Complaint is styled as an action for the relief stated in

1

Paragraph 3, and expressly deny that the Plaintiffs are entitled to the relief sought. All allegations not expressly admitted are denied.

## JURISDICTION & VENUE

4. Defendants admit that the Plaintiff purport to sue under the Lanham Act and that this Court therefore has original subject matter jurisdiction over the Plaintiff's federal claims, and except as so admitted, deny the allegations contained in Paragraph 4.

5. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 5.

6. Defendants admit the allegations contained in Paragraph 6.

7. Defendants admit that the Defendant Keith Slifstein is a resident of the State of New York and that he is and was an owner and the president of the Defendant Exotic Island Enterprises, Inc., and, except as so admitted, deny the allegations contained in paragraph 7.

8. Defendants admit the allegations contained in Paragraph 8.

9. Defendants state that Paragraph 9 sets forth legal conclusions to which no response is required and refer all questions of law to this Honorable Court. To the extent a response is require the Defendants deny the allegations contained in Paragraph 9.

## PARTIES

10. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraphs 10, 11, 12, 13, 14, 15, 16, and 17.

11. Defendants admit that the Defendant Exotic Island Enterprises, Inc. is formed under the laws of the state of New York and that the said Defendant has operated Mansion, a strip club at 5268 Route 9W, Newburgh, New York 12550, and, except as so admitted, deny knowledge

2

or information sufficient to form a belief as to the allegations contained in Paragraph 18 because

no dates are set forth in the Complaint.

12. Defendants admit that the Defendant Slifstein maintains operational control over

Mansion as of the present time, and, except as so admitted, deny knowledge or information

sufficient to form a belief as to the allegations contained in Paragraph 19 because no dates are

set forth in the Complaint.

## FACTUAL ALLEGATIONS

13. Defendants deny knowledge or information sufficient to form a belief as to the

allegations contained in Paragraphs 20 and 21.

14. Defendants deny the allegations contained in Paragraph 22.

15. Defendants deny the allegations contained in Paragraphs 23 and 24 as set forth

therein.

16. Defendants deny knowledge or information sufficient to form a belief as to the

allegations contained in Paragraph 27 with respect to Exhibit "A" because there is no Exhibit

"A" annexed to the Complaint. Defendants deny the remaining allegations contained in

Paragraph 27.

17. Defendants admit that Campos has never been employed at Mansion and has never

been hired to endorse Mansion, and except as so admitted, deny knowledge or information

sufficient to form a belief or deny the remaining allegations contained in Paragraph 28.

18. Defendants deny knowledge or information sufficient to form a belief as to the

allegations contained in Paragraph 30 with respect to Exhibit "B" because there is no Exhibit "B"

annexed to the Complaint. Defendants deny the remaining allegations contained in Paragraph

30.

19. Defendants admit that Banx has never been employed at Mansion and has never been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 31.

20. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 33 with respect to Exhibit "C" because there is no Exhibit "C" annexed to the Complaint. Defendants deny the remaining allegations contained in Paragraph 33.

21. Defendants admit that Johnson has never been employed at Mansion and has never been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 34.

22. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 36 with respect to Exhibit "D" because there is no Exhibit "D" annexed to the Complaint. Defendants deny the remaining allegations contained in Paragraph 36.

23. Defendants admit that Swedberg has never been employed at Mansion and has never been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 37.

24. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 39 with respect to Exhibit "E" because there is no Exhibit "E" annexed to the Complaint. Defendants deny the remaining allegations contained in Paragraph 39.

4

25.  Defendants admit that Longoria  has never been employed at Mansion and has never been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 40.

26.  Defendants  deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 42  with respect to Exhibit "F" because there is no Exhibit "F" annexed to the Complaint.  Defendants deny the remaining allegations contained in Paragraph 42.

27.  Defendants admit that Hinton  has never been employed at Mansion and has never been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 43.

28.  Defendants  deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 45  with respect to Exhibit "G" because there is no Exhibit "G" annexed to the Complaint.  Defendants deny the remaining allegations contained in Paragraph 45.

29.  Defendants admit that Gray  has never been employed at Mansion and has never been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 46.

30.  Defendants  deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 48  with respect to Exhibit "H" because there is no Exhibit "H" annexed to the Complaint.  Defendants deny the remaining allegations contained in Paragraph 48.

31.  Defendants admit that Mayes  has never been employed at Mansion and has never

5

been hired to endorse Mansion, and except as so admitted, deny knowledge or information sufficient to form a belief or deny the remaining allegations contained in Paragraph 49.

32.  Defendants admit that Defendant Exotic Island Enterprises, Inc. has operated Mansion where it engages and has engaged in the business of selling alcohol and food in an atmosphere where semi-nude women entertain the business' clientele, and except as so admitted, deny the allegations contained in Paragraph 50.

33.  Defendants admit the allegations contained in Paragraphs 51, 52,  53, 67, and 71 of the Complaint.

34.  Defendants deny the allegations contained in Paragraphs 54, 55, 56 and 57 of the Complaint.

35.  Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraphs 25, 26, 29, 32, 35, 38, 41, 44, 47, 58, 59, 60, 66, 68, 69, and 70.

36.  Defendants deny the allegations contained in Paragraphs 61, 62, 63, 64, 72, 73

37.  Defendants admit that the Plaintiffs allege in Paragraph 65 that "any improper or unauthorized use of their Images substantially injures their careers", and except as so admitted, deny such allegations.

### FIRST CAUSE OF ACTION

38.  As to the allegations contained in Paragraph 74 of the Complaint, the Defendants restate and incorporate herein by reference their answers to Paragraphs 1 through 73, inclusive, as if fully set forth herein at length.

39.  Defendants state that Paragraph 75 sets forth legal conclusions to which no response

6

Case 21-2149, Document 48, 01/11/2022, 3241954, Page58 of 303

is required and refer all questions of law to this Honorable Court. To the extent that a response is required, Defendants deny all allegations contained in Paragraph 75.

40. Defendants deny the allegations contained in Paragraphs 76, 77, 78, 79, 80, 81, 82 and 83.

## SECOND CAUSE OF ACTION

41. As to the allegations contained in Paragraph 84 of the Complaint, the Defendants restate and incorporate herein by reference their answers to Paragraphs 1 through 83, inclusive, as if fully set forth herein at length.

42. Defendants state that Paragraph 85 sets forth legal conclusions to which no response is required and refer all questions of law to this Honorable Court. To the extent that a response is required, Defendants deny all allegations contained in Paragraph 85.

43. Deny the allegations contained in Paragraphs 86, 87, 88, 89, 90, 91, and 92 of the Complaint.

## THIRD CAUSE OF ACTION

44. As to the allegations contained in Paragraph 93 of the Complaint, the Defendants restate and incorporate herein by reference their answers to Paragraphs 1 through 92, inclusive, as if fully set forth herein at length.

45. Defendants deny the allegations contained in Paragraphs 94, 95, 99, 102, 103, and 104 of the Complaint.

46. Defendants admit the allegations contained in Paragraph 96 of the Complaint.

47. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraphs 97, 98, 100, and 101 of the Complaint.

JA-52

### FOURTH CAUSE OF ACTION

48. As to the allegations contained in Paragraph 105 of the Complaint, the Defendants restate and incorporate herein by reference their answers to Paragraphs 1 through 104, inclusive, as if fully set forth herein at length.

49. Defendants deny knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 106 because, among other things, no dates are set forth in the Complaint.

50. Defendants deny the allegations contained in Paragraphs 107, 108, 109, 110, 111, and 112 of the Complaint.

### FIFTH CAUSE OF ACTION

51. As to the allegations contained in Paragraph 113 of the Complaint, the Defendants restate and incorporate herein by reference their answers to Paragraphs 1 through 112, inclusive, as if fully set forth herein at length.

52. Defendants deny the allegations contained in Paragraphs 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, and 125 of the Complaint.

### AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses as full and complete defenses to all claims asserted by the Plaintiffs. By alleging the following separate and affirmative defenses, Defendants are not agreeing or conceding that they have the burden of proof or burden of persuasion with respect to any of these affirmative defenses.

### FIRST AFFIRMATIVE DEFENSE

53. Plaintiffs' Complaint fails to state a claim for which relief can be granted.

8

### SECOND AFFIRMATIVE DEFENSE

54.  Upon information and belief, each of the causes of action alleged in the Complaint is barred by the statute of limitations applicable thereto.

### THIRD AFFIRMATIVE DEFENSE

55.  The relief requested in the Complaint is barred in whole or in part by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

56.  The relief requested in the Complaint is barred in whole or in part by the doctrines of acquiescence, waiver and/or estoppel.  Upon information and belief, the Plaintiffs executed model releases whereby each Plaintiff gave the photographer/videographer permission to photograph Plaintiffs and relinquished their rights, including, but not limited to, the subject photograph and the rights to their likenesses as depicted in the subject photographs.

### FIFTH AFFIRMATIVE DEFENSE

57.  To the extent that the subject images are freely available on the Internet, with Plaintiffs' knowledge and/or consent, Plaintiffs have arguably abandoned any interest in the images. Also, Plaintiffs knew or should have known that the subject images were freely available on the Internet and Plaintiffs took no action to either remove or protect the alleged images from redistribution.

### SIXTH AFFIRMATIVE DEFENSE

58.  The Plaintiffs may not recover punitive damages under either the Lanham Act or the law of New York.

### SEVENTH AFFIRMATIVE DEFENSE

9

59. Plaintiff's alleged right to recovery is barred and/or limited by the fair use/public domain doctrine.

### EIGHTH AFFIRMATIVE DEFENSE

60. Upon information and belief, the Plaintiffs failed to mitigate their damages, if any, by filing to instruct photographers on any limitations of the use of the subject photographs. Upon information and belief, Plaintiffs failed to define the parameters of any releases that they signed. As such, Plaintiffs' damages, if any, should be reduced for failure to mitigate damages caused by publication of the photographs.

### NINTH AFFIRMATIVE DEFENSE

61. Plaintiffs fail to state facts or laws sufficient to permit recovery of attorneys' fees

### TENTH AFFIRMATIVE DEFENSE

62. Upon information and belief, the Court lacks jurisdiction over the Defendants because service of process upon the Defendants was insufficient.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants hereby demand a trial by jury of all issues so triable.

Dated: January 31, 2019                         Respectfully submitted,

                                                O'CONNOR & PARTNERS, PLLC

                                                By: Joseph E. O'Connor
                                                /s/Michael Kolb
                                                130 North Front Street, Suite 200
                                                Kingston, NY 12401
                                                Tel. (845) 303-8777
                                                joconnor@onplaw.com
                                                mkolb@onplaw.com
                                                Attorneys for Defendants

10

**JA-55**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALANA SOUZA a/k/a ALANA CAMPOS, *et al.*,

                                    *Plaintiffs*,

            - against -

EXOTIC ISLAND ENTERPRISES, INC. d/b/a
THE MANSION GENTLEMEN'S CLUB &
STEAKHOUSE, *et al.*

                                    *Defendants.*

Case No.  18-cv-09448 (KMK)

<u>NOTICE OF MOTION</u>

 

     PLEASE TAKE NOTICE that upon the accompanying declaration of Plaintiffs' counsel, John V. Golaszewski, Esq., the exhibits thereto; the accompanying memorandum of law; the accompanying Local Rule 56.1 Statement of Undisputed Facts; and upon all other papers and proceedings hitherto had herein, Plaintiffs hereby respectfully move this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in Plaintiffs' favor and against Defendants, and for such other and further relief as this Court deems just and proper. Oral argument will be on a date and at a time designated by the Court.

Dated: New York, New York
      February 5, 2021

                         **THE CASAS LAW FIRM, P.C.**

                         By: <u>/s/ John V. Golaszewski</u>
                            John V. Golaszewski, Esq.
                            1740 Broadway, 15th Floor
                            New York, New York
                            T: 646.872.3178
                            F: 855.220.9626

1

JA-56

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of February, 2021, the foregoing was electronically filed with the U.S. District Court Clerk, Southern District of New York, by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ John V. Golaszewski

John V. Golaszewski, Esq.
Casas Law Firm, P.C.
1740 Broadway, 15th Floor
New York, New York 10019
Tel: (646) 872-3178
john@casaslawfirm.com

*Attorneys for Plaintiffs*

2

JA-57

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, *et al.*, | |
| *Plaintiffs,* | Case No.  18-cv-09448 (KMK) |
| - against - | |
| EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSIONS GENTLEMEN'S CLUB & STEAKHOUSE, *et al.* | |
| *Defendants.* | |

## TRANSMITTAL DECLARATION OF
## JOHN V. GOLASZEWSKI

**JOHN V. GOLASZEWSKI**, hereby declares, pursuant to 28 U.S.C. § 1746, the following under the penalties of perjury:

1.      I am a member of the Casas Law Firm, P.C., counsel for plaintiffs ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON A/K/A JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ A/K/A URSULA MAYES (collectively, "Plaintiffs"), I submit this declaration in support of Plaintiffs' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and to respectfully put before the Court certain documents Plaintiffs' rely on in support of same.

2.      A true and correct copy of Plaintiffs' Complaint, with Exhibits, is annexed as Exhibit A.

3.      The declaration of Alana Souza a/k/a Alana Campos is annexed as Exhibit B.

4.      The declaration of Brooke Marrin a/k/a Brooke Banx is annexed as Exhibit C.

5.      The declaration of Brooke Taylor Johnson is annexed as Exhibit D.

1

6.      The declaration of Jaclyn Swedberg is annexed as Exhibit E.

7.      The declaration of Jaime Edmondson Longoria is annexed as Exhibit F.

8.      The declaration of Jessica Hinton a/k/a Jessa Hinton is annexed as Exhibit G.

9.      The declaration of Tiffany Toth Gray is annexed as Exhibit H.

10.     The declaration of Ursula Mayes is annexed as Exhibit I.

11.     Portions of the transcript of defendant Keith Slifstein's July 29, 2020 deposition is annexed as Exhibit J.

12.     A print-out of the homepage of Mansion Gentlemen's Club & Steakhouse as of today, February 5, 2021, is annexed as Exhibit K.

13.     The expert report of Martin Buncher, without its voluminous exhibits, is annexed as Exhibit L.

Dated:  New York, New York
        February 5, 2021

                                            /s/ John V. Golaszewski
                                            John V. Golaszewski

2

JA-59

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February, 2021, the foregoing was electronically filed with the U.S. District Court Clerk, Southern District of New York, by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ John V. Golaszewski

John V. Golaszewski, Esq.
Casas Law Firm, P.C.
1740 Broadway, 15th Floor
New York, New York 10019
Tel: (646) 872-3178
john@casaslawfirm.com

*Attorneys for Plaintiffs*

**JA-60**

**EXHIBIT A TO GOLASZEWSKI DECLARATION -
COMPLAINT, DATED OCTOBER 16, 2018, WITH
EXHIBIT A TO H ANNEXED THERETO
(REPRODUCED HEREIN AT PP. JA-13-JA-44)**

**JA-61**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES<br><br>                   Plaintiffs,<br><br>     - against -<br><br>EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN<br><br>                  Defendants. | Case No: 7:18-cv-09448-KMK-JCM |

**DECLARATION OF ALANA SOUZA A/K/A ALANA CAMPOS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Alana Souza (a/k/a Alana Campos), declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, that the following is true and correct:

1.      My name is Alana Souza (a/k/a Alana Campos). I am over 18 years of age and I am competent to testify regarding the statements contained in this declaration based on my personal knowledge of the matters set forth herein. I have also reviewed information about the business and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of the discovery exchange and disclosed in this matter.

**Professional Background and Work in the Modeling Industry**

2.      I am a professional model from Brazil and started working at 15. I was

1

approached by the director of Ford Models, which remained my agency for five years. I have been nominated in several beauty pageants in my county and so decided to move to the United States at 20. I'm currently represented by Wilhelmina Models. I have been published in *Playboy, Astonish, Viva Glam,* and *Bliss* magazines and a cover girl for *Arizona Foothills* magazine. I've also participated in campaigns for Arden B, Target, Chyna Dolls, Frederick's of Hollywood, ICollection, Elegant Moments, Drift Eyewear, Sexy Dresses, Sachika, Marisa Kenson, Sports Calendar, and have been a spokes model for My Body Journey. I also appeared in "Last Vegas" with Robert DeNiro, Morgan Freeman, and Michael Douglas.

3.       I currently have over 498 thousand followers on Instagram, over 7 thousand followers on Facebook, and over 113.6 thousand followers on Twitter. Since the advent of social media – particularly with platforms such as Facebook, Instagram, Snapchat, TikTok, the modeling industry has changed drastically from traditional "runway" and glamour type models to the social media influencing world. I am considered a social media Influencer. Influencers in social media are individuals, such as myself, who have built a reputation for their brand, their look, and/or knowledge and expertise on a specific topic. Companies and brands hire influencers to make regular posts about their products, services, or specific topics on their preferred social media channels and generate large followings of enthusiastic, engaged people who pay close attention to their views. Influencers, by their very nature, have achieved fame and notoriety on social media.

4.       I have achieved celebrity status and fame in the modeling industry and as a social media influencer. On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model and Influencer, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.      I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.      I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.   I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness.  If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes.  Also, it is

my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet.  By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.      It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.      I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is

4

stolen. Based on my extensive experience as Influencer, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags. Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted. This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally). For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today. When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time. While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.     The use of my image and likeness is subject to considerable negotiation. There are many factors which I consider in determining the fair market value to charge for the use of my image. For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid. My image may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

**Mansion Willfully Used and Misappropriated My Image and Likeness**

11.     Neither Mansion, nor any related or affiliated entity or individual acting on its

behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.     Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit A** of the Complaint, which contains 2 advertisements used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image(s) in **Exhibit A.** The first advertisement, posted by Mansion on May 5, 2016, shows me wearing a white top with red and green accents and corresponding skirt. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for the Three Wishes catalog. The second advertisement, posted by Mansion on May 5, 2018, is a different angle of myself wearing the same white top with red and green accents and the matching skirt. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in any of the photographs contained in Exhibit A, and I retain those rights in perpetuity.

13.     Without my permission, Mansion used my image, as reflected in **Exhibit A** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit A, (in the first advertisement) I am pictured on Mansion's Instagram advertisement wearing the white top and skirt with red and green accents.  Mansion stated

"Celebrate Cinco De Mayo TONIGHT @ Mansion!". Additionally, in Exhibit A (in the second advertisement) I am pictured on Mansion's Instagram advertisement wearing the same outfit. Mansion stated "Celebrate Cinco De May at the Mansion! It's going to be the sexiest party in the Hudson Valley! #Mansion #GentlemensClub #Steakhouse #Margaritas #Coronas #CincoDeMayo #HudsonValley #Newburgh #NightLife #Sexy #Fun #MakeItAMansionNight." It's common sense, at least to me, that Mansion intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club. Mansion's representations, suggestions or implications are false. Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.     Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances. Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model [and social influencer] I too, commercialize my look and identity by promoting products and services. As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club. In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's

7

establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online. As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested in sexy women and who, I believe, are likely to frequent gentlemen's clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.     I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.     Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.     When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

20.     Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness.

Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.     Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place.   Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.     I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $20,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $40,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

JA-70

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

Executed this __27__ day of January, 2021.

By: _____
Alana Souza (a/k/a Alana Campos)

10

JA-71

# ATTACHMENT "A"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES <br><br> Plaintiffs, <br><br> - against - <br><br> EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN <br><br> Defendants. | Case No: 7:18-cv-09448-KMK-JCM |

<u>**DECLARATION OF BROOKE BANX IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

I, Brooke Marrin (a/k/a Brooke Banx), declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, that the following is true and correct:

1. My name is Brooke Marrin (a/k/a Brooke Banx ). I am over 18 years of age and I am competent to testify regarding the statements contained in this declaration based on my personal knowledge of the matters set forth herein. I have also reviewed information about the business and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of the discovery exchange and disclosed in this matter.

<u>**Professional Background and Work in the Modeling Industry**</u>

2. I am a professional model and have been featured in countless magazines,

calendars, posters, catalogs, and ad campaigns nationwide such as *FHM*, www.savvy.com, and *American Curves* magazine. I can also be seen in music videos, films, a few reality shows, and as a host for numerous events around the world. I've finished obtaining my biology degree and am attending medical school.

3.      I currently have over 13.9 thousand followers on Instagram, over 160.4 thousand followers on Facebook, and over 11.5 thousand followers on Twitter.  Since the advent of social media – particularly with platforms such as Facebook, Instagram, Snapchat, TikTok, the modeling industry has changed drastically from traditional "runway" and glamour type models to the social media influencing world.   I am considered a social media Influencer. Influencers in social media are individuals, such as myself, who have built a reputation for their brand, their look, and/or knowledge and expertise on a specific topic.  Companies and brands hire influencers to make regular posts about their products, services, or specific topics on their preferred social media channels and generate large followings of enthusiastic, engaged people who pay close attention to their views.  Influencers, by their very nature, have achieved fame and notoriety on social media.

4.      I have achieved celebrity status and fame in the modeling industry and as a social media influencer.  On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model and Influencer, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant

my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.     I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.     I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.   I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness.  If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes.  Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet.  By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give

3

companies or persons the right to use my image and likeness for commercial purposes without my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.      It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.      I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my extensive experience as Influencer, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it

4

was just posted.   This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally).   For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today.   When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.   While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.      The use of my image and likeness is subject to considerable negotiation.    There are many factors which I consider in determining the fair market value to charge for the use of my image.   For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.   My image may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

**<u>Mansion Willfully Used and Misappropriated My Image and Likeness</u>**

11.      Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.      Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a

true and correct copy of **Exhibit B** of the Complaint, which contains 2 advertisements used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image(s) in **Exhibit B.** The first advertisement, posted by Mansion on January 17, 2016, shows me wearing a black cut off top with the Steelers name and Logo and jean skirt. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for my portfolio. The second advertisement, posted by Mansion on January 18, 2016, is the same photograph of myself in the black cut off top with Steelers name and logo and the jean skirt – however it is different in that the image was enlarged or 'zoomed in' causing a portion of the jean skirt, etc. to be 'cut off' from the image. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in any of the photographs contained in Exhibit B, and I retain those rights in perpetuity.

13.    Without my permission, Mansion used my image, as reflected in **Exhibit B** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit B, (in the first advertisement) I am pictured on Mansion's Facebook advertisement wearing the Steelers top and jean skirt.  Mansion stated "No sexier place to watch the Steelers vs. Broncos!! #Mansion". Additionally, in Exhibit B (in the second advertisement) I am pictured on Mansion's Instagram advertisement wearing the same outfit. Mansion stated "No sexier place to watch the #NFL."  It's common sense, at least to me, that Mansion intended to

6

entice their customer base by using my image along with comments that make it seem as if I myself will be at the club.  Mansion's representations, suggestions or implications are false. Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.     Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances.  Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model [and social influencer] I too, commercialize my look and identity by promoting products and services.  As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club.  In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online.  As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested

in sexy women and who, I believe, are likely to frequent gentlemen's clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.    I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.    I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.    Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.    When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

20.    Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.    Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the

unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place.   Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.     I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $7,500 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $15,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

Executed this ___27th___ day of January, 2021.

By: _____
Brooke Marrin (a/k/a Brooke Banx)

JA-81

# ATTACHMENT "A"

**JA-82**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES<br><br>Plaintiffs,<br><br>- against -<br><br>EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN<br><br>Defendants. | Case No: 7:18-cv-09448-KMK-JCM |

<u>**DECLARATION OF BROOKE TAYLOR JOHNSON IN SUPPORT OF PLAINTIFFS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

I, Brooke Taylor Johnson, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, that the following is true and correct:

1.      My name is Brooke Taylor Johnson. I am over 18 years of age and I am competent to testify regarding the statements contained in this declaration based on my personal knowledge of the matters set forth herein. I have also reviewed information about the business and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of the discovery exchange and disclosed in this matter.

<u>**Professional Background and Work in the Modeling Industry**</u>

2.      I am a professional model. I have appeared in magazines such as *FHM, Maxim, viva Glam,* and *Stuff.* I have also appeared in commercials and billboards for Fredricks's of

1

Hollywood, Coors Light, and Budweiser as well as countless catalogs, television commercials, and shows.

3.      I currently have over 1500 followers on Instagram and over 8000 followers on Facebook..

4.      I have achieved celebrity status and fame in the modeling industry. On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.      I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.      I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.  I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my

authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness. If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes. Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet. By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without my consent. In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.      It is my custom and practice to exercise complete control over how my image and likeness is used. Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career. In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.      I have been using social media platforms extensively since each platform was launched. I am particularly vigilant about how my image is used on the internet or social media

3

because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my experience with social media, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted.   This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally).  For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today.  When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.  While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.     The use of my image and likeness is subject to considerable negotiation.   There are many factors which I consider in determining the fair market value to charge for the use of my image.  For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.  My image

may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

## **Mansion Willfully Used and Misappropriated My Image and Likeness**

11.     Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.     Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit C** of the Complaint, which contains 1 advertisement used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image in **Exhibit C.** The advertisement, posted by Mansion on September 30, 2014, shows me wearing a white blouse and red plaid skirt, with coordinating accessories. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for Leg Avenue catalog. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in the photograph contained in Exhibit C, and I retain those rights in perpetuity.

13.     Without my permission, Mansion used my image, as reflected in **Exhibit C** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or

JA-87

the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit C, I am pictured on Mansion's Facebook advertisement wearing a white blouse, red plaid skirt, and coordinating accessories.  Mansion stated "Friday Oct 17th SEXY SCHOOL GIRL PARTY! No Cover For Ladies That Wear A Sexy School Girl Skirt All Our Dancers Will Be Wearing Short Plaid Skirts!" The caption went on to read, "Who's ready for the sexiest party of the year! No cover for anyone wearing sexy school girl attire! #SexySchoolGirl #Mansion.". It's common sense, at least to me, that Mansion intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club. Mansion's representations, suggestions or implications are false.  Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.     Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances.  Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model I too, commercialize my look and identity by promoting products and services.  As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club.  In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that

Case 21-2149, Document 48, 01/11/2022, 3241954, Page95 of 303

Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online.  As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested in sexy women and who, I believe, are likely to frequent gentlemen's' clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.     I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.     Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.     When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

20.     Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on

my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.      Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place.   Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.      I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $30,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $30,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

8

JA-90

Executed this ___27___ day of January, 2021.

By: _____
    Brooke Taylor Johnson

JA-91

# ATTACHMENT "A"

JA-92

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES | Case No: 7:18-cv-09448-KMK-JCM |

Plaintiffs,

- against -

EXOTIC ISLAND ENTERPRISES, INC.
d/b/a THE MANSION GENTLEMEN'S
CLUB & STEAKHOUSE and KEITH
SLIFSTEIN

Defendants.

**DECLARATION OF JACLYN SWEDBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Jaclyn Swedberg, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, that the following is true and correct:

1.      My name is Jaclyn Swedberg. I am over 18 years of age and I am competent to testify regarding the statements contained in this declaration based on my personal knowledge of the matters set forth herein. I have also reviewed information about the business and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of the discovery exchange and disclosed in this matter.

**Professional Background and Work in the Modeling Industry**

2.      I am an American actress and professional model. I've appeared in a number of television series such as Badass, Playboy's Beach House, Pauly Shore's Paulytic's, Snake and

1

Mongoose, and most recently the film Muck. I have been Playboy's Playmate of the Month for April 2011 and went on to win Playmate of the Year in 2012.

3.      I currently have over 898 thousand followers on Instagram and over 201 thousand followers on Twitter.  Since the advent of social media – particularly with platforms such as Facebook, Instagram, Snapchat, TikTok, the modeling industry has changed drastically from traditional "runway" and glamour type models to the social media influencing world.  I am considered a social media Influencer.  Influencers in social media are individuals, such as myself, who have built a reputation for their brand, their look, and/or knowledge and expertise on a specific topic.  Companies and brands hire influencers to make regular posts about their products, services, or specific topics on their preferred social media channels and generate large followings of enthusiastic, engaged people who pay close attention to their views.  Influencers, by their very nature, have achieved fame and notoriety on social media.

4.      I have achieved celebrity status and fame in the modeling industry and as a social media influencer.  On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model and Influencer, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.      I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal

2

knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.      I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.   I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness.  If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes.  Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet.  By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

3

8.      It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.      I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my extensive experience as Influencer, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted.   This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally).  For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and

4

Case 21-2149, Document 48, 01/11/2022, 3241954, Page103 of 303

comment as if it was posted today.  When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.  While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.     The use of my image and likeness is subject to considerable negotiation.   There are many factors which I consider in determining the fair market value to charge for the use of my image.  For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.  My image may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

**Mansion Willfully Used and Misappropriated My Image and Likeness**

11.     Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.     Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit D** of the Complaint, which contains 1 advertisement used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image in **Exhibit D.** The advertisement, posted by

Mansion on May 4, 2015, shows me posed on a motorcycle wearing a black top and a skirt with coordinating accessories. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for Playboy magazine. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in any of the photographs contained in Exhibit D, and I retain those rights in perpetuity.

13.     Without my permission, Mansion used my image, as reflected in **Exhibit D** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit D, I am pictured on Mansion's Instagram advertisement wearing the black top and skirt with accessories.  Mansion stated "EVERY TURSDAY [sic] IS BIKE NIGHT AT #THEMANSION  #bikenight  #adultentertainment  #stipclub  #strippers  #gentlemensclub #newburgh #hudsonvalley #steakhouse". It's common sense, at least to me, that Mansion intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club.  Mansion's representations, suggestions or implications are false.  Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.     Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances.  Defendant

6

Case 21-2149, Document 48, 01/11/2022, 3241954, Page105 of 303

promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model [and social influencer] I too, commercialize my look and identity by promoting products and services.  As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club.  In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online.  As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested in sexy women and who, I believe, are likely to frequent gentlemen's clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.     I was never offered any compensation, or compensated in any way, for Mansion's

Case 21-2149, Document 48, 01/11/2022, 3241954, Page106 of 303

use of my image from Mansion or anyone associated with Mansion.

18.   Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.   When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

20.   Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.   Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first

place.    Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.    I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $225,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $225,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

Executed this __29__ day of January, 2021.

By: _____
Jaclyn Swedberg

9

Case 21-2149, Document 48, 01/11/2022, 3241954, Page108 of 303

# **<u>ATTACHMENT "A"</u>**

JA-102

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES | Case No: 7:18-cv-09448-KMK-JCM |
| Plaintiffs, | |
| - against - | |
| EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN | |
| Defendants. | |

**DECLARATION OF JAIME EDMONDSON-LONGORIA IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Jaime Edmondson-Longoria, declare under penalty of perjury, pursuant to 28 U.S.C. §

1746 and the laws of the United States of America, that the following is true and correct:

1.      My name is Jaime Edmondson-Longoria . I am over 18 years of age and I am

competent to testify regarding the statements contained in this declaration based on my personal

knowledge of the matters set forth herein. I have also reviewed information about the business

and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club &

Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and

review of the discovery exchange and disclosed in this matter.

**Professional Background and Work in the Modeling Industry**

2.      I am a professional model coming from a family of police officers. I graduated

from Florida Atlantic University with a degree in Criminal Justice in 2002 and worked the night

shift as a police officer in Boca Raton, Florida for two years until I became a cheerleader for the Miami Dolphins. Shortly after, I along with Cara Rosenthal were participants in the competitive reality TV series "The Amazing Race 14." I was playmate of the Month in the January 2010 issue of *Playboy*, have been a sports blogger for Playboy online, and a co-host of Sirius Fantasy Sports Radio. I appeared in "The Bunny House" documentary, in the Trace Adkins video for "This Ain't No Love Song," and several other television, print, radio, and online outlets. My husband, Evan Longoria, and I have two children.

3.      I currently have over 13.8 thousand followers on Instagram and over 90.6 thousand followers on Twitter.  Since the advent of social media – particularly with platforms such as Facebook, Instagram, Snapchat, TikTok, the modeling industry has changed drastically from traditional "runway" and glamour type models to the social media influencing world.  I am considered a social media Influencer.  Influencers in social media are individuals, such as myself, who have built a reputation for their brand, their look, and/or knowledge and expertise on a specific topic.  Companies and brands hire influencers to make regular posts about their products, services, or specific topics on their preferred social media channels and generate large followings of enthusiastic, engaged people who pay close attention to their views.  Influencers, by their very nature, have achieved fame and notoriety on social media.

4.      I have achieved celebrity status and fame in the modeling industry and as a social media influencer.  On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model and Influencer, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I

have carefully chosen to advertise, I am using my own advertising idea. Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.      I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.      I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take. I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights. I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness. If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes. Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet. By the same token, the mere fact that my image and likeness is

used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.      It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.      I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my extensive experience as Influencer, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image

4

(regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted.   This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally).   For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today.   When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.   While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.   The use of my image and likeness is subject to considerable negotiation.   There are many factors which I consider in determining the fair market value to charge for the use of my image.   For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.   My image may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

**Mansion Willfully Used and Misappropriated My Image and Likeness**

11.   Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.   Mansion's unauthorized use of my image associates me personally with Mansion

**JA-107**

strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit E** of the Complaint, which contains 2 advertisements used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image(s) in **Exhibit E.** The first advertisement, posted by Mansion on January 17, 2016, shows me wearing a blue cut off top with the Seahawks name and Logo. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for Playboy.com. The second advertisement, posted by Mansion on January 17, 2016, is the same photograph of myself in the blue cut off top with the Seahawks name and logo. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in any of the photographs contained in Exhibit E, and I retain those rights in perpetuity.

13.     Without my permission, Mansion used my image, as reflected in **Exhibit E** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit E, (in the first advertisement) I am pictured on Mansion's Instagram advertisement wearing the blue Seahawks top.  Mansion stated "#football #nfl #food #Mansion." Additionally, in Exhibit E (in the second advertisement) I am pictured on Mansion's Facebook advertisement wearing the same outfit. Mansion stated "It's FOOTBALL Sunday at #Mansion! Watch all the BIG games today with us!"  It's common sense, at least to me, that Mansion

6

intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club.  Mansion's representations, suggestions or implications are false.  Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.      Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances.  Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model [and social influencer] I too, commercialize my look and identity by promoting products and services.  As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club.  In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.      In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online.  As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested

in sexy women and who, I believe, are likely to frequent gentlemen's clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.     I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.     Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.     When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

20.     Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.     Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the

unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place. Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.     I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $20,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $40,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

Executed this _____ day of January, 2021.

1/28/2021                              By: _ *Jaime Edmondson* _____
                                            Jaime Edmondson-Longoria

JA-111

# ATTACHMENT "A"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES<br><br>Plaintiffs,<br><br>- against -<br><br>EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN<br><br>Defendants. | Case No: 7:18-cv-09448-KMK-JCM |

**DECLARATION OF JESSICA HINTON A/K/A JESSA HINTON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Jessica Hinton (a/k/a Jessa Hinton), declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, that the following is true and correct:

1.      My name is Jessica Hinton (a/k/a Jessa Hinton). I am over 18 years of age and I am competent to testify regarding the statements contained in this declaration based on my personal knowledge of the matters set forth herein. I have also reviewed information about the business and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of the discovery exchange and disclosed in this matter.

**Professional Background and Work in the Modeling Industry**

2.      I am a professional model. I was discovered at age 14 by a talent manager at a

1

Case 21-2149, Document 48, 01/11/2022, 3241954, Page120 of 303

wedding. By age 16, I locked in three national TV commercials and made guest appearances on *Baywatch* and *7th Heaven*. I expanded my portfolio to include runway modeling and print campaigns at age 18. In 2010, I was the face of the *Palms Hotel & Casino's* ad campaign. I then pursued TV personality roles by hosting for *Victory Poker*, and *Top Rank Boxing*, interviewing the likes of Manny Pacquiao and Shane Mosley. In 2011, I was selected as *July's Playmate of the Month,* becoming one of the most popular Playmates of that year. I was the center piece of an ad campaign for *Milwaukee's Best Beer* in conjunction with *Playboy Enterprises*. I also attained spokesmodel roles for *Affliction Clothing*, *Enzo*, *Milano Hair Products*, *REVIV Wellness Spa*, and *Protein World*. I have ongoing modeling contracts with *Rhonda Shear Shapewear*, *Leg Avenue,* and *Roma Costume*, in addition to hosting a Los Angeles, CA television station *KTLA*. My images have appeared on billboards, magazines, posters, and multiple forms of electronic media. I have been a featured front cover model gaining attraction for magazines such as *FHM*, *Kandy*, *MMA Sports*, *Guitar World*, and *Muscle & Fitness*. I was also named Creative Director for *MAJR Media* and was given part ownership for my role with the company.

3.      I currently have over 1.1 million followers on Instagram, over 2.7 million followers on Facebook, and over 255.2K followers on Twitter.  Since the advent of social media – particularly with platforms such as Facebook, Instagram, Snapchat, TikTok, the modeling industry has changed drastically from traditional "runway" and glamour type models to the social media influencing world.  I am considered a social media Influencer.  Influencers in social media are individuals, such as myself, who have built a reputation for their brand, their look, and/or knowledge and expertise on a specific topic.  Companies and brands hire influencers to make regular posts about their products, services, or specific topics on their preferred social media channels and generate large followings of enthusiastic, engaged people who pay close

attention to their views.  Influencers, by their very nature, have achieved fame and notoriety on social media.

4.      I have achieved celebrity status and fame in the modeling industry and as a social media influencer.  On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model and Influencer, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.      I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.      I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.   I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare

3

to register a copyright for every photograph containing my image and likeness.  If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes.  Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet.  By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.       It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.       I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media

4

because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my extensive experience as Influencer, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted.   This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally).  For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today.  When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.  While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.      The use of my image and likeness is subject to considerable negotiation.   There are many factors which I consider in determining the fair market value to charge for the use of my image.  For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.  My image

may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

**Mansion Willfully Used and Misappropriated My Image and Likeness**

11.     Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.     Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit F** of the Complaint, which contains 2 advertisements used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image(s) in **Exhibit F.** The first advertisement, posted by Mansion on December 23, 2015, shows me wearing a white bra and Santa hat. I am familiar with this photo of me because I recognize myself in the photograph. The second advertisement, posted by Mansion on January 2, 2016, is the same image of me wearing the white bra and Santa hat. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in any of the photographs contained in Exhibit F, and I retain those rights in perpetuity.

13.     Without my permission, Mansion used my image, as reflected in **Exhibit F** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on

the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit F, (in the first advertisement) I am pictured on Mansion's Facebook advertisement wearing a white bra and Santa hat.  Mansion stated "The Naughtiest party of the year is happening tonight! Are you naughty enough to party with our girls? https://www.facebook.com/events/518599734981188/". Additionally, in Exhibit F (in the second advertisement) I am pictured on Mansion's Instagram advertisement wearing the same white bra and Santa hat. Mansion stated "What are you doing tonight? Come to #Mansion."  It's common sense, at least to me, that Mansion intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club.   Mansion's representations, suggestions or implications are false.  Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.      Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances.  Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model [and social influencer] I too, commercialize my look and identity by promoting products and services.  As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club.  In this regard, Defendant has stolen my advertisement idea and used it to

trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online.  As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested in sexy women and who, I believe, are likely to frequent gentlemen's clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.     I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.     Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.     When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

8

20.     Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.     Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place.   Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.     I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $30,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $60,000. This valuation range does not include and is exclusive of

monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

Executed this ___27___ day of January, 2021.

By: _____
Jessica Hinton (a/k/a Jessa Hinton)

JA-122

# ATTACHMENT "A"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES | Case No: 7:18-cv-09448-KMK-JCM |
| Plaintiffs, | |
| - against - | |
| EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE and KEITH SLIFSTEIN | |
| Defendants. | |

**DECLARATION OF TIFFANY TOTH-GRAY IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

I, Tiffany Toth-Gray, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America, that the following is true and correct:

1.      My name is Tiffany Toth-Gray. I am over 18 years of age and I am competent to testify regarding the statements contained in this declaration based on my personal knowledge of the matters set forth herein. I have also reviewed information about the business and events hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of the discovery exchange and disclosed in this matter.

**Professional Background and Work in the Modeling Industry**

2.      I am a professional model and take great pride in holding the prestigious title of Playboy Playmate. I've been the Playboy 'Cyber Girl of the Month' in May of 2006. I then went

1

on to pose for three pictorials under Playboy's Fresh Faces. I've been featured in such magazines as *Super Street Bike, Import Tuner, Sport Truck, Iron Man, Seventeen,* and *Maxim* and have also posed for several catalogs.

3.      I currently have over 1.3 million followers on Instagram, over 3.6 million thousand followers on Facebook, and over 314.6 thousand followers on Twitter.  Since the advent of social media – particularly with platforms such as Facebook, Instagram, Snapchat, TikTok, the modeling industry has changed drastically from traditional "runway" and glamour type models to the social media influencing world.  I am considered a social media Influencer. Influencers in social media are individuals, such as myself, who have built a reputation for their brand, their look, and/or knowledge and expertise on a specific topic.  Companies and brands hire influencers to make regular posts about their products, services, or specific topics on their preferred social media channels and generate large followings of enthusiastic, engaged people who pay close attention to their views.  Influencers, by their very nature, have achieved fame and notoriety on social media.

4.      I have achieved celebrity status and fame in the modeling industry and as a social media influencer.  On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.      As a model and Influencer, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

2

Case 21-2149, Document 48, 01/11/2022, 3241954, Page132 of 303

6.      I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

7.      I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.   I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness.  If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes.  Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet.  By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without

my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.      It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.      I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my extensive experience as Influencer, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted.   This is particularly the case for Facebook (a platform which I am familiar with

4

both personally and professionally).  For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today.  When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.  While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.     The use of my image and likeness is subject to considerable negotiation.   There are many factors which I consider in determining the fair market value to charge for the use of my image.  For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.  My image may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

**Mansion Willfully Used and Misappropriated My Image and Likeness**

11.     Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.     Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit G** of the Complaint, which contains 1 advertisement used by

Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image in **Exhibit G.** The advertisement, posted by Mansion on May 14, 2017, shows me wearing a pink and gold corset and a skirt with coordinating accessories. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for the Seven Til Midnight catalog. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in any of the photographs contained in Exhibit G, and I retain those rights in perpetuity.

13.     Without my permission, Mansion used my image, as reflected in **Exhibit G** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit G, I am pictured on Mansion's Instagram advertisement wearing the ping and gold corset and skirt with accessories.  Mansion stated "Celebrate Valentine's Day TONIGHT at Mansion! #Mansion #GentlemensClubAndSteakhouse #ValentinsDay #Sexy #ExoticEntertainment #Newburgh #NewYork.". It's common sense, at least to me, that Mansion intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club.  Mansion's representations, suggestions or implications are false.  Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.     Based on my own research and personal knowledge, I understand that Defendant

is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances. Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model [and social influencer] I too, commercialize my look and identity by promoting products and services. As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club. In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online. As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested in sexy women and who, I believe, are likely to frequent gentlemen's clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to

endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.      I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.      Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.      When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

**Retrospective Fair Market Valuation Damages Assessment**

20.      Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.      Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a)

that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place.   Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.   I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $40,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand compensation of at least $40,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

Executed this 27th day of January, 2021.

By: _____
Tiffany Toth-Gray

JA-132

# ATTACHMENT "A"

DocuSign Envelope ID: 2B4E8073-8D62-4E3F-A2C2-733B670335F9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALANA SOUZA a/k/a ALANA CAMPOS, BROOKE BANX, BROOKE TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA, JESSICA HINTON a/k/a JESSA HINTON, TIFFANY TOTH-GRAY, AND URSULA SANCHEZ a/k/a URSULA MAYES | Case No: 7:18-cv-09448-KMK-JCM |

                                    Plaintiffs,

            - against -

EXOTIC ISLAND ENTERPRISES, INC.
d/b/a THE MANSION GENTLEMEN`S
CLUB & STEAKHOUSE and KEITH
SLIFSTEIN

                                    Defendants.

**DECLARATION OF URSULA MAYES IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

     I, Ursula Mayes, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the

laws of the United States of America, that the following is true and correct:

     1.     My name is Ursula Mayes. I am over 18 years of age and I am competent to

testify regarding the statements contained in this declaration based on my personal knowledge of

the matters set forth herein. I have also reviewed information about the business and events

hosted by Exotic Island Enterprises, Inc., d/b/a The Mansion Gentlemen's Club & Steakhouse

and Keith Slifstein ("Mansion" or "Defendant") through my own online research and review of

the discovery exchange and disclosed in this matter.

     **Professional Background and Work in the Modeling Industry**

     2.     I am a professional model. My career started when my photos won first place in

prestigious photography awards and a spread in *Maxim* magazine. I am well known as a

DocuSign Envelope ID: 2B4E8073-9D62-4E3F-A2C2-739B670335FB

"suitcase model #5" from the hit game show *Deal or No Deal*. I have appeared on *Minute To Win It*, *The Tonight Show*, and *The Jay Leno Show*. I have also appeared in campaigns for Coronet Diamonds, Volkswagen, Subaru, Bacardi, *Vogue, Elle, In Style, Cosmopolitan*, and *Marie Claire*, to name a few. I was the cover model and a star of the game *Juiced 2: Hot Import Nights*. I have a modeling contract under CESD Talent Agency (Los Angeles, California) as well as Brand Model & Talent Agency (Orange County, California), and as an actress with Abstract Talent Agency.

3.       I currently have over 5.6 thousand followers on Instagram, over 12 thousand followers of Facebook, and over 2 thousand followers on Twitter.

4.       I have achieved celebrity status and fame in the modeling industry. On any given day, regardless of where I'm at, I am recognized by complete strangers and my fans who follow me on social media.

5.       As a model, I earn a living by promoting my image, likeness and/or identity (collectively "image") for the benefit of various clients, commercial brands, media and entertainment outlets.  When I use my image to promote my brand or products that I have carefully chosen to advertise, I am using my own advertising idea.  Similarly, when I grant my clients a license to use my image to promote their products or company, my clients are using my advertising idea as well as theirs.

6.       I rely on my professional reputation to book modeling and advertising jobs. My reputation is, therefore, critical to the opportunities that I am offered. Based on my personal knowledge and experience in the modeling and entertainment industries, clients afford significant weight to the reputations of the models they select for a particular promotion or advertising campaign.

JA-135

7.    I have spent considerable time and energy protecting my image and reputation in the modeling industry, including being selective about the jobs that I take.  I also protect my image, brand and reputation by hiring The Casas Law Firm, PC to police the unauthorized use of my image and likeness and sue companies who infringe on my rights.   I do not need to register a copyright for every single photograph containing my image and likeness in order to enforce my publicity and privacy rights against companies that use my image and likeness without my authority or consent. Moreover, it would be economically impractical, and a logistical nightmare to register a copyright for every photograph containing my image and likeness.  If I had to register a copyright for each of my photographs, it would require me to register thousands of images per year. Based on my personal experience in and knowledge of the modeling and social media industry, it is not industry practice to register a copyright for every image we post of ourselves in order to enforce rights against those that steal it for commercial purposes.  Also, it is my understanding and belief, and in my years of experience in the industry, it is not necessary to indicate that my image and likeness is "copyrighted" or otherwise protected when I use the same on social media or the internet.  By the same token, the mere fact that my image and likeness is used on my social media – or by my customers and clients as authorized by me – does not give companies or persons the right to use my image and likeness for commercial purposes without my consent.   In other words, I do not "waive" – and have never waived – my legal rights by the mere fact that I use my image and likeness on the internet for personal or business purposes.

8.    It is my custom and practice to exercise complete control over how my image and likeness is used.  Prior to booking a job, I receive specific detailed information about what the job entails and how my image will be used for that particular job, including any subsequent uses of my image. In my experience in the industry and in my own personal experience, any fee associated with each job is negotiated based on the kind of job and my informed assessment of

JA-136

DocuSign Envelope ID: 2B4E8073-8D62-4E3F-A2C3-739B670335FB

how a particular job may improve my brand or, alternatively, whether that job will harm or diminish my brand. There are certain jobs that I would not accept, and have not accepted, because the harm to my brand would end or significantly diminish my career.   In my career, I have turned down jobs or projects if I felt they would harm my brand.

9.        I have been using social media platforms extensively since each platform was launched.  I am particularly vigilant about how my image is used on the internet or social media because once my image is placed on line, especially on social media platforms, it is very difficult to remove, especially if my image has been "hash tagged" or commented on (for example "#hotmodel"). Once an image is posted, it remains on the internet forever unless it is deleted or the user's social media account is deleted or suspended.  Over time, as a user posts more content on their social media platform, posts (and associated photos/images) get "pushed down" on the user's timeline, but they do not go away, this makes it difficult to discover when my image and likeness is stolen. Based on my experience with social media, I know that once my image has been commented on or tagged on social media it goes into a cyber "portal" where my image can come up on search terms or search strings using similar tags.  Similarly, if someone "likes" my image (regardless of the platform) – regardless of when it was posted – the image is refreshed as if it was just posted.   This is particularly the case for Facebook (a platform which I am familiar with both personally and professionally).  For example, if someone likes or comments on an image today that was posted in 2010, the social media platform will refresh/ highlight that image and comment as if it was posted today.  When this happens, a whole new set of people (even those that were not using the social media platform at the time of the first posting) can view the image for the first time.  While this can be good for my brand if the image was initially posted with my permission and by a client that I previously vetted, it can also be damaging to my career

DocuSign Envelope ID: 2B4E8073-8D62-4E3F-A2C2-739B670335FB

and reputation when this happens on an image that was used without my permission and/or by a company that I do not want to be associated with.

10.     The use of my image and likeness is subject to considerable negotiation.   There are many factors which I consider in determining the fair market value to charge for the use of my image.  For example, I take into consideration *where* the image will be used, *how* it will be used, how *long* it will be used, what *product or service* will I be directly or indirectly promoting, and *how* the use will affect my brand in the long term, and *how much* I will get paid.  My image may only be used with my express authority subject to the terms and conditions of the agreement(s) (which take into consideration the negotiated terms) I have entered into with that particular client.

### Mansion Willfully Used and Misappropriated My Image and Likeness

11.     Neither Mansion, nor any related or affiliated entity or individual acting on its behalf, ever sought my permission or consent to use my image to advertise, promote, market or endorse its strip club or the strip club activities that take place at Mansion.

12.     Mansion's unauthorized use of my image associates me personally with Mansion strip club and the strip club activities that take place there. **Attachment A** to my declaration is a true and correct copy of **Exhibit H** of the Complaint, which contains 1 advertisement used by Mansion without my authorization, consent or permission, either directly or indirectly. I have identified and recognized myself in the image in **Exhibit H.** The advertisement, posted by Mansion on March 16, 2018, shows me wearing a Saint Patrick's Day themed dress and accessories. I am familiar with this photo of me because I recognize myself in the photograph and it was originally shot for the Dreamgirl catalog. At no time have I given up my rights to my image and likeness (e.g., copyrights, publicity, and/or privacy rights) in the photograph

DocuSign Envelope ID: 2B4E8073-8D62-4E3F-A2C2-739B670335FB

contained in Exhibit H, and I retain those rights in perpetuity

13.     Without my permission, Mansion used my image, as reflected in **Exhibit H** of the Complaint, to advertise and promote Mansion generally and/or the strip club event/special taking place at Mansion.  In doing so, Mansion made it look like I work for or am somehow affiliated with Mansion, agreed to participate in the advertising campaign, or endorsed Mansion, and Mansion's activities.  Mansion's unauthorized use of my image (and comments or wording on the advertising) made it look like I personally participate in the strip club lifestyle generally or the strip club activities, and/or that I may appear at the advertised event at Mansion. For example, in Exhibit H, I am pictured on Mansion's Instagram advertisement wearing a Saint Patrick's Day themed costume and accessories.  Mansion stated "Celebrate St. Paddy's Day at the sexiest party in the Hudson Valley! https://www.facebook.com/events/41794262865330/ #Mansion  #Sexy  #StPaddysDay  #Party  #HudsonVally  #Newburgh  #Nightlife  #Fun #MakeItAMansionNight".  It's common sense, at least to me, that Mansion intended to entice their customer base by using my image along with comments that make it seem as if I myself will be at the club.  Mansion's representations, suggestions or implications are false.  Further, by using my image, Mansion used my advertising ideas as their own to promote their products, services, and generally their establishment.

14.     Based on my own research and personal knowledge, I understand that Defendant is a strip club involved in a business of promoting its establishment and their entertainers, who are young females that wear costumes and lingerie during their performances.  Defendant promotes their establishment by using the images of sexy, beautiful women on their website and/or social media to attract men and women to attend their events and their club. As a model I too, commercialize my look and identity by promoting products and services.  As a result, I believe (and I think it is common sense) that a reasonable consumer viewing my image where I

6

DocuSign Envelope ID: 2B4E8073-8D62-4E3F-A2C2-738B670335F0

am wearing a sexy outfit on a Defendant's advertisement will believe that I am one of the strippers at Defendant's establishment and/or that I am endorsing or sponsoring their club. In this regard, Defendant has stolen my advertisement idea and used it to trick their customers.

15.     In addition, because I am in the business of commercializing my identity and image as a beautiful and attractive woman, and based on what I know of Defendant's establishment (a strip club where men come pay to see women dance nude), it is my belief that Defendant's customer base is the same or similar demographic that views and is attracted to my image and look in magazines and online. As such, Defendant and I compete in the entertainment industry, use similar marketing channels and our respective endeavors overlap. Defendant actually competes for the same dollars from the same demographic consumer group of men that I do. To be more precise, many of my fans and social media followers are men who are interested in sexy women and who, I believe, are likely to frequent gentlemen's' clubs. As such, Defendant's unauthorized use of my image to promote a strip club created an undeniable confusion in Defendant consumers' minds, which lead to a competitive injury to me.

16.     I, however, never worked at Mansion in any capacity, never agreed to associate with Mansion, never agreed to participate in Mansion's advertising campaign, never agreed to endorse Mansion and its activities, and never agreed to appear at the event being advertised.

17.     I was never offered any compensation, or compensated in any way, for Mansion's use of my image from Mansion or anyone associated with Mansion.

18.     Mansion's unauthorized use of my image deprived me of the right to control my career and forced me to endorse a brand and lifestyle without my consent.

19.     When I learned that Mansion had used my image without my authority and consent, I agreed to initiate this lawsuit and seek compensation for their unauthorized use of my image. Mansion failed to compensate me.

7

DocuSign Envelope ID: 2B4E8073-8D62-4E3F-A2C2-739B670335FB

### Retrospective Fair Market Valuation Damages Assessment

20.     Because Mansion used my image without my permission or consent for an obvious commercial purpose (to attract customers to its strip club and its special event), I am entitled to damages that include the fair market value for the use of my image and likeness. Based on my experience in the modeling and talent industry, I or my representatives acting on my behalf, have negotiated prospectively to reach agreement on terms and conditions relating to usage and compensation.

21.     Mansion deprived me of the opportunity to reject or decline the opportunity and used my image anyway.  Because of this, my expert in this case (and ultimately the fact finder) has to "reverse engineer" that negotiation (retrospectively) to arrive at a fair market value for the unauthorized use of my image. Retrospectively estimating the fair market value of the use of my image in a situation where my image has been stolen is very different from the typical process of negotiating prospectively that is customary for me in the modeling and entertainment industries. While I understand that this retrospective, hypothetical negotiation, is the way the law calculates damages in these cases, I certainly hope that two main factors are taken into consideration: (a) that Mansion used my image for advertising purposes for free for many years; (b) that they did so without my consent; and importantly, (c) that I wouldn't have accepted this job in the first place.   Put another way, Mansion should not a windfall simply because the law requires a "hypothetical negotiation."

22.     I have reviewed the Expert Report of Stephen Chamberlin of September 19, 2020 and agree with Mr. Chamberlin's conservative, retrospective fair market valuation of at least $30,000 for each separate usage of a single image of me. Therefore, given what I have learned about Mansion and its usage, if asked to provide a fair market valuation range, I would demand

compensation of at least $30,000. This valuation range does not include and is exclusive of monetary damages that might be available under damages theories other than a fair market valuation.

**I swear and affirm that all matters stated herein are true and accurate to the best of my knowledge.**

1/27/2021

Executed this _____ day of January, 2021.

By: _____

Ursula Mayes

9

# ATTACHMENT "A"

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Civil Action No. 18-cv-09448
 5   ---------------------------------------x
 6   ALANA SOUZA A/K/A ALANA CAMPOS, BROOKE
 7   BANX, BROOKE TAYLOR-JOHNSON, JACLYN
 8   SWEDBERG, JAIME EDMONDSON-LONGORIA,
 9   JESSICA HINTON A/K/A JESSA HINTON, TIFFANY
10   TOTH-GRAY, AND URSULA SANCHEZ A/K/A URSULA
11   MAYES,
12                    Plaintiffs,
13        - against -
14   EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE
15   MANSION GENTLEMEN'S CLUB & STEAKHOUSE and
16   KEITH SLIFSTEIN,
17                    Defendants.
18   ---------------------------------------x
19                    July 29, 2020
                      12:00 p.m.
20
21   Deposition of KEITH SLIFSTEIN, taken by
22   the Plaintiffs, pursuant to Notice, held
23   via Zoom, before Tammy O'Berg, a Shorthand
24   Reporter and Notary Public of the State of
25   New York.
```

Page 1

1
2  A P P E A R A N C E S :
3
4      THE CASAS LAW FIRM, P.C.
5      Attorneys for Plaintiffs
6          1745 Broadway, 17th Floor
7          New York, New York 10019
8      BY:  JOHN GOLASZEWSKI, ESQ.
9
10     O'CONNOR & PARTNERS, PLLC
11     Attorneys for Defendants
12         255 Wall Street
13         Kingston, New York 12401
14     BY:  JOSEPH E. O'CONNOR, ESQ.
15
16              *   *   *
17
18
19
20
21
22
23
24
25
                                        Page 2

1              KEITH SLIFSTEIN
2  KEITH SLIFSTEIN, having first been duly
3  sworn by a Notary Public of the State of
4  New York, was examined and testified as
5  follows:
6  EXAMINATION BY
7  MR. GOLAZEWSKI:
8      Q.   State your name for the record.
9      A.   Keith Slifstein.
10     Q.   Where do you reside?
11     A.   9 Quail Ridge Road, Hyde Park,
12 New York 12538.
13     Q.   Good afternoon, Mr. Slifstein.
14          Have you been deposed before?
15     A.   No.
16     Q.   Basically, how it's going to go,
17 I'm going to ask you a series of
18 questions.  I'd ask that you answer them
19 as truthfully and fully as possible.
20          If you don't understand
21 something, let me know; I'll try to
22 rephrase it.
23          Your attorney might object from
24 time to time to a question.  Unless he
25 specifically instructs you not to answer,
                                        Page 4

1        S T I P U L A T I O N S
2
3
4      IT IS HEREBY STIPULATED AND
5  AGREED, by and between the Attorneys for
6  the respective parties hereto, that filing
7  and sealing be and the same are hereby
8  waived;
9      IT IS FURTHER STIPULATED AND
10 AGREED that all objections, except as to
11 the form of the question, shall be
12 reserved to the time of the trial;
13     IT IS FURTHER STIPULATED AND
14 AGREED that the within deposition may be
15 signed and sworn to before any notary
16 public with the same force and effect as
17 though signed and sworn to before the
18 Court.
19
20
21
22
23
24
25
                                        Page 3

1              KEITH SLIFSTEIN
2  you should go ahead and answer it.
3          As Tammy mentioned, especially
4  given this Zoom situation, there's a
5  tendency when we're talking to either
6  interrupt or to -- if you see where I'm
7  going with a question, to kind of answer.
8  If we can both try to not do that; that
9  is, let me finish the question, and I'll
10 let you finish the answer.  It will make a
11 cleaner record.
12          Is that fair?
13     A.   Yes.
14     Q.   Great.
15          You are the owner of Exotic
16 Island Enterprises; is that correct?
17     A.   Correct.
18     Q.   Do you have any partners?
19     A.   Yes.
20     Q.   Who are they and what percentage
21 do they have in the company?
22     A.   James Gelb.  He's a nonworking
23 partner.  50 percent.
24     Q.   Is that Gelb, G-E-L-B?
25     A.   Correct.
                                        Page 5

2 (Pages 2 - 5)

**JA-145**

KEITH SLIFSTEIN

1
2    Q.   What do you mean by "nonworking
3  partner"?
4    A.   He just invested.
5    Q.   Okay.
6         Is that in or around 2009, when
7  the company started?
8    A.   Correct.
9    Q.   Am I correct that you own 50
10 percent of Exotic Island, as well?  Is
11 that right?
12   A.   Correct.
13   Q.   Exotic Island owns Mansions
14 Gentlemen's Club & Steakhouse, right?
15   A.   Correct.  Operates it.
16   Q.   Excuse me?
17   A.   We operate The Mansion.
18   Q.   Okay.
19        Do you not own it, as well?
20   A.   The property or the building is
21 owned by somebody else.
22   Q.   I understand.  We'll get to that
23 in a second.
24        Is there another entity that
25 owns Mansions Gentlemen's Club?

Page 6

KEITH SLIFSTEIN

1
2  the club; is that accurate?
3    A.   Correct.
4    Q.   What was the name of the
5  corporation that owned it?
6    A.   Sliffer Enterprises Inc..
7    Q.   Did Sliffer Enterprises Inc. own
8  one hundred percent of Pleasure Island?
9    A.   Yes.
10   Q.   Did you own 100 percent of
11 Sliffer Enterprises?
12   A.   Correct.
13   Q.   When did Pleasure Island close?
14   A.   Several years ago.  Possibly
15 between three and four years ago.
16   Q.   As a general rule, neither I nor
17 your attorney want you to guess, but if
18 you have a fair approximation, that's
19 fine; and if later you realize it was six
20 years ago, that's fine, too, you can tell
21 your lawyer.  I'm looking for your best
22 recollection.
23        You think between three and five
24 years ago?
25   A.   Yeah, approximately.

Page 8

KEITH SLIFSTEIN

1
2    A.   No.  That's the d/b/a for
3  Exotic.
4    Q.   Fair enough.  Thank you.
5         Does Exotic Island own anything
6  else or operate anything else?
7    A.   No.
8    Q.   Do you have an ownership
9  interest in any other gentlemen's clubs?
10   A.   Not presently, no.
11   Q.   To be clear, that is whether you
12 have an ownership personally or an
13 ownership through an LLC or corporation.
14        As of today, do you have an
15 owner interest in any other gentlemen's
16 clubs?
17   A.   No.
18   Q.   Have you at any time in the past
19 10 years?
20   A.   Ten years.  Yes.
21   Q.   What was the name of that club?
22   A.   Pleasure Island.
23   Q.   Where was Pleasure Island?
24   A.   Newburgh, New York.
25   Q.   Pleasure Island was the name of

Page 7

KEITH SLIFSTEIN

1
2    Q.   How long did Pleasure Island
3  operate?
4    A.   Since 1993.
5    Q.   Did you open Pleasure Island in
6  1993?
7    A.   Yes.
8    Q.   And it closed in, let's say,
9  we'll call it 2016 or so?
10   A.   Approximately.
11   Q.   Between 1993 and the present,
12 have you had any other ownership interest
13 in any other gentlemen's club?
14   A.   No.
15   Q.   At any time in your life, have
16 you, other than Pleasure Island and
17 Mansions?
18   A.   Can I say the property that
19 where Mansion is, we had to buy the
20 existing club there first, but it was the
21 same -- Exotic Island just moved to a
22 bigger building.  Does that make sense?
23   Q.   No.  Can you explain that to me?
24   A.   When we purchased the property,
25 the business that was there.  It was a

Page 9

3 (Pages 6 - 9)

**JA-146**

KEITH SLIFSTEIN

1 KEITH SLIFSTEIN
2 club called The Blue Moon.  We had to
3 purchase that and then build a bigger
4 building behind it and then transfer
5 everything to the bigger building.
6    Q.    And that became Pleasure Island?
7    A.    No, that became Mansion.
8    Q.    I see.
9         So for a brief period you might
10 have technically owned another club, but
11 that was just in furtherance of opening
12 Mansion; is that correct?
13    A.    Correct.  It was the same
14 corporation.
15    Q.    I appreciate the clarification.
16 Thank you.
17         So with that clarification
18 aside, other than Mansion and Pleasure
19 Island, you have never had an ownership
20 interest in any other gentlemen's club; is
21 that fair?
22    A.    I did in Poughkeepsie, New York,
23 back in '94, I believe, 1994.
24    Q.    What was that called?
25    A.    That one was called Bare Assets.
Page 10

1 KEITH SLIFSTEIN
2    Q.    Have you at any time since 1993?
3    A.    Yes.
4    Q.    What were they?
5    A.    Steel House Restaurant and Bar.
6    Q.    Where is that?
7    A.    That's -- that was in Kingston,
8 New York.
9    Q.    Approximately what years were
10 you operating Steel House?
11    A.    Steel House was 2003,
12 approximately, until 2013, approximately.
13 Then we closed.
14    Q.    That was just a bar and
15 restaurant?
16    A.    Bar/restaurant, correct.
17    Q.    Any others?
18    A.    No.
19    Q.    You understand the nature of
20 plaintiffs' claims in this lawsuit; is
21 that right?
22    A.    Yes.
23    Q.    Do you have a general idea what
24 they are?
25    A.    General idea, correct.
Page 12

1 KEITH SLIFSTEIN
2    Q.    B-A-R-E?
3    A.    Yes, Assets.
4    Q.    What was your ownership interest
5 in that?
6    A.    That one I had 50 percent, but I
7 gave the club up to the other owner.
8    Q.    You sold it to him or you gave
9 it to him?
10    A.    I took -- he helped me out in
11 the beginning, so -- it was not making
12 money, so it wasn't enough to feed two
13 people.
14    Q.    Did you get the interest in 1994
15 and then give it up in 1994?
16    A.    Yes.
17    Q.    So aside from Bare Assets,
18 Pleasure Island and Mansions, you've never
19 had an ownership interest in any other
20 gentlemen's club; is that fair?
21    A.    Correct.
22    Q.    As of today, do you have any
23 ownership interest in any bar or
24 restaurants other than Mansions?
25    A.    No.
Page 11

1 KEITH SLIFSTEIN
2    Q.    Which is what?
3    A.    That they're looking for money
4 for pictures.
5    Q.    Plaintiffs allege that Mansions
6 used their images in advertising without
7 permission, more or less.
8         Do you understand that?
9    A.    Yes.
10    Q.    You don't have to agree with it.
11 I just want you to understand the
12 allegations.
13    A.    Yes.
14    Q.    You've had a chance to review
15 the complaint in this action?
16    A.    Yes.
17    Q.    And the images that were posted
18 or attached to the complaint; is that
19 right?
20    A.    I saw them in the complaint.
21    Q.    Okay.
22         Have you had a chance to look at
23 them since?
24    A.    No.
25    Q.    In defendant's interrogatories
Page 13

4 (Pages 10 - 13)

**JA-147**

KEITH SLIFSTEIN

1    KEITH SLIFSTEIN
2  defendants note that all of the
3  advertisements at issue in this lawsuit --
4  and there are images of eight different
5  plaintiffs -- were created and posted by
6  an entity called Exclusive Events &
7  Promotions d/b/a Think Social First.
8        Is that your understanding?
9    A.   That is correct.
10   Q.   Mansions had a relationship with
11 Think Social First?
12   A.   Exclusive Events, yes.
13   Q.   Exclusive Events.  Fair enough.
14       Just explain to me the nature of
15 that relationship, please.
16   A.   They approached me, wanted to
17 advertise the nightclub industry.  I
18 checked them out, saw that they were a
19 solid company.  They did the Bonura
20 Restaurant Group, which has the largest
21 catering halls and restaurants in our
22 area.
23       So I agreed to let them promote
24 us on social media to try gain them a
25 foothold in the nightclub industry.

Page 14

1    KEITH SLIFSTEIN
2  authority to go on to, for instance, The
3  Mansion's Facebook page or Instagram page
4  and post advertisements; is that fair?
5    A.   That's correct.  They created
6  those pages and had the passwords.
7    Q.   So let's be clear.
8        They created -- let's just stick
9  with Facebook for a minute.
10       Exclusive Events created the
11 Facebook page for Mansions; is that right?
12   A.   Yeah.  They were supposed to do
13 all our social media.
14   Q.   Again, this was just pursuant to
15 conversations that you had with them; is
16 that right?
17   A.   Correct.
18   Q.   They would thereafter from time
19 to time post advertisements on the
20 Facebook page, is that fair?
21   A.   Yes.  They would ask me what
22 events we have; for instance, St.
23 Patrick's Day in March.  We told them we
24 have St. Patrick's Day.
25   Q.   Is that the same for

Page 16

1    KEITH SLIFSTEIN
2    Q.   Do you recall approximately when
3  they approached you?
4    A.   Probably around 2012, maybe 2013
5  early.
6    Q.   And they pitched you at some
7  point.  Presumably, you agreed to work
8  with them.
9        Did you enter into a contract
10 with them?
11   A.   No.  They just said to let them
12 know, you know, if we have events, and
13 they'll get it out there.
14   Q.   I understand you haven't looked
15 at them maybe since you got the complaint,
16 but are you confident that each of the
17 images in the exhibits of the complaint
18 were created by Exclusive Events?
19   A.   Yes.  They are the only ones
20 that handled it.
21   Q.   To be clear, did they also post
22 these images?
23   A.   Yes.  They handled all aspects
24 of social media.
25   Q.   Meaning that they had the

Page 15

1    KEITH SLIFSTEIN
2  Instagram -- well, let's stick with that.
3        Was that the same for Instagram?
4    A.   Yes.
5    Q.   Did Mansions have a Twitter page
6  between 2012 and 2018?
7    A.   I honestly don't know.  If it
8  was social media, we may have, if they had
9  one.  That I don't know.
10   Q.   I lost you for a second.
11   A.   I'm not sure if there was a
12 Twitter page, if that was -- if they did
13 that, as well.  I don't know.  I'm not
14 savvy with that stuff.
15   Q.   Fair enough.
16       You're sure about Facebook and
17 you're sure about Instagram?
18   A.   They ran Facebook and Instagram
19 for us, and they had the passwords.
20   Q.   Do they do that to this day?
21   A.   No.
22   Q.   Did you also have the passwords?
23   A.   No.
24   Q.   To your knowledge, the only
25 entity that had the passwords to The

Page 17

5 (Pages 14 - 17)

**JA-148**

KEITH SLIFSTEIN

1 KEITH SLIFSTEIN
2 Mansion's Facebook and Instagram pages was
3 Exclusive Events; is that right?
4     A.    That's correct.
5     Q.    Did you have a point person
6 there who you conferred with?
7     A.    The owner would call me.  Danny
8 Lepore.
9     Q.    Can you spell that?
10    A.    L-E-P-O-R-E.
11    Q.    Let's stick with 2015 to 2018,
12 if we can.
13        Approximately how often would
14 you speak to Mr. Lepore about posting
15 advertisements on these pages?
16    A.    Probably once a month, sometimes
17 possibly twice.
18    Q.    If you have an estimate.
19    A.    Once to twice, max.
20    Q.    Once or twice a month.
21        I'm looking, for instance, at
22 Exhibit B -- I'm going to put it up for
23 you.  Exhibit B is an image of my client,
24 Brooke Banx, and she's wearing a short,
25 let us say, Steelers T-shirt, and it says,

Page 18

1 KEITH SLIFSTEIN
2 with be professional, do it the proper
3 way.
4     Q.    Understood.
5        I want to be broad in this
6 question.  At no point from the time in
7 2012 when you first were approached by
8 Exclusive Events up through the end of
9 your relationship, did you ever have a
10 communication with them about the need to
11 have a release for the images used in
12 advertisements; is that fair?
13        MR. O'CONNOR:  Objection.
14        You can answer.
15        THE WITNESS:  I couldn't hear.
16        MR. O'CONNOR:  Objection.
17        You can answer, Keith.  I just
18    had an objection.
19 BY MR. GOLASZEWSKI:
20    A.    Could you just repeat the
21 question?  Towards the end I couldn't hear
22 you.
23    Q.    Of course.  Sorry.  I want to be
24 clear, and I'm being intentionally broad
25 in the question.

Page 20

1 KEITH SLIFSTEIN
2 Mansions Gentlemen's Club & Steakhouse, No
3 sexier place to watch the Steelers versus
4 the Broncos.
5        Can you see that?
6     A.    Yes.
7     Q.    I understand the St. Patrick's
8 Day party or a Cinco de Mayo party, but
9 were you conferring with him weekly about
10 particular football games, for instance,
11 as in the image of Miss Banx?
12    A.    No.  Sporting events they would
13 just post to get people to know that we
14 had sports.
15    Q.    Did you ever have communications
16 Mr. Lepore about the images used in those
17 advertisements?
18    A.    No.
19    Q.    You never asked him where he got
20 them from?
21    A.    No.
22    Q.    You never asked him if he had
23 the right to use them?
24    A.    No.  I -- them being a
25 professional business, I would assume they

Page 19

1 KEITH SLIFSTEIN
2        From 2012, when they first
3 approached you, through the end of your
4 relationship with Exclusive Events, you at
5 no point had a conversation with them
6 about the need to have a release for the
7 images used in advertising; is that fair?
8     A.    I believe that's correct.
9        I believe after they were let
10 go -- after we got the complaint, we came
11 up with a release.
12    Q.    Fair enough.  That leads me to
13 my next question.
14        Between -- well, do you have an
15 approximate date that you ended your
16 relationship with Exclusive Events?
17    A.    It was probably around the time
18 we got the complaint, whenever that was.
19    Q.    Sometime, let's say, in the fall
20 of 2018, end of 2018?
21    A.    Whenever -- when the complaint
22 came.
23    Q.    I'm going to get to that in a
24 minute.
25        Prior to -- let's call it

Page 21

6 (Pages 18 - 21)

KEITH SLIFSTEIN
1
2    Q.   And his position is that an
3  intern found these images and created all
4  of these advertisements, every one of them
5  in the complaint; is that accurate?
6    A.   That's what he claimed to me.
7    Q.   Okay.  I want to contrast this
8  advertisement -- okay -- with, for
9  instance -- now here's an image -- and a
10  portion of her face is cut off -- of Miss
11  Ursula Mayes.  This the St. Patrick's
12  Day --
13      (Reporter asked for
14  clarification.)
15    Q.   You see the difference I'm
16  drawing here?  This is just the picture of
17  a woman, albeit with a portion of her face
18  cut off, whereas this is more of an
19  advertisement with some information in it
20  and at least some graphics that have gone
21  on.
22      Do you see that?
23    A.   Yes.
24    Q.   Did you ever ask Mr. Lepore, in
25  sum or substance, whether his intern just

Page 62

KEITH SLIFSTEIN
1
2  recall ever specifically seeing this while
3  it was posted?
4    A.   No.
5    Q.   At any point did you look at The
6  Mansion's Facebook or Instagram pages and
7  see women who didn't dance there and say
8  to Mr. Lepore, in sum or substance, Why
9  don't we use women who dance at the club
10  in our advertisements?
11    A.   No.
12    Q.   You never had that conversation,
13  either you to him or he to you on that
14  topic; is that fair?
15    A.   Correct.
16    Q.   However, now that you've hired
17  Victoria Rose Photography, you have
18  specifically said only use the women at
19  the club; is that fair?
20    A.   Yes, after I got the lawsuit,
21  yes.
22    Q.   Is the purpose of using -- only
23  using the women at the club --
24      MR. GOLASZEWSKI:  Strike that.
25    Q.   Is the reason that you specified

Page 64

KEITH SLIFSTEIN
1
2  got these images -- and here I'm
3  referencing the Miss Mayes images -- or
4  all of the images from somewhere, an
5  intern got them?
6    A.   I did not ask.
7    Q.   He made no distinction and you
8  didn't ask; is that fair?
9    A.   Correct.
10    Q.   Do you recall as you sit here
11  today seeing any of these advertisements
12  on The Mansion's social media pages when
13  they were posted, prior to receiving the
14  complaint?
15    A.   People may have shown them to
16  me.  I mean, when I got the complaint is
17  when I saw all of them.
18    Q.   Sure.
19      Here's an image of my client,
20  Jessa Hinton, and Miss Hinton has been a
21  Playboy Playmate, et cetera.  It says,
22  Mansions Gentlemen's Club.  What are you
23  doing tonight?  Come to Mansions.  And
24  it's an image of her.
25      My first question is do you

Page 63

KEITH SLIFSTEIN
1
2  to Victoria Rose Photography to only use
3  women at the club because of the lawsuit,
4  or because you thought it was a more
5  accurate representation of the women who
6  dance at the club?
7    A.   Because of the lawsuit.
8      There's women all over the place
9  that dance and you may not know they
10  dance -- there's women that dance in all
11  different professions, and you may not
12  know they dance, so you never know who's a
13  dancer.
14    Q.   Can you explain that to me?  Say
15  that again.
16    A.   You said only use dancers in the
17  pictures.  I mean, if they had the rights
18  to use other people, say somebody in an
19  outfit, they may be a dancer somewhere
20  else but allowed themselves to be used.
21    Q.   Sure.  Fair point.
22      Here's an image with Miss Hinton
23  again.  The naughtiest -- here's what the
24  caption says:  The naughtiest part of the
25  year is happening tonight.  Are you

Page 65

17 (Pages 62 - 65)

KEITH SLIFSTEIN
1 KEITH SLIFSTEIN
2 naughty enough to party with our girls?
3        It says "our girls," and I'm
4 wondering if you think that a reasonable
5 customer would look at that and say, well,
6 they're saying our girls; this is one of
7 the girls who is going to be there?
8        MR. O'CONNOR:  Objection.
9        You can answer.
10   A.   That's up to them.  I'm not --
11 some may, some may not.  It's the
12 individual's discretion if they choose to
13 believe what they see.
14        MR. GOLASZEWSKI:  I'm going to
15   make a request on the record for --
16   I'd like to see a copy of the Victoria
17   Rose release.  I'd like to see a copy
18   of documents sufficient to show gross
19   revenues in the past four years.  I'll
20   follow up with this in writing after I
21   review the transcript because there
22   are a couple of other issues, but
23   subject to those requests -- and
24   counsel and I can certainly confer on
25   them -- I don't have any other

Page 66

---

1                I N D E X
2
3 Witness:  KEITH SLIFSTEIN
4 Examination by:          Page
5 MR. GOLAZEWSKI                4
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

---

KEITH SLIFSTEIN
1 KEITH SLIFSTEIN
2 questions.
3        Thank you very much for your
4 time.
5        (Information requested.)
6        MR. O'CONNOR:  This is Joe
7 O'Connor, and I'd like the a copy of
8 the transcript from today's
9 deposition.
10        (Time noted:  1:12 p.m.)
11
12
13
14        _____
15        KEITH SLIFSTEIN
16
17 Signed and subscribed to
18 before me this      day
19 of            , 2020.
20 _____
21 Notary Public
22
23
24
25

Page 67

---

1
2      LITIGATION SUPPORT INDEX
3
4    REQUESTS FOR PRODUCTION OF DOCUMENTS
5        Page   Line
6        67    5
7
8      INFORMATION TO BE FURNISHED
9        Page   Line
10        None
11
12      QUESTIONS MARKED FOR A RULING
13        Page   Line
14        None
15
16   DIRECTION TO WITNESS NOT TO ANSWER
17        Page   Line
18        None
19
20
21
22
23
24
25

Page 69

18 (Pages 66 - 69)

Case 21-2149, Document 48, 01/11/2022, 3241954, Page158 of 303

(https://www.mansiongentlemensclub.com)

5268 Route 9W,
Newburgh NY, 12550
(845) 565-6969

# *Mansion Gentlemen's Club & Steakhouse*



## Now accepting new dancers.

Call ahead for dinner reservations and
we'll comp your cover charge.
(not valid during special events)

Forward photos and contact # to
mansiongentlemensclubny@gmail.com
(mailto:mansiongentlemensclubny@gmail.com)

Tel: (845) 565-6969

Address: 5268 Route 9W, Newburgh NY, 12550

## Click here to get directions (/location/)

JA-152

# *Perfect for your Bachelor Party / Bachelorette Party!*

- **World-Class Entertainment**
- **Relax in Comfort**
- **Dine in Elegance**
- **Top-Shelf Liquors**
- **Divorce Parties**

- Open at 6 pm, 7 Days a Week
- Working man's steak special for $9.99 served at the bar from 6-8pm every day. Call for details.
- No Smoking
- Proper attire required for admittance: Dress to Impress. No tank tops, hats, athletic apparel, headgear, or baggy pants
- Must be 21 to enter with proper ID
- Personal bottle service & cocktail waitress
- Live DJ every day
- Happy Hour Mon-Fri 6-7pm
- Steakhouse Dinner
- Catch your favorite sports on TV

00:55

## Like Us On Facebook!

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ALANA SOUZA A/K/A ALANA CAMPOS,
BROOKE BANX, BROOKE TAYLOR-
JOHNSON, JACLYN SWEDBERG, JAIME
EDMONDSON-LONGORIA,          JESSICA
HINTON A/K/A JESSA HINTON, TIFFANY
TOTH-GRAY, AND URSULA SANCHEZ
A/K/A URSULA MAYES

Plaintiffs,

- against -

EXOTIC ISLAND ENTERPRISES, INC. d/b/a
THE MANSION GENTLEMEN'S CLUB &
STEAKHOUSE and KEITH SLIFSTEIN

Defendants.

**REPORT OF MARTIN BUNCHER**

1

JA-154

**September 2020**

## TABLE OF CONTENTS

1    Summary of Assignment and Opinions

2.   Qualifications of Martin Buncher

3.   Consumer Survey

    a    Study Integrity

    b.   Study Design

    c.   Study Sample

    d    Study Questionnaire

4.   Measuring Likelihood of Confusion

5.   Analysis of Results

6.   Conclusions

## TABLE OF EXHIBITS

**Exhibit 1 – Martin Buncher Resume**

**Exhibit 2 – Martin Buncher Experience Table**

**Exhibit 3 – Documents /Other Information Considered By Martin Buncher**

**Exhibit 4 – The Questionnaire**

**Exhibit 5 – Tabulated Data**

**Exhibit 6 – Stimuli**

**Exhibit 7 – Verbatim Responses To Open-Ended Questions**

**Exhibit 8 – Disposition Of Contacts For The Research Sample**

**Exhibit 9 – Raw Data File**

# 1. Summary of Assignment and Opinions

The Casas Law Firm, P.C. has retained Intercontinental Marketing Investigations, Inc. ("IMI") to conduct a marketing research survey concerning certain advertisements containing images of plaintiffs Alana Souza, A/K/A Alana Campos, Brooke Banx, Brooke Taylor-Johnson, Jaclyn Swedberg, Jaime Edmonston-Longoria, Jessica Hinton A/K/A Jessa Hinton, Tiffany Toth-Gray, and Ursula Sanchez A/K/A Ursula Mayes.

IMI was asked to conduct marketing research specifically designed as a "communications study" with the purpose of exploring possible confusion among consumers exposed to this advertising in terms of what they understood about the women's appearances in the Internet advertising material

This report is a statement of the opinions I have formulated in this matter and the basis and reasons for those opinions. In forming the opinions expressed, I rely upon my education, experience and knowledge of the subjects discussed. I have also reviewed, considered or relied upon documents and other materials which are cited herein and/or listed in the Exhibits submitted herewith.

This report summarizes my current conclusions, which are subject to change depending upon ongoing discovery and additional information. I respectfully reserve the right to supplement this report to address any additional fact discovery, opinions by other experts, and/or trial testimony.

Payment for this research will be in the amount of $18,900 +/- 10% for research project expenses. The Casas Law Firm, P.C. is also paying costs of $800 per hour for general consulting, and $1000 per hour for expert witness testimony and depositions preparation. None of this compensation depends on the substance of my testimony or the outcome of this matter.

4

**2. Qualifications of Martin Buncher**

I earned a Master's Degree in Consumer and Industrial Psychology at the University of Southern California in 1964 and have provided marketing research and marketing consulting services for 56 years across a broad spectrum of American and foreign industries. I have completed over seven thousand studies, and by remaining on the cutting edge of the latest marketing research technology, had succeeded in every case in advancing the market intelligence, conceptual, product and service needs of my clients. Those clients often consist of  leaders in government, private industry, social agencies and the military.   My experience with consumer and trade advertising and communications is extensive and alone includes a few thousand studies both, qualitative and quantitative in nature, with many in the Internet advertising  field.

I have served as Vice-President and Member of the Board of the National American Marketing Association (AMA), and have been active in the American Society of Trial Consultants (ASTC), California Trial Lawyers Association (CTLA), American Psychological Association (APA), Marketing Research Association (MRA), European Society for Marketing and Opinion Research (ESOMAR), and the San Diego Advertising Association. I have served on the faculty of San Diego State University and the University of California-San Diego teaching marketing and marketing research courses. I have been an undisclosed contributing author working with Dr. Larry Percy involving marketing communications texts used world-wide in leading business schools as part of the teaching curriculum.

Since 1977, I have served as managing director of Intercontinental Marketing Investigations, Inc.  Our clients reflect a broad cross-section of manufacturers and service providers, as well as government, social, and political agencies in the United States and over 50 foreign countries.

Specific examples of our areas of heavy involvement during the past half century include aging/mature markets, airlines/aerospace, alcoholic beverages, apparel, automotive, confectionary, chemicals, computers/hi-tech hardware and software, construction, real estate, education, employee benefit programs, energy/utilities, adult and family entertainment business, financial/banking, foods, health/beauty aids, household products, health care/medical products and services, human resources,

5

hotels/resorts, insurance, newspapers/magazines, pets, political campaigns, radio/TV, security systems, social behavior, telecommunications, tobacco, toys/games, tourism, and zoological agencies. For more detail, my Curriculum Vitae are attached as EXHIBIT 1.

It should be noted that I am a highly recognized marketing research professional both domestically and internationally, and in executing each of the thousands of studies which I have conducted and been involved since 1964, follow the ethics of the major marketing research societies as mentioned above. As such, I make it clear to my clients that I cannot and will not forecast or control the outcome of any proposed research undertaken by myself and my corporation. Such a policy is particularly important in cases involving litigation, where not only professional marketing research ethics apply, but also those court standards set forth for valid and reliable studies. Rules and standards to eliminate sources of error and bias have been closely followed in designing and administering each and every project assigned. Reference to those guidelines appears throughout this report to help the reader understand established and recognized research theory and practice.

It should also be noted that as I have been actively conducting research for over five decades, I have intentionally not published my work for two reasons; first, all studies are confidential and remain in the custody and control of my clients, and second, not having the time to publish more general theories and techniques which I have developed, I have supported and relied upon those marketing research professionals whose published works are accepted by accredited marketing research journals and professional organizations, to structure my own studies. Accordingly, my work remains on the cutting edge of marketing research science, and is consistent with the latest findings and developments in this industry. Our profession is essentially divided between two types of implementers, the theoreticians (who write the articles and books about what transpires in the marketing research world) and the practitioners (who are actually conducting the studies which theoreticians use in their writings). I belong to the latter group.

6

**3. Consumer Survey**

a. Study Integrity

The survey sample selection, questions, questionnaire design, and interviewing procedures employed in this survey were specifically designed in accordance with the generally accepted standards and procedures in the fielding of surveys set forth by the American Marketing Association, Marketing Research Association, CASRO and ESOMAR. The survey was designed to meet the criteria for survey trustworthiness detailed in the Federal Judicial Center's Manual for Complex Litigation, Fourth.[1]

b. Study Design

The survey was designed to measure the degree of confusion which may have been created by the use of eight women (as presented in the Complaints) in the Internet advertising of the Mansion Gentlemen's Club relative to their acting as spokespeople representing the brand, endorsing the brand, and participating in the activities at the Club and/or the life style represented in the advertisements, and/or being otherwise affiliated or associated with the brand. The study design took into consideration the fact that the Defendants' advertisements used the Internet as the social media for their distribution to potential consumers who might be interested in what was being promoted. Accordingly, interviewing for this research was completed using the Internet as well.

A self-administered questionnaire (Exhibit 4) was constructed consisting of representative ads for the Mansion Gentlemen's Club, using images of the eight Plaintiffs (shown in Exhibit 6). Presentation of these ads was accompanied by a series of closed and open-end questions relating to the respondent reactions to the advertising, and their demographics.

---

[1] For the proffered poll or survey, "…Relevant factors include whether: the population was properly chosen and defined; the sample chosen was representative of that population; the data gathered were accurately reported; and the data were analyzed in accordance with accepted statistical principles . . . . In addition, in assessing the validity of a survey, the judge should take into account the following factors: whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity." See Federal Judicial Center, Manual for Complex Litigation, Fourth, Section 11.493, @ 102 – 104 (2004).Section 11.493, @ 102 – 104 (2004).

Upon examination of the eight implicated in the Complaint in this action, a design was applied to account for such factors as the nature of the metropolitan area, possible social and cultural differences, club and general geographic location, and population densities relating to past target group incidence levels in similar studies.

In total, eight ads each showing different women appearing in the Complaint were tested among 812 respondents selected from the metropolitan areas among a random sample of adult men and women, 21 years and older living in the metropolitan areas surrounding the club location, who had patronized a patronized a "Bikini Bar/Gentlemen's Club/Strip Club" in the past two years.   A 50/50 gender quota was applied to men and women so that comparative results for both genders could be analyzed. The order of presentation of the images was rotated to avoid any possible serial position effect.

The use of eight ads as representative of an advertising campaign reflects a standard practice in the marketing research industry and is consistent with the theory of representativeness in all marketing research. So long as the critical variables are present in the representative sample selected, whether the sample referred to is advertising material, target group members, specific products or services, the reliability and validity of the research design is established. The impracticality and lack of need to include all stimuli or target group members in research in order to draw conclusive results reflects the very foundation of marketing research sampling theory and practice.

I have completed a major series of over 45 studies completed in 2017, 2018, 2019, and 2020 highly similar and some parts identical to the design of this study, which have demonstrated beyond a doubt that the use of representative ads reflecting the campaign theme of Clubs in this adult entertainment industry (e.g., Nightclubs, Bikini Bars/Gentlemen's Clubs/Strip Clubs) provides reliable and valid information as to the role those women in the ads are perceived to play. Acceptance of the results of these studies is reflected in both court decisions and the arbitrated agreements between Plaintiffs and Defendants.

As stated, it is standard and accepted practice in marketing research to use a representative sample randomly selected from the target group involved in the industry

8

upon which to conduct the desired research. The use of this representative sample in the Mansion Gentlemen's Club research occurred for two reasons, the first of which was that Defendants did not provide a list of the current  patrons who we might have considered for our study. Our specially qualified and current sample was the most relevant available resource.

However, more importantly, since this is an advertising communications study, using our sample, we would not be exposed to the error variance which would occur in a purely Mansion Gentlemen's Club Patron sample. That sample would not likely be accurately representative of all those Club patrons, since data to be reliable and projectable to the actual patron population would have to be collected in such as manner as to take into account and balance specific variables such as;

- the manner in which the sample was collected (from email addresses, by phone, at the Club referrals, etc.),
- the questions which were used to qualify them as patrons (e.g. frequency of Club visits),
  -activities at the Club on the dates visited (different activities or events would tend to generate different patronage samples),
-seasonality (holidays, week-day versus week-ends, etc).

Moreover, a sample consisting <u>only</u> of Mansion Gentlemen's Club patrons with heavy patronage experience could potentially affect what was communicated by the advertising tested, introducing  a potential bias into the research results, as that actual Club patronage experience might affect recording desired reactions essentially limited only to the advertising. For example, we examined whether the advertising communicated that women shown in the ads "might participate in any of the events or activities taking place at the club". Frequent patrons might tend to know the "regular" girls at the club.

We also asked, as another example, what the "first thing was that came to mind" only in looking at the ads used in this research, and what "feelings or emotions" were elicited.  Frequent patrons would be more likely to have previously seen these ads, depending on the time frame in which they appeared.

9

Case 7:18-cv-09448-KMK  Document 43-12  Filed 02/05/21  Page 10 of 32

However, our objective of asking survey participants to respond only to what was presented in the advertising used in this survey is shown to have worked well when this instruction was included in the questionnaire as a condition for responding. Those Club patrons who  randomly appeared  in the survey sample did not seem to affect the outcome of the findings, based on their individual responses. A separate analysis was performed on those past patrons of clubs in the targeted industry.

It is particularly important to recognize that this research was designed as a <u>communications study</u>, intended to document only what the advertising alone conveyed, as opposed to actual club patronage experience. Accordingly, presentation of these ads was accompanied by a series of closed and open-end questions relating only to the advertising, and demographics of those responding.

The survey more specifically was introduced to potential respondents  as designed "to understand the role of women in different Internet advertising" so as not to sensitize them or induce a bias relating to the more specific objectives of this particular research. It was explained that the use of Internet material shown in the survey was an example of women as they appear in such Internet advertising.

It should be noted that this was not a "causal study," a scientific term describing other types of research with different objectives. Thus, it was not appropriate nor was it possible to use a control group in this type of study, i.e., a matched sample of respondents showing the same ads without the female images  because the research was designed to measure what the women shown in the advertisements (attached as exhibits to the Complaint) <u>communicated</u> and <u>how their roles were perceived</u>. It would not have been possible to use a "control group" as one could not make such measurements  (i.e. ask the same questions as required in a valid control group)  if the women were not part of the stimuli, i.e., were not part of the ad.

By the same token, using other women would still mean we could not be measuring the correct female images we needed to study.  To compare what the Plaintiff images communicated versus what other female images communicated is not relevant. Our design objective is only to determine what the Plaintiff images communicate.

10

JA-163

More specifically, if our objective was to measure what the women in the ads communicated, how could we get meaningful data if we attempted to take those women out of the ads and ask, as would be necessary, the same questions to a matched sample of respondents as would be required to meet the definition of a valid "control group"? Obviously this would not be possible.

It would not have been appropriate either because knowledgeable researchers recognize that control groups are not appropriate or called for by the standards applied by the Courts in accepting the reliability and validity of communication studies. They may be for causal studies, but this was not a causal study. An attempt to label it as such would reflect an inability of the critic to understand the  standard mentioned in the following paragraph.

I again emphasize that this research was a communications or descriptive study, negating the need for any control group. Accordingly, in this case the absence of a separate control group of respondents which would not be exposed to the women in these ads was in fact consistent with the logic of the Diamond research standard (Sheri S. Diamond, Reference Guide on Survey Research, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359 Federal Judicial Center 3rd ed. 2011). Specifically, Diamond asks on Page 249:

> F. If the Survey Was Designed to Test a Causal Proposition, Did the Survey Include an Appropriate Control Group or Question?

As the purpose of this research is not the test of a causal proposition, but rather a communications or descriptive study, there is no need for a control group. However, Diamond does discuss the use of a control question on page 252, which is exactly what I determined was appropriate to add in the questionnaire:

> Another more common use of control methodology is a control question. Rather than administering a control stimulus to a separate group of respondents, the survey asks all respondents one or more control questions along with the question about the product or service.

11

Therefore, so as to isolate and better understand the role of the female images in these ads, "control questions" (as mentioned in the Diamond standard) were included showing both the original ad and a photo-shopped version of each ad without the model's image in it, with the instruction to respondents to "assume that the quality of the photo-shopped version would be comparable to that of the original". With this approach we could among the same respondents isolate the effect of having the female images in or out of the ads.

Moreover, to add a further control aspect to this communication study, we took eight images of women off the Internet who were either working at Mansion or other clubs in the same geographic region as the Mansion club, or were patrons, and explored the area of recognition and impact on Mansion club patronage. These images as well as those of the Plaintiff images were explored in this manner prior to being exposed to questions which might sensitize them to the focal point of the study, thus negating any opportunity to affect their responses.

It should be noted that the practice in marketing communications research of pre-testing ads for predictive results using "storyboards" or rough-finished versions of the ultimate ad which may include photo-shopping has been a long-established practice which has been proven to yield reliable and insightful data particularly in terms of establishing what certain individual elements in the advertising execution contribute to overall communication of the message. Thus, it was perfectly valid to use these photo-shopped versions.

It should also be noted that the order of presentation of the ads as well as response scales were rotated in each interview to avoid any possible serial position effect.

c. Study Sample

The sample used in this study was provided and managed by Precision Sample, a Macromill Group Company serving 22 countries in four continents, with over 25 million respondents in panels, offer programming and hosting and sample across nearly every major country in North America, Europe, Asia and South America. It is the sample provider, field and tabulation company of choice for discerning market researchers fielding complex mission critical research projects . In the USA alone they have 13 million panel members

The panels have 15,000 daily sign-ups and over 50,000 site visits daily. Quality Sentinel is a proprietary 20-step panel validation, vetting and security process available only from Precision Sample. Quality Sentinel ensures only the most engaged and highest quality respondents access a client survey each and every time. Panel management includes GEO-IP fencing, digital fingerprint deduplication on each survey, reCaptcha bot detection, respondent scoring, profile consistency checks, LOI scans, silent deactivation, 2 strike policy, and weekly panel cleansing. 100% of its panels are validated against national consumer databases confirming the accuracy of an individual's self-reported data against thousands of well-known databases that integrate billions of records. As these procedures are defined by Precision Sample:

"GEO-IP fencing, We know each panel member's computer IP address and location. If a respondent tries to take a survey and are outside a 50-mile range of where they registered to be a panelist then they will not be allowed to enter a survey

Digital fingerprint deduplication on each survey, each respondent has a designated respondent ID. Therefore, we can control what surveys they take. In case of a tracker which requires fresh respondents for each wave, we can make sure that respondents do not take the same survey twice

ReCaptcha bot detection, We use Captcha questions for security measures prior to entering a survey (ie: those 6 square pictures where it says "click on all of the pictures with stop signs I them"

Respondent scoring, "we score respondents based on how active they are in the panel with taking surveys. Also, we keep track of any red flags in which our client's have removed the respondent from counting as a complete due to them speeding through the survey, straight lining, etc.

Profile consistency checks, We constantly scan each respondent's panel profile, ensuring that they aren't constantly changing their profile (i.e. they save they have 3 kids under the age of 18, and then 3 months later their profile says they have 0 kids)

LOI scans, for surveys that we program, we are able to term respondents who speed through surveys

Silent deactivation. We have a 2 strike policy. If our client/s inform us that a respondent does not count as a complete due to fraudulent behavior, they are silently de-activated from being a panel member (hence our 2-strike policy)

Once validated with Verity, panelists are presented with challenge questions relating to their credit activity and previous addresses. Failure to accurately respond results in suspension from the panel.

 In the initial profiling process, members are asked to complete an open ended question. Questions rotate on a variety of topics related to their personal life such as describing their dream vacation and what activities they plan to participate in on that vacation or to describe their dream job. Questions are tailored to spark an interest and passion in members to generate a response that is easy to provide. Text analytics and scoring are applied to the response to evaluate engaged vs. disengaged panelists. Only members passing this evaluation are invited to participate in client surveys.

At every interaction with each panelist, Relevant ID digital fingerprinting is applied insuring panelists have not previously completed a survey and are participating from the country identified in their self-reported data.

Our custom platform powers validation, profiling, monitoring, real-time profiling, automated access and evolved sample balancing and blending systems.  Every Precision Sample panelist is validated with Quality Sentinel, our industry-leading proprietary 20-step validation process.”

Generic invitations are sent out via Internet addresses to panelists known to have the basic demographics desired for the study, and the computerized sampling matches participants to existing census data for the geographic area. Screening on the survey form itself terminates those in the general demographic population who do not qualify, providing us with an incidence of the target group in the general Internet population. The validity of Internet populations in the use of marketing research studies is essentially an uncontested method which has to a large extent replaced phone studies because of cost and sample accessibility.

As with any reliable research panel operator, Precision Sample has a wealth of information on its participants, some relating to our research and others not related.

Therefore, matched to general population demographics in the USA, for this research a random sample of residents oriented around the Club location was used as a base of contacts to begin the screening process to locate target group members for

participation in the survey. More specifically, from a random sample in the geographic areas surrounding the Club, we screened for adults 21 and over who were residents with Internet addresses, and were screened to confirm that they patronized a "Bikini Bar/Gentlemen's Club/Strip Club" in the past two years. The questionnaire used is shown in EXHIBIT 4 of this report.

It should be noted that the questionnaire shown is one example of the multiple formats used to allow for rotation of images in each research cell as well as response scale rotation, to allow for elimination of any possible serial position effect. To show each variation of image and response rotation would generate many additional report pages. The sample questionnaire shown, to avoid unnecessary redundancy, represents exactly the questions used in each questionnaire as shown to respondents.

As is it generally acknowledged that women as well as men constitute a significant percentage of Club patronage, the sample was controlled to yield roughly equivalent sub-samples of men and women, allowing gender to be analyzed as an independent variable. Since the actual average proportion of men versus women in attendance of this club, or any others that we have studied, is not known and would vary depending on a variety of factors (club promotions/orientation of activities/surrounding population demographics and socio-graphics, etc.), the strategy of isolating gender resulted in our understanding the perceptions and attitudes of both men and women as they perceived the role of the female images featured in these "social media" advertisements.

Having said that, we can in fact study the results of our randomized recruiting of males and females to suggest what the actual balance of gender might be for the Mansion Gentlemen's Club, using the patronage incidence of qualification recorded separately for men and women. It was about 23% for men and fractionally over 6% for women. However, this is only a single snap-shop in time from the current sample. A more reliable estimate, as mentioned, would require control of multiple variables such as seasonality, special club promotions and activities, advertising programs, etc. Past patronage of the Mansion Gentlemen's Club among the research sample was 27%.

In this particular communications study, the research, meeting accepted court-followed standards, utilizing a sample that did reflect the specific target audience of adults

15

21 and over who patronized a Strip Club, Gentlemen's Club/Bikini bar within the past two years. It is helpful to refer to what J.C. Nunnally had to say when discussing domain sampling in his iconic book 'Psychometric Theory'. He states: "strictly speaking items are almost never actually sampled randomly; rather, items are composed (his emphasis) for particular measures" (Nunnally, J.C. (1967) Psychometric Theory, New York: McGraw-Hill).  In this Club research, we have identified and utilized the target audience consistent with the research objectives.

Data was collected by computer from those responding to the Email research request during September of 2020. During that time, a total of 812 completed the interview responded from the targeted sample. If we explain the sample composition using the guidelines presented and consider all 812 representing elements of the target group, the resultant reliability factor of this total sample at the 95% confidence level is close to +/-3.5%. It should be remembered that reliability changes with response levels, so that for response levels near 5% and 95%, the reliability factor increases and for response levels closer to 50%, it decreases.

Fieldwork was terminated when the designated quotas for each location were reached, as is standard and accepted practice in the industry. The true total number of potential consumers responding to our invitation and others like it, therefore, can never be established, since it is likely many more tried to respond and would have tried to respond had we not closed down the website used for the survey upon reaching our design quota.

d. Study Questionnaire

In developing the questionnaire for the survey (See EXHIBIT 4) specific areas of information were covered to measure possible confusion generated by the use of women in the advertising. Respondents were directed to "help understand exactly what impact these ads have on their thinking "by responding based on their reactions only to the material shown". The questions in these areas included spontaneous (unaided) impressions generated by looking at Internet ads, feelings or emotions associated with those ads, and perceptions of:

--the extent to which the women in the ads were important in terms of <u>initially attracting attention to the advertising;</u>

--what the respondents felt the ads <u>were trying to communicate to them;</u>

--how <u>important the women were in terms of communicating the  perceived message and why;</u>

--whether or not all the women shown <u>have some affiliation, connection or association with those Clubs</u> in whose ad they appear;

--whether or not all the women have <u>agreed to sponsor, endorse, or promote the Club</u> represented in these ads;

--whether or not all the women <u>approve of the use of their image in those Club advertisements in which they appear;</u>

--whether or not all the women <u>probably enjoy a lifestyle like that reflected in those Club advertisements</u> in which they appear;

--whether or not all the women <u>probably do participate in the events or activities which take place in the Club,</u> and as reflected in the ads in which they appear;

--whether or not all the women <u>were paid to be in the ads</u> in which they appear;

--and whether respondents felt they <u>recognized</u> the women in the ads,  how this recognition would have occurred, future potential recognition and its impact in terms of promoting willingness to patronize the club and spend money there.

Additional measures also applied included:

 --perceived likelihood of feeling all the women in the ads represent the same kind of women they would expect to see at the Club;

--which of two ad versions, one with and one without the women shown, would be more likely to generate   interest in considering the possibility of patronizing the Club;

--which of two ad versions, one with the Plaintiff image and one with a replacement image  shown, would be more likely to generate   interest in considering the possibility of patronizing the Club;


-- the percentage increase, if any, the ads with the women shown would   generate in terms of attending one of the events at the Club;

--as a patron of the Club from time to time, expectations that they would see the woman in the ads working at the club and interacting with the patrons in some way;

17

--previous Club patronage;

-- devices regularly depended upon to read Email such as that represented by the ads;

--demographic data including age, gender, marital status, income, Club patronage and type of devices used.

Any possible response bias was eliminated from the research execution by adding the phrase "if any" to appropriate questions.


Preference for the scales applied for this attitudinal research are further provided by others who suggest avoiding use of the Likert scale for attitudinal questions (Bishop 2005, Oppenheim 1992, Mondak & Davis 2001, Visser et al, 2002, and Vannette 2015).  The Likert scale avoided in this club research design represents degrees of discrimination which are often outside the capabilities of the respondent in attempting to provide an accurate attitudinal response.

## 4. Measuring Likelihood of Confusion

The measurement of the likelihood of confusion in this research focused on whether the use/appearance of women in advertising used by this Club gave a significant amount of those who would see their likeness in the material the understanding that:

a) All of the women shown in the ads have some affiliation, connection or association with the Club in whose ads they appear;

b) All of the women shown have agreed to sponsor, endorse or promote the Club represented in these ads;

c) All of the women in these ads approve of the use of their image in those Club advertisements in which they appear;

d) All of the women in these ads probably enjoy a lifestyle like that reflected in those Club advertisements in which they appear;

e) All of the women in these ads probably do participate in the events or activities which take place in the Club, as reflected in the ads in which they appear;

f) All of these women were paid to be in the ads in which they appear.

g) Assuming one was to become a patron of the club from time to time, one would expect to see the woman working at the club and interacting with patrons in some way

As mentioned, both spontaneous/unaided and closed-end (aided) measures were utilized as well in order to measure the role of the women in the ads in terms of their contribution to what was communicated, all else that was communicated, and what emotions were associated with those communications. The open-end responses offer major insight coming spontaneously from respondents prior to directing their focus to specific areas and are also recommended in the Diamond Standard. They facilitate how we interpret closed-end questions which are answered by respondents.

And again it is emphasized that in accordance with these previously mentioned standards of research design, the format of all questions and response scales were carefully designed so as not to induce any bias or loading in the possible responses provided by survey participants with respect to the issue of confusion.

# 5. Analysis of Results

### a.  Summary and Major Conclusions Resulting From The Communications Data

The results of this study focusing on advertising for this Club used many identical questions used in over 50 other independent studies during the past few years involving many similar adult evening-oriented social-interaction recreational Clubs with locations ranging from the East to West Coast of the U.S.

The manner in which the women's images are shown in the advertising involved in this case clearly leads to false and misleading ideas about their role in the message communicated, inconsistent with what is known to be the facts surrounding the use of their likenesses, as evidenced by respondents' answers to measures evaluating this issue.

Once again in this latest research--comparable to those previous studies based on identical objectives, and using either identical or similar questions and the same target groups in both the same and other geographic locations of the U.S. -- we have found that the manner of use of the particular female images for Internet ads in this adult recreation evening-oriented social interaction industry communicates wrong impressions about the basis for their appearance among both male and female target groups, resulting in erroneous feelings about the role they play in promoting the advertised club.

### b.  Control Questions and Impact

At this early  point in the interview when Control questions were presented, respondents had no idea of what the purpose of the study was and could not have been sensitized by the later closed-end questions which would point directly to specific aspects of communication.

Correct application of Control questions requires <u>that the only element that changes in the control situation versus the test situation is some aspect of the overall  stimuli being isolated,</u> which in this case was <u>the Plaintiff image</u>. There are two options to dealing with the stimuli in a valid and meaningful Control design. One option is to replace the initial stimuli element (Plaintiff images)  in the test question with a different stimuli element in the control question (images of other females). The only other valid possible option is to eliminate the initial test stimuli element entirely ( the Plaintiff images) and test the remaining material in the ads. In both cases, any

20

difference in the performance of the ad with the test stimuli element (Plaintiff images) versus the other two conditions (other female images or missing female images) is isolated and attributable to the test stimuli element.

It is important to note that the replacement images were mostly taken from the Mansion Internet ads not using our Plaintiffs, but with other female images. All Replacement images were reflective then of Mansion Internet advertising

Accordingly using these three sets of ads, we have established a test group and two control  group situations. The first Control design isolated the impact of the <u>Plaintiff images</u> in the Test ads versus that of the <u>other female images</u> Mansion Club used in Internet advertising. In other words, the Test and these Control ads were virtually the same except for the female image shown.

The second control designed  compared the impact of the <u>Plaintiff  images</u> in the Mansion ads versus what those same ads communicated <u>with no female image</u> in them.

Using both the Plaintiff images and the both types of Control images, what we specifically sought to learn was which of these three presentations  would be more likely to significantly increase the likelihood of Club patronage, and what the <u>intensity</u> of any increase would be.

Overall, almost four out of five respondents (78%) indicated the Plaintiff images were more likely to significantly increase Club patronage considerations than the Replacement Control images. The strength of this preference was very strong, as the mean increase among these respondents on a scale of 1% to 100% was 70.8%

In the second control situation, slightly more than four out of five (82%) felt the Test Ad would be more likely to increase their patronage consideration than the same ads with no female images,  again to a very strong degree, as the mean increase on a scale of 0% to 100%  was 73.8%.

JA-174

### c. Recognition

Notwithstanding the fact that two of the eight images did not show the Plaintiff faces, the table following shows that  almost half the respondents felt they recognized the Plaintiff images in the ads in some manner having seen them prior to this research. The average level of recognition for all eight models in the Mansion Club ads was 48.85%

|  | Plaintiff Ad 1 | Plaintiff Ad 2 | Plaintiff Ad 3 | Plaintiff Ad 4 | Plaintiff Ad 5 | Plaintiff Ad 6 | Plaintiff Ad 7 | Plaintiff Ad 8 |
|---|---|---|---|---|---|---|---|---|
| Definitely | 29% | 32% | 28% | 32% | 29% | 28% | 24% | 26% |
| Probably | 21% | 23% | 21% | 19% | 19% | 23% | 19% | 19% |
| TOTAL | 50% | 55% | 49% | 51% | 44% | 53% | 43% | 45% |

Recognition is a broad term and is based on a variety of different perceptions. It is far from synonymous with name identification. Many highly recognizable models, spokespersons and other characters are immediately "recognizable" to consumers, yet their names are unknown. Some primary examples of this phenomenon are:

The "Mayhem" character in the Prudential Insurance car commercials (Dean Winters)

 Mr. "We know a thing or two because… from  Famers Insurance Advertising"  (Jonathan Simmons)

"Flow" from Profressive insurance advertising (Stephanie Courtney)

 "Lily Adams" from the AT&T advertising (Milana Vanytrub)



In registering "recognition", this study defined what was meant by recognition based on how it occurred. In other words, we studied why some people felt they recognized the female models shown in the Mansion Internet ads. The following table shows scores for those respondents who stated they  "definitely" or "probably" recognized the Plaintiff images in the Mansion Club ads.

22

| | Overall, Average Recognition score for all 8 Ads | Ad 1 Cell 1 | AD1 Cell 2 | Ad 2 Cell 1 | AD2 Cell1 | Ad 3 Cell 1 | AD3 Cell2 | Ad 4 Cell1 | AD4 Cell2 |
|---|---|---|---|---|---|---|---|---|---|
| Saw in other Mansion's ads | 46.50% | 50.00% | 46.00% | 48.00% | 40.00% | 50.00% | 47.00% | 46.00% | 45.00% |
| d Saw in similar Club ads | 54.88% | 53.00% | 54.00% | 53.00% | 53.00% | 54.00% | 59.00% | 56.00% | 57.00% |
| d Saw in other different types of ads, different media | 31.38% | 29.00% | 32.00% | 32.00% | 38.00% | 29.00% | 28.00% | 33.00% | 30.00% |
| e Would remember her /recognize her in other ads | 64.00% | 64.00% | 78.00% | 73.00% | 72.00% | 58.00% | 51.00% | 64.00% | 52.00% |
| if Would expect to see her at Mansion's interacting with patrons | 68.13% | 72.00% | 74.00% | 68.00% | 74.00% | 65.00% | 62.00% | 67.00% | 63.00% |

Close to half the sample felt they had seen the Plaintiffs in other Mansion ads.

Slightly more than half felt they had seen the Plaintiffs in ads for other similar Clubs.

Slightly under one-third overall stated they recognized her from appearing in other advertising on television or the Internet or magazines for some other type of product, service or promotion.

Across the board, from half to three-fourths of the respondents felt they would remember and recognize these Plaintiffs if they appeared in ads from other advertising, on either television or the Internet or magazines. When the face of the Plaintiff was shown, that percentage was significantly higher.   The overall average of this anticipated recognition was two-out of three respondents.

These data clearly reflect the strong sense of recognition these club goers have for the Plaintiff images as they appear in the Mansion ads, and suggest the strong possibility that their appearance in other Internet as well as other media advertising will be recognized.

Additionally, over two-thirds thought that if they patronized the club, they would expect to see the Plaintiff working at the Club and interacting with patrons in some way.

**d.  Measures of Communication and Confusion/Misleading Communications**

Overall scores from the different key measures applied were consistently indicative of a major degree of confusion,  with scores in the  60th and 70th percentiles of the total sample. Therefore, these perceptions of the communicated role of the women in these ads was not just a

**JA-176**

little bit inaccurate, they were highly inaccurate as construed by a substantial majority of the target audience.

Sixty-one percent felt that that Plaintiffs probably <u>do participate  in the events and activities </u>which take place in the club based on what the ad communicated to them and seventy-eight percent felt they had <u>been paid for their appearance</u>.   Also, eighty-six percent felt the Club was using the  women (Plaintiffs) in the ads to make them think they represent the same kind of women expected to be seen performing at Mansion.

Of course, as factually related by Plaintiff Counsel, **<u>none</u>** of the Plaintiffs have appeared at or participated in Mansion Gentlemen's Club activities nor were they paid for the use of their image. But use of their image is clearly having a major impact on patronage considerations.

Comparable degrees of confusion and delusion were reflected on all other communication measures as well, and as described in the Specific Results which follow.

**e.  Specific Results Of Detailed Measurements Used In This Study**

<u>1. Spontaneous (Open-end) Responses</u>

Spontaneous comments reveal what first came into mind as respondents looked at the advertisements. Researchers generally agree that any idea mentioned spontaneously by 10% of the respondents begins to become significant as a focal point of analysis. Response levels of 20% and 30% or more are very significant. These unaided spontaneous data clearly reflect the nature of the strong impact the women have in contributing to the major communications aspect of the ads. Of all the thoughts elicited,  the single heavy mentioned comment category was the "Beautiful/Pretty/Sexy/Hot/Attractive/ Cute/Women/Girls/with sex appeal" , mentioned by 51% of the respondents, 30% as a first mention and 21% as a second mention.  Other more isolated references were made to these female images, (e.g., "girls in bikinis",  "naked women/models/dancers/strippers/ looking for money/single women", "sex/porn/female anatomy (boobs/tits, etc.). No other individual ideas were expressed by more than a few percentages of the respondents.

24

These spontaneous first impressions reflected in open ended questions are essential to provide an understanding of exactly what message and feelings are generated before specific issues in the Complaint are brought to focus in the remaining portions of the questionnaire. At this early point in the interview, it is again noted that <u>respondents do not know that individual aspects of the perceived role the women play in the ads are what we will be exploring in the latter part of the interviews.</u>  These unaided spontaneous data clearly reflect the nature of the strong impact the women have in contributing to the major communications aspect of the ads, specifically with most frequent mention of sexual enticement associated with them.  Such references predominated in both "immediate" as well as "secondary" spontaneous associations with the material.

The significant amount of recognition of the eight models in the ads has already been discussed.

Given that representative comments mentioned as first reactions to the ads were heavily focused on the female images and their sexuality, it was not surprising to find that when respondents explained what <u>feelings or emotions</u> they experienced as they looked at the ads, their comments  included most  frequent mention of such comments as "sexy/attractive/beautiful women/girls" (21%), "aroused/horny/hot/ sex/lust (12%) and "excitement/intriguing/fun/enticing" (12%). Many other specific similar feelings were expressed including "desire, turned me on, shows women as objects, selling sex, dirty", and "erotic".

Such feelings and emotions serve to highlight the fact that the communicated message came across as more than a simple fact of existence. It was  emotionally loaded as well. These emotions were strongly tied to first associations and  represent motivators which will lead to those attitudes which will drive behavior (in this example, Club patronage).

Among the many different ideas respondents included about what the ads communicated, comments most often specifically mentioned the female images, i.e., "come to see/meet the beautiful/attractive/sexy girls/women" (28%) and "Come to the strip club/see us" (22%).     The more generic idea of going to the club to "spend

money/have fun/play/drink and have a good time" was included as part of the message by 13%.

## 2. Closed-End Responses

In addition to these spontaneously generated responses, closed-end response measures probing relevant aspects of communication concerning the perceived role of the women, and which accurately reflect the pattern of perceptions and attitudes generated among all respondents, led to the following findings:

- A follow-up question was asked following  the above open-ended communications measure probing respondent's feelings about how important they felt the women's images were in terms of <u>communicating the message</u> of the ads. Results showed that almost nine out of ten (87%) felt the women were "very" or "somewhat" important, with most (56%) indicating they were "very important" and another 32% stating they were "somewhat important".

- Respondents explained this predominant feeling of importance based most often on the comments such as;
  - "good/great/important in communicating/enhancing the message"(22%)
  - "girls are sexy/hot/attractive/what men want to see" (21%)
  - "sexuality sells/sex is what the Club is selling/girls are the
       main attraction" (14%),
  - "attract customers/entice men to the club" (9%).
  -  and other more occasional specific references to the female images.

- In terms of determining how important, if at all, the women shown were in terms of <u>initially attracting attention to the ads</u>, similarly nine out of ten (91%)  of these respondents felt they were "extremely" or "somewhat important", with 64% stating they were "extremely important" and another 27% stating they were "somewhat important".

26

**JA-179**

Specific probing of six issues occurred at this point in the interview to record any possible confusion with what was communicated in key areas. Respondents were asked to provide based on their strongest impression for each pair of opposing statements, the one they thought was true considering their individual personal feelings based only on the advertising to which they were being exposed in this survey.

1) Sixty-two percent felt that the correct statement was

**All the women shown in these ads have some affiliation, connection or association with those clubs in whose ad they appear**

Versus 38% who chose the opposite.

2) Three-fourths of the respondents (75%) felt that

**All of the women in these ads have agreed to sponsor, endorse or promote the club represented in these ads**

versus 25% who felt the opposite.

3) Also, three-fourths of the respondents (76%) felt that

**All of the women in the ads approve of the use of their image in those Club advertisements in which they appear**

versus 24% who felt the opposite.

4) Two-thirds (67%) felt that

**All the women in these ads probably enjoy a lifestyle like that reflected in those Club advertisements in which they appear**

versus 33% who felt the opposite.

5) And as mentioned, 61% felt the true statement was

**All of the women in these ads probably do participate in the events or activities which take place in the Club, as reflected in the ads in which they appear**

versus 39% who chose the opposite.

6) Again, almost four out of five (78%) of these  respondents felt

27

**All the women were paid to be in the ads in which they appear**

versus 22% who chose the opposite.

It is again noted that the position of each of the paired statements was rotated to avoid any possible serial position effect (i.e., a tendency to intrinsically favor picking either the first or second appearing statement).

Respondents were also asked how likely they think it is that the **"Club is using the women shown in the ads to make you think they represent the same kind of women you would expect to see performing in some way at the Club represented".** Results revealed that more than four out of five respondents (86%) indicated they felt it was "very" or "somewhat likely" the case, with 58% indicating it was "very likely" and about 28% "somewhat likely."

**f. Differences Among the Eight Ads and Two Cells.**

Given the diverse nature of the 8 ads tested with regards to themes, creative strategies and specific messaging, it was not surprising occasionally to find some statistically significant difference in specific scores at the extreme 95% level at which the scores were compared. However, the actual extent of these differences did not alter the overall conclusions drawn, since in the large majority of cases open-end response and closed-end response levels between cells were in the same ballpark, particularly in terms of their impact on generating confusing and misleading perceptions of what the communicated role of the Plaintiffs in the advertising was, and what the impact on patronage might be.

Even the two ads which did not show the Plaintiff's faces still tended to perform overall at the same level as the other six ads which showed Plaintiff faces, though in one specific area measured, the ability to "significantly increase the likelihood of patronage" versus the Replacement Control ad, their scores were somewhat lower compared to the other Plaintiff ads.

For many measures the results were similar with regard to gender. However, some response scores relating to the positive sex appeal of the women in the ads were higher for males than females. Also, in some cases males tended to have more recognition of the models. But for

28

measures associated with confusion and misleading information, there ranked to be no significant gender differences

The net impact of generating patronage considerations for the Mansion Gentlemen's Club was also often significantly higher among men than women across the board, particularly when the female image is eliminated from the ad.

**g. The Use of "Communications" or "Descriptive" Research  among the Representative Sample of the Target Group**

Among this representative sample of patrons of the Club industry involved, 27% of the 812  respondents were found to be past patrons of the Mansion Gentlemen's Club. The fact that the data in this specific report remain highly consistent with over 40 other studies completed among this same target group clearly demonstrates <u>that past patronage does not have a significant impact on the perceived role of the female models in this type of advertising.</u> Designed as a communications study, this research required respondents to focus on the stimuli presented to them and relate their perceptions, attitudes and anticipated behavior on that material only. The similarity of findings supports the contention that this instruction was followed.

I have experienced  in a few cases involving my extensive Club research studies occasional attempts by "professional experts" to portray this basic research design as a totally different type of study with different objectives, such as a "recall study" or a "causal study". With 56 years as a marketing research professional as opposed to a "hired opinion provider",  I recognize that such attempts are what we qualified researchers refer to as "Straw Dog" arguments. They ignore the articles, facts and supporting evidence (such as those referenced in this report) from other marketing research experts bound to the ethics of our professional organizations and committed to applying the latest, most sophisticated and widely accepted aspects of consumer research science and theory.  Simply put, a communications study such as this one by all recognized theoretical and legal standards simply requires presenting the stimuli to respondents and

asking them immediately about their perceptions (understanding and impressions), related attitudes and probable behavioral impact.

## 6. Conclusions

We cannot understate the high percentages recorded for the responses which point to the importance of the role the women's images played in message communication, highlighting the very widespread confusion and misleading perceptions of the role they were playing in this Club's ads.

The data generated in this research clearly indicate that both women appearing in the Mansion Gentlemen's Club ads are very highly likely to be perceived and understood as:

1) **having some affiliation, connection or association with those Clubs in whose ads they appear have agreed to sponsor, endorse, or promote the clubs represented in these ads**

2) **have agreed to sponsor, endorse, or promote the clubs represented in these ads**

3) **having approved of the use of their image in those Club advertisements in which they appear**

4) **probably enjoying a lifestyle like that reflected in those Club advertisements in which they appear**

5) **probably participating in the events or activities which take place in the Club, as reflected in the ads in which they appear**

6) **having been paid to be in the ads in which they appear**

7) **Contributing significantly to the probability of patronage and spending money at the club based on the specific appeal of the Defendant's images appearing in the ads.**

The levels of recognition recorded among respondents were quite significant, who often tend to see Plaintiffs participating in the events and activities occurring at the Club.

Respondents mostly tend to feel the Club is using these Plaintiffs to make them think they are the kind of women they would expect to see inside the Mansion Gentlemen's Club, and contribute in a major way to their patronizing it which includes patron interaction.

Given that these women, as reported by Counsel, did not legally agree to have their likenesses appear in these ads, notwithstanding some level of past patronage experience of our research sample, there is no doubt that the large majority of respondents seeing the ads cited what amounts to confusion and false communications surrounding ideas relating to the women's role in the material. The significance of the perceived role of female images as reflected in these survey results cannot be understated.

The importance of advertising strategy in affecting the widespread miscommunication that occurred is shown consistently throughout the results. However, it is highlighted by the high percentages of respondents who felt the women in the ads contributed to overall likelihood of considering patronage.

The frequency of response levels demonstrating wrong impressions of the images of the women as communicated in the ads, based on what we know to be fact, is very high, with scores consistently in the 60th and 70th percentiles of the target population. These wrongful perceptions are extremely widespread, as opposed to existing among just a small portion of ad viewers, and cross lines of gender.

It should be mentioned that Communication data in marketing research has long established the fact that in general, visual elements in advertising tend to greatly overshadow what printed verbiage or statements are made, sometimes amounting to as much as 80% of the recall of the advertising material. That finding points to the importance of the females as part of the visual imagery in this Club advertising. While this research involved communication and not recall, the results clearly point to the importance of the female images in this advertising as highly responsible for what message comes across, and how it shapes the perceptions and attitudes of the viewers.

JA-184

Given that this study was carefully designed to following the guidelines and requirements of:

    1) The Manual For Complex Litigation, Fourth-Federal Judicial Center
    2) Diamond Reference Guide on Survey Research
    3) The Frye Standard,

the reliability and validity of these data confirm the high degree of misdirection concerning the role and appearance of the seven women's images tested as they were used in the Skin Cabaret ads.

Dated: Sept. 16, 2020 _____
Martin M. Buncher

32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ALANA SOUZA A/K/A ALANA CAMPOS, BROOKE
BANX, BROOKE TAYLOR-JOHNSON, JACLYN
SWEDBERG, JAIME EDMONDSON-LONGORIA,
JESSICA HINTON A/K/A JESSA HINTON, TIFFANY
TOTH-GRAY, and URSULA SANCHEZ A/K/A URSULA
MAYES,

                                   Plaintiffs,

    - against -

EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE
MANSION GENTLEMEN'S CLUB & STEAKHOUSE
and KEITH SLIFSTEIN,

                                  Defendants.
-------------------------------------------------------------------x
EXOTIC ISLAND ENTERPRISES, INC. d/b/a
THE MANSION GENTLEMEN'S CLUB &
STEAKHOUSE and KEITH SLIFSTEIN,

                      Third-Party Plaintiffs,

    -against-

EXCLUSIVE EVENTS & PROMOTIONS INC., d/b/a
THINK SOCIAL FIRST,

                      Third-Party Defendant.
-------------------------------------------------------------------x

Case No. 18-cv-09448 (KMK)

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE** that, upon the annexed Declaration of Michael Kolb, the

Exhibits annexed thereto, the Rule 56.1 Statement of the Defendants, the Affidavit and Report of

the Defendant's consumer survey expert Robert L. Klein, the Affidavit of the Defendant Keith

Slifstein with Exhibit A, the Defendants' Memorandum of Law, and all prior papers and

proceedings had herein as reflected by the Docket Entries in this case, the Defendants, by their

undersigned attorneys, will move this Court at the United States Courthouse, 300 Quarropas

Street, White Plains, New York 10601, before the Honorable Kenneth M. Karas, on a date to be

set by the Court for an Order (a) pursuant to Federal Rule of Procedure 56, granting to the

defendant Keith Slifstein summary judgment dismissing the Complaint in its entirety insofar as

its causes of action are directed against him, and granting to the defendant Exotic Island

Enterprises, Inc. d/b/a The Mansion Gentlemen's Club & Steakhouse summary judgment

dismissing the Complaint in its entirety as against it, except, perhaps, for the cause of action of

the plaintiff Ursula Sanchez a/k/a Ursula Mayes pursuant to New York Civil Rights Law § § 50-

51, which, if not dismissed on its merits because of insufficient proof of damages, should be

dismissed on jurisdictional grounds pursuant to 28 USC § 1367(c)(3) and 28 USC § 1332 and (b)

in the context of this summary judgment motion,  pursuant to Federal Rules of Evidence 104(a),

403, 702, 703 and the principles of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 US 579

(1993) excluding the expert report, survey, and testimony of the Plaintiffs' consumer survey

expert Martin Buncher and the report and testimony of the Plaintiffs' damages expert Stephen

Chamberlin, on the grounds that the reports and expected testimony based thereon will not help

the trier of fact to understand the evidence or to determine facts in issue, are not based on

sufficient facts or data, are not the product of reliable principles and methods,  are not the result

of the experts having reliably applied the principles and methods to the facts of the case, and that

any conceivable probative value of such testimony is substantially outweighed by the dangers of

unfair prejudice to the defendants and of misleading the jury, (c) awarding the defendants costs

and fees, and (d) granting to the defendants such other and further relief as to the Court may

seem just and proper.

2

JA-187

Dated: Newburgh, New York
       February 5, 2020

_____
Michael Kolb
O'Connor & Partners, PLLC
Attorneys for Defendants
356 Meadow Avenue
Newburgh, New York 12550
mkolb@onplaw.com
(845) 303-8777

TO:   John V. Golaszewski, Esq.
      The Casas Law Firm, P.C.
      Attorneys for Plaintiffs
      1745 Broadway, 17th Floor
      New York, NY 10019
      john@talentrights.law
      (855) 220-9626

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ALANA SOUZA A/K/A ALANA CAMPOS, BROOKE
BANX, BROOKE TAYLOR-JOHNSON, JACLYN
SWEDBERG, JAIME EDMONDSON-LONGORIA,           Case No. 18-cv-09448(KMK)
JESSICA HINTON A/K/A JESSA HINTON, TIFFANY
TOTH-GRAY, AND URSULA SANCHEZ A/K/A URSULA
MAYES,

                          Plaintiffs,              **DECLARATION OF**
                                                  **MICHAEL KOLB**
        - against -

EXOTIC ISLAND ENTERPRISES, INC. d/b/a THE
MANSION GENTLEMEN'S CLUB & STEAKHOUSE and
KEITH SLIFSTEIN,

                          Defendants.
------------------------------------------------------------------------x
EXOTIC ISLAND ENTERPRISES, INC. d/b/a
THE MANSION GENTLEMEN'S CLUB &
STEAKHOUSE and KEITH SLIFSTEIN,

                  Third-Party Plaintiffs,

         -against-

EXCLUSIVE EVENTS & PROMOTIONS INC., d/b/a
THINK SOCIAL FIRST,

                  Third-Party Defendant.

------------------------------------------------------------------------x

        MICHAEL KOLB, an attorney duly admitted to practice before this Court, declares that

the following is true under the penalties of perjury:

1.      I am an associate of the law firm of O'Connor & Partners, PLLC, the attorneys for the

        Defendants.  I respectfully submit this Declaration in support of the Defendants' motion

        for an Order pursuant to F.R.C.P. 56 granting dismissing the plaintiff's Complaint in its

Case 21-2149, Document 48, 01/11/2022, 3241954, Page196 of 303

entirety as to the defendant Keith Slifstein and granting to the defendant Exotic Island Enterprises, Inc. d/b/a The Mansion Gentlemen's Club & Steakhouse summary judgment dismissing the Complaint in its entirety as against it, except for the cause of action of the plaintiff Ursula Sanchez a/k/a Ursula Mayes pursuant to New York Civil Rights Law § § 50-51, which, if not dismissed outright, should be dismissed on jurisdictional grounds pursuant to 28 USC § 1367(c)(3).

2.      Also submitted herewith are the Rule 56.1 Statement of Undisputed Facts, the Affidavit and Report of the defendants' consumer survey expert, Robert L. Klein, the Affidavit of Defendant KEITH SLIFSTEIN, and the Defendants' Memorandum of Law.

3.      In addition, the following Exhibits are submitted herewith and described as follows.

4.      **Exhibit A** – Transcript of Deposition of Plaintiff ALANA SOUZA a/k/a ALANA CAMPOS in this case with deposition Exhibits 21-39.

Exhibits 21-32 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K). Exhibit 33 contains the images at issue in this case. Exhibit 34 is this plaintiff's responses to Interrogatories. Exhibits 35-39 were obtained by the defendants through investigation. This plaintiff is referred to herein as Alana Campos, the name that she has commonly used in her modeling career and by which she is often referred to in other similar cases.

**Exhibit B** – Transcript of Deposition of Plaintiff BROOKE BANX in this case with deposition Exhibits 87-96.

Exhibits 87-91 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K). Exhibit 92 contains the

images at issue in this case. Exhibit 93 is this plaintiff's responses to Interrogatories. Exhibits 94-96 were obtained by the defendants through investigation. Exhibits 87-91 contain the only documents that plaintiffs have disclosed to the defendants concerning the plaintiff's earnings from modeling.

**Exhibit C** - Transcript of Deposition of Plaintiff BROOKE TAYLOR-JOHNSON in this case with deposition Exhibits 40-46a;

Exhibits 40-44 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K). Exhibit 45 contains the image at issue in this case as it appeared annexed to the Complaint. Exhibit 46 is this plaintiff's responses to Interrogatories. Exhibit 46a, another copy of the image at issue, was e-mailed by plaintiffs' counsel to defendants' counsel the evening before the deposition of the plaintiff. Exhibits 40-44 contain the only documents that plaintiffs have disclosed to the defendants concerning the plaintiff's earnings from modeling.

**Exhibit D** - Transcript of Deposition of Plaintiff JACLYN SWEDBERG in this case with deposition Exhibits 97-108.

Exhibits 97-101 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K). Exhibit 102 contains the one image at issue in this case as it appeared annexed to the Complaint. Exhibit 103 is this plaintiff's responses to Interrogatories. Exhibits 104-108 were obtained by the defendants through investigation. Exhibits 97-101 contain the only documents that plaintiffs have disclosed to the defendants concerning the plaintiff's earnings from modeling.

**Exhibit E** – Transcript of Deposition of Plaintiff JAIME EDMONDSON-LONGORIA in

3

Case 21-2149, Document 48, 01/11/2022, 3241954, Page198 of 303

this case with deposition Exhibits 47-54.

Exhibits 47and 48 were produced by the plaintiffs in response to the defendants' Request for production of documents (See Exhibit K).  Exhibit 49 contains the images at issue in this case as they appeared annexed to the Complaint. Exhibit 50 is this plaintiff's responses to Interrogatories.  Exhibits 51-54 contain documents that the defendants obtained through investigation. Exhibits 47 is the only document that plaintiffs have disclosed to the defendants concerning the plaintiff's earnings from modeling and concerning earnings from a specific modeling job.

**Exhibit F** -- Transcript of Deposition of Plaintiff JESSICA HINTON A/K/A JESSA HINTON in this case with deposition Exhibits 69-86.

Exhibits 69-82 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K).  Exhibit 83 contains the two images at issue in this case as they appeared annexed to the Complaint.  Exhibit 84 is this plaintiff's responses to Interrogatories.  Exhibits 85 and 86 were obtained by the defendants through investigation. Exhibits 69-82 contain the only documents that plaintiffs have disclosed to the defendants concerning the plaintiff's earnings from modeling.

**Exhibit G** - Transcript of Deposition of Plaintiff TIFFANY TOTH-GRAY in this case with deposition Exhibits 1-20.

Exhibits 1-12 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K).  Exhibit 13 contains the one image at issue in this case as it appeared annexed to the Complaint.  Exhibit 14 is

this plaintiff's responses to Interrogatories.  Exhibits 15-20 were obtained by the defendants through investigation.

**Exhibit H** – Transcript of Deposition of Plaintiff URSULA SANCHEZ A/K/A URSULA MAYES in this case with deposition Exhibits 55-68.

Exhibits 55-58 and 61-64 were all produced by the plaintiffs in response to the defendants' request for production of documents (See Exhibit K).  Exhibit 59 contains the one image at issue in this case as it appeared annexed to the Complaint.  Exhibit 60 is this plaintiff's responses to Interrogatories.  Exhibits 65-68 were obtained by the defendants through investigation. Exhibits 55-58 and 61-64 contain the only documents that plaintiffs have disclosed to the defendants concerning the plaintiff's earnings from modeling.  This plaintiff is referred to herein as Ursula Mayes, the name that she has commonly used in her modeling career and by which she is often referred to in other similar cases.

**Exhibit I** – Defendants' First Request For Production to Plaintiffs;

**Exhibit J** – Plaintiff's Objections and Answers to the Defendants' First Set of Requests For Admissions;

**Exhibit K** – Documents produced by Plaintiffs before the depositions of the plaintiffs in response to the Defendants' Request for Production of Documents;

**Exhibit L** – Documents produced by Plaintiffs after the depositions of the plaintiffs in response to requests made by the defendants during the depositions; These documents consist of a modeling portfolio of the plaintiff Taylor-Johnson and financial documents relating to the plaintiffs Campos and Toth-Gray;

**Exhibit M** – Report of Plaintiffs' expert Martin Buncher, dated "September 2020" with Exhibits 1 through 8;

**Exhibit M-1** – Exhibit M-1 is a pdf copy of an Excel spreadsheet originally produced as Exhibit 9B to the report of Plaintiff's consumer survey expert, Martin Buncher. This exhibit represents raw data gathered during a marketing research survey conducted by Mr. Buncher. The Excel spreadsheet includes approximately 186 columns ("A" through "GD") that are not printable on one page. The pdf copy of the spreadsheet includes column and row labels to assist with reviewing the data contained within the spreadsheet. If necessary, the Excel spreadsheet can be produced to the Court by mail or email.

**Exhibit N** – Report of Plaintiffs' expert Stephen Chamberlin in this case dated September 19, 2020;

**Exhibit O** – Memorandum and Order dated January 3, 2019 in <u>Toth, Hinton, Taylor, Mayes, et al. v. 59 Murray Enterprises, Inc</u>. et al., 15 Civ. 8028 (SDNY, Buchwald J.) granting defendants' motion for summary judgment dismissing all of plaintiffs' Lanham Act and other claims, except for plaintiff Carmen Electra's claim for injunctive relief, and granting the motion of the defendants to strike the reports, survey, and testimony of the plaintiffs' experts Stephen Chamberlin and Martin Buncher;

**Exhibit P** – Report of Plaintiff's expert Stephen Chamberlain in the <u>Toth, Hinton, Taylor, Mayes, et al. v. 59 Murray Enterprises, Inc. et al., 15 Civ. 8028</u> insofar as it relates to the plaintiffs Toth, Mayes, and Hinton;

**Exhibit Q** – Order dated March 29, 2019 in <u>Mayes et al. v. 490 Habitat, Inc. et al.</u>, 18 Civ. 1427 (EDNY, Feuerstein J.) accepting in full the Report and Recommendation of

Magistrate Judge Gary R. Brown, dated March 4, 2019 (also included in this Exhibit) and granting plaintiffs' unopposed motion for a default judgment as against the defendant 490 Habitat, Inc. and for $400.00 in costs, and denying plaintiff's request for any damages pursuant to the Lanham Act and New York Civil Rights Law § § 50-51 on the ground that the plaintiffs had failed to establish damages where the sole basis for plaintiff's claim for damages was a report by their expert Stephen Chamberlin; [1]

**Exhibit R** – Declaration of Stephen Chamberlin dated August 1, 2018 with respect to damages in <u>Mayes et al. v. 490 Habitat, Inc. et al.</u>, 18 Civ. 1427 (EDNY);

**Exhibit S** – Decision and Order dated July 17, 2019, in <u>Gibson, Hinton, Mayes et al. v. SCE Group, Inc., d/b/a Sin City, et al.</u>, 15 Civ. 08168 (SDNY, Ramos J.) granting defendants' motion for summary judgment dismissing all of plaintiff's claims, including those under the Lanham Act, except for plaintiff Jessica Burciaga's claim for compensatory damages pursuant to New York Civil Rights Law § § 50-51;

**Exhibit T** – Opinion and Order dated March 30, 2020 in <u>Edmondson, et al. v. RCI Hospitality Holdings, Inc. et al.</u>, 16 Civ. 2242 (SDNY, Caproni J.) granting the defendants' motion to preclude plaintiffs' experts Martin Buncher and Stephen Chamberlin from offering their reports or testifying in support of plaintiffs' Lanham Act and other claims;

---

[1] This default judgment was later vacated on plaintiff's motion by order dated February 6, 2020 on the sole ground that the plaintiffs had mistakenly named 490 Habitat, Inc. as the owner and operator of the gentlemen's club in question. Plaintiffs were permitted to amend their Complaint to add new defendants. The plaintiff's claims against 490 Habitat, Inc. were dismissed with prejudice for failure to state a claim for relief. The vacatur of this judgment in no way detracts from the Court's prior refusal to award plaintiff any damages based on Mr. Chamberlin's report.

**Exhibit U** – Report of Stephen Chamberlin dated March 28, 2019 in <u>Edmondson, et al. v. RCI Hospitality Holdings, Inc. et al.</u>, 16 Civ. 2242 (SDNY) insofar as it relates to the plaintiffs Edmondson-Longoria, Toth-Gray, Hinton, Taylor-Johnson, Banx, Mayes, and Campos;

**Exhibit V** – Intentionally Omitted;

**Exhibit W** – Plaintiffs' Response to the Defendants' First Request for Documents;

**Exhibit X** - Intentionally Omitted;

**Exhibit Y** – Newspaper article dated November 26, 2012 which defendant's counsel downloaded on January 29, 2021 from the website of the "The Guardian" newspaper entitled "Evan Longoria signs $100m deal to stay with Tampa Bay Rays until 2023.";

**Exhibit Z** – Excerpts from transcript of the deposition of plaintiff Edmondson-Longoria in <u>Edmondson v. 2001 Live, Inc.</u>, 16-cv-3243-T-17AEP (MD Fla);

**Exhibit AA** – Excerpts from transcript of the deposition of plaintiff Edmondson-Longoria in <u>Timed Out LLC v. Midway Venture, LLC d/b/a Pacers</u>, 37-2015-00021222-CU-NP-CTL (Sup Ct California, County of San Diego);

**Exhibit BB** - Excerpts from transcript of the deposition of plaintiff Edmondson-Longoria in <u>Gibson v. CSWS, LLC d/b/a Oceans Gentlemen's Club d/b/a Ocean</u>, 18-cv-05149 (ND Ill);

**Exhibit CC** – Photograph of the plaintiff Jessica Hinton a/k/a Jessa Hinton from the website of the Las Vegas Sun showing the plaintiff inside the Crazy Horse III, captioned "Jessa Hinton hosts at Crazy Horse III on Friday, May 25, 2012.";

**Exhibit DD** – Two pages from the website blog.vegas.com discussing Crazy Horse III,

8

and depicting the interior of Crazy Horse III;

**Exhibit EE** – Excerpts from the transcript of the deposition of the plaintiff Hinton in Gibson, Hinton, Mayes et al. v. SCE Group, Inc., d/b/a Sin City, et al., 15 Civ. 08168 (SDNY, Ramos J);

**Exhibit FF** – Page from the website www.jessafinds.com that defendants' counsel downloaded on January 29, 2021. This was the only page that appeared on that website at that time;

**Exhibit GG** – Email from plaintiffs' counsel to defendants' counsel dated September 28, 2020 by which plaintiffs provided to defendants their "supplemental production" of documents." These documents are submitted herewith as Exhibit L to this Declaration;

**Exhibit HH** – Email from defendants' counsel to plaintiff's counsel dated July 20, 2020 sending the pre-marked exhibits for the deposition of plaintiff Tiffany-Toth Gray which was conducted on July 21, 2020, commencing at 11:15 a.m. These deposition Exhibits are submitted herewith as part of Exhibit G to this Declaration;

**Exhibit II** – Full face image of the plaintiff Ursula Mayes provided to defendants by plaintiffs' counsel in connection with the deposition of plaintiff Mayes;

**Exhibit JJ** – Four unnumbered pages containing the images of the plaintiffs Campos, Taylor-Johnson, Toth Gray and Mayes, as contained in Exhibit 4 "The Questionnaires" of the report of plaintiffs' consumer survey expert Martin Buncher, which report is submitted herewith as Exhibit M;

**Exhibit KK** – Copy of Complaint, exclusive of Exhibits, in Gibson, Hinton, Mayes et al. v. SCE Group, Inc., d/b/a Sin City, et al., 15 Civ. 08168 (SDNY, Ramos J.);

9

JA-197

**Exhibit LL** – Copies of images the plaintiff Burciaga annexed to the Complaint in the <u>Gibson</u> case that may have been published on approximately April 21, 2015. The one image of relevance in this case is the image which was published on or about that date. That image was the subject of her claim for defamation, to the extent that that claim was not time-barred. The defendants cannot tell which of these images was published on or about April 21, 2015.  However, that information should be known to the plaintiffs, who are represented by the same attorney who represented the plaintiffs in Gibson.

Dated: February 5, 2021

_____
MICHAEL KOLB

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------
ALANA SOUZA a/k/a ALANA CAMPOS,
BROOKE BANX, BROOKE TAYLOR-JOHNSON,
JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA,
JESSICA HINTON a/k/a JESSA HINTON,
TIFFANY TOTH-GRAY AND URSULA SANCHEZ
a/k/a URSULA MAYES,

                Plaintiffs,

                                        18-cv-09448 (KMK)

        - against -

EXOTIC ISLAND ENTERPRISES, INC., d/b/a
THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE
and KEITH SLIFSTEIN,

                Defendants.
---------------------------------------------
EXOTIC ISLAND ENTERPRISES, INC., d/b/a
THE MANSION GENTLEMEN'S CLUB & STEAKHOUSE
and KEITH SLIFSTEIN,

                Defendants/Third Party Plaintiffs,

        - against -

EXCLUSIVE EVENTS & PROMOTIONS, INC.,
d/b/a THINK SOCIAL FIRST

                Third-Party Defendant.
---------------------------------------------
                                July 21, 2020
                                3:55 p.m.
                                WebEx Remote


    Examination Before Trial of Plaintiff, ALANA SOUZA, held
at the above time and place, and before Julie A. Provenzano,
a Shorthand Reporter and Notary Public within and for the
State of New York.
```

**JULIE A. PROVENZANO**
**Shorthand Reporter**
**15 Dunneman Avenue**
**Kingston, New York  12401**
**845-331-1314**

1

2

3    <u>A P P E A R A N C E S</u>

4

5    O'CONNOR & PARTNERS, PLLC
         Attorneys for Plaintiff
6        255 Wall Street
         Kingston, New York  12401
7
         BY:  MICHAEL KOLB, ESQ.,
8             of Counsel

9

10   THE CASAS LAW FIRM, P.C.
         Attorneys for Plaintiffs
11       1745 Broadway
         17th Floor
12       New York, New York  10019

13       BY:  JOHN GOLASZEWSKI, ESQ.,
              of Counsel
14

15

16

17

18

19

20

21

22

23

24

## S T I P U L A T I O N S

     IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto that all rights provided by the F.R.C.P. including the right to object to any question except as to the form or to move to strike any testimony at this examination are reserved and, in addition, the failure to object to any question or move to strike testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved for the trial of this action;

     It is further stipulated and agreed that this examination may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun;

     It is further stipulated and agreed that the filing and certification of the original of this examination are waived;

     It is further stipulated and agreed that the examining party will furnish the examined party with a copy of the transcript of testimony free of charge.

JA-201

4

```
 1    ALANA SOUZA, 2745 Botticelli Drive, Henderson, Nevada  89052,

 2    having been first duly sworn by the Notary Public, was

 3    examined and testified as follows:

 4

 5         (SERIES OF DOCUMENTS (INDEXED AT END OF TRANSCRIPT)

 6          WERE MARKED EXHIBITS 21 THROUGH 39 FOR IDENTIFICATION,

 7          RESPECTIVELY.)

 8

 9    EXAMINATION BY MR. KOLB:

10         Q    Ms. Souza, my name is Michael Kolb.  I represent

11              the defendants in this case.  I'll be ask you some

12              questions today.  I would ask if you don't

13              understand any of my questions, rather than try to

14              answer, please let he know that you don't

15              understand it and I'll try to rephrase it for you,

16              okay?

17         A    Okay.

18         Q    Let me just remind you, particularly since we

19              can't see your image, if you can make all of your

20              answers in the form of words and not gestures so

21              the reporter can understand what your response is,

22              okay?

23         A    Okay.

24         Q    Do you also go by the name of Alana Campos?
```

JA-202

| | | |
|---|---|---|
| 1 | A | Correct, yes. |
| 2 | Q | Have you ever been known by any other names other |
| 3 | | than Alana Campos and Alana Souza? |
| 4 | A | I did use my ex-husband's last name, Herold. |
| 5 | Q | How do you spell that? |
| 6 | A | H-e-r-o-l-d. |
| 7 | Q | What is your ex-husband's first name? |
| 8 | A | David. |
| 9 | Q | During what period of time were you married? |
| 10 | A | 2010 to 2012. |
| 11 | Q | Where does he live? |
| 12 | A | Now in Brazil. |
| 13 | Q | I'm going to ask for your date of birth, but we |
| 14 | | won't put the date in the transcript for privacy |
| 15 | | purposes.  What is your date of birth? |
| 16 | A | (XXXXXXX) |
| 17 | Q | Are you an American citizen? |
| 18 | A | Yes, I am. |
| 19 | Q | When did you become a citizen? |
| 20 | A | 2017, I believe. |
| 21 | Q | I take it you were born in Brazil, correct? |
| 22 | A | Yes. |
| 23 | Q | How old were you when you started professional |
| 24 | | modeling? |

```
 1        A      I was 15 years old.

 2        Q      Were you living in Brazil at that time?

 3        A      Yes.

 4        Q      I would appreciate if you could tell us where

 5               you've lived between the time you were 15 years

 6               old and today.  It doesn't have to be exact

 7               addresses.

 8        A      Do you want the cities?

 9        Q      Initially, that would be fine, yes.

10        A      I lived in Florianopolis in Brazil.  After that, I

11               moved to Tacoma, Washington.

12        Q      How old were you then?

13        A      I was about 20, 19 or 20.  Then I moved to Boise,

14               Idaho.  I was probably 21.  Then Los Angeles,

15               California.

16        Q      When did you move to Los Angeles?

17        A      About 2013, I believe.

18        Q      Where have you lived since then?

19        A      Las Vegas.  I mean I lived in the City of Las

20               Vegas for like a year and now I'm in the City of

21               Henderson.  It's all Las Vegas.  I don't know if

22               that matters.

23        Q      When did you move to Las Vegas?

24        A      Two years ago.
```

1       Q       That would be 2018?

2       A       Yes.

3       Q       And then sometime after that, you moved to

4               Henderson which is considered to be another part

5               of Las Vegas, correct?

6       A       Yes, correct.

7       Q       Have you ever lived in New York State?

8       A       No.

9       Q       I have to ask you these questions for the record.

10              Where are you located?  Are you located at home

11              during this deposition?

12      A       Yes.

13      Q       Is there anyone else there in the building who can

14              hear my questions?

15      A       No.

16      Q       Are you alone during this deposition?

17      A       Yes.

18      Q       To prepare for this the deposition, did you look

19              at any documents?

20      A       Yes.  I looked at the lawsuit, I guess, the

21              questions I submitted and the picture that was

22              used.

23      Q       Did you receive any of the exhibits that I had

24              provided to your attorney?  I ask that because if

JA-205

```
 1                    you didn't, I would just show them on the screen.
 2        A    Yes.
 3        Q    You did receive things that were marked as
 4             exhibits?
 5        A    Yes.  The Instagram?
 6        Q    Right.  You got those?
 7        A    Yes.
 8        Q    Exhibit 33 consists of two pages and it's the
 9             photo that was -- actually the front and back it
10             seems -- photos that were attached to your
11             complaint in this case.
12        A    Yes.
13        Q    Do you see those?
14        A    I have it.
15        Q    Can you tell me the original origin of that photo?
16        A    It was for a catalog for the brand 3 Wishes.
17        Q    What is 3 Wishes?
18        A    It's a lingerie company.
19        Q    The images that were attached to your complaint
20             are blocked a little bit at the top by your name,
21             Alana Campos.  For example, the front image we can
22             only see maybe half of your face.  Do you have a
23             copy of this image that shows your whole face?
24        A    Possibly.
```

```
 1        Q     When did you first realize that this photo had

 2              been posted on the defendant's social media site?

 3        A     I don't recall.

 4        Q     How did you determine that the origin of this

 5              photo was a catalog for 3 Wishes?

 6        A     Because I only worked for this brand once and I

 7              remember like the outfits being very different

 8              than what I usually shoot.

 9        Q     How was it very different from what you usually

10              shoot?

11        A     I don't know.  The costumes were -- it's

12              different.  How can I explain?  The outfits,  it's

13              something I'm going to remember which brands are

14              for because the styles for the brands I work with

15              are very different.

16        Q     This clothing that's shown in this photo, is that

17              a costume, is it lingerie or is it something else?

18        A     I believe a little bit of both.

19        Q     This company, 3 Wishes, do they sell costumes as

20              well as lingerie?

21        A     I believe so, yes.

22        Q     When was this image taken?

23        A     I don't remember exactly.  I would say between

24              2013 and 2015.
```

```
 1      Q    It's either a side view or a back view.  How would

 2           you describe the other, the second picture?

 3      A    A back shot.

 4      Q    Were you paid money to have your photo taken for

 5           the front shot and the back shot?

 6      A    Correct, yes.

 7      Q    How much money were you paid?

 8      A    I don't remember exactly, but I would say between

 9           a thousand and $1500.

10      Q    Was that under a written contract or an oral

11           agreement or something else?

12      A    I don't remember who I booked this photo shoot

13           with, but I would say it was a verbal agreement

14           and I think we signed a model release.  I don't

15           remember if I signed a contract.

16      Q    Do you remember the terms of the model release?

17      A    I do not.

18      Q    Is it your practice to keep the paperwork from the

19           modeling assignments that you do?

20      A    I do my best to keep it.  I don't keep all of

21           them, but do keep a lot of them.

22      Q    Do you usually keep the releases that you've

23           signed?

24      A    Yes.
```

JA-208

| | | |
|---|---|---|
| 1 | Q | In this case, did you turn over a release to your |
| 2 | | attorney? |
| 3 | A | I don't remember.  If I had it, I probably did. |
| 4 | Q | But you don't remember if you did or not, correct? |
| 5 | A | No, I don't. |
| 6 | Q | Who obtained this job for you? |
| 7 | A | I don't remember. |
| 8 | Q | If this job were obtained for you by a third |
| 9 | | party, would you have owed a commission to that |
| 10 | | third party? |
| 11 | A | Yes. |
| 12 | Q | How much of a percentage would that commission |
| 13 | | have been? |
| 14 | A | The agencies usually take 20 percent of me and 20 |
| 15 | | percent of the client. |
| 16 | Q | What do you mean 20 percent of the client? |
| 17 | A | The agency charges the model 20 percent.  If it |
| 18 | | was a thousand dollars, they charge me 20 percent |
| 19 | | of the thousand dollars and then 20 percent on top |
| 20 | | of the thousand from the client. |
| 21 | Q | That goes to the agent? |
| 22 | A | Yes. |
| 23 | Q | I'd like to refer your attention to your answers |
| 24 | | to interrogatories which I think you have there. |

```
1     A    Yes, I do.

2     Q    If you could go to answer Number 3 which starts at

3          the very bottom of Page 6?

4     A    Yes.

5     Q    Do you see that?

6     A    Yes.

7     Q    Is 3 Wishes listed here in this response?

8     A    I don't see it.

9     Q    Is there any company listed here that is

10         associated with 3 Wishes?

11    A    I don't believe so.

12    Q    Did you provide the information that's included

13         here in Number 3?

14    A    What information?  I did work for every single one

15         of those companies.

16    Q    I'm not questioning that.  My question is did you

17         yourself provide this information that's contained

18         here?

19    A    Yes.

20    Q    Where is 3 Wishes located?

21    A    I have no idea.

22    Q    Did you go to their premises for the photo shoot?

23    A    It was a studio in Los Angeles, so I don't

24         remember if it was their studio or if it was
```

```
 1                  rented or who the studio belonged to.

 2          Q       Do you have any documents that relate to this

 3                  photo shoot?

 4          A       I don't know.  Maybe.

 5          Q       If you had them, where would they be located?  Do

 6                  you have a place where you usually keep documents

 7                  related to your photo shoots?

 8          A       Yes, I have a folder.

 9          Q       We are going to make a request through your

10                  attorney of any documents that you have relating

11                  to this photo shoot, so if you have any, please

12                  retain them.

13          A       Okay.

14

15                         (REQUESTED INFORMATION)

16

17          Q       On the occasion when you had these images created,

18                  did the photographer take other photos of you?

19          A       Only for the catalog.

20          Q       How many other photos did he or she take of you

21                  for the catalog?

22          A       I don't remember.

23          Q       Do you have any estimate?

24          A       I don't.  Sometimes we shoot ten outfits,
```

| | | |
|---|---|---|
| 1 | | sometimes we shoot five, sometimes we shoot 20 |
| 2 | | plus, so I really don't remember how many outfits |
| 3 | | or how many shots were taken. |
| 4 | Q | But you only worked for this company once, right? |
| 5 | A | Yes. |
| 6 | Q | And that doesn't help you to remember? |
| 7 | A | No. |
| 8 | Q | Have you ever been deposed before this deposition? |
| 9 | A | Yes. |
| 10 | Q | How many times have you been deposed? |
| 11 | A | If I remember correctly, maybe two or three. |
| 12 | Q | Let me ask you please to look at your response to |
| 13 | | Interrogatory Number 2 which starts at Page 5. |
| 14 | A | Okay. |
| 15 | Q | As I count down -- and I could be wrong, but I |
| 16 | | counted 23 cases set forth here.  I'd ask you to |
| 17 | | look through this list of cases and can you tell |
| 18 | | us which cases you were deposed in? |
| 19 | A | I was deposed in Edmondson versus Caliente |
| 20 | | Resorts.  I was deposed twice on that case.  And I |
| 21 | | remember a Texas case, but I don't remember the |
| 22 | | name of the case. |
| 23 | Q | A Texas case? |
| 24 | A | Yes, I believe so. |

```
 1        Q    So you have a recollection of being deposed twice
 2             in the Edmondson v. Caliente case?
 3        A    Yes.
 4        Q    And once in another case that may have been a
 5             Texas case; is that right?
 6        A    Correct.
 7                  MR. KOLB:  John, similar to our request
 8             in the first deposition today, we are going to be
 9             requesting transcriptS of those depositions.
10             Madam Reporter, would you note that please.
11
12                  (REQUESTED INFORMATION)
13
14                  MR. GOLASZEWSKI:  To the extent we have
15             those transcripts, you can have them.
16        Q    I'm going to refer to you as Ms. Campos; is that
17             okay?
18        A    That's okay.
19        Q    The image that is the subject of this lawsuit,
20             front and back, were those images of you the
21             subjects of any of these other lawsuits that are
22             listed here?
23        A    I don't remember, but I would say possibly.
24        Q    It's possible?
```

1    A    Yes.

2    Q    Back to these images again; they were published in

3         catalog, right?

4    A    Correct.

5    Q    Who would have access to that catalog?  Is it on

6         line, is it just a paper catalog?

7    A    I believe both.

8    Q    So it's accessible on line?

9    A    Yes, I think so.

10   Q    Do you know what somebody would search on line to

11        find this catalog?

12   A    You could search the brand name.

13   Q    3 Wishes?

14   A    Yes, 3 Wishes, Mexican outfits, costumes, I guess.

15        I don't know.

16   Q    Do you have a copy of this catalog?

17   A    I don't.

18   Q    When your photos were published in this catalog,

19        was your name also published in the catalog?

20   A    I don't believe so.

21   Q    Is it true that it would be unusual for the

22        model's name to be published in that type of

23        catalog?

24   A    Yes.

JA-214

```
 1      Q    Putting aside these 23 lawsuits that are listed
 2           here, have you ever been a party either as a
 3           plaintiff or a defendant in any other lawsuit?
 4      A    No.
 5      Q    I wouldn't be looking for your divorce records,
 6           but just for the record, was there any lawsuit
 7           involving your divorce or not?
 8      A    No.
 9      Q    Other than last names of Souza, Campos and
10           Compos-Herold -- I think you used your husband's
11           name in hyphenated form?  I saw that on some
12           documents.
13      A    Yes.
14      Q    Other than those three names, have you used any
15           other names?
16      A    No.
17      Q    This next question I don't want you to be offended
18           by it, but it's commonly asked in litigation.
19           Just don't take it the wrong way.  Have you ever
20           been convicted of a crime?
21      A    No.
22      Q    Can you tell me about your educational background,
23           please?
24      A    I would say I finished high school.  I finished
```

```
 1                 school in Brazil.  The school system there is

 2                 different than here.

 3          Q      Any formal education beyond high school?

 4          A      No.

 5          Q      I think you had your first professional job as a

 6                 model when you were 15 years old?

 7          A      Correct.

 8          Q      Between that time and today, have you performed

 9                 any other type of work in order to earn money?

10          A      Yes.  I worked as a real estate agent in Los

11                 Angeles.

12          Q      Anything else?

13          A      No.

14          Q      To be a real estate agent in Los Angeles, did you

15                 have to obtain a license?

16          A      Yes.

17          Q      When did you obtain your real estate license?

18          A      I would say 2015.

19          Q      Have you actually worked as a real estate agent

20                 since you obtained your license?

21          A      Yes, I have.

22          Q      How much time have you devoted to being a real

23                 estate agent since you obtained your license?

24          A      Almost two years.
```

```
1       Q    So you haven't worked as a real estate agent in

2            over a two-year period, correct?

3       A    Yes.

4       Q    If you can't answer it in this way, let me know,

5            but can you say over the two years that you worked

6            as a real estate agent how much time on the

7            average each week you devoted to being a real

8            estate agent?

9       A    Like six to eight hours a day.

10      Q    Is that correct?

11      A    Yes.

12      Q    Was that for a period of about two years?

13      A    Correct.

14      Q    Were you doing any modeling during that period?

15      A    Not much.

16      Q    Why did you undertake to be a real estate agent as

17           opposed to a model for that period?

18      A    At the time I wanted to do something more serious

19           and I really loved architecture and I liked real

20           estate.  I decided to get my license.  I got my

21           license in California and Nevada, but it was

22           really hard so I went back to modeling.

23      Q    I'm just trying to find out now the two years

24           approximately that you worked primarily as a real
```

| | | |
|---|---|---|
| 1 | | estate agent, would it be fair to say that was |
| 2 | | from sometime in 2015 to sometime in 2017? |
| 3 | A | Yes. |
| 4 | Q | During that period of time, were you always |
| 5 | | working for yourself as a real estate agent or did |
| 6 | | you work for someone else at all during that |
| 7 | | period? |
| 8 | A | All real estate agents need to be under a broker, |
| 9 | | so I was under the broker, but I was |
| 10 | | self-employed. |
| 11 | Q | Can you tell me the name of the broker? |
| 12 | A | Rodeo Realty. |
| 13 | Q | Was that in both California and Nevada? |
| 14 | A | That was in California. |
| 15 | Q | What about the one in Nevada? |
| 16 | A | In Nevada, I worked for One Realty.  I think it's |
| 17 | | called One Group Realty. |
| 18 | Q | I'd like you to look at the image that we are |
| 19 | | talking about here today that brought us here |
| 20 | | today.  The first page of it says May 5th and then |
| 21 | | the second page says May 5th, 2016.  You see that? |
| 22 | A | Yes. |
| 23 | Q | If this image was posted on May 2016, would it be |
| 24 | | fair to say you were not doing any modeling as of |

```
 1              that time; you were working as a real estate
 2              agent?
 3         A    Well, I was working as a real estate agent, but
 4              also doing modeling, but modeling was like my
 5              second focus.
 6         Q    You said before you were not doing much modeling,
 7              I think?
 8         A    Yes.  That's why it wasn't my main focus.  If any
 9              agency was sending me jobs, I was still doing
10              jobs.  I wasn't going out for castings every day.
11         Q    You do have some modeling work listed in response
12              to Number 3, so we'll get into that a little
13              later.  Have you ever received or taken any
14              courses concerning modeling?
15         A    Yes.  When I was probably 13, 14, I did a runway
16              course in Brazil.
17         Q    Is that the most recent instruction that you had
18              concerning modeling?
19         A    Like a course, I would say yes, but I participated
20              in many other seminars and things to like learn
21              how to photograph and do runways, but I wouldn't
22              call it a course.
23         Q    When you say runway, is that modeling clothing?
24         A    Yes.  It means like the runway show, like the New
```

Case 21-2149, Document 48, 01/11/2022, 3241954, Page226 of 303

| | | |
|---|---|---|
| 1 | | York Fashion Show.  That's runway. |
| 2 | Q | Have you done any work in a fashion show? |
| 3 | A | Yes. |
| 4 | Q | In New York? |
| 5 | A | No. |
| 6 | Q | What work have you done in fashion shows? |
| 7 | A | Do you want me to remember like brand names? |
| 8 | Q | I'd like you to try to remember -- |
| 9 | A | The last one I did was for Balmain here in Vegas. |
| 10 | Q | That's in Las Vegas? |
| 11 | A | Yes. |
| 12 | Q | What is Balmain?  What kind of company is that? |
| 13 | A | It's a fashion couture brand. |
| 14 | Q | When was that runway work that you did? |
| 15 | A | It was last year, I believe, |
| 16 | Q | End of 2019? |
| 17 | A | Yes. |
| 18 | Q | Was that associated with the Christmas season at |
| 19 | | all? |
| 20 | A | I think it was around Christmas, yes. |
| 21 | Q | Were you paid for that work? |
| 22 | A | I don't remember. |
| 23 | Q | You don't remember whether you were paid or not |
| 24 | | paid? |

JA-220

| | | |
|---|---|---|
| 1 | A | Oh, I was paid.  I don't remember how much. |
| 2 | Q | Can you give us a reasonable estimate of what you |
| 3 | | were paid? |
| 4 | A | I think it was 400 to $600.  It was just like a |
| 5 | | one-hour thing. |
| 6 | Q | Was that a job that was obtained by an agent? |
| 7 | A | Correct. |
| 8 | Q | What agent was that? |
| 9 | A | TNG Models. |
| 10 | Q | Looking at your answers to interrogatories, Number |
| 11 | | 3, this information stopped in 2016.  That's the |
| 12 | | last date of work.  Do you see that? |
| 13 | A | Yes. |
| 14 | Q | Do you have records at home or elsewhere that |
| 15 | | would indicate the modeling work that you have |
| 16 | | done in the years subsequent to 2016? |
| 17 | A | Yes. |
| 18 | Q | Do you have that at home? |
| 19 | A | Yes. |
| 20 | | MR. KOLB:  I'm going to call for |
| 21 | | production of those documents and perhaps for |
| 22 | | supplementation of her answers to interrogatories. |
| 23 | | |
| 24 | | (REQUESTED INFORMATION) |

JA-221

```
 1        Q    Have you ever done any other runway work?

 2        A    Yes.

 3        Q    For whom did you do runway work?

 4        A    I don't remember.  I don't work much as a runway

 5             model.

 6        Q    You don't remember the name of the company?

 7        A    I don't.

 8        Q    Do you remember the style of clothing that was

 9             involved?

10        A    Definitely lingerie, bikini, dresses.  It really

11             depends on the brand.

12        Q    I know you gave us a term for the style that you

13             did for Balmain.  I think you said fashion

14             couture.  What is that more specifically?

15        A    It's more like high-end fashion.  Kardashians wear

16             Balmain, you know, super models.  It's like a

17             high-end fashion.

18        Q    You said Victoria Secret?

19        A    I never worked for them, but those models wear

20             Balmain.

21        Q    For the runway job that you did for Balmain, were

22             you wearing Victoria Secret type clothing?

23        A    No.  I was wearing a jacket and pants, I think.  I

24             don't remember.
```

```
 1      Q      Do you remember any other runway jobs beside the
 2             two that you referred to so far?
 3      A      No, I don't.
 4      Q      Have you done any work of any kind in the State of
 5             New York?
 6      A      I worked for Playboy like hosting a party.
 7      Q      In New York City?
 8      A      Yes.
 9      Q      Other than that, have you done any work in the
10             State of New York?
11      A      No.
12      Q      Do you know where Newburgh, New York is?
13      A      No.
14      Q      Have you ever been to place called Newburgh, New
15             York?
16      A      I don't recall.
17      Q      There are different types of models as I
18             understand it.  For example, fashion models,
19             lifestyle models, fitness models, social
20             influencers and others.  What the type or types of
21             model do you consider yourself to be?
22      A      Lifestyle, lingerie and swim.  I'm an influencer,
23             commercial model.
24      Q      You say commercial; is that for ads of different
```

```
1                kinds?

2        A       Yes, like TV commercials.

3        Q       Has your name ever appeared in any TV commercial?

4        A       Not my name, but my face, yes.

5        Q       What TV commercials have you done?

6        A       I did Luxor Hotel here in Las Vegas.  I did --

7                what is the casino in Palm Springs?  Morongo

8                Casino.

9        Q       Is that Palm Springs, California?

10       A       Yes.  It's called Morongo Casino.  I did another

11               one in Texas, but I don't remember the name of the

12               hotel.

13       Q       These were basically ads for hotels or casinos,

14               correct?

15       A       Correct.

16       Q       Do you recall how much you were paid for any of

17               these TV commercial jobs?

18       A       I think between two and $3,000.  I think Luxor was

19               more.  I think it was like 4,000 or something, but

20               I don't remember exactly.

21       Q       How much time was devoted for the Luxor TV

22               commercial to shoot?

23       A       Two days.

24       Q       How about the casino in Palm Springs, the Morongo?
```

JA-224

| | | |
|---|---|---|
| 1 | A | I think it was the same, two days. |
| 2 | Q | How about whatever the hotel was in Texas? |
| 3 | A | That was a one-day shoot. |
| 4 | Q | I'm sorry, do you recall what you were paid for |
| 5 | | that one? |
| 6 | A | I don't, but I believe it was around a thousand, |
| 7 | | 1500, maybe 2,000.  I don't know. |
| 8 | Q | Have you heard the term day rate? |
| 9 | A | Yes. |
| 10 | Q | What do you understand that term to mean? |
| 11 | A | How much the client is paying you to photograph |
| 12 | | for six to eight hours. |
| 13 | Q | In your career, have you ever had a day rate? |
| 14 | A | Yes. |
| 15 | Q | What day rates have you had? |
| 16 | A | It depends on what time of my career.  I'm sure |
| 17 | | when I started it was $500 and now it's a lot |
| 18 | | different.  It depends. |
| 19 | Q | Could you take me through it, starting with the |
| 20 | | beginning of your career as it progressed? |
| 21 | A | Yes.  I think I probably started around 500.  It |
| 22 | | also depends on what kind of job it is.  If it's |
| 23 | | like a convention show that I just go and like |
| 24 | | talk to clients, it's a different day rate for |

```
 1              when I'm shooting photographs or when I'm shooting
 2              video.  It's all different.
 3      Q       Is the shooting higher than talking to clients,
 4              the day rate, or the same?
 5      A       Yes, it's higher.
 6      Q       Ms. Campos, have you had a day rate for catalog
 7              shoots such as the one that resulted in the image
 8              that's at issue in this lawsuit?
 9      A       Yes, probably.
10      Q       What would that day rate be?
11      A       I said probably.
12      Q       Yes.
13      A       As I said, it depends on what time in my career.
14              Back then, it probably would have been from 600 to
15              $800.  Now, it's double that.
16      Q       At the time you took the image that's shown in
17              Exhibit 33, I think you called it a Mexican dress,
18              correct?
19      A       Yes.
20      Q       At the time you did that, what was your day rate
21              for catalog shoots?
22      A       Probably around $800.
23      Q       Have you had TV appearances other than the
24              commercials that you testified about?
```

| | | |
|---|---|---|
| 1 | A | Yes.  I was in this movie called Last Vegas. |
| 2 | Q | Was that in movie theaters? |
| 3 | A | Yes, it was. |
| 4 | Q | Was it on TV, also? |
| 5 | A | Now, it's on TV, but it was in the theaters. |
| 6 | Q | Have you been in any other movies? |
| 7 | A | No. |
| 8 | Q | Did you have any speaking role in Last Vegas, the |
| 9 | | movie? |
| 10 | A | No. |
| 11 | Q | What was your role in that movie? |
| 12 | A | I was just a hot girl coming out of the pool. |
| 13 | Q | How long were you on screen for? |
| 14 | A | Probably like five seconds. |
| 15 | Q | What were you wearing as you came out of the pool? |
| 16 | A | A bikini. |
| 17 | Q | Do you know if your name appears in the credits? |
| 18 | A | I don't know. |
| 19 | Q | Were you paid for that appearance in Last Vegas? |
| 20 | A | Yes, I was. |
| 21 | Q | How much were you paid? |
| 22 | A | I don't recall.  I was booked through Playboy, so |
| 23 | | I don't recall how much. |
| 24 | Q | Did you get that job through Playboy? |

```
1    A    Correct.

2    Q    Any other movies or television shows other than

3         what you testified to so far?

4    A    Not that I recall.

5    Q    Have you ever been a member of any union that

6         usually contains TV performers or movie performers

7         as members?

8    A    No.

9    Q    Do you have any knowledge of the type of

10        entertainment that goes on at the Gentlemen's Club

11        which is the defendant in this case?

12   A    What do you mean by entertainment?

13   Q    Is it your understanding that they have adult

14        females providing entertainment in these gentlemen

15        clubs?

16   A    Yes, I understand that.

17   Q    Do you have any knowledge as to what these adult

18        females do at the Gentlemen's Club that's the

19        defendant in this case?

20   A    I believe the females are working to get the men

21        aroused and party, drinking.

22   Q    What do they do to do that?

23   A    I don't know.  They dance, play with themselves,

24        touch the man.  I'm not sure.
```

JA-228

| | | |
|---|---|---|
| 1 | Q | Have you yourself -- |
| 2 | A | I've never been to this strip club. |
| 3 | Q | Let me complete my question for the record.  Have |
| 4 | | you ever been in what you call a strip club for |
| 5 | | any reason, either as a visitor or for any other |
| 6 | | reason? |
| 7 | A | Yes, I have. |
| 8 | Q | For what reason have you been inside a strip club, |
| 9 | | what you call a strip club? |
| 10 | A | I've been there with friends. |
| 11 | Q | How many times have you done that? |
| 12 | A | Maybe less than a handful. |
| 13 | Q | Less than five? |
| 14 | A | Yes. |
| 15 | Q | Where have these clubs been located and when |
| 16 | | approximately did you go there? |
| 17 | A | I would say in Las Vegas probably a couple years |
| 18 | | ago. |
| 19 | Q | Do you remember the name of the place you went to? |
| 20 | A | I don't. |
| 21 | Q | How about the other places; do you remember -- |
| 22 | A | I don't remember.  I probably went to Rhino Strip |
| 23 | | Club, something like that. |
| 24 | Q | Is that R-h-i-n-o? |

1    A    Yes, I believe so.

2    Q    Where is that located?

3    A    In Las Vegas.

4    Q    Do you remember anything about any other strip

5         clubs, as you use the term, that you went to as a

6         visitor?

7    A    I don't remember.

8    Q    Have you ever made any promotional appearances in

9         New York State other than the Playboy promotional

10        appearance that you referred to before that

11        occurred in New York City?

12   A    No, I have not.

13   Q    The photo that is the subject of this lawsuit, the

14        images, the front and back images, when it was

15        published in the catalog, was there any warning in

16        the catalog that it would be improper to publish

17        any of the images that appeared in the catalog?

18   A    I don't know.

19   Q    This image, just talking about the image itself,

20        is there anything that you feel is embarrassing

21        about the image?

22   A    No.

23   Q    The complaint in this case alleges that the images

24        were altered.  What do you mean by altered?

```
 1      A     I'm not sure if I understand your question.

 2      Q     If you look at the complaint in this case --

 3            that's the document that starts the lawsuit -- I

 4            believe it alleges in the complaint that these

 5            images that were annexed as exhibits were altered.

 6                  MR. KOLB:  John, for your reference --

 7            and you don't have to take note of this detail,

 8            Ms. Campos -- it says as detailed throughout this

 9            complaint in Paragraph 114, defendants have

10            published altered images of plaintiffs in order to

11            promote their club to the general public and

12            potential clientele.

13      Q     Ms. Campos, what is your understanding of what is

14            meant in the complaint when it says the images of

15            the plaintiffs were altered?

16      A     Either they were altered by putting writing on it,

17            insinuating something or making alterations on my

18            body and my face.

19      Q     Looking at Defendant's Exhibit 33, that's the

20            images of you in, I think you referred to it as a

21            Mexican skirt.  Do you see any alteration of your

22            body, either what you could see of your face or

23            the rest of your body in that exhibit?

24      A     No.
```

```
 1      Q    Do you see any photoshopping at all?
 2      A    I don't think so.
 3      Q    I think you testified before that you don't
 4           remember when you first learned about the
 5           defendant's use of this image; is that correct?
 6      A    Yes.
 7      Q    When you first became aware of it, did you
 8           consider either yourself or having somebody else
 9           on your behalf contact the club and tell the club
10           that your image was being used improperly and you
11           wanted that to stop?
12      A    Yes.
13      Q    You did?
14      A    Yes.
15      Q    Did anyone follow up on that to your knowledge?
16           Before this lawsuit was filed, did you ask anyone
17           on your behalf to notify the defendant club that
18           it was using your image improperly and that it
19           should stop doing so?
20      A    Before the lawsuit, I'm not sure.
21      Q    Have you done that in other cases?
22      A    I don't know.
23      Q    Do you follow any regular procedure to track the
24           use of your images on social media?
```

```
 1      A    Can you repeat that?  You got cut off.

 2      Q    Do you follow any regular procedure to track the

 3           use of your images on social media?

 4      A    No.

 5      Q    Have you ever hired anybody to track the use of

 6           your images on social media?

 7      A    What do you mean by that?

 8      Q    Have you ever paid anyone money to do the job of

 9           searching social media to see if your image has

10           been used in ways that you were not aware of?

11      A    No.

12      Q    I think you said you don't know how you discovered

13           that these images at issue in this case were

14           published by the defendants on the social media of

15           the defendant club; is that correct?

16      A    Yes.

17      Q    Just considering the image itself, does the image

18           in Exhibit 33, in your mind, is that the image of

19           a stripper?

20      A    No.

21      Q    Compared to the bikini that you wore in the Last

22           Vegas movie, how would this outfit that's shown in

23           Exhibit 33 compare?

24      A    I don't know.  One is a costume, one is a bikini.
```

JA-233

36

| 1 | | I'm not sure I understand. |
|---|---|---|
| 2 | Q | Was the bikini in the movie Last Vegas that you |
| 3 | | wore more revealing than the outfit that's shown |
| 4 | | in this image? |
| 5 | A | Probably not. |
| 6 | Q | At the present time, do you have any agency or |
| 7 | | representative that works on your behalf? |
| 8 | A | Yes, I do. |
| 9 | Q | Can you tell me the names? |
| 10 | A | TNG Models and IT models. |
| 11 | Q | Any others? |
| 12 | A | No. |
| 13 | Q | What about Wilhelmina Models? |
| 14 | A | I did work with them in the past, but I haven't in |
| 15 | | probably three years or more. |
| 16 | Q | Was there a reason that you haven't worked with |
| 17 | | Wilhelmina Models in the past three years? |
| 18 | A | They are located in Los Angeles, so since I moved |
| 19 | | to Las Vegas, I just decided to drop the agency. |
| 20 | Q | I'm going to ask you about some of the magazines |
| 21 | | that you indicate you have been published in, |
| 22 | | basically, ones I'm not that familiar with.  One |
| 23 | | is -- and I'm going to have to spell this -- |
| 24 | | A-s-t-o-n-i-s-h, Astonish Mag.  Am I spelling that |

| 1 | | correctly? |
|---|---|---|
| 2 | A | Yes, I believe so. |
| 3 | Q | What type of magazine is that? |
| 4 | A | It's a lifestyle magazine. |
| 5 | Q | What work have you done for them? |
| 6 | A | I did a beauty segment.  It was about makeup, I |
| 7 | | think. |
| 8 | Q | When was that? |
| 9 | A | I don't recall exactly what year.  Between 2014 |
| 10 | | and '16, I would say. |
| 11 | Q | What were you paid for that work? |
| 12 | A | I don't remember. |
| 13 | Q | It wasn't a cover shoot, was it? |
| 14 | A | No, I don't believe so. |
| 15 | Q | It was photos that appeared somewhere inside the |
| 16 | | magazine; is that correct? |
| 17 | A | Yes. |
| 18 | Q | Do you have any idea how much you were paid for |
| 19 | | that? |
| 20 | A | No. |
| 21 | Q | There's another magazine called Viva Glam? |
| 22 | A | Yes. |
| 23 | Q | What type of magazine is that? |
| 24 | A | It's a life and beauty magazine. |

| | | |
|---|---|---|
| 1 | Q | What type of work did you do for them? |
| 2 | A | I believe the same, a makeup pictorial or |
| 3 | | something like that. |
| 4 | Q | Not a cover, correct? |
| 5 | A | No, I don't think so. |
| 6 | Q | Do you have any idea of how much you were paid for |
| 7 | | that? |
| 8 | A | I think they are like trade for exposure.  I don't |
| 9 | | even remember being paid for that job. |
| 10 | Q | When you say trade, what do you mean by that? |
| 11 | A | It means I would photograph and be paid in like |
| 12 | | monetary, like cash, but I would trade for the |
| 13 | | exposure so more people can see me and |
| 14 | | subsequently I can get more work. |
| 15 | Q | When you do something for trade, do you get any |
| 16 | | money from it or just the exposure? |
| 17 | A | It really depends, but usually not. |
| 18 | Q | Usually, you do not get money; is that correct? |
| 19 | A | Yes. |
| 20 | Q | What is Blisss Mag? |
| 21 | A | I think Blisss Mag is like a surfer magazine. |
| 22 | Q | Do you remember what type of work you did for |
| 23 | | Blisss Mag? |
| 24 | A | I think it was trade.  I think it was trade. |

```
 1        Q      Have you done any work for a company called

 2               Arden B?

 3        A      Yes.

 4        Q      What type of company is that?

 5        A      They are clothing brand like H&M, I think.

 6        Q      What type of work did you do for them?

 7        A      Photo shoot.

 8        Q      For what type of medium?  Is it catalog, magazine?

 9        A      I believe it was for the website.

10        Q      Did your name appear on the website?

11        A      I don't think so.

12        Q      What about Target; have you done anything for

13               Target?

14        A      Yes, I did a photo shoot for Target.

15        Q      What were you paid for that?

16        A      I don't remember.

17        Q      What type of medium did you do a photo shoot for

18               Target?

19        A      I don't remember.  I think they used my photo on

20               the billboard or something.  I don't remember.

21        Q      How much would you ordinarily be paid for using

22               your photo on a billboard?

23        A      I don't know.  I think that job for Target I got

24               paid like $2500 or something like that.  I don't
```

Case 21-2149, Document 48, 01/11/2022, 3241954, Page244 of 303

```
 1              recall.
 2    Q    But you don't recall whether it was 2500 or not,
 3         do you?
 4    A    I don't.
 5    Q    What is Chynna Dolls, C-h-y-n-n-a?
 6    A    It's a swimwear company.
 7    Q    What work did you do for that company?
 8    A    Same, web catalog.
 9    Q    Does your name appear on the web catalog?
10    A    I don't think so.
11    Q    What kind of work did you do for Frederick's of
12         Hollywood?
13    A    The same, web catalog.  I don't know if they used
14         my pictures on the printed catalog.
15    Q    Do you know if your name appeared with any of
16         those pictures?
17    A    I don't think so.
18    Q    What is iCollection?
19    A    It's a lingerie catalog as well.
20    Q    What type of work did you do for iCollection?
21    A    That was print and web catalog.
22    Q    Do you know what you were paid by iCollection?
23    A    I believe between 1200 and $1500.
24    Q    Does your name appear with any of your images that
```

Case 21-2149, Document 48, 01/11/2022, 3241954, Page245 of 303

| | | |
|---|---|---|
| 1 | | you did for iCollection? |
| 2 | A | I don't think so. |
| 3 | Q | What is Elegant Moments? |
| 4 | A | It's also a lingerie company. |
| 5 | Q | What type of kind of work did you do for Elegant |
| 6 | | Moments? |
| 7 | A | Printed and web catalog. |
| 8 | Q | Do you know what you were paid for that work? |
| 9 | A | $1400. |
| 10 | Q | Did your name appear with your images that were |
| 11 | | created for Elegant Moments? |
| 12 | A | I don't think so. |
| 13 | Q | What is Drift Eyewear? |
| 14 | A | It's a sunglass company. |
| 15 | Q | What kind of work did you do for them? |
| 16 | A | Web catalog, I believe. |
| 17 | Q | Do you know what you were paid for that? |
| 18 | A | I don't recall, but I would guess around a |
| 19 | | thousand dollars. |
| 20 | Q | Why would you guess around a thousand dollars? |
| 21 | A | Because I remember it was just a half-a-day shoot. |
| 22 | Q | Was that to promote certain eyewear? |
| 23 | A | Correct. |
| 24 | Q | What type of clothing did you wear for that shoot? |

JA-239

42

```
 1      A     I think it was a photo shoot on the beach, so I
 2            was wearing a bikini.
 3      Q     Did you do any work for Sexy Dresses?
 4      A     Yes, I have.
 5      Q     What kind of work did you go for Sexy Dresses?
 6      A     Web catalog.
 7      Q     Did your name appear with your images for that
 8            one?
 9      A     I don't think so.
10      Q     Do you know what you were paid for that one?
11      A     I don't recall.
12      Q     What about Sachika, S-a-c-h-i-k-a?  What is that
13            company?
14      A     It's like dresses, like fashion, I would say.
15      Q     How much were you paid for that work?
16      A     I don't recall.
17      Q     What type of work was that?
18      A     It was a web catalog as well.
19      Q     Did your name appear with your images on that
20            work?
21      A     I don't recall.
22      Q     What is Marisa Kenson, M-a-r-i-s-a, K-e-n-s-o-n?
23      A     It's also clothing, dresses, jackets, stuff like
24            that.
```

JA-240

| | | |
|---|---|---|
| 1 | Q | Outdoor clothing, did you say? |
| 2 | A | Dresses, jackets, pants, like H&M. |
| 3 | Q | What type of work did you do for them? |
| 4 | A | It was also web catalog. |
| 5 | Q | Did your name appear with your images there? |
| 6 | A | I don't think so. |
| 7 | Q | Do you remember what you were paid by Marisa |
| 8 | | Kenson? |
| 9 | A | I don't. |
| 10 | Q | There's a name here; I don't know if you could |
| 11 | | recognize it or not. It's Sports Calendar. Do |
| 12 | | you recognize that name? |
| 13 | A | Sports Calendar? |
| 14 | Q | Yes. |
| 15 | A | I don't remember. |
| 16 | Q | It says you appeared as a spokesmodel for My Body |
| 17 | | Journey; what is that? |
| 18 | A | It was a fitness app. |
| 19 | Q | Did that involve your traveling to different |
| 20 | | countries around the world? |
| 21 | A | No. I would just use the app and record me using |
| 22 | | the app and post it on my Instagram. |
| 23 | Q | What were you paid for that? |
| 24 | A | I don't remember, maybe $2,000. I don't know. |

1      Q    Do you know how much work was involved for that

2          $2,000?

3      A    I think I had to pose once a week for a month or

4          two months.  I don't remember.

5      Q    And for all of that posing, you were paid a total

6          of $2,000?

7      A    Yes.  I don't remember.

8      Q    It says you were a cover girl for Arizona

9          Foothills magazine.  When did that happen?

10     A    I think it was 2017.

11     Q    How much were you paid for that assignment?

12     A    I don't remember.  I think that was a trade.

13     Q    I'm going to ask you now about your Playmate of

14         the Month appearance.  When was that appearance,

15         what month?

16     A    2012, September 2012.

17     Q    So far, do you consider that appearance to be the

18         high point of your modeling career?

19     A    It's the most recognizable job, yes.

20     Q    Was that your only appearance in Playboy?

21     A    Yes.

22     Q    And did that appearance involve nude modeling?

23     A    Yes.

24     Q    Do you have photos from that appearance?

1    A    You mean photos of behind the scenes or photos of
2         the magazine?
3    Q    That's a good question.  No, just the photos that
4         appeared that were published in the magazine.  Do
5         you have those or the magazine itself?
6    A    Yes, of course.
7    Q    Which do you have or both?
8    A    I have both.  I have the magazine and I have the
9         photos.
10             MR. KOLB:  Defendants are calling for the
11        production of the photos.  That would probably be
12        easier to transmit than the magazine.
13
14             (REQUESTED INFORMATION)
15
16   Q    Did this appearance in Playboy as Playmate of the
17        Month in September 2012 have an effect on career?
18   A    Yes.
19   Q    What was that effect?
20   A    I think it helped me a lot.  Playboy is one of the
21        reasons why I got to stay in the United States
22        because I was getting a lot of jobs through them.
23        It helped me get into a movie and booked a lot of
24        catalogs.  I think Playboy was great for me.

Case 21-2149, Document 48, 01/11/2022, 3241954, Page250 of 303

```
 1        Q     Did Playboy work with you for a period of time

 2              after you were playmate of the month?

 3        A     Yes.

 4        Q     Are they still working with you as of the present

 5              time?

 6        A     Sometimes they will send me requests for modeling

 7              appearances or posts on Instagram.  It just

 8              depends if I'm available or not, but they do

 9              request, yes.

10        Q     Do they get any type of commission when they

11              facilitate your getting a job?

12        A     I don't think so.  I don't know if they do because

13              they have a set rate for each job.  I don't know

14              if they are charging more than that or not.

15        Q     Are you familiar with what those set rates are?

16        A     If we were doing an appearance at a party, we are

17              usually there for two to three hours and it would

18              be $900, I think.  And then if we are wearing the

19              bunny suit, it would be more.  I think it was

20              $1200 if we were wearing the bunny suit.

21        Q     When is the last time that you wore the bunny

22              suit?

23        A     It was Super Bowl, maybe two or three years ago.

24              It was in Minneapolis.  It was really cold.  I
```

```
 1              don't know if that was two years ago or three
 2              years ago.
 3        Q     Were there other parts of the fee schedule that
 4              you were familiar with?  You mentioned an
 5              appearance for 900 and then 1200 for the bunny
 6              costume.  Are you familiar with any of their other
 7              rates?
 8        A     No.
 9        Q     You are on different social media platforms,
10              correct?
11        A     Yes.
12        Q     This photo of you that brought us here today seems
13              to have been published on or about May 5th, 2016.
14              Can you tell us how many followers you had on each
15              of the social media platforms as of May 5th, 2016?
16        A     I do not know.  I probably had more than I have
17              now because I have been deleting old accounts,
18              inactive accounts.  I remember I had 850,000
19              followers at one point.  I don't know if that was
20              around then, probably.
21        Q     Which platform was that?
22        A     Instagram.
23        Q     What about Facebook?
24        A     I did have a Facebook page.  I think it had over
```

Case 21-2149, Document 48, 01/11/2022, 3241954, Page252 of 303

| | | |
|---|---|---|
| 1 | | 250,000 people, but I deleted that a few years |
| 2 | | ago. |
| 3 | Q | You are no longer on Facebook? |
| 4 | A | Not as a personality, let's say. I only have a |
| 5 | | private profile for my family. |
| 6 | Q | What about Twitter; have you ever been on Twitter? |
| 7 | A | Yes, I'm on Twitter. |
| 8 | Q | How many followers do you have on Twitter? |
| 9 | A | A little over a hundred thousand. |
| 10 | Q | How many the followers did you have on Twitter |
| 11 | | back on May 5th, 2016, approximately? |
| 12 | A | I don't know. Probably 50,000, 60,000. I don't |
| 13 | | know. |
| 14 | Q | As of that day, May 5th, 2016, what would your |
| 15 | | estimate be on your Instagram followers? |
| 16 | A | Probably around 700,000. |
| 17 | Q | I'm going to go back to your interrogatories. |
| 18 | | Number 3, there's a list of different companies. |
| 19 | | I'm not going to go over the ones we've gone over |
| 20 | | before, although I may have a couple questions. |
| 21 | | Do you have that page in front of you? It's |
| 22 | | Page 7. |
| 23 | A | Yes. |
| 24 | Q | The first listing is Playboy Enterprises, 27,700 |

```
 1                a year.  That was in 2012.  That was the year in

 2                which your centerfold was published, correct?

 3          A     Correct.

 4          Q     That 27,700, does that basically represent the

 5                total amount that you were paid for your

 6                centerfold and the follow-up promotional

 7                activities that you did?

 8          A     That was probably just the centerfold and probably

 9                one other job because Playboy sets the payments

10                and it's divided in three.  I think the first 75

11                percent of the payment is when the centerfold

12                comes out and then the rest is the following year.

13          Q     So the payments are paid over time?  They are not

14                paid all at the same time, correct?

15          A     Yes.

16          Q     What is the work Playboy Enterprises 22,570 per

17                year in 2014, what does that refer to?

18          A     Probably appearances, photo shoots for apparel and

19                stuff like that.

20          Q     What is Michele & Group, the next one down?

21          A     That is a modeling agency in Florida.

22          Q     That's an agency?

23          A     Yes.

24          Q     Does the 5280 a year, does that represent the
```

| | | |
|---|---|---|
| 1 | | income that this modeling agency helped you to |
| 2 | | obtain? |
| 3 | A | Correct. |
| 4 | Q | The next one is LVC, LLC; what do they do? |
| 5 | A | Honestly, I have no idea what this is.  I don't |
| 6 | | recall the LLC name. |
| 7 | Q | Do you know what is meant here $500 for social |
| 8 | | media posts? |
| 9 | A | Yes.  It was probably one post on my Instagram. |
| 10 | Q | How long would you have to keep that up there to |
| 11 | | earn the $500? |
| 12 | A | It depends on the company.  Some are 24 hours, |
| 13 | | some are seven days, some are for weeks.  It |
| 14 | | depends.  I don't remember what this was for |
| 15 | | though. |
| 16 | Q | Fair to say you don't have a memory as far as this |
| 17 | | one is concerned? |
| 18 | A | Yes. |
| 19 | Q | Now, the next one -- and I have to spell this for |
| 20 | | the reporter -- w-t-r-m-l-n is the first word and |
| 21 | | the second word is w-t-r.  It indicates you were a |
| 22 | | social media influencer and were you paid $300 per |
| 23 | | social media posts.  What type of company is that |
| 24 | | company? |

```
 1         A    It's a drink.  It's called watermelon water.

 2         Q    It says 300 per social media post.  Do you know

 3              how long the social media post had to be up to

 4              earn the $300?

 5         A    I don't.

 6         Q    The next one on the list is Tancueticals,

 7              T-a-n-c-u-e-t-i-c-a-l-s.  What company is that?

 8         A    I don't recall.

 9         Q    Do you remember how long you would have to keep

10              your social media posts up there to earn $250?

11         A    No.

12         Q    The next one I'm going to spell also, O-i-s-t-a,

13              LLC.  It says you were a social media influencer

14              and the compensation was $550 for social media

15              posts.  Do you remember how long you had to have

16              your social media post up to be compensated $550?

17         A    No.

18         Q    Next one on the list is My Body Journey P-t-y and

19              you were paid 2700 AUD per month plus $250 per

20              live stream.  First of all, what is AUD?

21         A    Australian dollar.

22         Q    What were you paid that money for, the $2700 per

23              month?

24         A    This is the fitness app I told you about earlier.
```

```
 1              It was for a post of me using the app.

 2    Q    How much work did you put in to produce this?

 3    A    I didn't produce the fitness app; I just had to

 4         post the photo or video of me using the app.

 5    Q    How much time did you spend creating the photos

 6         and the video?

 7    A    Honestly, probably no more than 20 minutes.

 8    Q    How long did you have that work?

 9    A    I don't know.  I don't think I worked with them

10         for long.

11    Q    Was it less than a year?

12    A    Yes, probably.

13    Q    Did that end sometime in 2015?

14    A    I believe so.

15    Q    The CPTN Apparel Company was a three percent

16         royalty according to your answers to

17         interrogatories.  Do you recall how much you made

18         from that?

19    A    I think I made around $2,000, $2500.

20    Q    What was that for?

21    A    They wanted to use one of my pictures to put it on

22         a T-shirt.

23    Q    Vixen Clothing, it says $2,000 for three photo

24         shoots.  When you say three photo shoots, is that
```

```
 1              three different appearances to have your picture
 2              taken?
 3      A       Yes.
 4      Q       Was it common on the Vixen Clothing website not to
 5              show the face of the model who was wearing the
 6              clothing?
 7      A       I don't think so.
 8      Q       Did your name appear with your image on the Vixen
 9              Clothing website?
10      A       I don't think so.
11      Q       Now, the Notion Studio, the compensation says
12              $3,000 in trade; is that correct?
13      A       Yes.
14      Q       Would it be fair to say you did not receive any
15              money for whatever work you did for the Notion
16              Studio?
17      A       Yes.  I don't even remember what Notion Studio is.
18      Q       I'd like you to look down in the next answer,
19              Paragraph 4 and it says "Plaintiff states she's
20              been represented by each of the following during
21              her career" and it lists Michele & Group and Brand
22              Model and Talent.  You indicated a couple other
23              companies as well, I think, correct?
24      A       Yes.
```

| | | |
|---|---|---|
| 1 | Q | Michele & Group, when did they represent you? |
| 2 | A | I believe since 2013. |
| 3 | Q | Are they still representing you? |
| 4 | A | Yes.  They have me on the list, but I haven't |
| 5 | | worked with them for over a year, maybe more. |
| 6 | Q | What about Brand Model and Talent; when did they |
| 7 | | represent you? |
| 8 | A | I think since 2013 or '14 up to maybe 2017, '16 or |
| 9 | | '17.  I don't know. |
| 10 | Q | So they no longer represent you? |
| 11 | A | No. |
| 12 | Q | Did you stop working with them in connection with |
| 13 | | your real estate career? |
| 14 | A | My agent from Brand, they both opened IT Models so |
| 15 | | I decided to go with them instead of staying with |
| 16 | | the old agency basically. |
| 17 | Q | I want to refer you to Paragraph 7 of your answer |
| 18 | | to interrogatories which is Page 9.  I'll read you |
| 19 | | the sentence from Paragraph 7.  Specifically, I'm |
| 20 | | going to read you a part of the last sentence in |
| 21 | | Paragraph 7.  It says "Plaintiff" -- that's you -- |
| 22 | | "has not been contacted directly by a third party |
| 23 | | with notice of a refusal to do business or the |
| 24 | | rescission of an offer to hire due to defendant's |

```
1                    use of plaintiff's image."  Is that correct?

2        A          Yes.

3        Q          I'd like to refer you to Paragraph 12 which is on

4                    Page 13.

5        A          I'm there.

6        Q          Again, the last sentence of the paragraph, I'm

7                    going to read part of the sentence.  It says that

8                    "Defendants made it appear to the outside world

9                    and friends of plaintiff that she" -- that's you

10                   -- "willingly and knowingly agreed to endorse a

11                   deviant lifestyle and disreputable brand."  First

12                   of all, did any of your friends see this image as

13                   it was published on the defendant Gentlemen's Club

14                   social media?

15       A          I am not sure.

16       Q          Do you know of any who saw that?

17       A          I have friends who saw other pictures, but I don't

18                   know if it was from your client's club.

19       Q          When you say here a deviant lifestyle, what do you

20                   mean by that?

21       A          I mean I'm supporting girls to do this kind of

22                   work of arousing men and, I don't know.  It's

23                   something I wouldn't do myself.

24       Q          Do you consider that to be a deviant lifestyle; is
```

```
 1              that correct?

 2    A    Yes.

 3    Q    Is that on behalf of the women?  Are the women

 4         pursuing a deviant lifestyle in your opinion?

 5    A    I think so.  It's like they are selling

 6         themselves.

 7    Q    I notice on your Instagram site you have a

 8         reference to Brazi Bronze; what is that?

 9    A    That is my tanning oil company.

10    Q    That's a company that you own?

11    A    Yes.  I launched it February of this year.

12    Q    To the extent that your image was posted on the

13         defendant Gentlemen's Club Instagram account, it

14         was not posted along with your name.  What is it

15         that makes you believe that someone seeing this

16         image, front or back, would say that's an image of

17         Alana Campos?

18    A    I don't know, because it's me in the photo.  If

19         somebody knows me, they will see it's me.

20    Q    How would they put together your name and that

21         image?

22                   MR. GOLASZEWSKI:  Objection.

23    Q    You can answer.

24    A    I don't know how they would put my name with the
```

JA-254

```
 1              image.  I feel if I see a photo of Adriana Lima, I
 2              know that's Adriana Lima even though her name is
 3              not on it.
 4       Q      Who is Adriana Lima?
 5       A      She's also a model.
 6       Q      She's one of the most famous models in the world,
 7              isn't she?
 8       A      Yes.
 9       Q      I think she did a lot of work with -- I'm trying
10              to think of that company.  What company did she do
11              a lot of work with?
12       A      Victoria Secret.
13       Q      She did a lot of work with that company; is that
14              right?
15       A      Yes.
16       Q      Is she from South America as well?
17       A      Yes.  She is from Brazil as well.
18       Q      Do you consider yourself to be as well known as
19              Ms. Lima?
20                     MR. GOLASZEWSKI:  Objection.
21       A      No, I do not.
22       Q      With respect to the image that's shown as Exhibit
23              33, front and back, is there anything distinctive
24              about either your face or body that you feel
```

```
 1              distinguishes you from other physically attractive

 2              women with dark hair?

 3       A      You were cutting off a lot.   I didn't understand

 4              your question.

 5                      MR. KOLB:  Julie, did you hear my

 6              question?

 7

 8              (Pending question read back by stenographer)

 9

10                      MR. GOLASZEWSKI:  Objection.  You can

11              answer.

12       A      I am not sure.

13       Q      Have you received any money from any of these

14              lawsuits of this kind that you've brought?

15                      MR. GOLASZEWSKI:  The witness can answer

16              yes or no.

17       A      Yes.

18       Q      Are the amounts of money reflected on your income

19              tax returns?

20                      MR. GOLASZEWSKI:  Again, the witness can

21              answer yes or no.

22       A      Yes.

23       Q      Do you have Defendant's Exhibit 31, Ms. Campos?

24              Some are W-2s, some are -- actually, I think
```

JA-256

59

```
 1              there's only one 1099.  Do you see those, Exhibit

 2              31?  I can be bring it up for you.

 3    A         I don't think I have that one.

 4    Q         Do you see some documents there?

 5    A         Yes.

 6    Q         I'd like you to scroll and tell me if these are

 7              the only documents that you have that show what

 8              your income was in the past ten years?

 9    A         I don't think I can scroll.  Can you do it for me?

10    Q         Sure, sure, I'm sorry.  Page 1 looks like some

11              W-2s from Playboy.

12    A         Yes.

13    Q         Here's 2013 from Playboy, 2012 from Playboy and

14              then Michele & Group 2014.

15    A         Right.

16    Q         And that's it.  Do you have other documents in

17              your possession that show any of your income from

18              2010 to 2020?

19    A         Yes, I have 2014, '15, '16.

20                   MR. KOLB:  I'm just going to put on the

21              record, counsel and I had our colloquy in our

22              first deposition.  We are going to be requesting

23              copies of the income tax returns for this witness

24              to the extent they show modeling income for, I
```

```
 1              believe, 2015 to present.

 2

 3                     (REQUESTED INFORMATION)

 4

 5     Q    I'm going to go through the rest of these exhibits

 6          with you.  This is a social media influencer

 7          agreement.  Do you see that at the top?

 8     A    Yes.

 9     Q    It's between LVC, LLC, which I think you didn't

10          remember before?

11     A    Yes,  I didn't.

12     Q    Do you see at Paragraph B were it says "Shall post

13          upload the post content", et cetera, et cetera?

14     A    Yes.

15     Q    Does that refresh your recollection as to what

16          this was about?

17     A    No.

18     Q    You represented that you have a number of social

19          media accounts.  Was that correct as of whatever

20          date this agreement was?  Let's see if we can find

21          a date on it.

22     A    That was April 8th, 2015.

23     Q    Right.  Very good.  Did you provide these figures

24          to that company so they could put them in this
```

JA-258

61

| | | |
|---|---|---|
| 1 | | agreement? |
| 2 | A | Yes, I believe so. |
| 3 | Q | And then compensation, it says they will pay you a |
| 4 | | posting fee of $500 and a hundred dollars for |
| 5 | | every referral.  Every referral, what does that |
| 6 | | refer to? |
| 7 | A | I have no idea. |
| 8 | Q | You haven't seen the term referral used in this |
| 9 | | context? |
| 10 | A | It's probably saying if I find another influencer? |
| 11 | | I'm not sure. |
| 12 | Q | You are not sure what that means? |
| 13 | A | No, I don't. |
| 14 | Q | Did you actually sign this agreement at some |
| 15 | | point? |
| 16 | A | I don't know. |
| 17 | Q | Did you actually do this work?  Does it refresh |
| 18 | | your recollection as to whether you did this work? |
| 19 | A | I don't remember if I did. |
| 20 | Q | Here we have the 3 Wishes.  Does this refer to the |
| 21 | | photo shoot you had for 3 Wishes? |
| 22 | A | Yes. |
| 23 | Q | Does this indicate you were paid a thousand |
| 24 | | dollars a day for working on this photo shoot? |

```
1        A     Yes.

2        Q     I'm sorry, there are two names here.  One is

3              Laurie Young and one is you.  Do you know whether

4              you were paid a thousand?  What is your memory as

5              far as that goes?

6        A     I believe I was paid one thousand and the other

7              girl was paid a thousand.

8        Q     As far as you know, based on your prior testimony,

9              would this be a document showing what you were

10             paid to have the picture taken that appears as

11             Exhibit 33 in this case?

12       A     Yes.

13       Q     Then it shows here, to be fair, the last page says

14             that you were given two checks for this

15             assignment.  There's one for $800 which is a check

16             dated 8/13/2013 and there's another check for $800

17             dated 3/7/2013.  I'll just indicate that for the

18             record.  Now, we'll go to the next exhibit.  This

19             is a T-shirt.  Is this the T-shirt you testified

20             about before?

21       A     Yes.

22       Q     When did you model to have this image made for the

23             T-shirt?

24       A     I don't recall, between 2015 and '17, I believe.
```

Case 21-2149, Document 48, 01/11/2022, 3241954, Page267 of 303

| | | |
|---|---|---|
| 1 | Q | Was this T-shirt your own design, somebody else's |
| 2 | | design or how was it decided that this would be |
| 3 | | your image on a T-shirt? |
| 4 | A | I think I did a photo for it. |
| 5 | Q | Was the photo taken by CPTN Apparel? |
| 6 | A | Correct. |
| 7 | Q | I have to go back to the interrogatories, back to |
| 8 | | Number 3, Page 7.  This CPTN Apparel company, you |
| 9 | | were paid three percent royalties for this |
| 10 | | T-shirt.  I see CPTN Apparel in the upper |
| 11 | | left-hand corner of this photo with the T-shirt |
| 12 | | and then I'm looking at your interrogatories, |
| 13 | | Number 3, that says you were paid a three percent |
| 14 | | royalty.  Does that refresh your recollection that |
| 15 | | you were paid a three percent royalty for this |
| 16 | | T-shirt? |
| 17 | A | Yes. |
| 18 | Q | Do you see this, Exhibit 24? |
| 19 | A | Yes. |
| 20 | Q | This is between you and CPTN.  I'll scroll down |
| 21 | | for you and ask you does this agreement contain |
| 22 | | the agreement with respect to the T-shirt we were |
| 23 | | just looking at? |
| 24 | A | Yes. |

```
 1        Q    We'll go to 25.  This is a model agreement
 2             effective 9/11/16 between you and Vixen clothing.
 3             You testified about Vixen Clothing before,
 4             correct?
 5        A    Yes.
 6        Q    The compensation, according to the last page,
 7             compensation was $400 for two hours of shooting
 8             plus posts on social media.  What does that last
 9             word mean, plus posts on social media?  You were
10             going to do some posting as well?
11        A    Probably.
12        Q    Would a total of $800 then be complete payment for
13             all of your activity under this agreement?
14        A    I don't know.
15        Q    And this refers to a preapproved release form.  Do
16             you know if you have that release form in your
17             possession?
18        A    I don't know.
19        Q    We'll move on to 26.  This must be a double.
20             That's a duplicate.  This has your signature on
21             it.
22        A    Just reading this contract, I just saw it was to
23             post a music video like a shot of a music video
24             for Rihanna.
```

```
 1        Q      What are you referring to, which paragraph?

 2        A      It's relating to Rihanna, American Oxygen, post

 3               content.  It was like a snap shot of her new music

 4               video.

 5        Q      You do have a memory of that?

 6        A      Now, yes.

 7        Q      And you did sign it, so you did go ahead with it,

 8               correct?

 9        A      Yes, probably, for sure.

10        Q      Let's go back to the compensation part.  You see

11               Paragraph 2 there, a posting fee of 500 and a

12               hundred dollars for every referral.  What do you

13               interpret those terms to mean?

14        A      I was paid $500 to post a snap shot of her music

15               video and the hundred dollar referral, I'm not

16               sure what that's for.  I don't know if they wanted

17               me to find them more influencers or people had to

18               sign up on the website for something.  I'm not

19               sure.

20        Q      We'll go to the next one.  Social media post

21               agreement between Fan Annex and Watermelon Water.

22               You testified about Watermelon Water before.

23               Would it be fair to say the compensation you

24               received for this was one Instagram post for $300?
```

```
 1        A    Correct.

 2        Q    Looking down under term, it says the personality

 3             is required to keep the post on line indefinitely.

 4             What does that mean to you?  You had to keep that

 5             post on your social media?

 6        A    Yes, but I definitely didn't keep it forever.

 7        Q    That was not consistent with your agreement, was

 8             it?

 9        A    No.

10        Q    Exhibit 28, this says at the top "Agreement

11             between Christina Oliva and Alana Campos."  She is

12             going to provide you with complimentary hair in

13             exchange for professional services?

14        A    Yes.

15        Q    Did you receive any money for this?

16        A    I don't know.  I don't know even know what this

17             is.

18        Q    Do you recognize the name Christina Oliva?

19        A    No.

20        Q    One of the deal points, Number 2, is Christina

21             Oliva will install six bundles of Russian hair in

22             the color of dark brown priced at $3,000 on you on

23             the 21st day of November 2015.  Then you are to

24             post complimentary posts?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And they are supposed to stay up for a hundred |
| 3 | | days.  Do you know if either of you carried |
| 4 | | out -- |
| 5 | A | I don't remember. |
| 6 | Q | Let me just finish my question.  Do you know if |
| 7 | | either of you did anything they were supposed to |
| 8 | | do under this agreement? |
| 9 | A | I don't remember. |
| 10 | Q | This is an endorsement agreement with OISTA, LLC |
| 11 | | that you testified about before.  Did this |
| 12 | | accurately set forth the number of social media |
| 13 | | followers you had as of November 12th, 2015?  You |
| 14 | | see the numbers there? |
| 15 | A | Yes. |
| 16 | Q | Was that accurate as of November 12th, 2015? |
| 17 | A | Probably, yes. |
| 18 | Q | And you were paid $550 for your work under this |
| 19 | | agreement, correct?  Do you see that toward the |
| 20 | | bottom? |
| 21 | A | Yes. |
| 22 | Q | This is My Body Journey.  I think we have pretty |
| 23 | | much gone over this.  This says you were engaged |
| 24 | | for a three-month period commencing on the 15th of |

```
 1              July.  Do you know whether the agreement was

 2              extended beyond that?

 3     A        I don't.  I don't think so.

 4     Q        You don't think so?

 5     A        No.

 6     Q        Exhibit 31 we went over.  Exhibit 32, this is your

 7              contract, so to speak, with Playboy with Alana

 8              Campos-Herold.  I think this is pretty much self-

 9              explanatory.  If you could just confirm, is that

10              your contract with Playboy for your playmate

11              appearance?

12     A        Yes.

13     Q        Exhibit 33 is the image.  Exhibit 34 is your

14              interrogatories.  What do you recognize Exhibit 35

15              to be?

16     A        It's my centerfold.

17     Q        The centerfold that actually appears in Playboy,

18              is that a nude centerfold?

19     A        Yes.

20     Q        In other words, the blue rectangles do not appear

21              in the centerfold, correct?

22     A        Yes, correct.

23     Q        Did you have anything to do with offering this for

24              sale?
```

1  A  No.

2  Q  Number 36, can you tell us if that is your image?

3  A  Yes, it is.

4  Q  Is that from a photo shoot or how did that image

5     come to be made?

6  A  It's from a photo shoot.

7  Q  When was that photo shoot done?

8  A  I have no idea, maybe 2016 or '17.

9  Q  Do you recall who paid you for that photo shoot?

10  A  It was just a photo for my Instagram.  I wasn't

11     paid.

12  Q  This is a photo that you wanted to post on your

13     Instagram, correct?

14  A  Yes, content creation.

15  Q  Now, do you recognize Exhibit 37, what type of

16     page is that?

17  A  A web page, IMDb.

18  Q  Do you recognize what type of page that is?

19  A  No, I don't.

20  Q  Now this page, the filmography indicates you were

21     in some production called -- and I'll spell this

22     for the reporter -- D-r-n-k is the first word, the

23     second is T-e-x-t-i-n and underneath that, it says

24     Bella.  Was Bella your character?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What was this production?  What was the nature of |
| 3 | | this? |
| 4 | A | It was a music video. |
| 5 | Q | Do you have a copy of this music video? |
| 6 | A | I do not. |
| 7 | Q | Do you know where this music video can be |
| 8 | | obtained? |
| 9 | A | I don't. |
| 10 | Q | Were you paid any money for your participation in |
| 11 | | this music video? |
| 12 | A | Probably. |
| 13 | Q | Do you have a recollection one way or the other as |
| 14 | | to whether you were paid for this? |
| 15 | A | I was probably paid. |
| 16 | Q | Do you have any idea how much you were paid? |
| 17 | A | I don't. |
| 18 | Q | Do you have any contract or other written |
| 19 | | documents that pertain to your appearance in this |
| 20 | | music video? |
| 21 | A | I don't think so. |
| 22 | Q | Underneath that, it says "Playboy Sweet Spots: |
| 23 | | Shaken (Video)".  What does that refer to? |
| 24 | A | I've never seen this before. |

```
1      Q     Do you recall appearing in a video with the title
2            "Playboy Sweet Spots: Shaken"?
3      A     No.
4      Q     So as far as you know, would it be fair to say you
5            never appeared in this video?
6      A     Yes.
7      Q     But you did appear in the "Drnk Textin"; is that
8            correct?
9      A     Yes.
10     Q     Now, the final entry on this page, "Interns, TV
11           Series" and it says underneath that "Bikini
12           Woman".  Did you appear in a TV series called
13           "Interns"?
14     A     I don't recall.
15     Q     You have no memory one way or the other?
16     A     No.
17     Q     On the next page, it says "Self credits".  It says
18           "Eighth Annual Babes in Toyland:  Live from Avalon
19           Hollywood, TV Special".  Do you know what that
20           refers to?
21     A     I know Babes in Toyland is a charity event.  I
22           have no idea if it's a TV show.
23     Q     What about the next entry, "Playmate Playback, TV
24           Series Documentary, Episode Number 1.4".  Do you
```

```
 1                have any memory of appearing in that episode of
 2                the TV series?
 3        A       No.
 4        Q       And further on down, it says "Star Sign Scorpio";
 5                is that your star sign?
 6        A       That is correct.
 7        Q       What is your month of birth again?
 8        A       November.
 9        Q       The last page under filmography, it says "Self one
10                credit".  I think this is under Souza.  Yes, Alana
11                Souza.  It says "Red Elixir presents CeeLo Green
12                Live" and the year is 2017.  Do you have any
13                memory of appearing in this?
14        A       No.  This was convention work that I did and I
15                have no idea how I ended up the movie.
16        Q       Where was the convention held?
17        A       It was in Chicago.
18        Q       What was the nature of the work that you did at
19                the convention?
20        A       To stay in the booth and say hi to people, invite
21                them to drink the drink.  It was like an energy
22                drink or something like that.
23        Q       Oh, the Red Elixir?
24        A       Yes.
```

JA-270

| | | |
|---|---|---|
| 1 | Q | How much were you paid for that? |
| 2 | A | I think it was like $1700, something like that. |
| 3 | Q | Do you recognize what is shown here?  Let me |
| 4 | | scroll through for you.  Basically, it's two |
| 5 | | pages.  Do you recognize this? |
| 6 | A | I recognize my name.  Never been on this website |
| 7 | | though. |
| 8 | Q | In your complaint, I believe it says that you |
| 9 | | appeared for Maxim.  Let me just check that. |
| 10 | A | I have never shot for Maxim magazine. |
| 11 | Q | I could be wrong and if I'm wrong, I apologize.  I |
| 12 | | may have you confused with another plaintiff, I'm |
| 13 | | sorry.  You never shot for Maxim? |
| 14 | A | No. |
| 15 | Q | Did you communicate or cooperate with Maxim at all |
| 16 | | in the publication of this -- I don't know what to |
| 17 | | call it -- of these two pages? |
| 18 | A | I do not recall. |
| 19 | Q | You have no recollection one way or the other? |
| 20 | A | No. |
| 21 | Q | If I read you the last question and answer, my |
| 22 | | question would be does this give you any |
| 23 | | recollection of participating here with Maxim. |
| 24 | | "We can try again, no worries.  Lastly, what's |

```
 1              your ultimate sex fantasy?" and the answer stated

 2              here is -- I don't know whether you gave it or not

 3              -- "To bring another girl home with us."  Did you

 4              ever give that answer to Maxim magazine?

 5       A      I've never seen this before, so I don't know.

 6       Q      Apart from not seeing it before, does it ring any

 7              kind of bell with you?

 8       A      No.

 9       Q      Then the last one, Exhibit 39, let's take the

10              first image here on the first page.  Do you

11              recognize that image?

12       A      It's from Playboy Midsummer Night's Dream party.

13       Q      You testified about that already, right?

14       A      I don't think so.

15       Q      When and where was this party?

16       A      It was at the Playboy Mansion in 2017, I think.

17       Q      The Playboy Mansion at that time was in California

18              somewhere, correct?

19       A      Yes, Los Angeles.

20       Q      I ask you that because it was originally in

21              Chicago.  This next image, do you recognize this

22              one?

23       A      Yes.

24       Q      How did that image come to be created?
```

| | | |
|---|---|---|
| 1 | A | I was doing a photo shoot on the beach and I was |
| 2 | | changing and the photographer snapped a photo. |
| 3 | Q | Did you publish this on any of your social media? |
| 4 | A | Probably. |
| 5 | Q | The next image says "Only Crush on Ring Girls". |
| 6 | | Were you a ring girl at one point? |
| 7 | A | Yes. |
| 8 | Q | What does a ring girl do? |
| 9 | A | The ring girl carries the round number around the |
| 10 | | ring on a boxing or UFC event. |
| 11 | Q | That's between rounds, right? |
| 12 | A | Correct. |
| 13 | Q | On how many events were you a ring girl? |
| 14 | A | I don't know.  I guess I would say less than ten. |
| 15 | Q | Who hired you for that? |
| 16 | A | Tecate beer and Top Ring. |
| 17 | Q | The next photo I'll show you, it has a date of |
| 18 | | November 15, 2015 on it.  Do you recognize this |
| 19 | | image? |
| 20 | A | Yes. |
| 21 | Q | How was this image created? |
| 22 | A | Doing a photo shoot. |
| 23 | Q | Who was that photo shoot for? |
| 24 | A | For my Instagram. |

| | | |
|---|---|---|
| 1 | Q | Were you paid for that photo shoot? |
| 2 | A | No. |
| 3 | Q | Did you pay the photographer for this photo shoot? |
| 4 | A | I don't believe so. |
| 5 | Q | Let's go to the next image.  This has a date of |
| 6 | | the February 10th, 2015.  Do you recognize this |
| 7 | | image? |
| 8 | A | Yes. |
| 9 | Q | How did this image come to be created? |
| 10 | A | I was at home.  A photographer friend came over |
| 11 | | for dinner and we took a picture. |
| 12 | Q | Was that at your request? |
| 13 | A | I don't recall. |
| 14 | Q | Did you wind up posting this on your social media? |
| 15 | A | I don't think I did, no. |
| 16 | Q | Do you know who posted it on social media? |
| 17 | A | Probably the photographer. |
| 18 | Q | Did he have permission to do so? |
| 19 | A | Probably. |
| 20 | Q | I'm going now to the next image which is dated |
| 21 | | June 29th, 2017, according to the social media |
| 22 | | page on which it appears.  Are these images of |
| 23 | | you? |
| 24 | A | Yes.  This is for Elegant Moments the lingerie |

```
 1              catalog we spoke about earlier.
 2      Q       Let's go to the next one.  It says January 29th
 3              and it seems to refer, although one number is
 4              partially blocked out, it looks like 2020
 5              Collection.  Does your photo appear in this?
 6      A       I think so.  It's really hard to see, but I think
 7              so, yes.
 8      Q       This is for Elegant Moments, right?
 9      A       Correct.
10      Q       And now, I have to apologize, this image for some
11              reason I could not copy the words, so I wound up
12              writing them in in my own handwriting.
13      A       No worries.
14      Q       Thank you.  My love refers to your dog, right?
15      A       Correct.
16      Q       Could you just tell us what these various circles
17              refer to?
18      A       Those are called highlights on Instagram.  It's a
19              little video, a Snapchat of your day or whatever
20              you are doing that you post on your stories that
21              you can save as a highlight, so it's there longer
22              basically.
23      Q       So the first one is modeling, right?
24      A       Correct.  That's behind the scenes.
```

78

```
 1        Q      Thank you.  Then Brazi Bronze 2 is the next one.
 2               We went over that.  Is that Disco?  That's your
 3               dog?
 4        A      Yes.
 5        Q      Then we have cooking features; what does features
 6               refer to?
 7        A      It refers to when another page shares my picture.
 8        Q      I tried to capture this going all the way across
 9               because there are quite a few of these circles.
10        A      Yes.
11        Q      One is Bawah, B-a-w-a-h; what does that mean?
12        A      It's an island in Indonesia.
13        Q      Did you go there for professional purposes?
14        A      Yes.
15        Q      Did someone pay you to go there?
16        A      No.  It was for fun.
17        Q      Did you earn any money as part of that trip or
18               not?
19        A      No.
20        Q      What about Brazil 19, the next one?  Would your
21               answer be the same?
22        A      Yes, just registering my vacation in my hometown.
23        Q      And Rio?
24        A      Same answer.
```

| | | |
|---|---|---|
| 1 | Q | And what does fitness mean? |
| 2 | A | I shared my fitness videos, health and wellness |
| 3 | | stuff on there. |
| 4 | Q | And hockey, what does hockey mean? |
| 5 | A | I go to a lot of hockey games.  Just sharing |
| 6 | | hockey stuff. |
| 7 | Q | Is that in Las Vegas that you go to the hockey |
| 8 | | games? |
| 9 | A | Yes. |
| 10 | Q | The next one says Sri Lanka; is that for |
| 11 | | compensation or just a fun trip? |
| 12 | A | Just for fun. |
| 13 | Q | And then the next group of circles, I'll just go |
| 14 | | through each of these and if you can tell me if |
| 15 | | it's for fun or for compensation.  Bali? |
| 16 | A | Can I say something? |
| 17 | Q | Sure. |
| 18 | A | Ninety percent of these trips are all for fun, but |
| 19 | | I do trades with the hotel so instead for me |
| 20 | | paying 300 to $600 a night, I will post a photo on |
| 21 | | my Instagram and exchange it with the hotel. |
| 22 | | Basically, it's fun, but it's also work.  I don't |
| 23 | | know how to characterize that. |
| 24 | Q | I understand.  I'm just going to go through the |

| | | |
|---|---|---|
| 1 | | rest of these and tell me if that's the same |
| 2 | | situation for all of these. Bali? |
| 3 | A | Yes. |
| 4 | Q | Penita? |
| 5 | A | That was fun. |
| 6 | Q | What is Penita? |
| 7 | A | It's an island in Indonesia as well. |
| 8 | Q | Rome? |
| 9 | A | That's for fun. |
| 10 | Q | Venice. |
| 11 | A | For fun. |
| 12 | Q | Montroua? |
| 13 | A | Fun. |
| 14 | Q | Zermatt? |
| 15 | A | That was fun. |
| 16 | Q | Zurich? |
| 17 | A | For fun. |
| 18 | Q | Puerto Ric? Is that for Puerto Rico? |
| 19 | A | Yes, and that was for fun. |
| 20 | Q | Yosemite? |
| 21 | A | For fun. |
| 22 | Q | Singapore? |
| 23 | A | For fun as well. |
| 24 | Q | Maldives? |

|   |   |   |
|---|---|---|
| 1 | A | That was for fun and trade with the motel. |
| 2 | Q | And during what period of time did you do all |
| 3 |   | these travels? |
| 4 | A | Most of them were last year actually. |
| 5 | Q | What about books? |
| 6 | A | Just the books that I read that I like to share. |
| 7 | Q | I think we are almost near the end. Tulum? |
| 8 | A | Yes, that was for fun as well. It's Mexico. |
| 9 | Q | Hawaii? |
| 10 | A | That was for fun as well. |
| 11 | Q | Zion? |
| 12 | A | For fun. |
| 13 | Q | Just dance? |
| 14 | A | Basically, when I go to a concert and listen to |
| 15 |   | music I like, I share on there. |
| 16 | Q | And I have to apologize for my writing here. I |
| 17 |   | don't know if that's says Florida 18 or Floripa? |
| 18 | A | Floripa. |
| 19 | Q | Does that refer to your hometown in Brazil? |
| 20 | A | Correct. |
| 21 | Q | Was that for fun? |
| 22 | A | Yes, for fun, to the visit my family. |
| 23 | Q | And Canada? |
| 24 | A | That was for fun as well. |

```
 1       Q     Then the final two are Mexico 18 and Brazil 17.
 2             What can you say on those two?
 3       A     The same.
 4       Q     The next image was posted one day ago for the
 5             record to identify it.  Is this a photo of you and
 6             a friend of yours?
 7       A     Correct.
 8       Q     Did you compose the message that goes with this?
 9       A     Yes.
10       Q     How did this image come to be created?
11       A     We went to do a photo shoot in Death Valley.
12       Q     Were you paid for that photo shoot?
13       A     No.  It was just for content creation.
14       Q     For each of you as a model; is that correct?
15       A     Correct.
16                   MR. KOLB:  I have nothing further, ma'am.
17             Thank you.
18                   MR. GOLASZEWSKI:  Nothing for plaintiffs.
19
20             (Whereupon, the examination of Alana Souza
21             was concluded.)
22
23
24
```

```
 1

 2

 3    STATE OF                )

 4                            )  ss:
      COUNTY OF               )
 5

 6

 7
              I have read the foregoing record of
 8
        my testimony taken at the time and place noted
 9
        in the heading hereof and I do hereby acknowledge
10
        it to be a true and accurate transcript of the
11
        same.
12

13

14

15                           _____

                                    ALANA SOUZA
16

17
      Sworn to before me this
18
      day of                  , 2020.
19

20

21    _____

22         Notary Public

23

24
```

1

2

3                  I - N - D - E - X

4

5                        EXHIBITS

6

    NUMBER        DESCRIPTION                              PAGE
7

8    21     LVC social media influencer agreement
            4/8/15 - unsigned                                4

9    22     M&G Invoice to 3 Wishes.com
            2/15/13, 6/13/13                                 4
10
     23     Campos images - CPTN Apparel                     4
11
     24     CPTN Apparel agreement - 1/1/16                  4
12
     25     Vixen Clothing agreement - 9/11/16               4
13
     26     LVC social media influencer agreement
14          4/8/15 - signed                                  4

15   27     Fan Annex Social Media agreement 6/2/15          4

16   28     Christina Oliva agreement  11/14/15              4

17   29     Tosha Cole Clemens endorsement
            agreement 11/14/15                               4
18
     30     Journey Girl contract - 11/6/15                  4
19
     31     W-2s and 1099  2012-2014                         4
20
     32     Playboy agreement  3/12/12                       4
21
     33     Image of Campos (attached to complaint)          4
22
     34     Campos Answers to Defendants' Ingterrogatories  4
23

24

1

2

3                        EXHIBITS (CONT'D)

4      NUMBER      DESCRIPTION                              PAGE

5      35          Campos image - Amazon.com                4

6      36          Campos image - Maxim.com                 4

7      37          Campos bio IMDb.com                       4

8      38          Campos image - Maxim.com                 4

9      39          Campos Instagram                          4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3                              REQUESTED INFORMATION

4

5    Page 13, Page 15     Documents related to 3 Wishes photo shoot

6    Page 15, Line 12     Deposition transcripts

7    Page 23, Line 24     Records regarding modeling work
                          subsequent to 2016
8
     Page 45, Line 14     Playmate of Month photographs
9
     Page 60, Line  3     Tax returns for 2015 - present
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2

3

4                    C E R T I F I C A T I O N

5

6         I, JULIE A. PROVENZANO, a Stenograph Reporter

7    and Notary Public of the State of New York, do certify:

8

9         That the Plaintiff, **ALANA SOUZA**, was duly

10   sworn by me, that the foregoing is an accurate record

11   of the testimony of said **ALANA SOUZA**, to the best of my

12   knowledge and belief, the same having been

13   stenographically recorded and transcribed by me.

14

15        That I am not related to any of the parties to

16   this lawsuit in any way and that I have no personal

17   interest whatsoever in the outcome thereof.

18

19

20                    _____

21                         JULIE A. PROVENZANO

22

23

24

**JA-285**

## SOCIAL MEDIA INFLUENCER AGREEMENT

This Social Media Influencer Agreement, dated as of April 8, 2015 (the "Agreement"), is entered into by and between LVC, LLC ("Company"), and ALANA CAMPOS, ("Influencer", and together with Company, the "Parties", and each, a "Party").

WHEREAS, Company is in the business of providing internet marketing, social media consulting services and website development and related services and programs (the "Services") to its customers and clients; and

WHEREAS, Company desires to engage Influencer to post/upload content to the social media accounts owned, operated and/or managed by Influencer (including, without limitation, Facebook, Twitter and Instagram (the "Social Media Accounts")) relating to Rihanna's "American Oxygen" (the "Post Content"), and Influencer desires to accept such engagement all in accordance with the terms and conditions of this Agreement

NOW, THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Engagement

    (a)     Company hereby engages Influencer, and Influencer hereby accepts such engagement, to act as Company's non-exclusive social media influencer with respect to the posting of the Post Content to the Social Media Accounts solely in accordance with the terms and conditions of this Agreement. Company may in its sole discretion engage any other person or company to provide similar services as Influencer.

    (b)     Influencer shall post/upload the Post Content to the Social Media Accounts only on dates and times reasonably directed by Company.  Influencer agrees not to remove or take down any Post Content from any Social Media Account without the prior written consent of Company

        (i)     Influencer shall post/upload content on Instagram, Twitter, Facebook

            A   Content must include hashtag #TIDALforALL

            B   Content must include custom bit.ly for tracking

            C   1 Instagram post, 1 Twitter post, 1 Facebook post

            D   Influencer shall "like" and add a comment to a post by the Company @ConcertoMGMT on Instagram

    (c)     The frequency, content, format and other features of the Post Content shall be determined by Company in its sole discretion. Company shall have the authority to control all Post Content on the Social Media

LV 420429338v1

CONFIDENTIAL

DEFENDANTS' EXHIBIT 21

**JA-286**

Accounts  Nothing in this Agreement shall obligate Company to actually require or offer Influencer any right to post/upload the Post Content to the Social Media Accounts

    (d)    Influencer represents and warrants that it currently has approximately the following number of followers/friends on the Social Media Accounts:

        (i)    Instagram (@alanacamposs): 432K

        (ii)    Twitter (@alanacamposs): 52.6K

        (iii)    Facebook (Alana/419473088098634): 218K

2.    **Compensation**  In consideration for the services rendered by Influencer during the Term, Company shall pay to Influencer compensation ("**Posting Fee**") of $500 + $100 for every referral  Company shall pay the Posting Fee within ten (10) days after Influencer has posted/uploaded the Post Content to the Social Media Accounts in accordance with the terms and conditions of this Agreement.

3.    **Independent Contractor**  Influencer is an independent contractor of Company, and this Agreement shall not be construed to create any association, partnership, joint venture, employee or agency relationship between Influencer and Company for any purpose. Influencer has no authority (and shall not hold itself out as having authority) to bind Company and Influencer shall not make any agreements or representations on Company's behalf without Company's prior written consent  Without limiting the above, Influencer will not be eligible to participate in any vacation, group medical or life insurance, disability, profit sharing or retirement benefits or any other fringe benefits or benefit plans offered by Company to its employees, and Company will not be responsible for withholding or paying any income, payroll, Social Security or other federal, state or local taxes, making any insurance contributions, including unemployment or disability, or obtaining worker's compensation insurance on Influencer's behalf  Influencer shall be responsible for, and shall indemnify Company against, all such taxes or contributions, including penalties and interest

4    **Confidentiality**  All non-public, confidential or proprietary information of Company, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, information, customer lists, pricing, discounts or rebates, disclosed by Company to Influencer, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," in connection with this Agreement or the Services is confidential, solely for the use of performing this Agreement and may not be disclosed or copied unless authorized by Company in writing  Upon Company's request, Influencer shall promptly return all documents and other materials received from Company  Company shall be entitled to injunctive relief for any violation of this Section. This section shall not apply to information that is: (a) in the public domain; (b) known to the Influencer at the time of disclosure; or (c) rightfully obtained by the Influencer on a non-confidential basis from a third party.

5    **Non-Competition**  Intentionally blank.

6.    **Miscellaneous.**

2

LV 420429336v1

CONFIDENTIAL

**JA-287**

(a)    All notices, requests, consents, claims, demands, waivers, summons and other legal process, and other similar types of communications hereunder (each, a "Notice") must be in writing and addressed to the relevant Party at the address that may be designated by the receiving Party from time to time. All Notices must be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only (i) upon receipt by the receiving Party and (ii) if the Party giving the Notice has complied with the requirements of this Section.

(b)    This Agreement and all matters arising out of or relating to this Agreement are governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the conflict of laws provisions of such State.

(c)    This Agreement, and each of the terms and provisions hereof, may only be amended, modified, waived or supplemented by an agreement in writing signed by each Party.

(d)    Influencer shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Company. Any purported assignment or delegation in violation of this Section shall be null and void. Company may at any time assign, transfer or subcontract any or all of its rights or obligations under this Agreement without Influencer's prior written consent. This Agreement will inure to the benefit of and be binding upon each of the Parties and each of their respective permitted successors and permitted assigns.

(e)    This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together constitutes one and the same agreement.

(f)    If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

(g)    This Agreement constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(h)    The parties do not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

3

CONFIDENTIAL

**JA-288**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

LVC, LLC

By _____

Name:  Kimberly DelMonico
Title:  Manager

ALANA CAMPOS

By _____
Address:

Phone Number: (253) 753-3562
Email Address:
alana.campos@hotmail.com

4

*LV 420429336v1*

**CONFIDENTIAL**

**JA-289**



| Date: | 2/15/2013 | | Re: | 3wishes.com |
| Invoice #: | MPC-021313 | | | Photo Shoot |
| Job #: | FL-56 | | | 2/12-2/13/13 |
| To: | 3 Wishes.com | | | Los Angeles, CA |
| | Attn: Caron & Frank Spatola | | | |
| | 2144 East Lyon Station Road | | | |
| | Creedmoor, NC 27522 | | | |

Talent:   Laurie Young
          Alana Campos

| Item Description: | | Price: | |
|---|---|---|---|
| 1 Spokesmodel @ $1,000/day | | | $1,000.00 |
| 1 Spokesmodel @ $1,000/day | | | $1,000.00 |
| | | | |
| | | | |
| | | | |
| | Sub Total | | $2,000.00 |
| | Agency Fee (20%) | | $400.00 |
| | Total Due | | $2,400.00 |
| | Amount Due = | | $2,400.00 |
| | | PAYMENT DUE UPON RECEIPT | |

*** Invoices not paid within 30 days are subject to a 10% penalty.
Please make checks payable to:       Michele & Group, Inc.
                                     4 North Perrott Drive
                                     Ormond Beach, FL
                                     32174
Federal ID #: 59-2960951

# Thank you for your business!

cc: mv/acb/mpo/file

DEFENDANTS' EXHIBIT 22

Case 21-2149, Document 48, 01/11/2022, 3241954, Page297 of 303

**JA-290**



Date:     6/13/2013                          Re:      3wishes.com
Invoice #:  MPC-061213                                Photo Shoot
Job #:    FL-245                                      12-Jun-13
To:       3 Wishes.com                                Los Angeles, CA
          Attn: Caron & Frank Spatola
          2144 East Lyon Station Road
          Creedmoor, NC 27522

                                             Talent:    Laurie Young
                                                        Alana Campos

| Item Description: | Price: | |
|---|---|---|
| 1 Spokesmodel @ $1,000/day | | $1,000.00 |
| 1 Spokesmodel @ $1,000/day | | $1,000.00 |
| | | |
| | | |
| | | |
| | Sub Total | $2,000.00 |
| | Agency Fee (20%) | $400.00 |
| | *Total Due* | *$2,400.00* |
| | Amount Due = | $2,400.00 |
| | | PAYMENT DUE UPON RECEIPT |

**\*\*\* Invoices not paid within 30 days are subject to a 10% penalty.**

Please make checks payable to:      Michele & Group, Inc.
                                    4 North Perrott Drive
                                    Ormond Beach, FL
                                    32174

Federal ID #:  59-2960951

# Thank you for your business!

cc: mv/ecb/mpc/file

Case 21-2149, Document 48, 01/11/2022, 3241954, Page298 of 303

Type: All transactions &middot; Status: All statuses &middot; Name: Alana Marie Souza &middot; Date: All

| Date | Type | No. | Payee | Category | Total |
|------|------|-----|-------|----------|-------|
| 06/13/2013 | Check | 5590 | Alana Marie Souza | 3 Wishes | 800.00 |
| 03/07/2013 | Check | 5015 | Alana Marie Souza | 3 Wishes | 800.00 |

# CPTNAPPAREL

BRAND NAME | C●NTRAST

## ALANA CAMPOS





DEFENDANTS' EXHIBIT 23

CONFIDENTIAL

# SIGNATURE PRODUCT AGREEMENT AND
# MODEL RELEASE

This Signature Product Agreement ("Agreement") is entered into this 1st day of January, 2016 ("Effective Date"), by and between CPTN Apparel Company LLC, a California limited liability company, located at 1779 Apollo Court, Seal Beach, CA 90740 ("CPTN") and Alana Campos, an individual, residing at 1555 Vine Street, #379V, Los Angeles, CA 90028 ("MODEL"). CPTN and MODEL, are individually referred to as "Party" and collectively as "Parties."

1. **Term.** The term of this Agreement shall be for one (1) year from the Effective Date ("Term"). The Agreement automatically terminates should CPTN cease to sell the Signature Product.

2. **License Grant.**

   2.1    Subject to the terms and conditions of this Agreement, Model hereby grants to CPTN, an exclusive license for the Term to use Model's photo, and/or image, name and/or likeness (together, "Licensed Property") on and in connection with (i) CPTN's manufacture, production, promotion, sale and delivery worldwide of one limited edition CPTN branded shirt and on posters under its CONTRAST label incorporating one or more elements of the Licensed Property ("Licensed Product" or "Signature Product") and (ii) in printed or online material used to promote or advertise the Licensed Product during the Term.

      2.1.1 Licensed Product – Disposal of Inventory. CPTN may sell the Licensed Products on hand and/or in process at the end of the Term of this Agreement. Royalties and reporting (Paragraph 3 hereof) shall continue as during the Term.

3. **Royalty Compensation.** CPTN shall convey to Model a royalty of three percent (3%) of Net Sales on the Licensed Product ("Royalty").

   3.1    Net Sales shall be defined as the amount invoiced and shipped purchaser less allowances, freight, discounts, returns, sales taxes (if any) and credits, duties, customs charges, C.O.D. charges, insurance and handling. Royalties shall be paid by the thirtieth (30th) day after the end of each calendar quarter or portion thereof. Each remittance shall be accompanied by a sales report setting forth the Net Sales for the quarter and the royalties in connection therewith. No Royalty shall be due for give-aways.

4. **Model Release Obligations.** Notwithstanding anything to the contrary herein. Model hereby

   4.1 gives CPTN and its assignees, and parties designated by CPTN, including but not limited to clients, licensees, purchasers, agencies, lookbooks and periodicals, the irrevocable right to copyright, use, reuse, publish, republish my photographs or in which I may be included intact or in part, composite or distorted in character or form without restriction as to changes or transformations, in conjunction with any own or a fictitious name, for reproduction in any medium including and not limited to print and electronic (e.g. Internet) for such purposes as advertising, trade, display, exhibition or otherwise luse,

   4.2 agrees for the term to promote and market the Licensed Product on my social media, including but not limited to Facebook, Instagram, Snapchat, and Twitter. I shall post not less frequently than weekly on each of my social media for the Term or as long as the Licensed Product is available for sale. I represent that I have 741,000 followers on Instagram,

   4.3 declares that the photographer who took the photos and I, the model, have an understanding whereby I have the rights to give full permission authority to CPTN and its assignees to use the images I and/or the Photographer supplied, both printed images and electronic files (e.g., jpg images). I also declare that the person in the photographs is indeed me,

   4.4 waives any right that I/we may have to inspect and approve the finished product or copy that may be used in connection with an image that the Photographer has taken of me or the use to which it may be applied, and

   4.5 acknowledges that the photography session was conducted in a completely proper and professional manner, and this release is willingly executed. I affirm that I am more than 18 years of age and have the right to enter this Agreement. I have read this Agreement and fully understand its contents. This Agreement shall be binding upon me, my heirs, legal representatives and assigns.

5. **Ownership and Use.**

   5.1    CPTN's Exclusive Ownership. All materials produced in connection with this Agreement, including advertising ideas, phrases or works, and photographs, and images of Licensed Property, will be and remain the absolute and exclusive property of CPTN in perpetuity. Model acknowledges that she does not now have, nor will have in the future, any right, title or interest of any kind or nature in such materials or performances, or in or to any component part, element, character or characterization thereof whether same were furnished by Model or any other party, all without additional compensation to Model. Any and all copyrightable material created under this Agreement, and all

DEFENDANTS' EXHIBIT 24

CONFIDENTIAL

embodiments, arrangements and derivatives thereof, in any and all formats, shall be "work made for hire" under the United States Copyright Act of 1976.

    5.2    Use and Tactics. Except as may otherwise be provided in this Agreement, CPTN shall have the full and complete right to promote, use, reproduce, publish, advertise, market, copyright, and/or exhibit the Licensed Product, images, etc. in connection therewith throughout the world.

6.    Trademark; Rights. Model does not have and shall not have or acquire any interest whatsoever in CPTN's trade names or trademarks.

7.    Independent Contractor. The relationship of CPTN and Model established by this Agreement is that of independent contractors. The Parties hereto agree that nothing contained in this Agreement shall cause any Party hereto to be the agent or legal representative of the other for any purpose whatsoever, nor shall this Agreement be deemed to create any form of business organization between the Parties hereto, nor is any Party herein granted any right or authority to assume or create any obligation or responsibility on behalf of any other Party hereto, nor shall any Party hereto be in any way liable for any debt of the other as a result of this Agreement.

8.    Model Representations. Model represents and warrants: (i) she has all legal right, power, authority and capacity to enter into this Agreement and to perform all of its obligations hereunder, and (ii) his execution and performance of this Agreement will not result in the breach of any other agreement which Model is a party, (iii) there is no agreement to which Model is a party which prohibits or restricts Model's ability to enter into this Agreement or perform her obligations and duties hereunder, (iv) Model has the right to grant the rights granted under this Agreement including but not limited to the Licensed Property, and (v) she will not disclose the terms of this agree, and as it pertains to products, disclose or utilize confidential information obtained under this agreement, to any party.

9.    Indemnity. Each of CPTN on the one hand, and Model on the other hand, will indemnify, defend, save, and hold harmless the other, and each of their parents, subsidiaries, affiliates, officers, directors, representatives, employees and agents (the "Indemnified Parties") from and against any and all claims, liabilities, demands, causes of action, judgments, settlements and expenses (including, but not limited to, reasonable attorneys' fees and court costs) (collectively, a "Claim") brought by a third party which may be suffered, made, incurred, or sustained by the Indemnified Parties (i) arising out of or in connection with any breach or alleged breach by the indemnifying party of any of its warranties, representations or covenants set forth in this Agreement, or (ii) by reason of the breach or alleged breach of the Indemnifying Party's performance of any of its covenants or obligations contained in this Agreement, or (iii) in the case of CPTN as the Indemnifying Party, arising out of or in connection with the manufacture, distribution, promotion or sale of the Licensed Product including, but not limited to, actions founded on product liability and actions arising out of or in connection with any sub-manufacturer's acts or omissions, excluding, however, any Claim arising solely in connection with the use of Model's name, images, material provided by Model, the Licensed Property, or directly from the negligent or willful acts or omissions of Model, excluding but not limited to that associated with any form of damages whether intentional or otherwise foreseen or unforeseen, associated with the commercial or artistic use of the image(s) as well as any publication thereof including without limitation any claim for libel or invasion of privacy.

10.    Notices. The address of each party as set forth above will be the appropriate address for the mailing of notices, payments and reports. All notices to be given under this Agreement will be deemed sufficiently given if in writing and delivered personally or sent by a nationally recognized next day courier service. Such notices will be deemed received (i) immediately, if by personal delivery, or (ii) upon date of receipt as indicated by the courier service.

11.    Confidential Terms. Model agrees to keep all terms of this Agreement strictly confidential. The divulging of any of the terms of this Agreement, especially financial arrangements, shall be considered a breach of this Agreement and would thereby be grounds for immediate termination.

12.    General Provisions. The captions in this Agreement are inserted solely for purposes of facilitating easy reference and will not be construed in any way as a part of the text or in altering the substantive provisions of this Agreement. This Agreement is made in the State of California and will be construed and interpreted in accordance with the internal laws of the State of California applicable to contracts made or performed entirely in California. Model agrees and consents that jurisdiction and venue of all matters relating to this Agreement will be vested exclusively in the federal, state and local courts within the State of California. The successful party in any litigation relating to matters covered by this Agreement shall be entitled to an award of reasonable attorneys' fees in such action. If any provision of this Agreement is held to be invalid by a court of competent jurisdiction, such determination will in no way affect the validity or enforceability of any other provision in this Agreement to the fullest extent permitted by law. This Agreement will be binding upon the parties and their respective successors, heirs, guardians, representatives and assigns. This Agreement contains the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior agreements and understandings with respect to such subject matter, and may not be modified, altered or amended except by a writing signed by the Parties.

13.    Signatures; Counterparts. This Agreement may be executed in any number of counterparts and each such counterpart shall, for all purposes, be deemed an original, but all of which, taken together shall constitute one and the same instrument. Electronic signatures shall be binding and enforceable in the same manner as an original.

SIGNATURES ON FOLLOWING PAGE

Signature Product Agreement and Model Release 2016 A. Campos 0501 16 v1

CONFIDENTIAL

**JA-295**

IN WITNESS WHEREOF, the parties have caused this Signature Product Agreement and Model Release to be executed on the Effective Date.

CPTN APPAREL, LLC                    ALANA CAMPOS, an individual

_____              _____

Name:_____         AS TO PHOTOGRAPHY

Title: _____       Photographer Name: Shannon Ruhe, an individual

                                     _____

                                     Address: 13731 Mulholland Drive
                                         Beverly Hills, CA 90210

Signature Product Agreement and Model Release 2016 A. Campos (3GL) (2 v)

**CONFIDENTIAL**

**JA-296**

THIS MODEL AGREEMENT ("Agreements") is entered into

and effective this day of 09.11.16  between Vixen Clothing. (hereinafter referred to as "VXN")

and the undersigned model having a residence set forth below her signature

 (hereinafter referred to as "Model")  (collectively "The Parties").

VXN has undertaken the design and development of a Retail clothing website

and photographs of models will comprise a large portion of the website content.

and Model is willing to create exclusive photographic content for VXN under a

"work for hire" arrangement that is defined by the United States Copyright Laws:

and Model understands  VXN intends to own all worldwide intellectual property

right (copyright, trademark. service marks. patents. common-law) in and to the

website, all the photos taken of the Model. and any and all other content created for

VXN for use on the website or for any other VXN purposes.

Now therefore in consideration of the mutual agreement and for good and valuable

consideration, the Parties hereto agree as follows:

1. WORK FOR HIRE: Model agrees to create photos and understands that those photos are

being created under the direction and control of VXN, and contractor under the United States

Copyright Laws (17 U.S.C 101. et seq ) and, by the virtue of this agreement, are the sole

property of VXN free and clear from all claims of any nature relating to Model's contributions

and other efforts, including the right to copyright or obtain trade for service marks upon the work

in the name of VXN as author and proprietor thereof and any termination rights thereto. Model

understands and agrees that VXN owns all the right. title, and interest in the Photos and has the

right to register all copy. trade, and service mark rights therein in its own name as author in the

DEFENDANTS' EXHIBIT 25

CONFIDENTIAL