# 21-2149

## In the
## United States Court of Appeals
### For the Second Circuit



ALANA SOUZA, AKA ALANA CAMPOS, BROOKE BANX, BROOKE
TAYLOR-JOHNSON, JACLYN SWEDBERG, JAIME EDMONDSON-LONGORIA,
JESSICA HINTON, TIFFANY TOTH-GRAY and URSULA SANCHEZ,
AKA URSULA MAYES,

*Plaintiffs-Appellants,*

v.

EXOTIC ISLAND ENTERPRISES, INC., DBA MANSION GENTLEMEN'S
CLUB & STEAKHOUSE and KEITH SLIFSTEIN,

*Defendants-Third-Party-Defendants-Appellees,*

- and -

EXCLUSIVE EVENTS & PROMOTIONS INC., DBA THINK SOCIAL FIRST,

*Third-Party-Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

CASAS LAW FIRM, P.C.
*Attorneys for Plaintiffs-Appellants*
1740 Broadway, 15th Floor
New York, New York 10019
(646) 872-3178

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE................................................................4

    I.    Appellants' Backgrounds and Careers ........................................4

    II.   Respondent's Businesses.............................................................5

    III.  Subject Advertisements ..............................................................5

    IV.  Proceedings Below .....................................................................6

    V.   Discovery....................................................................................7

    VI.  The Parties' Cross-Motions for Summary Judgment .................7

STANDARD OF REVIEW ....................................................................9

ARGUMENT

    I.    The District Court Erred in Applying a One-Year Statute of
        Limitations to Appellants' Right of Publicity Claims............................10

        A. *N.Y. Civil Rights Law Protects Both a Right of Privacy*
            *and a Right of Publicity*................................................................10

        B. *CPLR § 215 Applies Exclusively to a Right of Privacy*
            *Violation and is Silent as to a Right of Publicity Violation* ...........11

        C. *Plaintiffs' Right of Publicity Claims Have a Three-Year*
            *Statute of Limitations* ..................................................................12

        D. *Certification to the New York Court of Appeals is Appropriate*....17

i

II. The District Court Erred in Granting Summary Judgment to Respondents on Appellants' Claim Under 15 U.S.C. 1125(a)(1)(A) ......19

    *A. The Lanham Act* ...............................................................19

    *B. Making "Recognition" the "Bottom Line" on a False Association Claim Cuts Against Decades of Precedent* ...............21

    *C. The Use of the Catch-All "Endorsement" Has Led to the Elevation of "Recognition"* ...........................................29

    *D. The District Court Erred in its Evaluation of the Other Polaroid Factors* ...........................................................33

        i. Actual Confusion ................................................33

        ii. Bad Faith ..........................................................34

    *E. The District Court Got the Polaroid Balancing Wrong* ...............37

III. The District Court Erred in Granting Summary Judgment to Exotic Island on Appellants' False Advertising Claim...........................40

IV. The District Court Erred in Striking the Buncher Survey and Report .....45

CONCLUSION .......................................................................51

ii

# <u>TABLE OF AUTHORITIES</u>

Page

## <u>Cases:</u>

*Accord, Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ..................................................... 19, 29, 32, 40, 41, 42, 43

*Accord, Skinner v. Tuscan, Inc.,*
  18-cv-319, 2020 WL 5946898 (D. Ariz. Oct. 7, 2020) ................................... 14

*Allen v. Nat'l Video, Inc.,*
  610 F.Supp.612 (S.D.N.Y. 1985) ....................................................... 32

*Amorgianos v. Nat'l R.R. Pass. Corp.,*
  303 F.3d 256 (2d Cir. 2002) .......................................................... 9, 45

*Arnold v. Treadwell,*
  642 F.Supp.2d 723 (E.D. Mich. 2009) .................................................. 22

*Barenboim v. Starbucks Corp.,*
  698 F.3d 104 (2d Cir. 2012) .......................................................... 18

*Biro v. Conde Nast,*
  883 F.Supp. 2d 441 (S.D.N.Y. 2012) ................................................... 12

*Bondar v. LASplash Cosmetics,*
  No. 12-cv-1417, 2012 WL 6150859 (S.D.N.Y. Dec. 11, 2012) ....................... 21

*Brennan's, Inc. v. Brennan's Rest., L.L.C.,*
  360 F.3d 125 (2d Cir. 2004) ....................................................... 21, 22

*Bridge v. Phoenix Bond & Indemnity Co.,*
  553 U.S. 639 (2008) .................................................................. 43

*Brinkley v. Casablancas,*
  80 A.D. 2d 428 (1st Dep't 1981) ..................................................... 16

*Burg v. Gosselin,*
  591 F.3d 95 (2d Cir. 2010) ............................................................. 9

*Cache, Inc. v. M.Z. Berger & Co.,*
  99-cv-12320 (JGK), 2001 WL 38283 (S.D.N.Y. 2001) ...................................50

*CBS, Inc. v. Springboard Int'l Records,*
  429 F. Supp. 563 (S.D.N.Y. 1976)............................................................26, 30

*Centaur Communs., Ltd. v. A/S/M Communs., Inc.,*
  830 F.2d 1217 (2d Cir. 1987)............................................................25

*Coach Services, Inc. v. Triumph Learning LLC,*
  668 F.3d 1356 (Fed. Cir. 2012)........................................................22

*Compare Dillon v. City of New York,*
  261 A.D.2d 34 (1st Dep't 1999) ......................................................12

*Coppola v. Bear Sterns & Co.,*
  499 F.3d 144 (2d Cir. 2007)..............................................................9

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,*
  604 F.2d 200 (2d Cir. 1979)...............................................20, 28, 46

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S.23 (2003) ............................................................................19

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) ....................................................9, 45, 47, 48

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.,*
  440 F.Supp.2d 249 (S.D.N.Y. 2006)...............................................35

*Dependable Sales & Serv. Inc. v. TrueCar, Inc.,*
  394 F.Supp.3d 368 (S.D.N.Y. 2019)..........................................40, 44

*Edmondson, et al. v. Caliente Resorts, LLC, et al.,*
  15-cv-2672 ......................................................................................45

*Electra v. 59 Murray Enterprises, Inc.,*
  987 F.3d 233 (2d Cir. 2011)............................. 10, 11, 12, 13, 15, 21

iv

*Electra v. Idaho Business Holdings LLC,*
  No. CV-18-01604-PHX-SRB, Doc. 79 at 5 (D. Ariz. Sept. 24, 2020)............15

*Estee Lauder, Inc. v. Gap, Inc.,*
  108 F.3d 1503 (2d Cir. 1997)...........................................................................25

*Famous Horse, Inc. v. 5th Ave. Photo Inc.,*
  624 F.3d 106 (2d Cir. 2010).............................................................................32

*Fincher v. Depository Trust & Clearing Corp.,*
  604 F.3d 712 (2d Cir. 2010).............................................................................37

*Floyd v. City of New York,*
  813 F.Supp.2d 457 (S.D.N.Y. 2011)................................................................37

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.,*
  221 F.Supp.2d 457 (S.D.N.Y. 2002)................................................................50

*Gray v. LG&M Holdings,*
  No. CV-18-02543, 2020 WL 6200165 (D. Ariz. Sept. 23, 2020) ...................42

*Hannex Corp. v. GMI, Inc.,*
  140 F.3d 194, 206 n.9 (2d Cir. 1988).......................................................... 33-34

*Henegan Const. Co., Inc. v. Heneghan Contracting Corp.,*
  No. 00-cv-9077 (JGK), 2002 WL 1300252 (S.D.N.Y. June 12, 2002)............33

*In re Delta Air Lines,*
  341 B.R. 439 (S.D.N.Y. Bnkr. 2006)...............................................................11

*In re Estate of Reynolds,*
  327 P.3d 215......................................................................................................14

*Int'l Info. Sys. Sec. Cert. Consortium, Inc. v. Security Univ., LLC,*
  823 F.3d 153 (2d Cir. 2016).............................................................................20

*Jackson v. Odenat,*
  9 F.Supp.3d 342 (S.D.N.Y. 2014)....................................................................32

*Jim Henson Productions, Inc. v. John T. Brady & Assocs., Inc.,*
  867 F.Supp. 175 (S.D.N.Y. 1994) ..................................................................13

*Kumho Tire, Co. v. Carmichael,*
  526 U.S. 137 (1999) .....................................................................................47

*Lerman v. Flynt Distrib. Co., Inc.,*
  745 F.2d 123 (2d Cir. 1984) ..........................................................................11

*Longoria v. Kodiak Concepts, LLC,*
  2021 WL 1100373 (D. Ariz. Mar. 23, 2021) ........................................ 45, 49-50

*MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha,*
  02-cv-3691 (DLC), 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004)....................50

*McGregor-Doniger, Inc. v. Drizzle, Inc.,*
  599 F.2d 1126 (2d Cir. 1979) ..........................................................................24

*Meisel v. Grunberg,*
  651 F.Supp.2d 98 (S.D.N.Y. 2009) .................................................................37

*Merck Eprova AG v. Gnosis S.p.A.,*
  760 F.3d 247 (2d Cir. 2014) ....................................................................33, 44

*Merck Eprova AG v. Gnosis S.p.A.,*
  901 F.Supp.2d 436 (S.D.N.Y. 2012) ...............................................................41

*Mobil Oil. Corp.,*
  818 F.2d 258 ...................................................................................................38

*Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC,*
  648 F.Supp.2d 576 (S.D.N.Y. 2009) ...............................................................38

*Osterweil v. Bartlett,*
  706 F.3d 139 (2d Cir. 2013) ...........................................................................18

*Park 'N Fly [Inc. v. Dollar Park & Fly, Inc.],*
  469 U.S. [189] 198 ........................................................................................24

*Pepaj v. Paris Ultra Club, LLC*,
    No. CV-19-01438-PHX-MTL, 2021 WL 632623 (D. Ariz. Feb. 18, 2021) ....45

*Pinder v. 4716, Inc.*,
    2020 WL 6081498 (D. Ariz. Oct. 14, 2020) ...................................................45

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) .....................................20, 21, 22, 37, 38

*PPX Enterprises, Inc. v. Autofidelity Enterprises, Inc.*,
    818 F.2d 266 (2d Cir. 1987) .............................................................33

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*,
    926 F.2d 134 (2d Cir. 1991) .............................................................34

*Savin Corp. v. Savin Group*,
    391 F.3d 439 (2d Cir. 2004) ................................................19, 33, 38

*Schering Corp. v. Pfizer, Inc.*,
    189 F.3d 218 (2d Cir. 1999) .............................................................50

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................47, 48

*Sec. Pac. Mortgage & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*,
    891 F.2d 447 (2d Cir. 1989) .............................................................37

*Skinner v. Tuscan, Inc.*,
    No. CV-18-319-TUC-RCC, 2020 WL 5946897 (D. Ariz. Oc. 7, 2020) ..........15

*Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*,
    119 F.3d 1236 (6th Cir. 1997) .........................................................27

*Star Indus. Inc. v. Bacardi & Co. Ltd*,
    412 F.3d 373 (2d Cir. 2005) ........................ 20, 21, 24, 30, 34, 35, 36

*Starbucks Corp. v Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2d Cir. 2009) .........................................................21, 31

*Stephano v. News Grp. Publ'ns, Inc.,*
  64 N.Y. 2d 174 (1984) ...............................................................................10, 16

*Takeguma v. Freedom of Expression LLC,*
  CV-18-2552-PHX-MTL, 2021 WL 487884 (D. Ariz. Feb. 10, 2021) .............15

*Taylor v. Trapeze Mgmt., LLC,*
  No. 0:17-cv-62262, 2019 WL 1977514 (S.D. Fla. Feb. 28, 2019)...................45

*Thompson v. Metropolitan Life Ins. Co.,*
  149 F.Supp.2d 38 (S.D.N.Y. 1996)..................................................................14

*Time Warner Cable, inc. v. DIRECTV, Inc.,*
  497 F.3d 144 (2d Cir. 2007).............................................................................28

*Time, Inc. v. Hill,*
  385 U.S. 374 (1967) ...................................................................................10, 12

*Toth v. 59 Murray Enterprises, Inc.,*
  15-cv-8028 (NRB), 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019) ........................27

*Troutman v. Valley Nat. Bank of Ariz.,*
  826 P.2d 810 (Ariz. Ct. App. 1992) .................................................................15

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
  505 U.S. 763 n.15 (1992) ...........................................................................19, 24

*U.S. v. Ron Pair Enterprises, Inc.,*
  489 U.S. 235 (1989) .........................................................................................11

*W.W.W. Pharm. Co. v. Gillette Co.,*
  984 F.2d 567 (2d Cir. 1993).............................................................................24

*Yeager v. Innovus Pharmaceuticals, Inc.,*
  No. 18-cv-397, 2019 WL 447743 (N.D. Ill. Feb. 5, 2019)...................22, 31, 32

*Zacchini v. Scripps-Howard Broadcasting Co.,*
  433 U.S. 562 (1977) .........................................................................................16

## Rules, Laws and Statutes:

15 U.S.C. § 1121 ....................................................................................2

15 U.S.C. § 1125 ..... 3, 6, 7, 19, 21, 22, 23, 26, 27, 28, 29, 30, 31, 32, 38, 40, 46, 52

15 U.S.C. § 1127 ..................................................................................19

28 U.S.C. § 1291 ....................................................................................2

28 U.S.C. § 1331 ....................................................................................2

28 U.S.C. § 1367 ....................................................................................2

A.R.S. § 12-542 ....................................................................................15

Article 5 ..................................................................................11, 13, 17

CPLR § 214 ..........................................................................................18

CPLR § 215 .......................................................... 11, 12, 16, 17, 18, 51

Fed. R. Civ. P. 56(a) ..............................................................................9

N.Y. Civ. Rights Law § 52-B(6) ..........................................................17

Restatement (Third") § 46 ..............................................................14, 15

Restatement 3d of Unfair Competition, § 21 ........................................25

Restatement (Second) of Torts § 652 (1977) ...................................13, 14

Second Circuit Local Rule 27.2 ......................................................17, 18

Section 50-f ..........................................................................................13

Section 51 ............................................................................................10

Section 52-B ........................................................................................17

Unfair Competition § 46 ......................................................................14

Unfair Competition § 49 ......................................................................14

Plaintiffs-Appellants Alana Campos, Brooke Banx, Brooke Taylor-Johnson, Jaclyn Swedberg, Jaime Edmondson Longoria, Jessica Hinton, Tiffany Toth-Gray, and Ursula Mayes (collectively, "Appellants") appeal from the August 9, 2021 Memorandum and Order ("Order") of the United States District Court for the Southern District of New York (Karas, J.) granting summary judgment and related relief to respondent Exotic Island Enterprises, Inc. ("Exotic Island" or "Respondent"). (SPA-1)

## <u>JURISDICTIONAL STATEMENT</u>

The district court had subject matter jurisdiction over Appellants' federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121, and over Appellants' state law claims under 28 U.S.C. § 1367.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1)      Did the district court err in applying a one-year statute of limitations to Appellants' right of publicity claim?

2)      Should this Court certify the issue of what limitations period applies to a right of publicity claim under New York law to the New York Court of Appeals?

3)      Did the district court err in granting Respondent's motion for summary judgment on Appellants' false association claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)?

4)      Did the district court err in granting Respondent's motion for summary judgment on Appellants' false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)?

5)      Did the district court err in excluding the expert report and survey of Martin Buncher on the grounds that some of his survey questions did not include a "don't know" option?

## STATEMENT OF THE CASE

### I.    Appellants' Backgrounds and Careers

Each Appellant is a well-known model who has earned her livelihood licensing her image, likeness and identity (collectively, "image") to select clients, commercial brands, and media and entertainment outlets who use those images promote their products, services and events. JA-1874, ¶ 1. Each Appellant relies on her professional reputation for modeling, acting, hosting, social media influencing, and other professional opportunities (collectively, "modeling"), has worked to establish herself as reliable, reputable, and professional, and it is each Appellant's reputation and status in the entertainment industry (and the attendant renown she has achieved) that allows and ensures she will continue to book jobs. JA-61, 72, 82, 92, 102, 112, 123, 133, all at ¶ 6.  Each Appellant seeks to control the use and dissemination of her image, is consulted on and participates in the negotiation, vetting, and selection of modeling, acting, social media influencing, brand spokesperson and hosting engagements, and has been vigilant in building and protecting her brand from harm, taint, or other diminution. JA-61, 72, 82, 92, 102, 112, 123, 133, all at ¶ 7.  In all instances of commercial marketing and promotion of her image, each Appellant has negotiated and expressly granted authority for such use pursuant to agreed-upon terms and conditions, and for agreed upon compensation. JA-61, 72, 82, 92, 102, 112, 123, 133, all at ¶ 8. Based on the work

they have each done in their career, each Appellants has achieved fame and celebrity in the modeling industry. JA-61, 72, 82, 92, 102, 112, 123, 133, all at ¶ 4.

In addition, the uncontroverted evidence makes clear that many of the Appellants are social media influencers and celebrities: Toth-Gray has over 5 million social media followers, JA-124; Hinton has over 4 million, JA-113; Swedberg has more than a 1 million, JA-93. In addition, five of the eight Appellants -- Hinton, Toth-Gray, Longoria, Campos, and Swedberg -- were *Playboy* Playmates, and Swedberg was the *Playboy* Playmate-of-the-Year. *See* JA-62, 92-93, 103, 113, 123.

## II.    **Respondent's Businesses**

Exotic Island owns Mansion Gentlemen's Club & Steakhouse ("Mansion"), a strip club in Newburgh, New York. JA-1900, ¶ 39. In furtherance of its promotion of Mansion, Exotic Island owns and operates the Mansion social media sites, where it regularly posted advertisements promoting Mansion. *Id.*, ¶ 40; JA-33-44. As uncovered in discovery, Exotic Island ceded all advertising to an entity called Exclusive Events & Promotions, Inc. ("Exclusive Events"), to which it gave unfettered access and authority to publish advertisements on its behalf, including those containing image of Appellants. JA-1901, ¶ 42.

## III.    **Subject Advertisements**

Between 2014 and 2018, Respondent published advertisements on its social

media pages containing images of Appellants beside Respondent-generated

advertising copy:

> "No sexier place to watch the #NFL," beside an image of appellant Brooke Banx in a Pittsburgh Steelers t-shirt. JA-35;

> "The Naughtiest party of the year is happening tonight! Are you naughty enough to party with **our** girls?", beside an image of appellant Jessa Hinton in a Santa Cap. JA-41 (emphasis added);

> "It's FOOTBALL Sunday at #Mansion! What all the BIG games today with **us**!," beside an image of appellant Jaime Edmondson-Longoria in a Seattle Seahawks t-shirt. JA-40 (emphasis added);

> "Every Tursday [sic] is BIKE NIGHT AT #THEMANSION…#strippers," beside an image of appellant Jaclyn Swedberg on a motorcycle. JA-38;

> "Who's ready for the sexiest party of the year! No cover for anyone wearing sexy school girl attire! #SexySchoolGirl #Mansion," beside an image of appellant Brooke Taylor-Johnson in a school uniform. JA-37.

## IV.  **Proceedings Below**

Because no Appellant worked at, promoted, or was otherwise affiliated with

Mansion, or ever consented to Respondent's use of her Image, Appellants filed this

lawsuit, alleging Exotic Island's use of Appellants' Images to promote Mansion

violated, *inter alia*, each Appellants' right of publicity and the Lanham Act, 15

U.S.C. § 1125(a)(1)(A) and (B). *See generally,* JA-13. Appellants alleged that, as

set forth in the subject advertisements, Exotic Island's intention in publishing

Appellants' Images was to trade on their looks and sex appeal and thereby confuse

consumers as to whether Appellants were strippers at Mansion, promoted it, or

were otherwise affiliated with it. JA-26, ¶ 80.

## V.    <u>Discovery</u>

Discovery established Exotic Island had no release or contract granting it authority to use any Appellants Image; that no Appellant ever worked at, agreed to promote or sponsor, or was otherwise affiliated or associated with Mansion; and that Exotic Island never purchased the Images from any entity that had a release with Appellants. *See* JA-1886-87, ¶¶ 6-7. It was further established Exotic Island gave Exclusive Events complete and unfettered access and control of its social media accounts. JA-1901, ¶¶ 43-44. Despite granting Exclusive Events this authority, Exotic Island never inquired where Exclusive Events obtained the Appellants' Images or whether it has secured for Exotic Island the legal right to publish them. JA-1901-1902, ¶¶ 45-46.

## VI.   <u>The Parties' Cross-Motions for Summary Judgment</u>

Following discovery, the parties cross-moved for summary judgment, JA-55 and JA-185, and Respondent moved to strike the expert report and survey of Appellants' consumer survey expert, Martin Buncher ("Buncher"). JA-185. By Order dated August 9, 2021, the district court granted Respondent's motion for summary judgment on Appellants' claims under 15 U.S.C. § 1125(a)(1)(A) and (B); dismissed as time-barred six Appellants' right of publicity claims; declined to exercise jurisdiction over those non-time barred right of publicity claims; and

granted Respondent's motion to strike Buncher. *See generally,* SPA-1-42.

This appeal followed.

## <u>STANDARD OF REVIEW</u>

This Court reviews *de novo* a district court's grant of summary judgment, "resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought." *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010) (citations omitted). For summary judgment to be warranted, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Coppola v. Bear Sterns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (internal quotation marks and citation omitted).

This Court reviews a district court's decision to exclude expert testimony under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) for abuse of discretion. *See Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256, 264 (2d Cir. 2002) (citations omitted).

# ARGUMENT

## I.     The District Court Erred in Applying a One-Year Statute of Limitations to Appellants' Right of Publicity Claims.

### A.     *N.Y. Civil Rights Law Protects Both a Right of Privacy and a Right of Publicity.*

Though it is long-established section 51 of the New York Civil Rights Law provides a cause of action for invasion of privacy, this Court held last year "Section 51 also protects a statutory right of publicity." *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 248 (2d Cir. 2011) (citations omitted). Such cause of action arises, as here, where "the plaintiff generally seeks publicity, or uses his name, portrait, or picture, for commercial purposes but has not given written consent for a particular use." *Id.* (citations omitted).

This Court in *Electra* went to significant lengths to contrast the rights of privacy and publicity, the former of which "serves to protect the sentiments, thoughts and feelings of an individual" when a defendant's commercial activities "cause[] distress to a person who wishes to lead a private life free of all commercial publicity." *Id.* (citing *Stephano v. News Grp. Publ'ns, Inc.*, 64 N.Y. 2d 174, 182 (1984).[1] Whereas a violation of the right of privacy often provides for nominal damages "designed primarily to compensate for injury to feelings," *id.*,

---

[1] *See also, Time, Inc. v. Hill*, 385 U.S. 374, 412-414 (1967) ("*Hill*") (it is "essential that the law recognize a right to privacy…. to protect private individuals against the unjustifiable infliction of mental pain and distress.")

-10-

987 F.3d at 255 (citing *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 141 (2d Cir. 1984)), because a right of publicity protects property interests, violation of this right provides for an award of the fair market value of a defendant's illicit use of a plaintiff's intellectual property. *Id.* (noting that fair market value damages "would not constitute a windfall [because] Appellants have not yet been compensated for the *Clubs'* use of their images.") (emphasis in *Electra*)).

### B. CPLR § 215 Applies Exclusively to a Right of Privacy Violation and is Silent as to a Right of Publicity Violation.

CPLR § 215 states "a violation of a <u>right of privacy</u> under section fifty-one of the civil rights law" is subject to a one-year statute of limitations. CPLR § 215(3) (emphasis added). The district court below held this language obligated it to apply a one-year limitations period to Appellants' right of publicity claims. SPA-39. This was in error.

Courts start with the plain language of the statute.[2] In enacting CPLR § 215, the New York legislature could have of course stated all claims under Article 5 of the Civil Rights Law are subject to a one-year limitations period. It declined to do so. Rather, the statute states only that "a violation of a right of privacy" has a one-

---

[2] *See U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240-41 (1989) ("[A]s long as the statutory scheme is coherent and consistent, there is generally no need for a court to inquire beyond the plain language of the statute."); *In re Delta Air Lines*, 341 B.R. 439, 445 (S.D.N.Y. Bnkr. 2006) ("Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress. It is not for the court to ignore what the statute actually says, or to employ strained or imaginative interpretations not consistent with the plain and ordinary usage and meaning of the statutory language.")

-11-

year limitations period, is silent as to publicity violations, and the legislature's decision to institute such limitations period for privacy violations makes statutory sense.

As noted in *Electra*, the purpose of a right of privacy claim is to protect an individual's "sentiments, thoughts and feelings" against mental distress. CPLR § 215(3) also sets a one-year limitations period for libel and slander claims which, like a privacy claim, also protect personal rights. *Compare Dillon v. City of New York*, 261 A.D.2d 34, 37 (1st Dep't 1999) (defamation defined in New York as "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him….") and *Biro v. Conde Nast*, 883 F.Supp. 2d 441, 456 (S.D.N.Y. 2012) ("Defamation is the injury to one's reputation….") *with Hill*, 385 U.S. at 419, n.9 ("In the right of privacy cases the primary damages is the mental distress from having been exposed to public view…."). Section 215 thus constitutes an articulation by the New York legislature that tort claims protecting personal rights have a one-year limitations period.

### C.    *Plaintiffs' Right of Publicity Claims Have a Three-Year Statute of Limitations.*

But as this Court recognized in *Electra*, privacy and publicity rights do not protect the same interests. Whereas a right of privacy is a personal right, aimed at protecting private individuals from emotional distress, a right of publicity is a

property right, geared towards protecting an individual's commercial interest in her name, likeness, and identity. *See also, Jim Henson Productions, Inc. v. John T. Brady & Assocs., Inc.*, 867 F.Supp. 175, 188-89 (S.D.N.Y. 1994). ("By contrast, a right of publicity action is designed for individuals who have placed themselves in the public eye. It secures for them the exclusive right to exploit the commercial value that attaches to their identities by virtue of their celebrity. **The right to publicity protects that value as property, and its infringement is a commercial, rather than a personal tort.** Damages stem not from embarrassment but from the unauthorized use of the plaintiffs' property.") (emphasis added).

This delineation between privacy and publicity rights was emphasized not only in *Electra* but more recently in an amendment to Article 5 of the Civil Rights Law, Section 50-f, entitled "Right of Publicity." Explicitly stating claims relating to the appropriation of one's likeness for commercial benefit are descendible and transferrable, the New York legislature could not have been clearer concerning the nature of the right protected: "The rights recognized under this section are property rights, freely transferable or descendible, in whole or in part, by contract, license, gift or by means of any trust or any other testamentary instruments." N.Y. Civil Rights Law § 50-f (emphasis added). Section 50-f aligns with section 652 of the Restatement (Second) of Torts, which also provides that claims for invasion of privacy are not assignable while claims for the appropriation of likeness are. *See*

-13-

Restatement (Second) of Torts § 652 cmt. a (1977). *Accord*, *Skinner v. Tuscan, Inc.,* 18-cv-319, 2020 WL 5946898, at *5 (D. Ariz. Oct. 7, 2020) ("[T]he right of publicity is in essence a property right under Restatement (Third) of Unfair Competition §§ 46–49 that survives death, and … the statute precluding right to privacy claims by descendants did not apply to the right of publicity.").

Though it was not Appellants' burden, on Exotic Island's summary judgment motion, to articulate the correct limitations period for the right of publicity claim,[3] recent decisions on this issue are instructive. In evaluating similar claims of misappropriation in September 2020, the District of Arizona rejected defendant's argument that Arizona's one-year invasion of privacy limitations period should apply to plaintiffs' right of publicity claims:

> The Court also rejects Defendant's argument that a one-year statute of limitations bars Plaintiffs' misappropriation claims. Relying on *In re Estate of Reynolds*, Defendant argues that because invasion-of-privacy claims are subject to a one-year limitations period in Arizona, misappropriation claims, which are "one of four varieties of invasion of privacy" should also be subject to the one-year period. <u>But Defendant misconstrues the nature of a misappropriation claim.</u> In *Estate of Reynolds*, the Arizona Court of Appeals clarified that the right of publicity –the right protected by this claim – is "<u>[r]ooted in recognition of the commercial value of an individual's name or likeness[]</u>" so "is in the nature of a *property* right." 327 P.3d at 215 (citing Restatement (Third) of Unfair Competition ("Restatement (Third)") § 46, cmt. g) (emphasis added). <u>The court distinguished</u>

---

[3] *See Thompson v. Metropolitan Life Ins. Co.*, 149 F.Supp.2d 38, 55 (S.D.N.Y. 1996) (denying motion for summary judgment on statute of limitations grounds where "defendants have failed to meet their burden of showing that there are no material issues of fact as to whether the statute of limitations bars plaintiffs['] claims.").

> misappropriation claims from invasion-of-privacy claims based on their distinct underlying injuries: the tort of appropriation the court explained, "affords redress of commercial injuries," not "personal injuries of the sort remedied by a claim for, e.g., invasion of privacy by intrusion or publication of private facts." *Id.* (citing Restatement Third § 46, cmt. a). **The difference in types of injuries underlying claims for misappropriation (commercial) and false light (reputational) render a statute of limitations governing the latter inapplicable to the former.** Defendant has failed to carry its burden of proving that a statute of limitations bars Plaintiffs' misappropriation claims. *See Troutman v. Valley Nat. Bank of Ariz.*, 826 P.2d 810, 814 (Ariz. Ct. App. 1992) ("When a defendant asserts the statute of limitations as a defense, the defendant has the burden of proving that the complaint falls within the statute.").

*Electra v. Idaho Business Holdings LLC*, No. CV-18-01604-PHX-SRB, Doc. 79 at 5 (D. Ariz. Sept. 24, 2020) (italics in original; other emphases added). Judges in the District of Arizona subsequently relied on *Electra* – which referenced an Arizona state appellate decision on the issue -- to apply that state's two-year property violation statute of limitations to similar right of publicity claims. *See Takeguma v. Freedom of Expression* LLC, CV-18-2552-PHX-MTL, 2021 WL 487884, at *11 (D. Ariz. Feb. 10, 2021) ("Plaintiffs' right of publicity claims are subject to the two-year statute of limitations set forth in A.R.S. § 12-542"); *Skinner v. Tuscan, Inc.*, No. CV-18-319-TUC-RCC, 2020 WL 5946897 (D. Ariz. Oc. 7, 2020) (same). These cases specifically and with good reason rejected the invitation, accepted by the district court here, to engraft a privacy limitations period to a publicity claim.

Rather than address the inconsistency in applying the one-year privacy limitations period of CPLR § 215 to Appellants' property violation claim, the district court pointed to the New York Court of Appeals' decision in *Stephano*, which 38 years ago held that "the 'right of publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy." 64 N.Y.2d at 183 (quoted at SPA-39). This holding had nothing to do with a statute of limitations analysis; rather, it was offered by the Court of Appeals as a basis to reject plaintiff's argument for a common law right of publicity in New York. The fact that New York recognizes no common law right of publicity is irrelevant to the statute of limitations issue, and the district court's decision to apply a privacy limitations period onto a publicity claim sidesteps both the plain language of CPLR § 215 and the clear distinction in the two causes of action, as articulated by this Court and others, including New York appellate courts and the U.S. Supreme Court. *See, e.g., Brinkley v. Casablancas*, 80 A.D. 2d 428, 436 (1st Dep't 1981) ("The United States Supreme Court has stated that the State's interest in the protection of the right of publicity 'is closely analogous to the goals of [the] patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors and having little to do with protecting feelings or reputation.'" (quoting *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573 (1977))).

-16-

Further, to the extent the district court was holding all claims brought under Article 5 of the Civil Rights Law are subject to the privacy limitations period of CPLR § 215(3), such position is contradicted by the recently enacted section 52-B, which creates a private right of action for the "unlawful dissemination or publication of an intimate image." A claim under this provision must be brought the later of either three years from publication or one year from discovery. N.Y. Civ. Rights Law § 52-B(6). Section 52-B is also "encompassed" under Article 5 of the Civil Rights Law and the provision is clearly aimed at addressing certain violations of a person's privacy. Nevertheless, a different statute of limitations applies.

Considering Respondent's failure to address all material facts as pertains to the statute of limitations on Appellants' right of publicity claim, the decision of the district court to award Respondent summary judgment should be reversed.

### D. Certification to the New York Court of Appeals is Appropriate.

In the alternative, Appellants respectfully request this question be certified to the New York Court of Appeals such that it can determine the proper statute of limitations for a right of publicity claim in New York.

Pursuant to Second Circuit Local Rule 27.2, this Court may certify to the New York Court of Appeals "determinative questions of New York law [that] are involved in a case pending before [it] for which no controlling precedent of the

Court of Appeals exists." Local Rule 27.2; *Osterweil v. Bartlett*, 706 F.3d 139, 142

(2d Cir. 2013). The decision to certify a question to the Court of Appeals hinges on

three issues: "(1) whether the New York Court of Appeals has addressed the issue

and, if not, whether the decisions of other New York courts permit us to predict

how the Court of Appeals would resolve it; (2) whether the question is of

importance to the state and may require value judgments and public policy choices;

and (3) whether the certified question is determinative of a claim before us."

*Barenboim v. Starbucks Corp.*, 698 F.3d 104, 109 (2d Cir. 2012). The issue of

what statute of limitations applies to a right of publicity claim is ripe for

certification to the New York Court of Appeals, and the question for certification is

straightforward:

> Does the one-year limitations period of CPLR § 215(3) apply to a
> plaintiff's right of publicity claim under New York law, or is such
> claim governed by the three-year limitations period for property
> damage set forth in CPLR § 214(4)?

This issue, which has never been before the Court of Appeals or any New York

appellate court, is a question of significant importance to litigants in New York and

certification to the Court of Appeals is appropriate.

**II.    The District Court Erred in Granting Summary Judgment to Respondents on Appellants' Claim Under 15 U.S.C. 1125(a)(1)(A).**

   *A.    The Lanham Act.*

Section 43(a) of the Lanham Act prohibits advertising activity "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person…." 15 U.S.C. § 1125(a)(1)(A). Because the purpose of this provision is to protect from "pirates and cheats" trademark owners who have spent "energy, time, and money" presenting their product to the public, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 781-82, n.15 (1992),[4] it confers standing on "any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(A).

The operative inquiry on a section 1125(a)(1)(A) claim "is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question," *Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004)

---

[4] *Accord*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 131 (2014), (purpose of the Lanham Act is, *inter alia*, to "to protect persons engaged in … commerce against unfair competition; [and] to prevent fraud and deception in such commerce by the use of reproductions."); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S.23, 28 (2003) (Lanham Act was  "intended to make 'actionable the deceptive and misleading use of marks.'" (quoting 15 U.S.C. § 1127))).

-19-

(emphasis added), and for decades this Circuit has emphasized that "confusion" under this statute means confusion "of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification." *Star Indus. Inc. v. Bacardi & Co. Ltd*, 412 F.3d 373, 383 (2d Cir. 2005) (citations omitted) (emphasis added).[5] "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204-05 (2d Cir. 1979); *Star. Indus*, 412 F.3d at 383 (citing same).

For sixty years, courts in this Circuit have applied the eight-factor balancing test first of *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) to determine likelihood of confusion, which focuses on: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8)

---

[5] *See also, Int'l Info. Sys. Sec. Cert. Consortium, Inc. v. Security Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016) ("The modern test for infringement is whether the defendant's use [is] likely to cause confusion not just as to source, but also as to sponsorship, affiliation or connection.").

sophistication of consumers in the relevant market. *Star Indus.*, 412 F.3d at 384.

"No single factor is dispositive, nor is a court limited to consideration of only these

factors," *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir.

2004) (emphasis added), as a court's focus is "on the ultimate question of whether,

looking at the products in their totality, consumers are likely to be confused."

*Starbucks Corp. v Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)

(citations omitted).

### B. Making "Recognition" the "Bottom Line" on a False Association Claim Cuts Against Decades of Precedent.

The district court held that the likelihood of confusion analysis on a claim

under section 1125(a)(1)(A) turns on a single *Polaroid* factor, strength of mark,

which in the district court's interpretation was determined by each Appellant's

"recognition:"

> In *Electra*, the Second Circuit affirmed [a] focus on **evidence of recognizability as the bottom line**, stating that "because the ultimate question under *Polaroid Corporation* is the likelihood of consumer confusion, the district court properly analyzed [the plaintiffs'] recognizability." 987 F.3d at 258. Indeed, the Second Circuit strongly suggested that the absence of evidence of recognition would suffice to defeat a false endorsement claim, quoting a district court's reasoning that "[t]he misappropriation of a completely anonymous face could not form the basis for a false endorsement claim, because consumers would not infer that an unknown model was 'endorsing' a product, as opposed to lending her image to a company for a fee." *Id.* (quoting *Bondar v. LASplash Cosmetics*, No. 12-cv-1417, 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012). Thus, the Court views Plaintiffs' recognizability as a critical requirement to sustain their false endorsement claims, and begins its analysis of the strength of

-21-

> Plaintiffs' marks by assessing whether Plaintiffs have adduced
> evidence that they are recognized.

SPA-10-11 (emphasis added). Such holding, which does not merely emphasize the

importance of "recognition" but makes it the *sine qua non* of a trademark claim

under section 1125(a), cuts against decades precedent from both within the Second

Circuit, *see, e.g., Breenan's*, 360 F.3d at 130, and without. *See, e.g., Coach*

*Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356 (Fed. Cir. 2012) ("[F]ame

cannot overwhelm the other *DuPont* factors."); *Arnold v. Treadwell*, 642

F.Supp.2d 723, 734 (E.D. Mich. 2009) ("The Lanham Act itself does not have a

requirement that a plaintiff be a celebrity. Instead … it is designed to protect

reasonable commercial interests in marks, including identities."); *Yeager v.*

*Innovus Pharmaceuticals, Inc.*, No. 18-cv-397, 2019 WL 447743, at *7 (N.D. Ill.

Feb. 5, 2019) (operative inquiry on a Lanham Act claim is whether a plaintiff has a

commercial interest in her image, and holding: "Nor does Yeager need to allege he

is a celebrity to have commercial interests in his identify…. In fact, [Defendant]

used Yeager's name for commercial interests in an advertisement promoting the

product, indicating his name did have at least some commercial value."). While

other federal courts have made clear that a trademark holder's lack of fame or

celebrity is of little or no consequence, the district court has now held

"recognition", *i.e.,* celebrity, is first and last word not merely on whether the

*Polaroid* strength of mark factor favors defendant, but whether an individual is

entitled to federal protection for misuse of her trademark in the first place.

Specifically: although section 1125(a) extends a civil remedy to "any person who believes that he or she is or is likely to be damaged" by misleading advertising activity, the district court has now explicitly held plaintiffs with uncontroverted commercial interests in their image, likeness, and persona as marks (such as Appellants) will be denied a section 1125(a) remedy -- and denied, even, the opportunity to present their case to a jury -- unless they can, in addition, meet some undetermined level of "recognizability" or "celebrity." This new standing requirement both limits section 1125(a) protections to only the publicly prominent and allows district judges to serve a gatekeeping role concerning which marks are (in their opinion) prominent *enough* to be worthy of that protection. It is supported by no authority and undermines the broad statutory protections of the Lanham Act.

Indeed, by eschewing a traditional strength of mark analysis in lieu of a recognition-based test and mandating that an inherently distinctive mark (like each Appellant's image and likeness) must, in addition, obtain an undisclosed level of recognition to be afforded statutory protection, the district court has run afoul of Supreme Court precedent:

> Engrafting onto §43(a) a requirement of secondary meaning for inherently distinctive trade dress would also undermine the purpose of the Lanham Act. Protection of trade dress, no less than that of trademarks, serves the Act's purpose to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National

> protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producers the benefits of good reputation." *Park 'N Fly* [*Inc. v. Dollar Park & Fly, Inc.*], 469 U.S. [189,] at 198, citing S. Rep. No. 1333, 79th Cong., 2d Sess., 3-5 (1946).

*Two Pesos*, 505 U.S. at 774. By requiring the owner of a distinctive mark to also demonstrate recognition the district court has ignored this precedent, while also ignoring the fact that "[t]he strength of a mark is determined by its tendency to uniquely identify the source of the product. This tendency is strong to the extent that the mark is distinctive, either inherently **or** by virtue of having acquired secondary meaning." *Star Indus.* 412 F.3d at 383 (citations omitted) (emphasis added). *See also, McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979) ("The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.").

For decades this Court (in line with courts around the country) has focused its strength of mark inquiry on the inherent distinctiveness of a plaintiff's mark, not the public's recognition of that mark. *See W.W.W. Pharm. Co. v. Gillette Co*., 984 F.2d 567, 572-73 (2d Cir. 1993) (Turning on its "'origin-indicating' quality in the eyes of the purchasing public," a mark's strength is assessed using two factors: "(1) the degree to which it is inherently distinctive; and (2) the degree to which it is

distinctive in the marketplace. . . In evaluating a mark's strength, a court is _permitted_ to consider the mark's secondary meaning, that is, the extent to which the public has come to identify the mark with a particular product. However, lack of secondary meaning does not preclude a court from finding that an otherwise distinctive mark is strong.") (citations omitted, emphasis added). _See also, Centaur Communs., Ltd. v. A/S/M Communs., Inc._, 830 F.2d 1217, 1225 (2d Cir. 1987) ("The strength of a mark is its tendency to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer.") (emphasis added, citation omitted). Allowing Lanham Act protection to turn exclusively on a plaintiff's recognition is a diversion from these long-standing principles.

Importantly, this Court has also made clear that "[t]he strength of a mark measures the degree of distinctiveness for the purpose of determining the likelihood of confusion resulting from another's use of a similar mark." _Estee Lauder, Inc. v. Gap, Inc._, 108 F.3d 1503, 1510 (2d Cir. 1997) (quoting Restatement 3d of Unfair Competition, § 21, cmt. i). But Exotic Island did not use marks "similar" to Appellants' marks; rather, they admittedly used exact copies of Appellants' marks. Considering this, it is unclear what purpose the strength of mark analysis here serves other than to protect fraudulent advertisers who seek, in the first instance, to exploit Appellants' trademarks but then turn around and argue

-25-

their exploitations are protected under federal law because the marks they admit to stealing are not famous "enough."

In a garden-variety trademark case, where a third-party competitor of (*e.g.*) Nike is seeking to trick consumers with the use of a trademark similar to the Nike swoosh, the strength of mark is an important component of a likelihood of confusion analysis because the third-party is trying to exploit Nike's goodwill and have consumers purchase their sneaker under the false impression that it is a Nike sneaker. There can be no confusion among consumers as to whether the third-party is putting a Nike product into the marketplace if Nike does not have a strong enough mark in the first place. Thus, an evaluation of strength of mark is appropriate. But here, Exotic Island did not use an image similar to that of Tiffany Toth in the hope that it would convince consumers Tiffany Toth would be stripping at Mansion. Rather, it admittedly used an actual image of Tiffany Toth to convince consumers that she was its stripper product, *i.e.,* that if consumers went to Mansion, they would see her dancing nude. But simply because the marketing scheme here is differs from a traditional trademark infringement case does not make it any less actionable under section 1125(a). *See CBS, Inc. v. Springboard Int'l Records*, 429 F. Supp. 563, 566 (S.D.N.Y. 1976) (section 1125(a) was intended for "the protection of consumers and competitors from a wide variety of misrepresentations of products and services in commerce. In enacting the section,

Congress in effect created a new federal statutory tort. The section is clearly

remedial and should be broadly construed." (internal citations omitted)); *Sovereign*

*Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1242 (6th Cir.

1997) (section 1125(a) "makes illegal a broad array of rather amorphous practices

that are commonly arranged under the rubric of 'unfair competition.'")

There is no dispute each Appellant, having commercialized her image and

persona, has trademark rights in them, nor is there any dispute those marks are

"inherently distinctive," which alone is the basis for a finding that strength of mark

presents an issue of fact for trial.  It is only by mandating that inherently distinctive

marks must also acquire secondary meaning to be afforded protection, and thereby

altering the Lanham Act's standing requirements, that the district court, like district

court's before it, has arrived at the legally and logically unsustainable conclusion

that advertisements <u>no one disputes</u> are facially false are nevertheless somehow

incapable of causing consumer confusion and thus protected under federal law.

*See, e.g., Toth v. 59 Murray Enterprises, Inc.*, 15-cv-8028 (NRB), 2019 WL 95564

(S.D.N.Y. Jan. 3, 2019) (holding that there was no dispute that "the prominent

display of plaintiffs' images in the Clubs' advertising constitutes false or

misleading representations of fact for purposes of a false endorsement claim" -- a

finding which should have alone entitled plaintiffs to a jury trial, as there is no

value in protecting advertisers who intentionally emit into commerce misleading

advertisements[6] -- but nevertheless holding these "false or misleading representations of fact" were <u>under no circumstances</u> capable of causing consumer confusion).

Finally, the decision to turn section 1125(a) analysis on "recognition" or "celebrity" cannot be squared with this Court's holding in *Dallas Cowboys Cheerleaders* that "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." 604 F.2d at 204-05. This Court did not state that it "satisfies the confusion requirement" *if and only if* the mark's owner was a "recognized celebrity." It stated -- without a shred of evaluation of the "recognizability" of plaintiff's mark -- that if the public believes the mark's owner "sponsored or otherwise approved" the use of the trademark, the confusion requirement is "*satisfied*." Considering this, the question here is: would a jury, reviewing the subject advertisements, believe that the "mark's owner" (*i.e*., Appellants) "sponsored or otherwise approved the use of the trademark (*i.e.,* their image and likeness)" in Mansion advertising? The Court need only review the advertisements to see that there is, at minimum, a material issue of fact on this issue.

---

[6] *See Time Warner Cable, inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)("If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required.")

### C. The Use of the Catch-All "Endorsement" Has Led to the Elevation of "Recognition."

Considering district courts' elevation -- in *Toth* and below -- of "recognition" into an outcome determinative component of establishing section 1125(a)(1)(A) standing and liability, the question must be asked: what sort of confusion did Congress aim to stamp out through section 1125(a)(1)(A)? Though it was only eight years ago in *Lexmark* that the Supreme Court held section 1125(a) "creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, §1125(a)(1)(B)," 572 U.S. at 122, courts in the Second Circuit have persisted in labeling certain claims those of "false endorsement." This when the statute specifically bars advertising activity likely to cause confusion as to "affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," 15 U.S.C. §1125(a)(1)(A), and says nothing about "endorsement."

Since (the theory goes) only publicly prominent plaintiffs have endorsing power, unless a Lanham Act plaintiff has achieved such prominence, no section 1125(a)(1)(A) claim can stand. This line of reasoning withstands scrutiny only if the confusion the Lanham Act intended to address was exclusively confusion as to "endorsement." But just as Congress made section 1125(a)(1)(A) available to "any

-29-

person," and not just the publicly prominent, Congress also created a cause of

action against use of marks that stoked confusion as to "affiliation, connection, or

association," not just "endorsement," and the district court's decision to narrow the

type of protections and class of protected people is particularly offensive to section

1125(a)(1)(A) considering its broad remedial purpose. *See CBS,* 429 F. Supp. at

566.

The disregard of the statutory text of section 1125(a) in favor of a more

stringent and narrow "endorsement" inquiry has far-reaching consequences

concerning how likelihood of confusion is gauged, who may bring a claim under

section 1125(a), and what confusion-related factors are afforded weight, especially

in a Circuit that for decades has emphasized that the operative confusion under the

Lanham Act means confusion "of any kind." *Star. Indus*, 412 F.3d at 383 (citing

same).

Appellants have alleged Mansion's use the use of their images was likely to

cause confusion as to their affiliation, association, and connection with Mansion or

their employment as strippers at Mansion.  During discovery, Appellants tested

survey respondents, 62% of whom believed, based exclusively on the subject

advertisements, that Appellants were associated or affiliated with Mansion, 75% of

whom believed Appellants sponsored or promoted Mansion, and 76% of whom

believed Appellants approved the use of their images by Mansion. Further, Exotic

Island's owner acknowledged the accuracy of Appellants' allegations that it was

using their images to trick consumers as to their employment as strippers at

Mansion:

> Q:    Here's an image with [Appellant Jessa] Hinton again [JA-41].
>        The naughtiest – here's what the caption says: The naughtiest
>        part of the year is happening tonight. Are you naughty enough
>        to party with our girls? It says "our girls," and I'm wondering if
>        you think that a reasonable customer would look at that and
>        say, well, they're saying our girls; this is one of the girls who is
>        going to be there?
>                                        *****
> A:    That's up to them. I'm no – some may, some may not. **It's the
>        individual's discretion if they choose to believe what they
>        see.**

JA-149-50 (emphasis added).  This remarkable admission by Exotic Island's owner

that anyone who "chooses to believe what they see" would believe Appellants are

strippers at Mansion was nowhere even addressed by the district court, which

focused instead on the fact that, although Appellants have millions of social media

followers, and five of the eight were *Playboy* Playmates, none met the district

court's nebulous and never defined level of "recognition" it held necessary confer

section 1125(a) standing.

    That such analysis plainly loses the forest for the trees and ignores the

directive of this Court that "the ultimate question [is] whether, looking at the

products in their totality, consumers are likely to be confused," *Starbucks,* 588

F.3d 115, is underscored by *Yeager*, *supra*, where the district court rejected the

argument that the plaintiff had to allege or demonstrate "celebrity" because the fact

defendant used plaintiff's "name for commercial interests in an advertisement

promoting the product, indicat[ed] his name did have at least some commercial

value." *Yeager,* 2019 WL 447743, at \*7. Similarly, the fact that Mansion used

Appellants' distinctive marks to promote its strip club indicates that their images in

fact have commercial value that Respondent sought to exploit. If section 1125(a) is

not the proper vehicle to protect against exploitative marketing activity, it is hard

to see what is. *See Allen v. Nat'l Video, Inc.*, 610 F.Supp.612, 625 (S.D.N.Y. 1985)

(noting the Lanham Act's underlying purpose of protecting trademarks and

"economic interests analogous to those protected by trademark law," including

those "of the 'trademark' holder in the value of his distinctive mark….").

Finally, "[w]hile the term 'false endorsement' often describes claims

concerning celebrity personas, the Second Circuit has recognized that a false

endorsement claim can be premised on <u>'confusion between [plaintiff's] product</u>

<u>and the alleged infringer's product.</u>'" *Jackson v. Odenat*, 9 F.Supp.3d 342, 354

(S.D.N.Y. 2014) (quoting *Famous Horse, Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106,

108 (2d Cir. 2010), *abrogated on other grounds by, Lexmark.,* 572 U.S. 118)

(emphasis added).  Put another way, the Lanham Act was not passed merely for the

purpose of protecting celebrities' images from being usurped by false endorsers,

but also to stamp out a defendant's attempt to pass off a plaintiff's product as its

own. In short, its purpose was to protect investments in marks and commercial interests, whether registered or unregistered, famous or obscure. The statute protects both the established worldwide celebrity and the emerging artist seeking to build her brand. By turning Lanham Act protection exclusively on a plaintiff's "recognition," the district court ignored this. Its analysis should be rejected, and its decision reversed.

### D. *The District Court Erred in its Evaluation of the Other* Polaroid *Factors.*

#### i.   Actual Confusion.

The district court held Appellants had no evidence of "actual confusion" because it excluded Appellants' survey wherein such evidence was presented. As discussed *infra*, Section IV, this was a reversible abuse of discretion. Though actual confusion "is not necessary to establish likelihood of confusion," *Henegan Const. Co., Inc. v. Heneghan Contracting Corp.*, No. 00-cv-9077 (JGK), 2002 WL 1300252, at * 7 (S.D.N.Y. June 12, 2002),[7] where, as here, a defendant has admitted deceptive intention it "raise[s] the rebuttal presumption of consumer confusion." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014) (citations omitted).[8]

---

[7] *See also*, *Savin Corp.*, 391 F.3d at 459 ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act ….") (quotations and citations omitted)).

[8] *See also, PPX Enterprises, Inc. v. Autofidelity Enterprises, Inc.*, 818 F.2d 266, 273 (2d Cir. 1987), *abrogated on other grounds, as recognized in Hannex Corp. v. GMI, Inc.*, 140 F.3d 194,

Considering that even Exotic Island's owner conceded that if consumers "choose to believe what they see," they would believe Appellants were strippers at Mansion, it should come as no surprise that a significant percentage of survey respondents believed that Appellants were associated with Mansions or worked there. Thus, due exclusively to Exotic Island's illicit and false advertising, these consumers believed something that was not true. Considering that the sole basis for Buncher's exclusion was the fact he did not include a "don't know" option for some of his questions, and that this bears (at most) on the weight the survey should be afforded by a jury, the survey should have been admitted, and Appellants' significant evidence of actual confusion should have been considered by the district court.

      ii.    <u>Bad Faith</u>.

    "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Star Indus.*, 412 F.3d at 388. Respondent of course knew no Appellant was a stripper at Mansion and yet

---

206 n.9 (2d Cir. 1988) (no need to provide actual consumer confusion, which was inferred by defendants' intentionally deceptive conduct); *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926 F.2d 134, 139-40 (2d Cir. 1991) (noting the holding of *PPX* inferring actual confusion based on defendant's deceptive conduct and noting that this rationale "applies equally to any situation where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public. Actual consumer confusion is not easily established through direct evidence or even through use of consumer surveys or market research.").

let their agent, Exclusive Events, to whom it ceded all advertising authority and responsibility, misappropriate and publish images of Appellants anyway. JA-1901-02, ¶¶ 43-46.

Relying on *Toth,* the district court held that since Respondent ceded all advertising authority to a third-party, it could not have acted in bad faith. But this inverts the bad faith analysis, which hinges not on whether Respondent intended to misappropriate and exploit, *e.g.*, Tiffany Toth's image, but rather on whether Respondent intended to confuse the public for its commercial benefit by making representations it knew to be false or was reckless in not knowing were false. Respondent's acknowledgment it knew no Appellant was a stripper at Mansion is significant evidence of bad faith,[9] and the district court's holding that Respondent somehow acted in good faith because it declined to inquire with its agent whether it had the right to Appellants' intellectual property does not withstand scrutiny. The question to be asked on a bad faith analysis is not "whether defendants knew" their agents had not secured rights to the Images, but rather, *first*, did Respondent have the right to use Appellants' trademarks in advertising, and, *second*, if it did not, did it have reason to believe it had secured such rights? Respondent's decision

---

[9] *See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F.Supp.2d 249, 278 (S.D.N.Y. 2006) (bad faith "may be inferred from the junior user's actual or constructive knowledge of the senior user's mark." (citing *Star Indus*. 412 F.3d at 389)).

to simply put its head in the sand and not make the least inquiry on this issue does not support a finding of good faith especially in light of this Court's holding that "[s]election of a mark that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." *Star Indus.*, 412 F.3d at 388 (citations omitted). The district court's holding that Respondent made no inquiry of its agent, and the fact that it never saw a release and knew no Appellant was a Mansion stripper, supports a finding of bad faith.

This is because irrespective of whether Respondent asked its marketing agents to specifically use Tiffany Toth's image, it was clearly trying to trade on the "good will and reputation" each Appellant has by virtue of being a beautiful model, each of whom Respondent apparently believed would be more likely to attract patrons to Mansion than its own strippers. Indeed, as noted *supra*, five of the eight Appellants have been *Playboy* Playmates, and obviously misappropriating the images of young women who have appeared in the world's most famous men's magazine was no accident. Rather, Respondent believed (not unreasonably) there was a significant overlap between readers of *Playboy* and strip club patrons.

Finally, since Respondent is liable for the actions of its agent working within the scope of his agency,[10] Exotic Island is responsible not only for its own repeated and reckless disregard of Appellants' rights but likewise for its agent's. The district court's conclusion that Respondents are somehow inoculated from a finding of bad faith because, though they knew no Appellant was a stripper at Mansion, they purportedly believed (without ever inquiring) its agent secured the right to Appellants' images should be rejected, and the bad faith *Polaroid* factor should be found to favor Appellants.

### E. The District Court Got the Polaroid Balancing Wrong.

Even were this Court to agree with the district court's analysis of the strength of mark, actual confusion, and bad faith *Polaroid* factors, the district court conceded all other *Polaroid* factors favored Appellants. SPA-31. The linchpin of a finding of summary judgment is that there "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and an "issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party…." *Floyd v. City of New York*, 813 F.Supp.2d 457, 465 (S.D.N.Y. 2011) (citing *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010)).

---

[10] *See Meisel v. Grunberg*, 651 F.Supp.2d 98, 110 (S.D.N.Y. 2009). *See also, Sec. Pac. Mortgage & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447, 448 (2d Cir. 1989) (per curiam) (stating it is an "established rule of agency law that a principal is liable to third parties for the acts of an agent operating within the scope of the agent's real or apparent authority.") (citations omitted)).

It is equally well-settled that the operative inquiry on any Lanham Act claim brought under section 1125(a)(1)(A) "is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Savin,* 391 F.3d at 456. Though this Circuit eschews a mechanical application of the *Polaroid* factors whereby the party with the most factors wins, it nevertheless bears noting that although four of the seven *Polaroid* factors favor Appellants, they have been denied the opportunity to present their case to a jury. This to say nothing of the fact that two of the factors that purportedly favor Respondent -- actual confusion and bad faith -- are not required for a finding of Lanham Act liability, and that the two "most significant," similarly of the marks and proximity of the products, favor *Appellants*. *See Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*, 648 F.Supp.2d 576 (S.D.N.Y. 2009) ("In sum, three of these factors— strength of the mark, actual confusion, and quality of Defendants' products -- favor Defendants as a matter of law. One factor -- bridging the gap -- slightly favors Plaintiffs. With respect to the remaining four factors -- including two that are the '*most significant*,' *Mobil Oil. Corp.*, 818 F.2d at 258, *similarity of the marks and proximity of products* -- genuine issues of fact preclude the Court from determining whether a likelihood of confusion exists. Accordingly, the parties' motions for

summary judgment on Plaintiffs' Lanham Act claims are denied.") (emphasis added).

Considering the above, the district court's grant of summary judgment to Exotic Island on Appellants' false association claim should be reversed.

**III.    The District Court Erred in Granting Summary Judgment to Exotic Island on Appellants' False Advertising Claim.**

Section 1125(a)(1)(B) of the Lanham Act prohibits commercial advertising that "misrepresents the nature, characteristics, qualities, or geographic origins of [defendant's] good, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To avail herself of protection under this provision, a false advertising plaintiff must "both fall within the 'zone of interests' covered by the Lanham Act and show an injury 'flowing directly' from the deception wrought by the defendant's advertising…." *Dependable Sales & Serv. Inc. v. TrueCar, Inc.,* 394 F.Supp.3d 368, 372 (S.D.N.Y. 2019) (citing *Lexmark*, 572 U.S. at 122). The district court held no Appellant met either criterion. SPA-33. This was in error.

*Zone-of-interests***:** the district court held that since Appellants and Exotic Island were not "direct competitors," Appellants did not fall within the zone-of-interests protected by section 1125(a)(1)(B). *Id.*  But the Supreme Court in *Lexmark* specifically rejected a "direct competitor"-test, making clear that a plaintiff who is not a direct competitor of the defendant nevertheless falls within the zone-of-interests where she has alleged a commercial interest in reputation and sales that were negatively affected by defendant's advertising. *See Dependable Sales*, 394 F.Supp.3d at 372. ("a party not directly in competition with a defendant could have an actionable claim, provided that it plausibly alleged 'injuries to business reputation and present and future sales." (citing *Lexmark*, 572 U.S. at

-40-

131)). *See also, Merck Eprova AG v. Gnosis S.p.A.*, 901 F.Supp.2d 436, 449

(S.D.N.Y. 2012) ("direct competition is not required under the Lanham Act.").

    *Lexmark* itself is instructive on this point because the plaintiff there was not

a "direct competitor" of the defendant, but rather was suing as a "perso[n] engaged

in commerce within the control of Congress whose position in the marketplace has

been damaged by Lexmark's false advertising. There is no doubt that it is within

the zone of interests protected by the statute." *Lexmark*, 572 U.S. at 137.  The same

can be said of each Appellant.  For example, Tiffany Toth markets herself to

companies in brands in the exact way Exotic Island marketed Mansion: with an

image of Tiffany Toth.  When a company like Exotic Island dilutes Ms. Toth's

brand by forcing her to associate with it, it damages her reputation among

companies and brands (to say nothing of her more than 5 million social media

followers). Further, that Ms. Toth is not herself a stripper is not relevant to the

*Lexmark* zone-of-interest analysis because Mansion is seeking to increase

commercial sales by illicitly stating she is, and doing so in a way that harms her

financially.

    Further, though perhaps not "direct" competitors, Appellants and Exotic

Island do in fact compete because they both seek to attract consumers and vie for

the same dollar by using the image of a beautiful woman, and the crux of

Appellants' allegations is that their images were illicitly used on Exotic Island's

social media for the same exact reason that Appellants and others use them: to attract consumers. *See Gray v. LG&M Holdings*, No. CV-18-02543*, 2020 WL 6200165, at \*7 (D. Ariz. Sept. 23, 2020) ("The modeling and strip-club industries share a common feature: both emphasize appearance and profit off the sexualization of women's bodies. What makes a successful model makes for an attractive stripper. A jury could reasonably conclude that Defendants chose Plaintiffs' precisely to capitalize on this shared feature.")

The Supreme Court made clear in *Lexmark* that courts properly afford relief to false advertising plaintiffs where "the defendant damages the product's reputation by, for example, equating it with an inferior product," and that "when a party claims reputational injury from disparagement, competition is not required for proximate cause." *Lexmark*, 572 U.S. at 138. Appellant's uncontradicted testimony is that their association with a strip club was potentially devastating to their careers. *See, e.g.,* JA-67-68, ¶¶ 13-19 (Appellant Alana Campos' testimony concerning how vital a model's reputation is to the establishment and furtherance of her career). The reason Exotic Island used each Appellants' image was to falsely represent to consumers that they had a superior "product," which in the strip club industry means a more attractive stripper. Considering this, each Appellant falls squarely within the *Lexmark* zone-of-interests.

*Injury*: each Appellant is a professional model who earns her livelihood licensing her images to brands and companies. When a company like Exotic Island chooses to bypass legal channels and misappropriate an Appellant's image for its own commercial benefit this deprives that individual of, at minimum, the revenue she would have generated had it operated through legal channels and hired her to appear in their advertisements. The focus of a damage analysis on a false advertising claim is damage to reputation and commercial sales, and each Plaintiff has minimum has alleged and proven that they were deprived of the revenue from the commercial license of their image to Exotic Island.

As set forth in *Lexmark*, "a defendant who 'seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product' may be said to have proximately caused the plaintiff's harm.'" *Lexmark*, 572 U.S. at 138 (citing *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 657 (2008) (emphasis in *Bridge*). The "known falsehood" Exotic Island was peddling was that Appellants were strippers at Mansion, and that if consumers attended Mansion as opposed to one of its competitors they would get to see Appellants dancing nude. This is obvious on the face of the advertisements and, as noted *supra*, roundly acknowledged by Exotic Island's owner during discovery whose admission that patrons would be confused as to Appellants' status as a stripper at Mansion if they

"choose to believe what they see" is precisely the type of false advertising activity Congress sought to stamp out through enactment of the Lanham Act.

Finally, the *Dependable Sales* court expressed concern that "plaintiffs who are not competitors and who have not been injured could bring a false-advertising [claim] solely seeking to disgorge the wrongdoer's profits. This would expand the category of eligible plaintiffs beyond those in the zone of interest." *Dependable Sales*, 394 F.Supp.3d at 375. But any argument Appellants' damages are speculative, or that they do not have a legitimate interest in deterring Exotic Island's willful violation of the Lanham Act, or that they are merely asserting such claims to improperly obtain a disgorgement of profits, does not withstand scrutiny. Again: Exotic Island admittedly used images of Appellants in advertising, without consent, and to trick consumers, thereby harming Appellants financially and diluting their brand. Since, in the Second Circuit, "a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark," *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014) (citations omitted), Appellants have alleged and demonstrated that, at minimum, material facts exist as to their injury, and this Court should reverse the award of summary judgment to Exotic Island on Appellants' false advertising claims.

-44-

**IV.**   **The District Court Erred in Striking the Buncher Survey and Report.**

The district court's exclusion of Buncher should be reversed on both

procedural and substantive ground:

***Procedurally***: rather than offer a *single argument* in its briefing as to why

exclusion of Buncher was appropriate, Exotic Island instead directed the district

court to a bare affidavit from its rebuttal expert, thereby utterly shirking its burden

under *Daubert* and the Rules of Evidence of demonstrating Buncher's "opinion is

based on data, a methodology, or studies that are simply inadequate to support the

conclusions reached…." *Amorgianos*, 303 F.3d at 266. Exotic Island having made

no argument for exclusion, the district court's exclusion was an abuse of

discretion, and this is especially so considering the many courts around the country

that have roundly accepted Buncher's surveys and opinions in similar Lanham Act

lawsuits. *See, e.g., Pepaj v. Paris Ultra Club, LLC*, No. CV-19-01438-PHX-MTL,

2021 WL 632623 (D. Ariz. Feb. 18, 2021) (denying motion to exclude Buncher);

*Longoria v. Kodiak Concepts, LLC*, 2021 WL 1100373 (D. Ariz. Mar. 23, 2021)

(same); *Pinder v. 4716, Inc.*, 2020 WL 6081498 (D. Ariz. Oct. 14, 2020) (same);

*Edmondson, et al. v. Caliente Resorts, LLC, et al.,* 15-cv-2672 (SDM)(TBM)

(M.D. Fla.) (same); *Taylor v. Trapeze Mgmt., LLC* No. 0:17-cv-62262, 2019 WL

1977514, at *4-5 (S.D. Fla. Feb. 28, 2019) (same).

***Substantively:*** for more than 40 years this Court has consistently held that

"[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders,* 604 F.2d at 204-05.(citations omitted); *Star. Indus*, 412 F.3d at 383 (same). Relying on this authority -- as well as the plain language of section 1125(a)(1)(A) forbidding advertising activity likely to cause confusion as to a plaintiff's "affiliation, connection or association" with the defendant, "sponsorship" of the defendant's product, or "approval" of defendant's commercial activities -- Appellants enlisted Buncher to survey strip club patrons concerning their beliefs about Appellants' involvement with Mansion. Buncher showed respondents the subject advertisements and asked them, *inter alia*, whether they believed: 1) Appellants were associated or affiliated with Mansions (62% of respondents believed they were); 2) Appellants sponsored or promoted Mansions (75% of respondents believed they did); and 3) Appellants approved the use of their images by Mansions (76% of respondents believed they had). JA-179. In a Circuit where the operative question is whether the public believes "the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement," this evidence overwhelmingly supports a finding that Exotic Island's illicit advertising activities were in fact likely to cause consumer confusion.

In response to this evidence of confusion, the district court issued a single

critique: that since Buncher did not include a "don't know" option in his questions, his entire survey should be stricken. SPA-27-28. This is the sole basis for exclusion, and it should be reversed.

*First*, "[i]n light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds 'serious flaws in reasoning and methodology.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (quotations and citations omitted). Otherwise, "'if in expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *Id.* (citing *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Excluding Buncher's survey and opinion because his questions did not contain a "don't know" option constitutes an extraordinary overreach by the district court that runs counter to *Daubert* and the Rules of Evidence, as interpreted by this Circuit.

*Second*, this is because research in the field of survey design makes clear that applying a "don't know" option is a common *mistake*, as doing so "provides

an easy way for respondents to avoid engaging with the subject of the question."[11] Buncher's decision to not include a "don't know" option was not some oversight; rather, it was a decision by an expert with 50-plus years in the marketing research field -- who's credentials were nowhere challenged by Respondent or the district court -- that research data is more reliable when there is "don't know" option. Though criticizing the absence of a "don't know" option, Respondent's rebuttal expert provided _no authority_ for the proposition that including a "don't' know" option leads to more accurate survey results, and the district court cited none. It is thus noting more than the bare opinion of Respondent's rebuttal expert which unsurprisingly (because he was hired as a rebuttal expert) runs counter to Buncher's opinion on the subject. The district court nowhere articulates why it credited Respondent's expert but not Buncher, and there was no basis to do so. But even without such explanation, Buncher's testimony nevertheless falls "within the range where experts might reasonably differ." _Scott_, 315 F.R.D. at 43. Under _Daubert,_ the weight such testimony should be afforded is the province of the jury.

**Third**, the most cursory review of Buncher's survey underscores why a "don't know" option would have been at best superfluous and at worst detrimental to the reliability of the research data. To take just one example, after showing the

---

[11] _See_ Dave Vannet, _Why including 'don't know' responses is hurting your survey data_, Qualtrics, May 20, 2015 at 1, https://www.qualtrics.com/blog/why-including-dont-know-responses-is-hurting-your-survey-data/.

respondents the subject advertisements, Buncher asked respondents whether they

agreed or disagreed with the following statement:

> All of the women shown have agreed to sponsor, endorse, or promote
> the club represented in these ads.

JA-179. If a respondent agreed with the statement, she would so indicate. If she

did not agree with it, she would indicate that. But no one "does not know" whether

they agree with the statement because if a respondent truly "does not know"

whether Appellants agreed to sponsor, endorse, or promote Mansions, she would

simply answer <u>she did not agree with the statement</u>.

*Fourth*, Buncher makes clear in his survey that "[t]he survey sample

selection, questions, questionnaire design, and interviewing procedures employed

in this survey were specifically designed in accordance with the generally accepted

standards and procedures in the fielding of surveys set forth by the American

Marketing Association, Marketing Research Association, CASRO and ESOMAR"

and that the survey was also "designed to meet the criteria for survey

trustworthiness detailed in the Federal Judicial Center's Manual for Complex

Litigation, Fourth." JA-159. Neither Respondent nor the district court disputed

these assertions, nor did they "dispute that the aforementioned entities are

responsible for promulgating the generally accepted standards in the surveying

field [or that]… Buncher's alleged 'methodological flaws' are inconsistent with

these entities' generally accepted standards." *Longoria v. Kodiak Concepts, LLC*,

No. CV-18-02334-PHX-DWL, 2021 WL 1100373 (D. Ariz. Mar. 23, 2021) (denying motion to exclude Buncher).

*Fifth*, even if the Court could (somehow) conclude Buncher committed an error by not including a "don't know" option, this constitutes only an error in methodology, which this Court has made clear "properly go[es] to the weight of the evidence," not its admissibility. *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 228 (2d Cir. 1999). *See also, Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F.Supp.2d 457, 459 (S.D.N.Y. 2002) (quoting same). The notion that Buncher's entire survey should be excluded because, following decades of his own experience and accepted authority in the field, he decided he would obtain more accurate results by not including a "don't know" option is deeply flawed, supported by no authority, and should be rejected.

*Sixth*, courts in this Circuit have repeatedly made clear that survey evidence should only be excluded when its "probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury." *MasterCard Int'l, Inc. v. First Nat'l Bank of Omaha*, 02-cv-3691 (DLC), 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) (citations omitted); *Cache, Inc. v. M.Z. Berger & Co.,* 99-cv-12320 (JGK), 2001 WL 38283, at *6 (S.D.N.Y. 2001) (survey should only be excluded under Rule 403 "when it is so flawed in its methodology" that the survey proves little and the jury is very likely to be misled.). Nowhere did the district court

articulate how Buncher's decision to not include a "don't know" option was prejudicial or could mislead the jury, and it is important on this point to again consider what Buncher was surveying: Buncher asked respondents whether, considering Appellants' appearance in the Mansion advertisements, they believed Appellants agreed to sponsor or promote Mansion, or were otherwise affiliated with it. When this exact issue was put to Exotic Island's *owner*, he admitted that if consumers "choose to believe what they see," then they would conclude Appellants were strippers at Mansions. It is unclear how the presence of a "don't know" option would have significantly altered the survey results or how a jury seeing this data would be prejudiced by it.

Considering the above, the district court's decision to exclude Buncher was an abuse of discretion and should be reversed.

## **CONCLUSION**

Appellants respectfully request this Court:

1)      Reverse the district court's decision to apply the one-year limitations period of CPLR § 215 to Appellants' right of publicity claims, or, in the alternative, certify to the New York Court of Appeals the question of what limitations period applies to right of publicity claims in New York;

2)      Reverse the district court's grant of summary judgment for Respondents on Appellants' claim under the Lanham Act, 15 U.S.C. §

1125(a)(1)(A), and remand to the district court for further proceedings on each

claim in accordance with the Court's disposition of this appeal;

    3)    Reverse the district court's grant of summary judgment for

Respondents on Appellants' claim under the Lanham Act, 15 U.S.C. §

1125(a)(1)(B), and remand to the district court for further proceedings on each

claim in accordance with the Court's disposition of this appeal;

    4)    Reverse the district court's order striking the expert report of Martin

Buncher; and,

    5)    Grant such other and further relief as this Court deems just and

proper.

Dated:    New York, New York
            January 11, 2022

**THE CASAS LAW FIRM, P.C.**

By: /s/ John V. Golaszewski
    John V. Golaszewski
    1740 Broadway, 15th Floor
    New York, New York
    T: 646.872.3178
    F: 855.220.962

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

   This brief contains 11,660 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:

   This brief has been prepared in Proportionally-Space typeface using Microsoft Word, in Times New Roman, Font Size 14.

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Opinion and Order of Honorable Kenneth M. Karas,
   Dated August 9, 2021...............................................................SPA-1

Judgment of United States District Court Southern District of
   New York, Dated August 9, 2021 ............................................SPA-43

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALANA SOUZA, *et al.*,

                              Plaintiffs,

              v.

EXOTIC ISLAND ENTERPRISES, INC., *et al.*,

                              Defendants.

No. 18-CV-9448 (KMK)

OPINION & ORDER

Appearances:

John Vincent Golaszewski, Esq.
Casas Law Firm, P.C.
New York, NY
*Counsel for Plaintiffs*

Joseph Edward O'Connor, Esq.
Mainetti, Mainetti & O'Connor, P.C.
Kingston, NY
*Counsel for Defendant Exotic Island Enterprises, Inc.*

Michael Edward Kolb, Esq.
O'Connor & Partners, PLLC
Kingston, NY
*Counsel for All Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs Alana Souza, also known as Alana Campos ("Campos"), Brooke Banx

("Banx"), Brooke Taylor-Johnson ("Taylor-Johnson"), Jaclyn Swedberg ("Swedberg"), Jaime

Edmondson-Longoria ("Edmondson-Longoria"), Jessica Hinton, also known as Jessa Hinton

("Hinton"), Tiffany Toth-Gray ("Toth-Gray"), and Ursula Sanchez, also known as Ursula Mayes

("Mayes"; collectively, "Plaintiffs") bring this Action, pursuant to the Lanham Act, 15 U.S.C.

§ 1125 *et seq.*, and New York state law, against Exotic Island Enterprises, Inc. ("Exotic Island"),

doing business as Mansion Gentlemen's Club & Steakhouse ("Mansion"), and Keith Slifstein

SPA-2

("Slifstein"; together, "Defendants"). (*See* Compl. (Dkt. No. 4).) Plaintiffs allege that

Defendants without permission used Plaintiffs' images to promote Defendants' business. (*Id.*)

Before the Court are Plaintiffs' Motion For Summary Judgment ("Plaintiffs' Motion"), (Not. of

Mot. ("Pls.' Mot.") (Dkt. No. 41)), and Defendants' Motion For Summary Judgment and To

Exclude Testimony of Plaintiffs' Expert Witnesses Martin Buncher and Stephen Chamberlin

("Defendants' Motion"), (Not. of Mot. ("Defs.' Mot.") (Dkt. No. 45)). For the reasons that

follow, Plaintiffs' Motion is denied, and Defendants' Motion is granted insofar as it seeks

summary judgment and to exclude certain testimony of Martin Buncher.

I.  Background

A.  Factual Background

The following facts are either undisputed or, because the Court grants Defendants'

Motion and denies Plaintiffs' Motion, construed in the light most favorable to Plaintiffs.

Plaintiffs are professional models. (Pls.' Local Rule 56.1 Statement of Undisputed

Material Facts ("Pls.' SMF") ¶¶ 9, 13, 17, 21, 25, 29, 32, 36 (Dkt. No. 44); Transmittal Decl. of

John V. Golaszewski ("Golaszewski Decl.") Ex. B ("Campos Decl.") ¶ 2 (Dkt. No. 43-2);

Golaszewski Decl. Ex. C ("Banx Decl.") ¶ 2 (Dkt. No. 43-3); Golaszewski Decl. Ex. D ("Taylor-

Johnson Decl.") ¶ 2 (Dkt. No. 43-4); Golaszewski Decl. Ex. E ("Swedberg Decl.") ¶ 2 (Dkt. No.

43-5); Golaszewski Decl. Ex. F ("Edmondson-Longoria Decl.") ¶ 2 (Dkt. No. 43-6);

Golaszewski Decl. Ex. G ("Hinton Decl.") ¶ 2 (Dkt. No. 43-7); Golaszewski Decl. Ex. H ("Toth-

Gray Decl.") ¶ 2 (Dkt. No. 43-8); Golaszewski Decl. Ex. I ("Mayes Decl.") ¶ 2 (Dkt. No. 43-9).)

Each has enjoyed commercial success, including, for example, appearances in magazines, ad

campaigns, TV shows, films, and at events. (Pls.' SMF ¶¶ 9, 13, 17, 21, 25, 29, 32, 36; Campos

Decl. ¶ 2; Banx Decl. ¶ 2; Taylor-Johnson Decl. ¶ 2; Swedberg Decl. ¶ 2; Edmondson-Longoria

SPA-3

Decl. ¶ 2; Hinton Decl. ¶ 2; Toth-Gray Decl. ¶ 2; Mayes Decl. ¶ 2.)  Each has a significant number of followers on various social media platforms, ranging from greater than ten thousand to several million.  (Pls.' SMF ¶¶ 9, 13, 17, 21, 25, 29, 32, 36; Campos Decl. ¶ 3; Banx Decl. ¶ 3; Taylor-Johnson Decl. ¶ 3; Swedberg Decl. ¶ 3; Edmondson-Longoria Decl. ¶ 3; Hinton Decl. ¶ 3; Toth-Gray Decl. ¶ 3; Mayes Decl. ¶ 3.)  All Plaintiffs except Taylor-Johnson and Mayes are considered social media influencers.  (Campos Decl. ¶ 3; Banx Decl. ¶ 3; Swedberg Decl. ¶ 3; Edmondson-Longoria Decl. ¶ 3; Hinton Decl. ¶ 3; Toth-Gray Decl. ¶ 3.)  Plaintiffs attest that they "have achieved celebrity status and fame" and that "[o]n any given day, regardless of where [they are] at, [they are] recognized by complete strangers and [their] fans who follow [them] on social media."  (Campos Decl. ¶ 4; Banx Decl. ¶ 4; Taylor-Johnson Decl. ¶ 4; Swedberg Decl. ¶ 4; Edmondson-Longoria Decl. ¶ 4; Hinton Decl. ¶ 4; Toth-Gray Decl. ¶ 4; Mayes Decl. ¶ 4.) Plaintiffs earn their livings by promoting their image for the benefit of various clients, commercial brands, media, and entertainment outlets.  (Campos Decl. ¶ 5; Banx Decl. ¶ 5; Taylor-Johnson Decl. ¶ 5; Swedberg Decl. ¶ 5; Edmondson-Longoria Decl. ¶ 5; Hinton Decl. ¶ 5; Toth-Gray Decl. ¶ 5; Mayes Decl. ¶ 5.)  Because they rely on their reputation to get work, Plaintiffs are selective about the jobs they take, and exercise "complete control" over the use of their images and likenesses.  (Campos Decl. ¶¶ 6–8; Banx Decl. ¶¶ 6–8; Taylor-Johnson Decl. ¶¶ 6–8; Swedberg Decl. ¶¶ 6–8; Edmondson-Longoria Decl. ¶¶ 6–8; Hinton Decl. ¶¶ 6–8; Toth-Gray Decl. ¶¶ 6–8; Mayes Decl. ¶¶ 6–8.)  This is particularly true on social media, where images of Plaintiffs can be difficult to find and remove, remain available via search, and may be refreshed or highlighted by a user interaction even years after they are posted.  (Campos Decl. ¶ 9; Banx Decl. ¶ 9; Taylor-Johnson Decl. ¶ 9; Swedberg Decl. ¶ 9; Edmondson-Longoria Decl. ¶ 9; Hinton Decl. ¶ 9; Toth-Gray Decl. ¶ 9; Mayes Decl. ¶ 9.)

Slifstein is the President of Exotic Island.  (Defs.' Statement Pursuant to Local Rule 56.1 ("Defs.' SMF") ¶ 984 (Dkt. No. 47); Pls.' Resp. to Defs.' SMF ("Pls.' Resp. SMF") ¶ 984 (Dkt. No. 57); Aff. of Def. Keith Slifstein ("Slifstein Aff.") ¶ 3 (Dkt. No. 49).)  Exotic Island operates Mansion.  (Defs.' SMF ¶ 985; Pls.' Resp. SMF ¶ 985; Slifstein Aff. ¶ 3.)  Plaintiffs allege that Mansion "engages or has engaged in the business of selling alcohol and food in an atmosphere [where] nude and/or semi-nude women entertain the [business's] clientele."  (Compl. ¶ 50.)[1] Mansion maintains social media accounts, including at least a Facebook account and an Instagram account.  (Pls.' SMF ¶ 41; Defs.' Resp. SMF ¶ 40; Slifstein Dep. 17.)  Defendants gave third party Defendant Exclusive Events & Promotions Inc., doing business as Think Social First ("Exclusive Events"), complete control over these accounts.  (Pls.' Resp. SMF ¶ 1009; Slifstein Dep. 17–18.)  Exclusive Events promoted Mansion on social media free of charge, with the goal of gaining a foothold in the night club industry.  (Defs.' SMF ¶ 995; Pls.' Resp. SMF ¶ 995; Slifstein Aff. ¶ 9.)  Promotions containing Plaintiffs' images were without Plaintiffs' permission posted to Mansion's social media pages.  (Pls.' SMF ¶¶ 10, 14, 18, 22, 26, 30, 33, 37; Campos Decl. ¶ 13; Banx Decl. ¶ 13; Taylor-Johnson Decl. ¶ 13; Swedberg Decl. ¶ 13; Edmondson-Longoria Decl. ¶ 13; Hinton Decl. ¶ 13; Toth-Gray Decl. ¶ 13; Mayes Decl. ¶ 13; *see also* Compl. Exs. A–H (Dkt. No. 1-1).)

B. Procedural Background

Plaintiffs filed their Complaint on October 16, 2019.  (Compl. (Dkt. No. 1).)  The Complaint alleges false advertising and false endorsement under the Lanham Act, violation of

---

[1] Plaintiffs purport to provide evidence to support this allegation.  (*See* Pls.' SMF ¶ 40.) However, they reference only unrelated deposition testimony.  (*See* Golaszewski Decl. Ex. J ("Slifstein Dep.") 6 (Dkt. No. 43-10); *see also* Defs.' Resp. to Pls.' SMF ("Defs.' Resp. SMF") ¶ 39 (Dkt. No. 54).)  Because this fact is immaterial to the outcome, the Court notes Plaintiffs' allegation.

SPA-5

Plaintiffs' right to publicity under New York Civil Rights Law ("NYCRL") Sections 50–51,

deceptive trade practices under New York General Business Law ("NYGBL") Section 349, and

defamation. (Compl. ¶¶ 74–125.) Defendants answered on January 31, 2019. (Dkt. No. 9.) The

Court held an initial pretrial conference on May 29, 2019, (Dkt. (minute entry for May 29,

2019)), at which it adopted a Case Management and Scheduling Order, (Dkt. No. 15), and

referred the Parties to mediation, (Dkt. No. 16). On November 21, 2019, Defendants requested

leave to file a third-party complaint against Exclusive Events, (Dkt. No. 19), which the Court

granted, (Dkt. No. 20). Defendants filed their Third Party Complaint on December 4, 2019.

(Dkt. No. 21.) On March 4, 2020, the Court held a status conference, (Dkt. (minute entry for

Mar. 4, 2020)), at which it adopted a second Case Management and Scheduling Order, (Dkt. No.

25). Upon the conclusion of discovery, the Court on November 6, 2020 held a status conference,

at which it adopted a briefing schedule for the Parties' Motions For Summary Judgment and

Defendants' Daubert Motion. (Dkt. (minute entry for Nov. 6, 2020); Dkt. No. 38.)

    The Parties submitted their opening briefs on February 5, 2021. (Pls.' Mot.; Pls.' Mem.

of Law in Supp. of Their Mot. for Summ. J. ("Pls.' Mem.") (Dkt. No. 42); Golaszewski Decl.

(Dkt. No. 43); Pls.' SMF; Defs.' Mot.; Decl. of Michael Kolb ("Kolb Decl.") (Dkt. No. 46);

Defs.' SMF; Aff. ("Klein Aff.") (Dkt. No. 48); Slifstein Aff.; Defs.' Mem. of Law. in Supp. of

Defs.' Mot. ("Defs.' Mem.") (Dkt. No. 50).)

    On February 9, 2021, the Second Circuit issued an opinion in *Electra v. 59 Murray*

*Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021). *Electra* is similar to the instant Action. There,

the plaintiffs—including Hinton, Toth-Gray, and Mayes—alleged that the defendants

SPA-6

misappropriated their images to advertise a strip club.  *See generally id.*[2]  The Second Circuit in

*Electra* considered four of the five causes of action advanced by Plaintiffs in the instant Action:

false endorsement under the Lanham Act, violation of the plaintiffs' right to publicity under

NYCRL Section 51, deceptive trade practices under NYGBL Section 349, and defamation.  *See*

*generally id.*

The Parties submitted their opposition papers on March 12, 2021.  (Defs.' Opp'n; Defs.'

Resp. SMF; Pls.' Mem. of Law in Opp'n to Defs.' Mot. ("Pls.' Opp'n") (Dkt. No. 55);

Transmittal Decl. of John V. Golaszewski ("Golaszewski Opp'n Decl.") (Dkt. No. 56); Pls.'

Resp. SMF.)  Reacting to the Second Circuit's opinion in *Electra*, Plaintiffs withdrew their claim

for deceptive trade practices under NYGBL Section 349 and their defamation claim.  (Pls.'

Opp'n 24–25.)  In addition, Plaintiffs did not respond to Defendants' argument that Plaintiffs'

claims against Slifstein should be dismissed because he was not personally involved in selecting

Plaintiffs' images, and was unaware that use of those images may violate the law.  (*See* Defs.'

Mem. 5.)  The Court deems these claims to be abandoned, dismisses Plaintiffs' deceptive trade

practices claim under NYGBL Section 349 and Plaintiffs' defamation claim, grants summary

judgment for Slifstein, and dismisses all claims against him.  *See Jackson v. Fed. Express*, 766

F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate,

infer from a party's partial opposition that relevant claims or defenses that are not defended have

been abandoned."); *see also Toth*, 2019 WL 95564, at *5 (dismissing all claims against

---

[2] Defendants accurately state that Taylor-Johnson also was a party in this case.  (*See* Defs.' Mem. of Law in Opp'n to Pls.' Mot. ("Defs.' Opp'n") 7 (Dkt. No. 53).)  However, the district court in the *Electra* matter noted that Taylor-Johnson had "withdrawn all claims in this action."  *Toth v. 59 Murray Enterprises, Inc.*, No. 15-CV-8028, 2019 WL 95564, at *1 n.2 (S.D.N.Y. Jan. 3, 2019), *aff'd in part, vacated in part, remanded sub nom. Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233 (2d Cir. 2021).  Thus, neither the district court nor the Second Circuit considered Taylor-Johnson's claims in *Electra*.

individual defendants where there was "nothing in the record to support a piercing of the

corporate veil or any other theory of liability implicating individual defendants").  As a result,

only claims against Exotic Island are before the Court, and there are only three of them: false

endorsement under the Lanham Act, false advertising under the Lanham Act, and Plaintiffs'

NYCRL Section 51 right to publicity claim.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v.

Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the

movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800

Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114,

123 (2d Cir. 2013) (alteration and citation omitted).  Further, "[t]o survive a [summary

SPA-8

judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

8

**SPA-9**

B.  Analysis

    1.  False Endorsement

Section 43 of the Lanham Act prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  To prevail on a false endorsement claim, "a plaintiff must prove (1) that the mark is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant."  *Electra*, 987 F.3d at 257 (alteration omitted) (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007)).  "To determine the likelihood of consumer confusion, [the Court is to] apply the eight-factor test of *Polaroid Corporation v. Polarad Electronics Corporation*[,] 287 F.2d 492, 495 (2d Cir. 1961)."  *Electra*, 987 F.3d at 257 (citing *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013)).  The *Polaroid* factors include

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Kelly-Brown*, 717 F.3d at 307 (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).

The Second Circuit has stated that "[o]n appeal from a grant of summary judgment, the findings with respect to predicate facts underlying each *Polaroid* factor are reviewed with considerable deference to the district court."  *Electra*, 987 F.3d at 257 (quoting *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 162 (2d Cir. 2004)).  On its face, this standard of review

9

appears to be in tension with the requirement that the Court, on summary judgment, "construe the facts in the light most favorable to the non-moving party." *Brod*, 653 F.3d at 164 (citation omitted). The Second Circuit has noted as much, *see Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 328 n.11 (2d Cir. 2020) (noting that "if a genuine dispute existed as to a material fact, the case would normally not be appropriate for summary judgment"), and has attempted to avoid this implication. For example, it referred to "considerable deference" as "an oft-repeated incantation," while noting that the Second Circuit "never purported to expand a district court's license to make factual findings at summary judgment," and concluding that "a district court will be authorized to find the sorts of facts that are entitled to deference only in circumstances in which the traditional summary judgment standard has been satisfied." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020). This clarification is important because it means that the Second Circuit's findings with respect to the *Polaroid* factors—most notably in *Electra*, 987 F.3d 233—do not merely indicate the absence of clear error. Instead, they establish de novo conclusions of law that the Court is bound to follow.

a.  Strength of the Mark

i.  Evidence of Recognition

In *Toth*, the district court explained that "the 'mark' is the plaintiff's persona and the 'strength of the mark' refers to the level of recognition that the plaintiff has among the consumers to whom the advertisements are directed." *Toth*, 2019 WL 95564, at *6 (citation omitted). After considering factors such as the plaintiffs' earnings and social media followings, the court in *Toth*, in deciding that this factor weighed in favor of the defendants, concluded that "[t]he bottom line is that regardless of the plaintiffs' presence on social media, they have failed to cite even one example of actual recognition." *Id.* In *Electra*, the Second Circuit affirmed this

10

SPA-11

focus on evidence of recognizability as the bottom line, stating that "because the ultimate

question under *Polaroid Corporation* is the likelihood of consumer confusion, the district court

properly analyzed [the plaintiffs'] recognizability." 987 F.3d at 258. Indeed, the Second Circuit

strongly suggested that the absence of evidence of recognition would suffice to defeat a false

endorsement claim, quoting a district court's reasoning that "[t]he misappropriation of a

completely anonymous face could not form the basis for a false endorsement claim, because

consumers would not infer that an unknown model was 'endorsing' a product, as opposed to

lending her image to a company for a fee." *Id.* (quoting *Bondar v. LASplash Cosmetics*, No. 12-

CV-1417, 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012)). Thus, the Court views Plaintiffs'

recognizability as a critical requirement to sustain their false endorsement claims, and begins its

analysis of the strength of Plaintiffs' marks by assessing whether Plaintiffs have adduced

evidence that they are recognized.

The Courts concludes that they have not. The record contains two possible sources of

evidence to suggest recognition. First is Plaintiffs' affidavits, which state that "[o]n any given

day, regardless of where [they are] at, [they are] recognized by complete strangers and [their]

fans who follow [them] on social media." (Campos Decl. ¶ 4; Banx Decl. ¶ 4; Taylor-Johnson

Decl. ¶ 4; Swedberg Decl. ¶ 4; Edmondson-Longoria Decl. ¶ 4; Hinton Decl. ¶ 4; Toth-Gray

Decl. ¶ 4; Mayes Decl. ¶ 4.) To defeat a motion for summary judgment, "a nonmoving party

'must offer some hard evidence showing that its version of the events is not wholly fanciful.'"

*Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New

York*, 132 F.3d 145, 149 (2d Cir. 1998)). Here, Plaintiffs do not refer to any specific examples of

being recognized. (*See* Campos Decl. ¶ 4; Banx Decl. ¶ 4; Taylor-Johnson Decl. ¶ 4; Swedberg

Decl. ¶ 4; Edmondson-Longoria Decl. ¶ 4; Hinton Decl. ¶ 4; Toth-Gray Decl. ¶ 4; Mayes Decl.

¶ 4.) Instead, they vaguely state that they are "recognized by complete strangers" "[o]n any given day." (*Id.*) These affidavits are "conclusory and completely lacking in evidentiary support." *Allegheny Coupling Co. v. Betts Indus., Inc.*, No. 06-CV-76, 2010 WL 1068199, at *7 (W.D. Pa. Mar. 18, 2010); *see also Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 907 (7th Cir. 1983) (finding that an affidavit that the plaintiffs mark "was well-known as a trademark for [the plaintiff's] product" did not establish an issue of fact); *cf. Applegate v. Top Assocs., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (affirming summary judgment where the plaintiff did not provide "the concrete particulars which would entitle him to a trial"); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (holding, where the plaintiff testified that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places," that "such conclusory allegations . . . are insufficient to satisfy the requirements of Rule 56(e)").

The second possible source of evidence regarding recognition is expert testimony from Martin Buncher ("Buncher"). Buncher offers to testify that "[t]he levels of recognition recorded among respondents were quite significant." (Golaszewski Decl. Ex. L ("Buncher Report") 30 (Dkt. No. 43-12).) His putative testimony is based on a survey of 812 people who were at least 21 years old living in the metropolitan area around Mansion, and who had patronized a "Bikini Bar/Gentlemen's Club/Strip Club" in the two years prior to taking the survey. (*Id.* at 8.) This survey showed that "almost half of the respondents felt they recognized . . . Plaintiff[s'] images in the ads in some manner having seen them prior to this research." (*Id.* at 22.) Defendants argue that this testimony should be excluded as unreliable. (Defs.' Mem. 28–29.) The Court agrees.

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the

method by which the expert draws an opinion from those facts, and how the expert applies the

facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 475

(W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d

Cir. 2002)). "[W]hen an expert opinion is based on data, a methodology, or studies that are

simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the

exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (citation omitted).

However, consistent with "the liberal admissibility standards of the federal rules and [the fact]

that our adversary system provides the necessary tools for challenging reliable, albeit debatable,

expert testimony," the Court "should only exclude the evidence if the flaw is large enough that

the expert lacks 'good grounds' for his or her conclusions." *Id.* at 267 (citation omitted). "The

decision to admit expert testimony is left to the broad discretion of the trial judge and will be

overturned only when manifestly erroneous." *Electra*, 987 F.3d at 254 (quoting *Boucher v. U.S.

Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

Defendants argue that Buncher's conclusions that Plaintiffs are recognizable lack good

grounds because he "did not show the respondents full face images of . . . Campos, Toth-Gray,

and Mayes." (Defs.' Mem. 28.) Instead, Buncher "used copies of the images annexed to the

Complaint with . . . [P]laintiffs' names removed from the top, which resulted in large parts of

their faces and heads being removed." (*Id.*) The Court agrees. Survey respondents are highly

unlikely to be able to accurately identify Campos, Toth-Gray, and Mayes based on photographs

that do not show their face above their nose. (*See* Compl. Exs. A, G, H.) Yet Buncher's study

shows relatively uniform levels of recognition across the images of all eight Plaintiffs, including

those that show a Plaintiff's face and those that do not. (Buncher Report 22.) According to

Buncher's survey, the most recognized Plaintiff was recognized by 55% of respondents, while

SPA-14

the least recognized Plaintiff was still recognized by 43% of respondents.  (*Id.*)  Assuming that each Plaintiff is relatively recognizable, this spread should be significantly larger to account for the images showing only part of Campos's, Toth-Gray's, and Mayes's faces.  Case law helps explain the survey flaws that resulted in this anomalous outcome.  In *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242, 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020), *reconsideration denied*, 2020 WL 2731968 (S.D.N.Y. May 26, 2020), the court held that "Buncher's failure to use a control group also makes it difficult to measure the effect of the specific images on the respondents or to account for participants' . . . guessing."  *Id.* at *7.  The Second Circuit affirmed the importance of a control group in *Electra*, rejecting Buncher's explanation that his survey was "a communications study, not a consumer confusion study" as "insufficient to set aside the district court's conclusion that the Buncher Report was fatally flawed."  987 F.3d at 258 (record citation omitted).  (*See* Buncher Report 11 ("[T]his research was a communications . . . study, negating the need for any control group.").)  Here, Defendants' expert offers to testify that, in the absence of a control group, "there is no way of distinguishing the true beliefs of the survey participants from random guessing."  (Klein Aff. Ex. A ("Klein Report") 9 (Dkt. No. 48-1).)  That the results bunch around 50% recognition for each Plaintiff, regardless of whether her whole face is shown, supports the view that many respondents were guessing.  Another possibility is that respondents—generally agreeable people who agreed to participate in the survey—were yea-saying.  (*See id.*)  Because Buncher made no effort to control for these possibilities, he lacks good grounds for his conclusion that Plaintiffs were recognizable, and the Court will not permit him to testify to this point based on these survey questions.[3]

_____

[3] The recognition questions in Buncher's survey are also defective for the independent reason that they "provided no opportunity for respondents either to express uncertainty or to provide the identity of the [p]laintiff."  *Edmondson*, 2020 WL 1503452, at *8.  The Second

14

SPA-15

Nor can Buncher testify that Plaintiffs were recognized based on responses to his survey's open-ended questions.  Indeed, Plaintiffs do not advance this argument in their briefs.  (*See* Pls.' Mem. 18; Pls.' Opp'n 18, 23 (noting only that "Buncher asked recognition-based questions in this case.").)  The survey respondents do not identify any Plaintiff by name.  (*See generally* Kolb Decl. Ex. M-1 ("Buncher Survey") (Dkt. No. 46-51).)  In *Toth*, the district court similarly noted that the plaintiffs "failed to cite even one example of actual recognition[,] . . . other than the single response out of 636 correctly identifying [Carmen] Electra," for whom the court granted summary judgment.  2019 WL 95564, at *7; *see also Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228, 245–47 (S.D.N.Y. 2019) ("[The] [p]laintiffs have not provided any survey that directly shows . . . specific recognition by [the] [d]efendants' customers."), *reconsideration denied*, No. 15-CV-8168, 2019 WL 5188932 (S.D.N.Y. Oct. 15, 2019).  Of course "it is possible to recognize a person without recalling their name."  *Skinner v. Tuscan, Inc.*, No. 18-CV-319, 2020 WL 5946897, at *4 (D. Ariz. Oct. 7, 2020).  (*See* Buncher Report 22.)  And the Court notes that Campos, Swedberg, Edmondson-Longoria, Hinton, and Toth-Gray have modeled for Playboy, (Campos Decl. ¶ 2; Swedberg Decl. ¶ 2; Edmondson-Longoria Decl. ¶ 2; Hinton Decl. ¶ 2; Toth-Gray Decl. ¶ 2), and the survey results contain at least eleven references to Playboy, (Buncher Survey 454, 685, 753, 787, 805, 821, 941, 958, 1127, 1671, 1773).  However, Playboy itself is a strong brand.  *See Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563, 566 (2d Cir. 1982) ("The district court's finding that the 'Playboy' mark was distinctive and enjoyed wide recognition is uncontroverted."); *Playboy Enterprises, Inc. v. Chuckleberry Pub.*,

---

Circuit has held that such failure "to provide respondents with an opportunity to indicate lack of knowledge" is a "defect[]."  *Electra*, 987 F.3d at 258.  "As a result, the Court has no way to verify whether respondents truly recognized any of the Plaintiffs."  *Edmondson*, 2020 WL 1503452, at *8.

*Inc.*, 486 F. Supp. 414, 420 (S.D.N.Y. 1980) (noting testimony that Playboy has a "high degree of world-wide public recognition"). The references to Playboy in the survey results are generic; most simply say "playboy," "play boy," "Playboy," or "Play boy." (*See, e.g.*, Buncher Survey 454, 753, 821, 941, 1127, 1671, 1773.) The one response that references a Playboy product says "Playboy magazines, lewd/nude magazines & or sex shop." (*Id.* at 685.) No reasonable jury could find that these references suggest that respondents recognized Plaintiffs from their work with Playboy.

Plaintiffs point to a number of out-of-district courts that have allowed Buncher to testify consistent with similar studies. (*See* Pls.' Opp'n 23–24.) Several of these courts have pointed explicitly to a circuit split regarding the admissibility of expert testimony. *See Takeguma v. Freedom of Expression LLC*, No. CV-18-2552, 2021 WL 487884, at *3–4 (D. Ariz. Feb. 10, 2021) ("Under Ninth Circuit law, technical inadequacies—like the lack of a control group—go to the weight of the survey evidence, not admissibility."); *Mitcheson v. El Antro LLC*, No. 19-CV-1598, 2020 WL 7075239, at *4–5 (D. Ariz. Dec. 3, 2020) ("Although the *Edmonson* court cites to other New York cases suggesting a control group is a necessary survey feature, the Ninth Circuit has no comparable mandate."); *Skinner*, 2020 WL 5946897, at *6 ("[The] [d]efendant's argument overlooks a key difference in the standard for admissibility of survey evidence between the Second and Ninth Circuits."). In *Takeguma*, the court points to the Ninth Circuit's decision in *Prudential Insurance Co. of Am. v. Gibraltar Financial Corp. of Cal.*, 694 F.2d 1150 (9th Cir. 1982). *See Takeguma*, 2021 WL 487884, at *4. In *Prudential*, the district court held that the plaintiff's survey "did not meet the reliability requirements necessary to overcome its hearsay character." 694 F.2d at 1155. The Ninth Circuit rejected this "composite conclusion," and held that "[t]echnical unreliability goes to the weight accorded a survey, not its

SPA-17

admissibility." *Id.* at 1155–56. However, it noted that "[a] few cases do support the position taken by the district court." *Id.* at 1156. The Ninth Circuit cited in particular *Am. Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2d Cir. 1979). *Id.* There, the Second Circuit held that "in light of [two surveys'] methodological defects,"—including self-serving questions and failure to replicate actual marketing conditions—"the district court's rejection of this survey evidence was not clearly erroneous." *Am. Footwear*, 609 F.2d at 660 n.4. Rejecting this view, the Ninth Circuit adopted what it deemed "[t]he majority view[:] . . . to admit the survey and discount its probative value." *Prudential*, 694 F.2d at 1156. Even the cases cited by Plaintiffs that do not identify a circuit split refer to this Ninth Circuit principle, or a similar principle from another circuit. *See, e.g.*, *Pepaj v. Paris Ultra Club LLC*, No. 19-CV-1438, 2021 WL 632623, at *3 (D. Ariz. Feb. 18, 2021) ("Objections regarding 'technical inadequacies' of a survey, 'bear on the weight of the evidence, not its admissibility.'" (citation omitted)); *Pinder v. 4716 Inc.*, No. 18-CV-2503, 2020 WL 6081498, at *3 (D. Ariz. Oct. 15, 2020) ("Challenges to survey methodology go to the weight given the survey, not its admissibility." (citation omitted)); *Edmondson v. Caliente Resorts, LLC*, No. 15-CV-2672, 2017 WL 10591833, at *11 (M.D. Fla. Aug. 31, 2017) ("Objections to the technical validity of the survey properly go to the weight to be accorded to the survey rather than to its admissibility."). As the Court is bound to follow the law of the Second Circuit, it does not find these cases dispositive, let alone persuasive.

Plaintiffs further argue that Defendants failed to adequately brief their critique of Buncher's opinion regarding whether Plaintiffs were recognized. (*See* Pls.' Opp'n 18 ("Defendants could have attacked Plaintiffs' evidence of actual . . . recognition in their brief, [but] they did not do so."), 23 ("Buncher asked recognition-based questions in this case. If Defendants['] position is that . . . Buncher's questions were nevertheless deficient, then the onus

was on them to explain that position to the Court.  Their silence on such comparisons is telling and dispositive.").)  The Court disagrees.  Defendants argued that Buncher's choice not to "show the respondents full face images of . . . Campos, Toth-Gray, and Mayes" was "an extremely careless failure in methodology that itself undermines the credibility of . . . Buncher's methodology and opinions." (Defs.' Mem. 28.)  Defendants certainly could have further elaborated, but their brief provided Plaintiffs with ample opportunity to respond to this argument.

### ii.  Other *Electra* Factors

Plaintiffs argue that they are recognizable because each is a "successful model" and they "have substantial followers on their social media accounts." (Pls.' Mem. 18.)  The Court disagrees.

In addition to affirming the district court's findings as to evidence of the plaintiffs' recognizability, the Second Circuit in *Electra* held that the district court had "properly analyzed the record of each [plaintiff's] public prominence to determine the strength of their marks."  987 F.3d at 258.  Based on this finding, the Court looks for guidance to the *Toth* court's analysis of the plaintiffs' public prominence.  In *Toth*, the district court granted summary judgment to the plaintiff on Carmen Electra's ("Electra's") false endorsement claim, and granted summary judgment to the defendants on the false endorsement claims brought by the other plaintiffs—including Hinton, Toth-Gray, and Mayes.  2019 WL 95564, at *15.  In so doing, it identified three relevant factors beyond evidence of recognition.  First is income.  After noting that "Electra earned over $5,000,000 from modeling between 2009 and 2012," and that the other plaintiffs had made annual modeling incomes ranging "from $400 . . . to $92,000," *id.* at *4, the court concluded that "[u]nlike . . . Electra, none of these other plaintiffs offered evidence of significant income earned through their various appearances," *id.* at *7.  Second is prominence.  The court

18

SPA-19

explained that Electra had "not just appeared in popular movies and television shows, but had regular and starring roles in them." *Id.* By contrast, it held that while the other plaintiffs had "participated in promotional campaigns for a wide variety of brands and appeared in magazines, TV shows, and movies, their resumes [were] devoid of evidence that they actually garnered recognition for any of their appearances." *Id.* The court held that "[s]imply listing brands or magazine titles is insufficient." *Id.* Third is social media followings. While the court did not make a finding regarding the size of the plaintiffs' social media followings, it noted that "the operative inquiry" was "what [the] plaintiffs' social media followings were at the time of the publishing of the images at issue"—not their followings at the time the plaintiffs' papers were filed. *Id.* The Court considers each of these three factors.

First, the Court considers Plaintiffs' income. Plaintiffs do not make an affirmative showing regarding their income. "[E]stablishing a likelihood of confusion is the plaintiff's burden . . . ." *Bondar*, 2012 WL 6150859, at *5 (citing *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)). As a result, Defendants "may satisfy [their] burden [on summary judgment] by 'pointing to an absence of evidence to support an essential element of the nonmoving party's' case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citation and alteration omitted). Defendants attest that they have provided all of the documents concerning Plaintiffs' income that were produced in discovery. (*See* Kolb Decl. 3–5 (noting that the exhibits to the Kolb Declaration contain all financial documents produced by Banx, Taylor-Johnson, Swedberg, Edmondson-Longoria, Hinton, and Mayes); Defs.' SMF ¶ 9; Pls.' Resp. SMF ¶ 9 (all financial records produced by Campos before her deposition are available as Exhibit A to the Kolb Declaration); Kolb Decl. 5 (supplemental documents regarding Campos's finances are included in Exhibit L to the Kolb Declaration);

SPA-20

Defs.' SMF ¶¶ 701–02, 704–05 (all financial documents produced by Toth-Gray, both before and after her deposition, are available in Exhibits K and L to the Kolb Declaration).)[4]  Thus, the Court considers Defendants' submissions regarding Plaintiffs' income.  These submissions include Plaintiffs' deposition testimony, produced documents, and their sworn response to an Interrogatory requesting "[f]or [e]ach Plaintiff . . . all sources of income and revenue from 2010 through the present . . . ." (Kolb Decl. Ex. A ("Campos Dep.") 51 (Dkt. No. 46-3); Kolb Decl. Ex. B ("Banx Dep.") 93–94 (Dkt. No. 46-4); Kolb Decl. Ex C ("Taylor-Johnson Dep.") 114 (Dkt. No. 46-5); Kolb Decl. Ex. D ("Swedberg Dep.") 6 (Dkt. No. 46-9); Kolb Decl. Ex. E ("Edmondson-Longoria Dep.") 101 (Dkt. No. 46-10); Kolb Decl. Ex. F ("Hinton Dep.") 7–9 (Dkt. No. 46-15); Kolb Decl. Ex. G ("Toth-Gray Dep.") 29–30 (Dkt. No. 46-21); Kolb Decl. Ex. H ("Mayes Dep.") 105–06 (Dkt. No. 46-22).)[5]

Based on the available evidence, the Court finds that Plaintiffs are in the same category as the plaintiffs in *Toth* with respect to their income.  While this income is not reflected in Campos's Interrogatory response, (*see* Campos Dep. 51 (Dkt. No. 46-3)), the documents Campos produced suggest that her highest earnings were $42,669.99 in 2013, including $21,350 from Playboy Enterprises, Inc., (Defs.' SMF ¶ 63; Pls.' Resp. SMF ¶ 63; Campos Dep. 35 (Dkt. No. 46-3)), $4,200 from Elegant Moments, Inc., (Defs.' SMF ¶ 103; Pls.' Resp. SMF ¶ 103; Kolb

_____

[4] Plaintiffs purport to dispute that Exhibits K and L to the Kolb Declaration contain all of the financial documents produced by Toth-Gray.  (*See* Pls.' Resp. SMF ¶¶ 702, 705.)  A party disputing a fact in a Local Rule 56.1 Statement must cite "to evidence which would be admissible."  Local Civ. R. 56.1(d).  However, Plaintiffs do not identify any specific omissions.  (*See* Pls.' Resp. SMF ¶¶ 702, 705.)  Thus, the Court takes as undisputed that Defendants have provided all financial documents produced by Toth-Gray.

[5] Because some of Plaintiffs' deposition transcripts span multiple filings containing discontinuous page numbers, the Court in referring to them indicates both the ECF-generated page number in the upper right-hand corner and the docket number.

Decl. Ex. L ("Suppl. Disclosure") 22 (Dkt. No. 46-35)), $4,150 from Michele & Group, Inc.,

(Defs.' SMF ¶ 103; Pls.' Resp. SMF ¶ 103; Suppl. Disclosure 23 (Dkt. No. 46-35)), $9,250 from

Shear Enterprises LLC, (Defs.' SMF ¶ 103; Pls.' Resp. SMF ¶ 103; Suppl. Disclosure 24 (Dkt.

No. 46-35)), and $3,719.99 from BRAND Model & Talent Agency Inc., (Defs.' SMF ¶ 103;

Pls.' Resp. SMF ¶ 103; Suppl. Disclosure 25 (Dkt. No. 46-35)).  Banx's highest earnings were in

2006, when she earned $18,300.  (Banx Dep. 94 (Dkt. No. 46-4).)[6]  Taylor-Johnson's highest

income was in 2009, when she earned $40,840 from Leg Avenue Inc.  (Taylor-Johnson Dep. 103

(Dkt. No. 46-5).)  Swedberg's highest income was a total of $107,000 in 2012, when she earned

$100,000 as Playmate of the Year, (Defs.' SMF ¶ 311; Pls.' Resp. SMF ¶ 311; Swedberg Dep. 6

(Dkt. No. 46-9)), up to $3,500 for her role in Snake and Mongoose, (Defs.' SMF ¶¶ 285–86;

Pls.' Resp. SMF ¶¶ 285–86; Swedberg Dep. 22 (Dkt. No. 46-6)), and up to $3,500 for her role in

Paulytics, (Defs.' SMF ¶ 287; Pls.' Resp. SMF ¶ 287; Swedberg Dep. 23 (Dkt. No. 46-6)).

Edmondson-Longoria testified in another matter that her highest annual income was around

$100,000 in 2010 or 2011.  (Defs.' SMF ¶ 411; Pls.' Resp. SMF ¶ 411; Kolb Decl. Ex. Z at 134–

35 (Dkt. No. 46-70).)  Hinton's highest annual income was $57,450 in 2013.  (Hinton Dep. 8

(Dkt. No. 46-15).)  Toth-Gray's highest annual income was $83,250 in 2016.  (Toth-Gray Dep.

30 (Dkt. No. 46-21).)  Aside from a $20,000 annual payment from Hot Import Nights in 2014–

2015, Mayes's Interrogatory response gives her hourly or daily rate rather than annual totals.

(Mayes Dep. 105–06 (Dkt. No. 46-22).)  Mayes testified that three ledgers produced in discovery

were the only documents reflecting her income that she had in her possession.  (Defs.' SMF

¶ 899; Pls.' Resp. SMF ¶ 899; Mayes Dep. 27–28 (Dkt. No. 46-22).)  These ledgers reflect total

---

[6] The Court notes that, in addition to attesting to its accuracy, Banx testified that her responses to Interrogatory 3 accurately reported her earnings from 2005 through 2014.  (Defs.' SMF ¶ 153; Pls.' Resp. SMF ¶ 153; Banx Dep. 44 (Dkt. No. 46-4).)

SPA-22

earnings of $98,083.38 from 2010 through 2016.  (Mayes Dep. 89–96 (Dkt. No. 46-22).)

Construing in Mayes's favor the ambiguous CESD Talent Agency ledger—which does not

contain a date—the most Mayes made in a single year was $74,117.62 in 2010.  (*Id.* at 94, 96.)

There is evidence suggesting that Swedberg and Edmondson-Longoria had peak annual incomes

of $106,000 and $100,000, respectively, which exceeds the $92,000 discussed in *Toth*.  2019 WL

95564, at *4.  However, this excess is fairly small, and Swedberg's and Edmondson-Longoria's

incomes came nowhere near $5,000,000 over a four-year period, which the court in *Toth* found

supported a finding of a strong mark.

Second, the Court considers Plaintiffs' prominence.  All Plaintiffs are situated similarly

to the plaintiffs in *Toth* with respect to their prominence.  Each Plaintiff provides an extensive

list of the magazines and ad campaigns in which they were featured.  (Pls.' SMF ¶¶ 9, 13, 17, 21,

25, 29, 32, 36; Campos Decl. ¶ 2; Banx Decl. ¶ 2; Taylor-Johnson Decl. ¶ 2; Swedberg Decl. ¶ 2;

Edmondson-Longoria Decl. ¶ 2; Hinton Decl. ¶ 2; Toth-Gray Decl. ¶ 2; Mayes Decl. ¶ 2.)

However, the Second Circuit affirmed the *Toth* court's holding that "[s]imply listing brands or

magazine titles is insufficient."  2019 WL 95564, at *7 (citing *Pelton v. Rexall Sundown, Inc.*,

No. 99-CV-4342, 2001 WL 327164, at *3 (S.D.N.Y. Apr. 4, 2001) ("One appearance in a Sports

Illustrated Swimsuit Issue in 1984 and some advertising work for well-known consumer products

does not deliver celebrity status.")).  Thus, these appearances do not suffice to establish

Plaintiffs' prominence.

Most Plaintiffs provide evidence of additional roles beyond magazines and ad campaigns.

Campos appeared in the film "Last Vegas."  (Campos Decl. ¶ 2.)  Banx can "be seen in music

videos, films, a few reality shows, and as a host for numerous events around the world."  (Banx

Decl. ¶ 2.)  Swedberg "appeared in a number of television series such as Badass, Playboy's

22

Beach House, Pauly Shore's Paulytics, Snake and Mongoose, and most recently the film Muck."

(Swedberg Decl. ¶ 2.)  While Swedberg had a "small role" in Snake and Mongoose, (Defs.' SMF

¶ 285; Pls.' Resp. SMF ¶ 285; Swedberg Dep. 23 (Dkt. No. 46-6)), she testified that she was "a

lead actress" in Muck, (Swedberg Dep. 22 (Dkt. No. 46-6)).  Edmondson-Longoria was a

cheerleader for the Miami Dolphins, participated in The Amazing Race 14, has been a sports

blogger for Playboy online and a co-host of Sirius Fantasy Sports Radio, appeared in "The

Bunny House" documentary, the Trace Adkins video for "This Ain't No Love Song," and

several other television, print, radio, and online outlets.  (Edmondson-Longoria Decl. ¶ 2.)

Hinton made guest appearances on *Baywatch* and *7th Heaven* and served as a TV host for

*Victory Poker* and *Top Rank Boxing*.  (Hinton Decl. ¶ 2.)  And Mayes was "suitcase model #5"

from the hit game show *Deal or No Deal*, has appeared on *Minute To Win It*, *The Tonight Show*,

and *The Jay Leno Show*, and was the cover model and star of the game *Juiced 2: Hot Import

Nights*.  (Mayes Decl. ¶ 2.)  Like the non-Electra plaintiffs in *Toth*, Plaintiffs' "resumes are

devoid of evidence that they actually garnered recognition for any of their appearances."  2019

WL 95564, at *7.  Only Swedberg—who was "a lead actress" in Muck, (Swedberg Dep. 22 (Dkt.

No. 46-6))—and Mayes—who was "cover model and a star of the game *Juiced 2: Hot Import

Nights*," (Mayes Decl. ¶ 2)—have adduced evidence that they had a "starring role[]" akin to

Electra's, *Toth*, 2019 WL 95564, at *7, but neither has made any showing that these productions

were "popular" or that they had "regular" starring roles, *id*.  Thus, no reasonable jury could find

that Plaintiffs' modeling appearances support the view that they have strong marks.

  Finally, the Court considers Plaintiffs' social media followings.  As in *Toth*, each Plaintiff

attests to their current social media followings.  (Campos Decl. ¶ 3; Banx Decl. ¶ 3; Taylor-

Johnson Decl. ¶ 3; Swedberg Decl. ¶ 3; Edmondson-Longoria Decl. ¶ 3; Hinton Decl. ¶ 3; Toth-

SPA-24

Gray Decl. ¶ 3; Mayes Decl. ¶ 3.)  However, the Second Circuit in *Electra* held that the district court "properly analyzed the record of each [plaintiff's] public prominence," 987 F.3d at 258, and the district court held that "the operative inquiry" was "plaintiffs' social media followings . . . at the time of the publishing of the images at issue," 2019 WL 95564, at *7.  Thus, evidence of Plaintiffs' current social media followings does not establish the strength of their marks. Before the Court is evidence of only Campos's, Swedberg's, and Toth-Gray's social media followings as of the publishing of the images at issue.  Campos testified that on May 5, 2016 she had around 700,000 Instagram followers, (Defs.' SMF ¶ 57; Campos Dep. 9 (Dkt. No. 46-2)), and around 60,000 Twitter followers, (Campos Dep. 9 (Dkt. No. 46-2)).[7]  Swedberg testified that on May 4, 2015 she had a little more than 500,000 Instagram followers, around 100,000 Twitter followers, and 500,000 to 750,000 Facebook followers.  (Defs.' SMF ¶ 269; Pls.' Resp. SMF ¶ 269; Swedberg Dep. 20 (Dkt. No. 46-7).)  Toth-Gray testified that on February 14, 2017 she had around 4,000,000 Facebook followers, around 1,000,000 Instagram followers, and "a couple hundred thousand" Twitter followers.  (Defs.' SMF ¶ 805; Pls.' Resp. SMF ¶ 805; Toth-Gray Dep. 13 (Dkt. No. 46-17).)  As in *Gibson*, where the record similarly suggested that "[s]ome [plaintiffs] have millions of followers," the Court concludes that "[b]ased on their resumes and in the absence of a[n] [admissible] consumer survey," a reasonable jury could find only that the plaintiffs are "as recognizable as the parties that prior courts have held to have relatively weak marks."  391 F. Supp. 3d at 246–47.[8]

---

[7] Plaintiffs neither dispute nor admit Campos's understanding of her Instagram followers as of May 5, 2016.  (*See* Pls.' Resp. SMF ¶ 57.)  Thus, the Court takes it to be undisputed.  *See Elwell v. Selective Ins. Co. of Am.*, No. 14-CV-2590, 2016 WL 5928682, at *1 (D.N.J. Oct. 11, 2016).

[8] The Court declines to grant judgment for Defendants based on their incompletely briefed argument that Hinton, Toth-Gray, and Mayes are collaterally estopped from asserting the

Plaintiffs have provided no evidence of recognition, and the evidence of their income, prominence, and social media followings does not suggest that they have strong marks. Thus, the Court concludes that Plaintiffs do not have strong marks.

### b. Actual Confusion

The Second Circuit in *Electra* stated that "[t]he misappropriation of a completely anonymous face could not form the basis for a false endorsement claim." 987 F.3d at 258 (quoting *Bondar*, 2012 WL 6150859, at *7). Based on this statement, the Court's holding that Plaintiffs provide no evidence that they are recognizable may itself suffice to grant summary judgment against Plaintiffs' false endorsement claim. However, the Second Circuit has held that "[n]o single [*Polaroid*] factor is dispositive." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995). And in *Electra*, the Second Circuit analyzed additional factors. *See* 987 F.3d at 258 (considering evidence of "actual consumer confusion or bad faith"). Thus, the Court will do the same.

To establish actual confusion, Plaintiffs must adduce "evidence that consumers are actually confused as to the origin of a particular product or service or as to whether [Mansion] is sponsored by or affiliated with [Plaintiffs]." *Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018). Because "[i]t is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion," the Second Circuit has "deemed evidence of actual confusion 'particularly relevant' to the [*Polaroid*] inquiry." *Virgin*

_____

strength of their marks due to the court's ruling in *Toth*. (Defs.' Opp'n 7.) "Defendant[s] make[] no showing that the factual circumstances in the cases are the same and warrant the application of collateral estoppel. The bare allegation that the same legal issues have been previously addressed is insufficient." *Mitcheson*, 2020 WL 7075239, at *17; *see also Takeguma*, 2021 WL 487884, at *17 (same).

SPA-26

*Enterprises Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (citation omitted). Plaintiffs rely on

the Buncher Report to establish actual confusion. (*See* Pls.' Opp'n 18.)[9] They summarize

Buncher's conclusion that "62% of survey respondents believed each Plaintiff had some

affiliation, connection[,] or association with Mansion; 75% believed Plaintiffs agreed to sponsor,

promote[,] or endorse Mansion; and 76% of respondents believed Plaintiffs approved Mansion's

use of their images." (*Id.*; *see also* Pls.' SMF ¶ 51; Buncher Report 27.) Defendants counter by

seeking to exclude Buncher's testimony. (Defs.' Mem. 28–29; Defs.' Opp'n 10–15.) The Court

agrees with Defendants that Buncher's testimony should be excluded, and thus finds that

Plaintiffs' have adduced no admissible evidence of actual confusion. *See Electra*, 987 F.3d at

258 (agreeing with the district court's finding that the plaintiffs "failed to establish any actual

consumer confusion"); *Toth*, 2019 WL 95564, at *7 (noting that the "plaintiffs' sole evidence of

consumer confusion in this case is a survey conducted by their proposed expert Martin

Buncher").

 After showing survey respondents photos from all of the social media posts at issue in

this Action, (*see* Compl. Exs. A–H), Buncher asked the respondents questions "to measure

possible confusion generated by the use of women in the advertising," (Buncher Report 16).

Defendants' expert provides the specific language of Buncher's questions. (*See* Klein Report 5–

6.) That language is excerpted below, along with the language of two additional survey

questions that speak to the respondents' view of the relationship between Plaintiffs and Mansion:

> Considering that these are actually real women shown in these ads and not just
> fictitious drawings, please indicate using your strongest (sic) impression for each

---

[9] In discussing the sophistication of the consumers in the relevant market, Plaintiffs quote
Slifstein's deposition testimony. (Pls.' Mem. 17.) Slifstein testified, in sum, that consumers
viewing the social media posts *could* think that Plaintiffs would be at Mansion. (Slifstein Dep.
66.) However, "at most the evidence show[s] a possibility and not the required probability of
confusion." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993).

pair of opposing statements the one you think is true based on your personal
feelings. Remember, we want your response based only on these ads you are seeing,
and nothing else you might have seen or heard previously.

- All of the women shown in these ads <u>have some</u> affiliation, connection or
association with those clubs in whose ad they appear
- All of the women shown in these ads <u>do not have any</u> affiliation, connection
or association with those clubs in whose ad they appear

- All of the women shown <u>have agreed</u> to sponsor, endorse or promote the
club represented in these ads
- All of the women shown <u>have not agreed</u> to sponsor, endorse or promote
the club represented in these ads

- All of the women shown in these ads <u>approve</u> of the use of their image in
those club advertisements in which they appear
- All of the women shown in these ads <u>do not approve</u> of the use of their
image in those club advertisements in which they appear
. . .
- All the women in these ads <u>probably do participate</u> in the events or activities
which take place in the club, and as reflected in the ads in which they appear
- All the women in these ads <u>probably do not participate</u> in the events or
activities which take place in the club, and as reflected in the ads in which
they appear

- All of the women <u>were paid</u> to be in the ads in which they appear
- All of the women <u>were not paid</u> to be in the ads in which they appear

(*Id.*)

Defendants' opening brief refers to the Klein Report and Klein Affidavit for a discussion

of the Buncher Report's "serious methodological flaws." (Defs.' Mem. 28; *see also* Klein

Report; Klein Aff.) Among the criticisms in the Klein Report is that Buncher's survey did not

instruct respondents "not to guess or [tell] them what to do if they didn't have an answer for a

question, were unsure[,] or simply did not have an opinion." (Klein Report 12.) Klein opines

that, in the absence of such instruction, "the question likely is a leading question because it leads

the respondent away from answering 'don't know' and toward selecting one of the provided

options." (*Id.* at 9.) Klein describes such questions as a "way in which respondents are

27

encouraged (or even required) to guess." (*Id.*) Defendants' opening brief also refers to two

courts that have struck Buncher marketing research surveys in similar cases. (Defs.' Mem. 28–

29.) In *Toth*, the court struck Buncher's testimony in part because his survey "failed to provide

survey takers with an opportunity to indicate lack of knowledge or an instruction for participants

not to guess." 2019 WL 95564, at *8 (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.

2d 558, 596 (S.D.N.Y. 2007) ("[C]onsumer confusion surveys should be designed to discourage

guessing."). The Second Circuit affirmed, agreeing that Bucher's survey was "defect[ive]"

because "it failed to provide respondents with an opportunity to indicate lack of knowledge about

how to interpret the use of [the plaintiffs'] images in the advertisements." *Electra*, 987 F.3d at

258.

        The defect identified by the Second Circuit in *Electra* exists here as well. Each of

Buncher's survey questions forced respondents to pick between two binary "impression[s]."

(Klein Report 5.) For example, either "[a]ll of the women shown in these ads <u>have some</u>

affiliation, connection or association with those clubs in whose ad they appear" or "[a]ll of the

women shown in these ads <u>do not have any</u> affiliation, connection or association with those clubs

in whose ad they appear." (*Id.*) In reality, a consumer viewing the ads could have had three

impressions: (1) the ads suggest that Plaintiffs were affiliated with Mansion; (2) the ads suggest

that Plaintiffs were not affiliated with Mansion; and (3) the ads do not suggest one way or the

other whether Plaintiffs were affiliated with Mansion.[10] Only the first of these three impressions

_____

[10] This assumes that survey respondents had the same impression for all of the images of
Plaintiffs—another flaw in Buncher's survey that is discussed in the Klein Affidavit. (*See* Klein
Aff. ¶ 30.)

suggests actual confusion; the second and third do not.[11]  By failing to provide the third option,

Buncher's survey led respondents to answers favoring Plaintiffs.  Respondents that had no

impression about Plaintiffs' affiliation with Mansion had to guess between the two options that

they were provided.  The other questions that get at possible confusion suffer from the same

flaw.  Thus, because Buncher did not give respondents the "opportunity to indicate lack of

knowledge," *Electra*, 987 F.3d at 258, "the significant methodological flaws in the survey

questions render the responses unreliable and liable to mislead a jury." *Edmondson*, 2020 WL

1503452, at *8.

Plaintiffs argue that Defendants' opening brief is inadequate to exclude Buncher's

testimony.  (Pls.' Opp'n 20–22.)  It is true that Defendants' opening brief does not explicitly

argue that Buncher failed to permit respondents to indicate a lack of knowledge.  (Defs.' Mem.

28–29.)  Nonetheless, the Court finds that Defendants' briefing was adequate and did not

prejudice Plaintiffs.  Defendants' opening brief referred to the Klein Report and Klein Affidavit,

as well as to the *Edmondson* and *Toth* cases.  (*See id.*)  The Klein Report and Affidavit both

argue that Buncher's survey is defective because it did not offer a "don't know" response.

(Klein Report 9; Klein Aff. ¶ 9.)  And the *Toth* and *Edmondson* courts reached this conclusion in

factually similar cases where the same expert sought to offer similar opinions.  *See Edmondson*,

2020 WL 1503452, at *8 (holding that Buncher's failure "to include an option to indicate a lack

of knowledge or understanding" was a "fatal defect[]"); *Toth*, 2019 WL 95564, at *8 (same).

Defendants made no new arguments in their Opposition.  (*See* Defs.' Opp'n 10–15.)  Instead,

---

[11]  Indeed, respondents who are not confused seem more likely to have the third
impression than the second.  It is logically difficult to see a person in an ad and draw the
affirmative conclusion that she has no affiliation whatsoever with the advertiser.  To the Court it
seems much more likely that a respondent who is not confused would take the view that the ads
do not suggest one way or the other whether Plaintiffs are affiliated with Mansion.

SPA-30

they reiterated their argument that Buncher failed to include the full faces of Campos, Toth-Gray, and Mayes, (*see id.* at 11–12; Defs.' Mem. 28), quoted from the *Electra* opinion, which was issued after Defendants filed their opening brief, (Defs.' Opp'n 11), and quoted extensively from *Toth*, *Edmondson*, and the Klein Affidavit, (*id.* at 12–15), all of which were cited in their opening brief, (Defs.' Mem. 28–29).[12]  Defendants' briefs could have been more explicit, but Plaintiffs had ample notice of the possible grounds for striking Buncher's testimony.  Indeed, Plaintiffs responded to Defendants' arguments, distinguishing *Edmondson* and *Toth*, and identifying contrary authority.  (*See* Pls.' Opp'n 23–24.)

Because Buncher may not testify to actual consumer confusion, and Plaintiffs provide no other evidence of actual confusion, the Court concludes that the ads did not actually confuse consumers.

### c.  Bad Faith

"Under this factor, [the Court] look[s] to 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'"  *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).  In *Electra*, the Second Circuit held that the plaintiffs "failed to establish . . . bad faith" where "the record merely show[ed] that [the defendants] failed to investigate whether the third-party contractor responsible for the advertisements secured legal rights to use [the plaintiffs'] pictures in the promotional images—not that [the defendants] intended to use the pictures without legal right to do so."  987 F.3d at 258.  The record here is the same.  Plaintiffs provide evidence that Exclusive Events created and published the ads at issue—which

---

[12] Thus, Plaintiffs' request for leave to respond to "arguments made for the first time in Defendants' opposition brief," (*see* Pls.' Opp'n 25), is denied.

SPA-31

Defendants gave it authority to do—and Defendants never asked where Exclusive Events got the images or whether Exclusive Events had the legal right to use them.  (Pls.' SMF ¶¶ 43–47; Defs.' Resp. SMF ¶¶ 42–46; Slifstein Dep. 14–16, 19–21.)  Plaintiffs do not dispute that "Defendants provided Exclusive Events with total control over the[ir social media] accounts."  (Pls.' Resp. SMF ¶ 997.)  As the district court found *Toth*, Plaintiffs do not offer evidence that Defendants "requested the use of any of . . . [P]laintiffs' images in their promotional material" or "knew or had reason to know that their third-party contractors did not have the rights to use the images at issue."  2019 WL 95564, at *9.  (*See generally* Pls.' SMF.)  Thus, "[t]his factor weighs in favor of Defendants."  *Gibson*, 391 F. Supp. 3d at 248.

### d.  Conclusion

The Court assumes without deciding that a reasonable jury could find that the remaining *Polaroid* factors favor Plaintiffs.[13]  However, the Second Circuit in *Electra* considered only the three factors the Court has discussed.  *See* 987 F.3d at 257 ("As is relevant here, these factors include, inter alia, the strength of the mark, evidence of actual consumer confusion, and evidence that the mark was adopted in bad faith.").  Finding that each of these factors favored the defendants, the Second Circuit "conclude[d] that the district court correctly dismissed [the plaintiffs'] Lanham Act claim."  *Id.* at 258.  Thus, while "[n]o single factor is dispositive," *Int'l Info. Sys.*, 823 F.3d at 160, that all three of these factors favor Defendants suffices to dispose of

---

[13] For example, it could find that the similarity of the marks favors Plaintiffs by concluding that Defendants used their pictures to advertise.  *See Jackson v. Odenat*, 9 F. Supp. 3d 342, 358 (S.D.N.Y. 2014) ("Defendants do not dispute that they used actual pictures of [the plaintiff].").  (*See* Pls.' SMF ¶ 42; Defs.' Resp. SMF ¶ 41; Compl. Exs. A–H.)

Plaintiffs' false endorsement claim under the Lanham Act.  Thus, the Court grants judgment for

Defendants on Plaintiffs' false endorsement claim.[14]

### 2.  False Advertising

Defendants argue that Plaintiffs do not come within the zone of interests protected in a

suit for false advertising under the Lanham Act.  (Defs.' Mem. 5–9.)[15]  The Court agrees.

---

[14] Plaintiffs argue that their claim should proceed if they can establish "confusion '*of any kind*, including confusion as to source, sponsorship, affiliation, connection, or identification.'" (Pls.' Mem. 13 (emphasis in original) (citation omitted).)  They argue that prior cases have inappropriately "narrow[ed] the statute by excising that portion prohibiting use of a plaintiff's mark likely to cause confusion as to 'affiliation, connection[,] or association' with a defendant's product."  (*Id.* at 12 (quoting 15 U.S.C. § 1125(a)(1)).)  In their Opposition, Plaintiffs argue that "the Second Circuit's decision in *Electra* to only address a test for 'false endorsement' is fatal to Defendants' motion."  (Pls.' Opp'n 17.)  The upshot of their argument appears to be that even if Defendants have satisfied their burden of establishing that there was no confusion about Plaintiffs' *endorsement* of Mansion, they have not satisfied their burden with regard to Plaintiffs' *affiliation* with Mansion.  (*See id.*)

This argument fails.  First, Plaintiffs' claim regarding the scope of *Electra* is misleading. Portions of their opening brief on this issue appear to be copied and pasted from the brief that was before the Second Circuit in *Electra*.  *Compare* (Pls.' Mem. 11–13) *with* Brief and Special Appendix for Plaintiffs-Appellants at 16–19, *Electra*, 987 F.3d 233 (No. 19-325), 2019 WL 1992065, at *16–19.  Of course it is fine to reuse relevant briefing material, but it is disingenuous for Plaintiffs to subsequently claim that their position was vindicated when in fact the Second Circuit affirmed summary judgment against them notwithstanding the *Electra* plaintiffs' nearly identical argument.  Second, Plaintiffs' distinction is immaterial.  Their opening brief explained that "whether Plaintiffs have stated a claim for false association should be analyzed based on the Second Circuit's test for trademark infringement."  (Pls.' Mem. 13.)  Plaintiffs continued to note that a likelihood of confusion is one of the elements of a trademark infringement claim, (*id.*), and that "[t]o determine likelihood of confusion in the Second Circuit, a court will evaluate the factors set forth in [*Polaroid*]," (*id.* at 14).  In other words, all roads lead to the *Polaroid* test and, as discussed, Defendants have satisfied their burden with respect to the *Polaroid* factors.  The Court's analysis applies with equal force to the claim that consumers were likely confused about Plaintiffs' *association* with Mansion as it does to the claim that consumers were likely confused about Plaintiffs' *endorsement* of Mansion.

[15] To plead a Lanham Act false advertising claim, Plaintiffs must allege that (1) "the statement in the challenged advertisement is false," (2) "the defendants misrepresented an inherent quality or characteristic of the product," (3) "the defendant placed the false or misleading statement in interstate commerce," and (4) "the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill

SPA-33

To satisfy the Lanham Act's zone of interests requirement, "a plaintiff . . . ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). However, "injury may be presumed" for "a misleading comparison to a specific competing product," because such an advertisement "necessarily diminishes that product's value in the minds of the consumer." *Merck Eprova*, 760 F.3d at 259 (alteration omitted). Short of false comparative advertising, "'some indication of actual injury and causation' would be necessary in order to ensure that a plaintiff's injury is not speculative." *Id.* In brief, a plaintiff must show either: (1) that a competitor made a false comparative claim, or (2) actual injury. *See Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 374 (S.D.N.Y. 2019) ("[A] presumption of injury may arise when an advertisement makes false claims about a direct competitor, but where . . . a misleading advertisement does not make comparative claims about a direct competitor, a plaintiff must demonstrate actual injury.").[16] It is beyond factual dispute that Plaintiffs have established neither.

First, Plaintiffs and Mansion are not direct competitors. "Clearly, the parties are not direct competitors, as Plaintiffs are models and Defendant[s] run[] a strip club." *Pinder v. 4716 Inc.*, 494 F. Supp. 3d 618, 637 (D. Ariz. 2020). Plaintiffs argue that the opposite is true, because "both seek to attract customers and vie for the same dollar via the use of an image of a beautiful woman." (Pls.' Opp'n 12.) This argument fails. While they share a marketing strategy,

_____

associated with its products." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (alterations, citations, and quotation marks omitted).

[16] Thus, while Plaintiffs correctly note that "direct competition is not required under the Lanham Act," (*see* Pls.' Opp'n 12 (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014))), this principle does not suffice to establish that Plaintiffs have a valid claim.

Plaintiffs and Defendants "each perform different functions within the marketplace." *CDX Diagnostics, Inc. v. U.S. Endoscopy Grp., Inc.*, No. 13-CV-5669, 2014 WL 2854656, at *5 (S.D.N.Y. June 20, 2014); *see also Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 416 (S.D.N.Y. 2013) ("Merck and Acella are not direct competitors, insofar as Merck does not produce finished consumer products . . . ."). To support their argument, Plaintiffs cite *Gray v. LG&M Holdings LLC*, No. 18-CV-2543, 2020 WL 6200165 (D. Ariz. Sept. 23, 2020), *reconsideration denied*, 2020 WL 9074801 (D. Ariz. Oct. 14, 2020). This case is inapposite. The *Gray* court observed that "[t]he modeling and strip-club industries share a common feature: both emphasize appearance and profit off the sexualization of women's bodies." *Id.* at *7. This statement was in the context of considering the "[r]elatedness of the [g]oods" to evaluate "the likelihood of confusion" in connection with the plaintiffs' false *endorsement* claim. *Id.* at *6–7. That two products are sufficiently related that consumers could be confused about the association between them does not suggest that these two products are direct competitors. Indeed, the *Gray* court found that the plaintiffs did not pass the zone of interests test, and could not bring a false advertising claim. *Id.* at *9–10.

Second, Plaintiffs do not establish injury. They have two theories of actual injury. The first is that they are entitled to compensation for Defendants' use of their image. (*See* Pls.' Opp'n 15.) "This assertion misunderstands the nature of a false advertising claim, which is focused on how false assertions in the market harm a plaintiff's present and future prospects." *Mitcheson*, 2020 WL 7075239, at *16. "[A] typical false-advertising case will implicate only the [Lanham] Act's goal of 'protecting persons engaged in commerce within the control of Congress against unfair competition.'" *Lexmark*, 572 U.S. at 131 (alterations omitted). Unfair competition, in turn, "was understood to be concerned with injuries to business reputation and present and

SPA-35

future sales." *Id.* Thus, "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32; *see also Merck Eprova*, 760 F.3d at 255 (noting that the plaintiff must establish that they have been "injured as a result of the [defendants'] misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products"). Plaintiffs' lost wages "are not within the zone of interests that the Lanham Act protects," *Takeguma*, 2021 WL 487884, at *17, because "[n]ot being hired by Defendant[s] is not equivalent to not being able to compete with Defendant[s]," *Pinder*, 494 F. Supp. 3d at 637. In their opening brief, Plaintiffs refer to two cases to support their claim that "each Plaintiff has been injured by being deprived of the fair market revenue she would have received but for Defendant[s'] misappropriations." (Pls.' Mem. 10.) These cases do not establish that Plaintiffs fall within the Lanham Act's zone of interests, because they are both in the context of damages for a state law right of publicity claim. *See Clark v. Am. Online Inc.*, No. CV-98-5650, 2000 WL 33535712, at *8 (C.D. Cal. Nov. 30, 2000) (discussing "the standard for measuring lost profits in a right of publicity case"); *Grant v. Esquire, Inc.*, 367 F. Supp. 876, 878, 881 (S.D.N.Y. 1973) (discussing "[Section] 51 of the [NYCRL]" and noting that the plaintiff "will be able to recover the fair market value of the use for the purposes of trade of his face, name and reputation"). In their Opposition, Plaintiffs again cite *Gray* for the argument that "the failure to pay any Plaintiff for the use of her [i]mage harmed each Plaintiff." (Pls.' Opp'n 15 (citing *Gray*, 2020 WL 6200165, at *4).) As discussed, *Gray* concluded that the plaintiffs did not pass the zone of interests test. 2020 WL 6200165, at *9–10. Thus, Plaintiffs cannot bring a false advertising claim based on their lost compensation.

   Plaintiffs' second theory of actual injury is that Defendants' use of their images hurts their reputation and business. (*See* Pls.' Opp'n 13 ( "Plaintiffs' uncontradicted testimony is that

their association with a strip club was potentially devastating to their careers.").)  Where, as here "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *CILP Assocs.*, 735 F.3d at 123 (citation omitted).  Defendants do this. Their Local Rule 56.1 Statement claims that "Plaintiffs have no evidence that any of [them] lost any income or any employment opportunity or suffered any special damages as a result or consequence of [Defendants'] publication of any of their images on its social media."  (Defs.' SMF. ¶ 87.)  In response, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs.*, 735 F.3d at 123 (citation omitted).  Plaintiffs fail to do this.  While they purport to dispute this fact, they state only that "[e]ach Plaintiff testified that she lost the income she should have been paid had Defendants operated through legal channels and paid her for her appearance in their advertisements."  (Pls.' Resp. SMF ¶ 87.)  As discussed, this injury is not within the zone of interests of the Lanham Act.  And Plaintiffs offer no evidence of reputational or other commercial harm.  (*Id.*)[17]  "Plaintiffs have produced no evidence that the alleged association

---

[17] While these facts are neither required to support summary judgment for Defendants, nor would they be dispositive of Plaintiffs' claims had Plaintiffs provided other evidence of reputational or competitive harm, the Court notes that a number of uncontested facts are consistent with the absence of Lanham Act injury.  For example, Campos was never contacted with notice of a refusal to do business or rescission of an offer because of Defendants' ads, (Defs.' SMF ¶ 86; Pls.' Resp. SMF ¶ 86; Campos Dep. 15–16 (Dkt. No. 46-2)); Banx has no knowledge that she lost a job as a result of Defendants' ads, (Defs.' SMF ¶ 161; Pls.' Resp. SMF ¶ 161; Banx Dep. 58 (Dkt. No. 46-4)); Taylor-Johnson is not aware of any job she lost as a result of Defendants' ads because she is "not currently working," (Defs.' SMF ¶ 199; Pls.' Resp. SMF ¶ 199; Taylor-Johnson Dep. 39 (Dkt. No. 46-5)); Swedberg acknowledged no "direct proof" of lost work, (Defs.' SMF ¶ 329; Pls.' Resp. SMF ¶ 329; Swedberg Dep. 13 (Dkt. No. 46-7)); Edmondson-Longoria stopped modeling in approximately August 2012, (Defs.' SMF ¶ 346; Pls.' Resp. SMF ¶ 346; Edmondson-Longoria Dep. 23 (Dkt. No. 46-10)), which is before Defendants' ad including her image was posted in 2016, (Compl. Ex. E); Hinton received no information that she lost a job or opportunity as a result of the ads, (Defs.' SMF ¶ 662; Pls.' Resp. SMF ¶ 662;

SPA-37

with [Mansion] has damaged their reputation or their ability to compete in any fashion." *Pinder*, 494 F. Supp. 3d at 637.  Thus, summary judgment is appropriate for Defendants on the issue of Plaintiffs' lost employment opportunity.

Citing *Lexmark*, Plaintiffs argue that "when a party claims reputational injury from disparagement, competition is not required *for proximate cause*" and that "a defendant who seeks to promote his own interests by telling a known falsehood to or about the plaintiff or his product may be said to have *proximately caused* the plaintiff's harm."  (Pls.' Opp'n 13–14 (emphasis added and omitted) (citation and quotation marks omitted).)  These cases concern proximate cause, not the zone of interests.  The two inquiries are distinct.  *See Lexmark*, 572 U.S. at 129–32 (analyzing "Zone of Interests" and "Proximate Cause" under separate section headings); *id.* at 134 ("[A] direct application of the zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue.").  The Court does not consider law regarding proximate cause in evaluating the Lanham Act's zone of interests.

Finally, citing *Merck Eprova*, Plaintiffs argue that "a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark."  (Pls.' Opp'n 16 (citation omitted).)  This quote relates to an analysis of the appropriate damages, *after* a Lanham Act violation has been established.  *See Merck Eprova*, 760 F.3d at 261.  The same is true for the case cited in *Merck Eprova*.  *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992).  Neither case involved a zone of interests inquiry, perhaps because both involved direct competitors.  *See Merck Eprova*, 760 F.3d at 260 (noting that the parties

---

Hinton Dep. 12 (Dkt. No. 46-12)); Toth-Gray did not know of anyone telling her that they saw her image in the ads, (Defs.' SMF ¶ 794; Pls.' Resp. SMF ¶ 794; Toth-Gray Dep. 10 (Dkt. No. 46-17)); and Mayes had no information that she would cite as evidence that she had lost work or a job as a result of appearing in the ads, (Defs.' SMF ¶ 928; Pls.' Resp. SMF ¶ 928; Mayes Dep. 50–51 (Dkt. No. 46-22)).

SPA-38

were "in direct competition in the folate market"); *George Basch*, 968 F.2d at 1534 (discussing competing wadding metal polish products).  The Court thus rejects this argument.

Because Plaintiffs do not compete directly with Defendants and have failed to adduce evidence of competitive injury, the Court grants summary judgment to Defendants on Plaintiffs' false advertising claim.

### 3. NYCRL Section 51

#### a.  Statute of Limitations

Defendants argue that many of Plaintiffs' NYCRL Section 51 claims are barred by the statute of limitations.  (Defs.' Mem. 30–32.)  The Court agrees.

The Parties dispute the applicable statute of limitations.  Defendants argue that it is one year because Plaintiffs bring "an action to recover damages for . . . a violation of the right of privacy under section fifty-one of the civil rights law."  N.Y. C.P.L.R. § 215(3).  (*See* Defs.' Mem. 30–31.)  Plaintiffs argue that Section 215(3) is inapplicable because Defendants violated their right of *publicity*, not their right to *privacy*.  (Pls.' Opp'n 2–5.)  They say that "[t]he right to publicity protects that value as property," (Pls.' Opp'n 6 (quoting *Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 867 F. Supp. 175, 188 (S.D.N.Y. 1994)), and that the three-year statute of limitations for "an action to recover damages for an injury to property" applies, N.Y. C.P.L.R. § 214(4), (*see* Pls.' Opp'n 10).

Defendants are right.  The Second Circuit clearly resolved this issue in *Electra*, where it held that "the district court correctly held that the one-year statute of limitations applicable in actions under Section 51 of New York's Civil Rights Law barred the claims of all but six of [the plaintiffs]."  987 F.3d at 240.  Many courts in this district have reached the same conclusion. *See, e.g.*, *Brooks ex rel. Est. of Bell v. The Topps Co.*, No. 06-CV-2359, 2007 WL 4547585, at *3

SPA-39

(S.D.N.Y. Dec. 21, 2007) ("[A]n action for right of publicity claims under Section 51 of the [NYCRL] . . . has a one-year statute of limitations."); *Fischer v. Forrest*, No. 14-CV-1304, 2017 WL 1063464, at *5 (S.D.N.Y. Mar. 21, 2017) ("New York law provides for a one-year statute of limitations for right of publicity claims."); *Cummings v. Sony Music*, No. 01-CV-4375, 2003 WL 22889496, at *3 (S.D.N.Y. Aug. 28, 2003) (holding that the "plaintiff's right of publicity claim . . . brought pursuant to [Section] 51 of New York's Civil Rights Law ha[d] a one-year statute of limitations"), *report and recommendation adopted*, 2003 WL 22271189 (S.D.N.Y. Sept. 30, 2003). Plaintiffs cite one case from New York holding that "recent decisions have clearly labeled the right of publicity a species of property." (Pls.' Opp'n 7 (citing *Factors Etc., Inc. v. Creative Card Co.*, 444 F. Supp. 279, 284 (S.D.N.Y. 1977), *aff'd sub nom. Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir. 1978)).) Among the "recent decisions" cited by this 1977 opinion is *Price v. Hal Roach Studios, Inc.*, 400 F. Supp. 836 (S.D.N.Y. 1975), which held that "in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph." *Id.* at 843. The New York Court of Appeals has subsequently clarified that "the 'right of publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy." *Stephano v. News Grp. Publications, Inc.*, 474 N.E.2d 580, 584 (N.Y. 1984). In other words, while the source of the right of publicity was unclear in the 1970s, it is now clear that it is a subset of the right of privacy under NYCRL Section 51, and thus subject to a one-year statute of limitations for "a violation of the right of privacy." *See* N.Y. C.P.L.R. § 215(3). The newly adopted Section 50-f does not change the outcome. (*See* Pls.' Opp'n 6–7.) It merely clarifies that publicity rights "are property rights," and thus "freely transferable or descendible." N.Y. Civ. Rights Law § 50-f. This new provision does not call into question the Court of Appeals' holding that the right of publicity "is

SPA-40

encompassed under the Civil Rights Law as an aspect of the right of privacy." *Stephano*, 474 N.E.2d at 584.  Indeed, Section 50-f is located within an article titled "Right of Privacy."  *See* N.Y. Civ. Rights Law Ch. 6, Art. 5.  Plaintiffs rely on several cases from Arizona, (Pls.' Opp'n 9–10), but the law there is different, because neither the right of privacy nor the right of publicity are identified specifically in Arizona's statutes of limitations.  *See* Ariz. Rev. Stat. §§ 12-541, 12-542.

Plaintiffs filed their Complaint on October 16, 2018.  (Defs.' SMF ¶ 1; Pls.' Resp. SMF ¶ 1; Compl. (Dkt. No. 1).)  Plaintiffs' claims "accrue[d] on the date the offending material [was] first published." *Fischer*, 2017 WL 1063464, at *5 (quoting *Nussenzweig v. diCorcia*, 878 N.E.2d 589, 590 (N.Y. 2007)).  With two exceptions, it is undisputed that Defendants published Plaintiffs' images more than one year before October 16, 2018.  One image of Campos was published on May 5, 2016.  (Defs.' SMF ¶ 19; Pls.' Resp. SMF ¶ 19; Compl. Ex. A at 2.)  The images of Banx were published on January 17, 2016 and January 18, 2016.  (Defs.' SMF ¶ 119; Pls.' Resp. SMF ¶ 119; Compl. Ex. B at 5–6.)  The image of Taylor-Johnson was published on September 30, 2014.  (Defs.' SMF ¶ 208; Pls.' Resp. SMF ¶ 208; Compl. Ex. C at 8.)  The image of Swedberg was published on May 4, 2015.  (Defs.' SMF ¶ 266; Pls.' Resp. SMF ¶ 266; Compl. Ex. D at 10.)  The images of Edmondson-Longoria were published on January 17, 2016.  (Defs.' SMF ¶ 364; Pls.' Resp. SMF ¶ 364; Compl. Ex. E at 12–13.)  The images of Hinton were published on December 23, 2015 and January 2, 2016.  (Defs.' SMF ¶ 450; Pls.' Resp. SMF ¶ 450; Compl. Ex. F at 15–16.)  The image of Toth-Gray was published on February 14, 2017. (Defs.' SMF ¶ 756; Pls.' Resp. SMF ¶ 756; Compl. Ex. G at 18.)  The Court grants summary judgment for Defendants on Plaintiffs' Section 51 claims insofar as they are based on one of these publications.  Plaintiffs' Section 51 claims survive insofar as they relate to the image of

SPA-41

Campos dated "May 5," (*see* Compl. Ex. A at 3), and the image of Mayes dated "March 16,"

(Compl. Ex. H at 20).

> b.  Jurisdiction

Defendants argue that the Court should decline to exercise jurisdiction over Campos's

and Mayes's Section 51 claims.  (Defs.' Mem. 33–34; Defs.' Opp'n 4.)  The Court agrees.

First, the Court finds that it lacks diversity jurisdiction.  Pointing to the damages

calculation in the Chamberlin Report, Defendants argue that the Court has "no jurisdiction over

any claim based on . . . diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in

controversy is less than $75,000."  (Defs.' Mem. 34.)  *See* 28 U.S.C. § 1332(a).  Plaintiffs do not

respond to this argument.  (*See generally* Pls.' Opp'n.)  Nor does the Complaint allege that the

Court has diversity jurisdiction.  (*See* Compl. ¶¶ 4–9.)  *Cf. Sommer v. Aspen Dental Mgmt., Inc.*,

No. 16-CV-3027, 2016 WL 6998665, at *2 (E.D.N.Y. Nov. 30, 2016) (dismissing the plaintiff's

claim for lack of subject matter jurisdiction in part because the plaintiff "[did] not invoke the

court's diversity jurisdiction").  And Plaintiffs have adduced no evidence suggesting that the

amount in controversy ever exceeded $75,000.  *See Pyskaty v. Wide World of Cars, LLC*, 856

F.3d 216, 223 (2d Cir. 2017) ("[A] plaintiff invoking federal jurisdiction must demonstrate a

'reasonable probability' that the amount-in-controversy requirement is satisfied . . . ." (citation

omitted)).  Campos and Mayes "seek the fair market value of Defendants' use of their

intellectual property without consent or remuneration."  (Pls.' Opp'n 8.)  According to Plaintiffs'

expert, this fair market value is $40,000 for Campos and $30,000 for Mayes.  (*See* Kolb Decl.

Ex. N ("Chamberlin Report") 16 (Dkt. No. 46-52).)  The Court considers separately the claim of

each Plaintiff, as "[t]he Supreme Court has long held that separate and distinct claims raised by

different plaintiffs may not be aggregated to satisfy the jurisdictional amount in controversy."

SPA-42

*Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000) (citing *Snyder v. Harris*, 394 U.S. 332, 336 (1969)).  Neither $40,000 nor $30,000 exceeds $75,000, nor do Campos or Mayes adduce additional evidence of damages.  Thus, the Court lacks diversity jurisdiction over Campos's and Mayes's Section 51 claims.

Further, because the Court is entering summary judgment for Defendants on Campos's and Mayes's Lanham Act claims, it declines to exercise supplemental jurisdiction over their Section 51 claims.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Thomas v. Grunberg 77 LLC*, No. 15-CV-1925, 2017 WL 3263141, at *1 (S.D.N.Y. July 28, 2017) (dismissing state claims where the federal claims had been mooted); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003) ("Where the basis for pendent jurisdiction is dismissed, ordinarily so should the state law claims be dismissed.").[18]

## III.  Conclusion

For the foregoing reasons, Defendants' Motion For Summary Judgment is granted and Plaintiffs' Motion For Summary Judgment is denied.  The Clerk of the Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 41, 45), enter judgment for Defendants, and close this case.

SO ORDERED.

DATED:   August 9, 2021
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[18] Because it is not material to the outcome of the instant Motions, the Court does not consider Defendants' argument that the Court should exclude the damages testimony of Plaintiffs' expert Stephen Chamberlin.  (*See* Defs.' Mem. 29–30.)

SPA-43

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
ALANA SOUZA, *et al.*,

|                          |                       |
|--------------------------|-----------------------|
| Plaintiffs,              | 18 **CIVIL** 9448 (KMK) |
| -against-                | **JUDGMENT**          |

EXOTIC ISLAND ENTERPRISES, INC., *et al.*,

Defendants.
------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated August 9, 2021, Defendants' Motion for Summary

Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied. Judgment is

entered for Defendants and this case is closed.


**Dated:**  New York, New York
        August 9, 2021


                                                    **RUBY J. KRAJICK**
                                          _____
                                                    Clerk of Court

                        **BY:**     [signature]

                                                    Deputy Clerk